NO - CV - 34

FILED ☐ ORIGINAL

1  AMANDA K. BONN (270891)
   abonn@susmangodfrey.com
2  SUSMAN GODFREY L.L.P.
   1900 Avenue of the Stars, Suite 1400
3  Los Angeles, CA 90067
   Telephone (310) 789-3100
4  Facsimile (310) 789-3150

2019 MAR 11 PM 3:51

BY: _____ (w)

PAID

MAR 11 2019    Pm

Clerk, US District Court
COURT 4612

5

6                                   **UNITED STATES DISTRICT COURT**

7                                  **CENTRAL DISTRICT OF CALIFORNIA**

8                                        WESTERN DIVISION

9                                  LACV19 01773 -CSC-MAAx

10  LOS ANGELES COUNTY, THE STATE OF        Case No.
    CALIFORNIA and THE UNITED STATES OF
11  AMERICA *ex rel.* Karen Gluck           **ORIGINAL COMPLAINT FILED**
                                            **UNDER SEAL PURSUANT TO 31 U.S.C.**
12          Plaintiffs,                     **§ 3730(b)(2)**

13  VS. THOMAS SHEPOS, FRANK A. VISCO,
    ET AL., DONALD G. ABBEY, ET AL.,
14  ARMAN GABAEE, ET AL., MARK GABAEE,
    ET AL., LEON NEMAN, ET AL., MORAD
15  NEMAN, ET AL., YOEL NEMAN, ET AL.,
    JOHN NEMAN, ET AL., DAVID
16  SCHAEFFER, ET AL., ALEX MORADI, ET
    AL., ISAAC MORADI, ET AL., AND DOES 1-
17  50.

18          Defendants.

19

20                                      **INTRODUCTION**

21          1.      Qui Tam Plaintiff Karen Gluck brings this suit against a group of commercial real

22  estate developers and a former Los Angeles County employee, Tom Shepos ("Shepos"), who

23  engaged in a decade's long bribery and kickback scheme to defraud Los Angeles County, the

24  State of California, and the federal government through hundreds of millions of dollars in

25  commercial real estate leases and other significant financial opportunities.  This long-running and

26  lucrative scheme would not have been discovered had it not been for the original source of all

27  information related to the fraudulent scheme—Karen Gluck—who took it upon herself to work

28

                                               1

with FBI investigators and the U.S. Attorney's Office to turn over evidence of the bribes received by her now-ex-husband Tom Shepos.

2.    Through the scheme, developers provided Shepos with (a) cash and bank deposits on a monthly basis; (b) pre-paid credit and gift cards; (c) hundreds of thousands of dollars in free home construction; (d) valuable tickets to concerts and sporting events; (e) plane tickets, hotel stays, and trips to various destinations paid for by developers; and (f) property management contracts for Shepos' side business.  In exchange, (1) developers minimized risk by getting assurances of future leases from the County employee before purchasing property to develop; (2) developers secured above-market leases, often on a no-bid basis; (3) developers avoided paying for repairs for which they were contractually obligated; and (4) developers were paid on fraudulent invoices to the County for inflated utility costs and improvements that were never made.

3.    Ms. Gluck's efforts to expose this scheme have resulted in the indictment of one developer with over $60 million in County leases, the initiation of a County investigation into Shepos' deals for the County, and the guilty plea of Shepos, who admits that the indicted developer alone provided him with hundreds of thousands of dollars since 2010.  But other developers have thus far avoided detection.

4.    Ms. Gluck now seeks to help the County, the State, and the federal government recover the money fraudulently obtained through the developers' illegal scheme.

## PARTIES

5.    The plaintiffs consist of Los Angeles County, the State of California, and the United States of America, all of which provided funds that paid for monthly lease payments and related charges under lease contracts with Los Angeles County that had been procured through various fraudulent acts.

6.    The following individuals and entities participated in the fraudulent acts:

a)  Thomas Shepos is a resident of California and can be found at with the address last listed on court documents as 4319 Bethpage Drive, Palmdale, CA 93551.

b)  Arman Gabaee is a resident of California and can be found at 1468 Donhill Dr., Beverly Hills, CA 90210-2216.

c)  Mark Gabaee is a resident of California and can be found at 1468 Donhill Dr., Beverly Hills, CA 90210-2216.

d)  Corsair, LLC is a limited liability company organized under the laws of California with its principal place of business at 9034 W. Sunset Blvd., West Hollywood, CA 90069.

e)  The Charles Company is a partnership organized under the laws of California with its principal place of business at 9034 W. Sunset Blvd., West Hollywood, CA 90069.

f)  Loma Vista LLC is a limited liability company organized under the laws of California with its principal place of business at 9034 W. Sunset Blvd., West Hollywood, CA 90069.

g)  Excel Property Management Services, Inc. is a corporation organized under the laws of California with its principal place of business at 9034 W. Sunset Blvd., West Hollywood, CA 90069.

h)  M & A Gabae, LP is a limited partnership organized under the laws of California with its principal place of business at 9034 W. Sunset Blvd., West Hollywood, CA 90069.

i)  Noble Investments, LLC is a limited liability company organized under the laws of California with its principal place of business at 9034 W. Sunset Blvd., West Hollywood, CA 90069.

j)  Endure, LLC is a limited liability company organized under the laws of California

with its principal place of business at 9034 W. Sunset Blvd., West Hollywood, CA
90069.

k) Leon Neman is a resident of California and can be found at 803 Foothill Rd.,
Beverly Hills, CA 90210-2903.

l) Morad Neman is an individual residing at 805 N. Linden Dr., Beverly Hills, CA
90210-3007.

m) Yoel Neman is a resident of California and can be found at 803 Foothill Rd.,
Beverly Hills, CA 90210-2903.

n) Neman Brothers & Associates, Inc. is a corporation organized under the laws of
California with its principal place of business at 1525 S. Broadway St., Los
Angeles, CA 90015.

o) Vertigo Real Estate Holdings, LP is a limited partnership organized under the laws
of California with its principal place of business at 1525 S. Broadway St., Los
Angeles, CA 90015.

p) Legend Real Estate Management, Inc. is a corporation organized under the laws of
California with its principal place of business at 1525 S. Broadway St., Los
Angeles, CA 90015.

q) Donald G. Abbey is an individual residing at 81885 Andalusia, La Quinta, CA
92253-8263.

r) Nittany Lion Landscaping, Inc. is a corporation organized under the laws of
California with its principal place of business at 12447 Lewis Street, Suite 203
Garden Grove, CA 92840.

s) AP-Palmdale LLC is a limited liability company organized under the laws of
California with its principal place of business at 12447 Lewis Street, Suite 203,
Garden Grove, CA 92840.

t)  AP-Commerce Plaza LLC is a limited liability company organized under the laws of Delaware with its principal place of business in 14770 E Firestone Blvd Suite 206, La Mirada, CA 90638.

u)  The Abbey Management Co, LLC is a limited liability company organized under the laws of California with its principal place of business at 12447 Lewis Street, Suite 203, Garden Grove, CA 92840.

v)  AP-Sierra LLC is a limited liability company organized under the laws of California with its principal place of business at 12447 Lewis Street, Suite 203, Garden Grove, CA 92840.

w)  DA Properties LLC is a limited liability company organized under the laws of Delaware with its principal place of business at 310 Golden Shore Suite 300, Long Beach, CA 90802.

x)  Abbey-Properties LLC is a limited liability company organized under the laws of California with its principal place of business at 12447 Lewis Street Suite 203, Garden Grove, CA 92840.

y)  Frank A. Visco is an individual residing at 393 W. Stafford Rd., Thousand Oaks, CA 91361-5065.

z)  David Schaeffer is an individual residing at 1600 W. Bedford St., Dimmitt, Texas 79027-2711.

aa) FCG Properties, LLC is a limited liability company organized under the laws of Texas with its principal place of business in Dimmitt, Texas.

bb) Castaic FCG Properties, LLC is a limited liability company organized under the laws of Texas with its principal place of business at 16150 Parish Hall Dr., Spring, Texas 77379-6630.

cc) Alex Moradi is a resident of California and can be found at 9301 Wilshire Bl.,

Beverly Hills, CA 90210.

    dd) Isaac Moradi is a resident of California and can be found at 9301 Wilshire Bl., Beverly Hills, CA 90210.

    ee)  Imperial Hawthorne Limited Partnership is a limited partnership organized under the laws of California with its principal place of business in 9301 Wilshire Blvd., Suite 315, Beverly Hills, CA 90210.

    ff)  ICO Investment Group, Inc. is a corporation organized under the laws of California with its principal place of business in 9301 Wilshire Blvd., Suite 315, Beverly Hills, CA 90210-6132.

    gg) Plaintiffs are ignorant of the true names and capacities of the defendants sued herein as Does 1-50 and therefore sue these Defendants by such fictitious names. On information and belief, Does 1-50 includes additional business entities tied to Defendants and used to advance fraudulent acts. Plaintiffs will amend this complaint to allege the true names and capacities of these Defendants when they are ascertained. Plaintiffs are informed and believe that each fictitiously named Defendant is legally liable as alleged herein.

## JURISDICTION

7.      Under 31 U.S.C. § 3732(a), this Court has subject matter jurisdiction over all alleged violations of 31 U.S.C. § 3730, the federal False Claims Act ("FCA"). Under 31 U.S.C. § 3732(b), this Court also has jurisdiction over all alleged violations of Cal. Gov't Code § 12651, the California False Claims Act ("CFCA").

## FACTS

**Gluck Discovers Shepos' Fraudulent Scheme.**

8.      When Karen Gluck ("Gluck") and Tom Shepos ("Shepos") married in August 1996, Shepos ran his own business managing small strip-mall properties called "CT

Management." Around 1997, the Real Estate and Leasing Division of the Los Angeles County Chief Executive Office hired Shepos.

9.     Shepos' role with the County gave him the authority to bind the County to real estate transactions and manage ongoing commercial relationships. Often these leases were on behalf of government departments seeking space, such as property for a school or a health clinic. However, Shepos also purchased land on behalf of the County for environmental restoration efforts and other green space initiatives and was privy to non-public information as to future development plans. In theory, Shepos should have acted on behalf of County clients and sought public and transparent bids in order to ensure the County paid a fair market rate. In practice, Shepos accepted bribes in order to act on behalf of billion-dollar commercial real estate companies, funneling hundreds of transactions to them on a no-bid basis so that they could bilk tax payers for above market rents, phantom improvement charges, and inflated management costs and utilities.

10.    Gluck's suspicions were raised in March 2010 when she found Shepos' gambling winnings tax form from the Palm Springs Spa Hotel & Casino with containing what appeared to be a false social security number. Gluck also found a few pages from a CT Management credit card statement, which indicated that Shepos had taken a $30,000 cash advance. A short while later, Gluck discovered Shepos' handwritten notes indicating he had taken cash advances totaling $48,000 through a credit card in order to direct cash to Frank Visco. Gluck later found credit card statements confirming the $48,000 in cash advances. After these discoveries, she began looking through Shepos' files and belongings when she was left alone in the home.

11.    In October 2010, Gluck found $5,000 in cash in Shepos' sock drawer. Gluck's discovery of cash put into perspective some of the odd behavior she had seen over the years: Shepos dropping off envelopes in private mailboxes at night, Shepos socializing with County clients, Shepos traveling to Lancaster, California, every Wednesday to meet in-person with the

same commercial developer who also called Shepos daily.

12.     Gluck then demanded a key from Shepos for his P.O. Box in Santa Monica owned by Shepos.  Gluck went to the P.O. Box, opened the box and observed a label indicating mail could be received for both Shepos and Arman Gabae.  Gluck later found Shepos used P.O. Box to receive bank statements and credit card statements for accounts she didn't know about.

13.     After trying to move past Shepos' suspicious conduct in order to save the marriage, Gluck ultimately filed for divorce in 2011.

14.     Beginning in September 2012, while divorce proceedings were pending, Shepos filed for multiple bankruptcies in order stay the divorce proceedings and to increase Gluck's legal costs.  Shortly after the divorce filing, Gluck removed numerous boxes of paperwork from the family storage unit.  Gluck believed Shepos' bankruptcy filings were fraudulent and began searching for evidence of Shepos' assets by reviewing the boxes of documents that had been in the family storage unit, the family email account, and a discarded old smart phone.  Additionally, Gluck went to each of the banks with which they had maintained joint bank accounts and asked whether Shepos maintained any other separate accounts.  Gluck found several bank accounts and dozens of credit cards she was not aware of during her marriage.  The bank statements revealed monthly direct deposits and numerous cash deposits ranging from $4,000 to $8,000.

15.     In the boxes, she found over thirty credit cards, evidence of numerous addresses and P.O. Boxes used by Shepos, checks written from CT Management to a redevelopment executive with the City of Lynwood who happens to be a former employee of The Charles Company, and paper records indicating a widespread bribery scheme implicating multiple real estate development companies.

16.     In the family email account, Gluck found that Shepos had been using the personal email address to coordinate real estate deals and payments with numerous developers.  In one email in particular, Shepos had provided a developer with the name and social security number of

his roommate in order to receive a bribe.  Gluck also discovered that in addition to the family email address "TJS2291@aol.com," her husband had created the nearly identical email address "TJS2292@aol.com" and attributed it to Gluck's sister.  And on Shepos' phone, Gluck found some developers' numbers listed under fake names, such as "Dad."

**B.    Shepos' Scheme Involves Numerous, Significant Real Estate Developers and Hundreds of Millions of Dollars' Worth of Leases and Agreements.**

17.    Gluck's records indicate how the developers were able to profit from leases obtained through the fraudulent scheme with Shepos:

a) <u>Above-Market Leases Worth Hundreds of Millions of Dollars:</u> County leases range between a few hundred thousand dollars per-year to a few million dollars per-year, with 5- and 10-year terms being most common.  Developers obtained these substantial leases at above-market rates.

b) <u>Fraudulent Reimbursements:</u> The leases also include "improvement reimbursements" under which the developers were able to submit for reimbursement expenses they incurred in maintaining the building.  Shepos received invoices from developers and simply had the County send reimbursement checks, without any further proof that the work had actually been performed (in at least some cases, it had not).  Developers obtained substantial reimbursements for improvements that were never made.

c) <u>Maintenance Fees and Utility Costs:</u> The leases also established that the developer could charge maintenance fees and pass on utility costs to the County.  On information and belief, the developers obtained additional County money to which they were not entitled by passing on inflated maintenance and utility costs to the County.

18.    The documents also identify specific entities and individuals as being most involved in the fraudulent scheme:

A.  <u>Mark Gabaee and Arman Gabaee</u>

19.    Founded by Mark and Arman Gabaee in 1979, the Charles Company owns 5 million square feet of commercial real estate in Southern California and Nevada. The Charles Company—and other entities owned by the Gabaees—has done over $100 million in transactions with the County as part of the fraudulent scheme.  Evidence of the fraudulent scheme includes:

a) Based on the evidence provided to the FBI by Ms. Gluck, Arman Gabaee has been indicted by the federal government.  Arman Gabaee was recorded offering Shepos

9

a ***$1.1 million residential property as a bribe for a no-bid contract.*** Shepos has pled guilty to receiving bribes from Arman Gabaee.

b) Plane tickets for Shepos and Arman Gabaee to Las Vegas.

c) Email to Shepos seeking W-9 information for Shepos' roommates in order to hide bribe.

d) A PO Box jointly held by Shepos and Arman Gabaee.

e) Email from Mark Gabaee to Shepos' personal email account intended to reduce Gabaee's financial risk by asking for Shepos' "thoughts" on a property before Gabaee committed to purchasing it.

f) Charles Company employee emailed Shepos' family email address to notify him that Shepos and Arman's House of Blues membership cards had arrived.

g) Shepos used a Southwest Airlines account registered under Arman Gabaee's name.

h) An invoice for construction material used on Shepos and Gluck's home that was paid by Arman and Mark Gabaee's company. Gluck has no record of Shepos repaying the Gabaees for the work done for their home construction (the same is true for other developers below).

i) An engineering report for Shepos and Gluck's home prepared and submitted by Gabaee's construction engineer.

j) A Las Vegas convention registration form listing Shepos as an employee of the Charles Company. The registration form was attached to a receipt from Arman Gabaee showing Shepos' registration fee had been paid by Gabaee.

k) Numerous emails involving Shepos providing County information to the Gabaees using his personal email address.

l) The Gabaees—along with the Donald G. Abbey—paid for and executed the construction of Shepos and Gluck's home.

B. Donald G. Abbey

20. Donald Abbey runs one of the largest commercial real estate development companies in the country. Through the Abbey Company and dozens of project-specific LLCs, Donald Abbey has done a large number of transactions with the County. The evidence of Abbey's involvement in the bribery scheme includes:

a) Donald Abbey—along with the Gabaees—paid for and executed the construction of Shepos and Gluck's home, including providing Shepos with a Home Depot credit card.

b) Shepos' records show that Abbey's construction company—NL Services—and landscaping company—Nittany Lions Landscaping—issued Shepos invoices for over $480,000. On information and belief, Shepos received that labor and material as a bribe from Donald Abbey and never actually paid any invoices.

C. Frank Visco and David Schaeffer

21.      Lancaster, California businessman Frank Visco played a significant role in organizing the bribery scheme, including organizing the no-bid deals in the Antelope Valley. Shepos met with Visco each Wednesday in Lancaster to coordinate their fraudulent conduct. Visco was compensated, in part, by other commercial real estate entities and contractors for arranging no-bid deals on their behalf.

22.      David Schaeffer is an example of an individual who received County contracts through Visco and in turn provided compensation to Visco. The County's contract for the Castaic Library was awarded to a Texas entity owned by David Schaeffer, yet Visco received County checks for alleged tenant improvements to a P.O. Box in Lancaster, California.

23.      The evidence of Visco and Schaeffer's involvement in the bribery scheme includes:

a) Shepos accidentally called Ms. Gluck during a meeting with Visco in Lancaster and left a voicemail. Visco can be heard on the recording saying, "no bid." Visco and Shepos also discussed cash payments. Shepos suggested making the payments in the name of Visco's secretary's daughter, to which Visco replied, "get the family out."

b) On behalf of FCG Properties, a company to which he has no known legal connection, Visco submitted improvement reimbursement forms with invoices from his construction company. Shepos approved the reimbursement requests and made the reimbursements payable to Frank Visco directly—made to his P.O. Box.

c) Visco provided Shepos trips to various destinations where together they frequented resorts and casinos.

d) Shepos took frequent trips with Frank Visco's employee, Michele Lantz.

11

e) Shepos took out numerous life insurance policies through Visco's insurance company, Visco Financial Insurance Services in Lancaster.

f) In January 2010, Gluck celebrated Shepos' 60th birthday at a high-end spa resort, which resulted in a substantial invoice. Several years later Gluck discovered the invoice for the weekend at the spa resort, which revealed a room for Frank Visco and a $5,000 gift certificate provided—on information and belief—by Visco covering the charges on the bill.

g) Contracts indicating that Shepos purchased land on behalf of the County directly from Visco. According to the contract, the land was purchased to ensure a certain portion of the county remained in a natural state.

D. Alex and Isaac Moradi

24.   Founded in 1966, Alex and Isaac Moradi's ICO Group owns over 3,000,000 square feet of commercial real estate. The Moradis are also relatives of Arman and Mark Gabaee, owners of the Charles Company. Alex and Isaac Moradi have done millions of dollars in lease transactions with the County. The evidence of the Moradis' involvement in the bribery scheme includes:

a) Alex Moradi emailed Shepos' family email address, "WE can pick up bldg. for good price" and asked whether Shepos would be able to line up a County need before Moradi would decide to move forward with the purchase.

b) Alex Moradi emailed Shepos' family email address, "Does County have need for space in Santa Clarita? Great opportunity there!" Shepos responded, "Yes contact me."

c) Alex and Isaac Moradi sent an ornate gold vase to Shepos as a Holiday gift.

E. The Neman Brothers

25.   The Neman brothers—Leon, Yoel, and John—own Neman Brothers & Associates Inc., a wholesale fabric business operating out of New York and Los Angeles. The brothers also own commercial real estate through holding companies such as Vertigo Real Estate Holdings LP and Legend Real Estate Management, Inc. The evidence of the Nemans' involvement in the bribery scheme includes:

a) The Neman brothers did multiple transactions with Los Angeles County.

b) Shepos emailed Leon Neman with bribe instructions by noting, "commissions payable to CT Management as has been done in the past."

c) Multiple Form 1099s documenting payments from various Neman Brothers entities—including the wholesale fabric company—to CT Management.

26.     In addition to procuring contracts through fraudulent conduct and bribery, each Defendant made false statements in connection with the execution of each lease.  On information and belief, each lease executed by Defendants contained the following representation: "Landlord acknowledges that it is aware of the following provisions: […] A landlord shall not offer or give, either directly or through an intermediary, consideration in any form to a County officer, employee or agent for the purpose of securing favorable treatment with respect to the award of the Lease."  Each Defendant made the false representation that he had not and would not engage in bribery, and in turn, obtained lucrative government contracts based in part on those false misrepresentations.

**C.     Gluck Reports Shepos' Scheme to the FBI, DOJ, and County Officials.**

27.     After Gluck made sense of the documents she had uncovered, she knew she needed to act.  At an event at Loyola Law School in 2014, Gluck introduced herself to a speaker at the event, Ranee Katzenstein, Deputy Chief of the Major Frauds Section of the Central District of California's USAO.  Shortly thereafter, Gluck met in person with Ms. Katzenstein, FBI Special Agent Michael Chai, and the Central District of California's Chief of the Criminal Division Lawrence Middleton.  Gluck agreed to let the FBI copy the boxes of evidence she had obtained from the family storage unit.

28.     In the middle of 2015, Gluck met with two FBI agents and the then-Chief of the Public Corruption and Civil Rights Section Brandon Fox, to discuss the evidence she had assembled in connection with her divorce with the assistance of a retired IRS agent.

29.     Gluck's cooperation with the FBI continued throughout 2016, with meeting in January, April, August September, and November.

30.    In June 2017, Gluck met with County Investigators, Brian Campbell, and Bryan Bell, and voluntarily shared the information underlying this Complaint.

31.    On January 31, 2018, Gluck met with County Investigators, Brian Campbell, Bryan Bell, and Amanda Andrews and California Department of Insurance Investigators Pollie Pent and Randy Hudson and voluntarily shared the information underlying this Complaint.

32.    Ms. Gluck's efforts have resulted in the indictment of Arman Gabaee, the initiation of a County investigation into Tom Shepos' deals for the County, and the guilty plea of Tom Shepos, who admits that the indicted developer alone provided him with hundreds of thousands of dollars since 2010.

33.    Based on the foregoing, Ms. Gluck is an original source of the information underlying this Complaint because, at the very least, she (a) voluntarily disclosed to Los Angeles County the information on which the allegations are based and (b) has knowledge that is independent of, and materially adds to, any previous public disclosure relating to these allegations and provided those facts to Los Angeles County before filing this action.

## **FIRST CLAIM FOR RELIEF**

(on behalf of Los Angeles County and the State of California)

Violation of the California False Claims Act, California Government Code § 12651(a)(1)

34.    The allegations contained in paragraphs 1 through 29 are incorporated in full as if set forth herein.

35.    Through the acts described above, the Defendants, their agents, and employees, knowingly presented and caused to be presented materially false and fraudulent claims to the County, State, and Federal Governments, and knowingly failed to disclose material facts, in order to obtain payment and approval from the Plaintiffs.

36.    The County, State, and Federal Governments, unaware of the falsity of the claims made and submitted by the Defendants, their agents, and employees, and as a result thereof paid

money that they otherwise would not have paid.

37.     By reason of the payments made by the County, State, and Federal Governments as a result of the Defendants' fraud, the County, State, and Federal Governments suffered millions of dollars in damages and continue to be damaged.

Wherefore, Plaintiffs pray for relief as set forth below.

**SECOND CLAIM FOR RELIEF**

(on behalf of Los Angeles County and the State of California)

Violation of the California False Claims Act, California Government Code § 12651(a)(2)

38.     The allegations contained in paragraphs 1 through 29 are incorporated in full as if set forth herein.

39.     Through the acts described above, the Defendants, their agents, and employees, knowingly made, used, and caused to be made and used materially false records and statements, which also omitted material facts, in order to induce the County, State, and Federal Governments to approve and pay false and fraudulent claims.

40.     The County, State, and Federal Governments, unaware of the falsity of the records, statements, and claims made and submitted by the Defendants, their agents, and employees, and as a result thereof paid money that they otherwise would not have paid.

41.     By reason of the payments made by the County, State, and Federal Governments as a result of the Defendants' fraud, the County, State, and Federal Governments have suffered millions of dollars in damages and continue to be damaged.

42.     Wherefore, Plaintiffs pray for relief as set forth below.

**THIRD CLAIM FOR RELIEF**

(on behalf of Los Angeles County and the State of California)

Violation of the California False Claims Act, California Government Code § 12651(a)(3)

43.     The allegations contained in paragraphs 1 through 29 are incorporated in full as if

set forth herein.

44.     Through the acts described above, the Defendants, their agents, and employees, conspired to knowingly make, use, and cause to be made and used materially false records and statements, which also omitted material facts, in order to induce the County, State, and Federal Governments to approve and pay false and fraudulent claims.

45.     The County, State, and Federal Governments, unaware of the falsity of the records, statements, and claims made and submitted by the Defendants, their agents, and employees, and as a result thereof paid money that they otherwise would not have paid.

46.     By reason of the payments made by the County, State, and Federal Governments as a result of the Defendants' fraud, the County, State, and Federal Governments have suffered millions of dollars in damages and continue to be damaged.

47.     Wherefore, Plaintiffs pray for relief as set forth below.

### FORTH CLAIM FOR RELIEF

(on behalf of the United States of America)

Violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A)

48.     The allegations contained in paragraphs 1 through 29 are incorporated in full as if set forth herein.

49.     Through the acts described above, the Defendants, their agents, and employees, knowingly presented and caused to be presented materially false and fraudulent claims to the County, State, and Federal Governments, and knowingly failed to disclose material facts, in order to obtain payment and approval from the Plaintiffs.

50.     The County, State, and Federal Governments, unaware of the falsity of the claims made and submitted by the Defendants, their agents, and employees, and as a result thereof paid money that they otherwise would not have paid.

51.     By reason of the payments made by the County, State, and Federal Governments

as a result of the Defendants' fraud, the County, State, and Federal Governments suffered millions of dollars in damages and continue to be damaged.

Wherefore, Plaintiffs pray for relief as set forth below.

## FIFTH CLAIM FOR RELIEF

(on behalf of the United States of America)

Violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B)

52.     The allegations contained in paragraphs 1 through 29 are incorporated in full as if set forth herein.

53.     Through the acts described above, the Defendants, their agents, and employees, knowingly made, used, and caused to be made and used materially false records and statements, which also omitted material facts, in order to induce the County, State, and Federal Governments to approve and pay false and fraudulent claims.

54.     The County, State, and Federal Governments, unaware of the falsity of the records, statements, and claims made and submitted by the Defendants, their agents, and employees, and as a result thereof paid money that they otherwise would not have paid.

55.     By reason of the payments made by the County, State, and Federal Governments as a result of the Defendants' fraud, the County, State, and Federal Governments have suffered millions of dollars in damages and continue to be damaged.

56.     Wherefore, Plaintiffs pray for relief as set forth below.

## SIXTH CLAIM FOR RELIEF

(on behalf of the United States of America)

Violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(C)

57.     The allegations contained in paragraphs 1 through 29 are incorporated in full as if set forth herein.

58.     Through the acts described above, the Defendants, their agents, and employees,

conspired to knowingly make, use, and cause to be made and used materially false records and statements, which also omitted material facts, in order to induce the County, State, and Federal Governments to approve and pay false and fraudulent claims.

59.    The County, State, and Federal Governments, unaware of the falsity of the records, statements, and claims made and submitted by the Defendants, their agents, and employees, and as a result thereof paid money that they otherwise would not have paid.

60.    By reason of the payments made by the County, State, and Federal Governments as a result of the Defendants' fraud, the County, State, and Federal Governments have suffered millions of dollars in damages and continue to be damaged.

61.    Wherefore, Plaintiffs pray for relief as set forth below.

## PRAYER FOR RELIEF

62.    Qui Tam Plaintiff prays for judgment against the Defendants, and each of them, as follows:

a)    For damages in an amount equal to three times the amount of damages the County, State, and Federal Governments sustained as a result of the Defendants' unlawful conduct;

b)    For civil monetary penalties for each false and fraudulent claim submitted to the County, State, and Federal Governments;

c)    For attorneys' fees and costs, including the Qui Tam Plaintiffs attorneys' fees and

d)    For an order awarding the Qui Tam Plaintiff the maximum awards allowed by the California False Claims Act and federal False Claims Act; and

e)    For such other further relief as the Court may deem just and proper.

## JURY DEMAND

63.    Qui Tam Plaintiff Karen Gluck demands a trial by jury.

Dated:  March 8, 2019

SUSMAN GODFREY L.L.P.

By:  */s/ Amanda Bonn*

Amanda Bonn

AMANDA K. BONN (270891)
abonn@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Telephone (310) 789-3100
Facsimile (310) 789-3150

Attorneys for Qui Tam Plaintiff