# Exhibit C



1   SUSMAN GODFREY LLP
2   Amanda Bonn (Bar No. 270891)
    *abonn@susmangodfrey.com*
3   ~~Argie Mina (Bar No. 331617)~~
    ~~amina@susmangodfrey.com~~
4   Connor Cohen (Bar No. 354686)
5   *ccohen@susmangodfrey.com*
    1900 Avenue of the Stars, Suite 1400
6   Los Angeles, CA 90067
7   Telephone: +1.310.789.3100
    Facsimile: +1.310.789.3150
8

9   Rocco Magni (pro hac vice)
    *rmagni@susmangodfrey.com*
10  David Peterson (pro hac vice)
11  *dpeterson@susmangodfrey.com*
    1000 Louisiana, Suite 5100
12  Houston, TX 77002
13  Telephone: +1.713.651.9366
    Facsimile: +1.713.654.6666
14

15  *Attorneys for Qui Tam Plaintiff Karen Gluck*

16  _____

17              **UNITED STATES DISTRICT COURT**

18
19                    ~~**CENTRAL**~~

20          **CENTRAL** **DISTRICT OF CALIFORNIA**

21                    ~~**WESTERN**~~
                 **LOS ANGELES** **DIVISION**
22

23  ~~LOS ANGELES COUNTY, THE STATE OF~~     Case No. 2:19-cv-01773-JFW-MAA
24  ~~CALIFORNIA and THE UNITED STATES OF~~
    ~~AMERICA ex rel. KAREN GLUCK~~
25                                            ~~**SECOND**~~**THIRD** **AMENDED**
           ~~Plaintiffs,~~                    **COMPLAINT**
26
    ~~_____ v.~~                   **JURY TRIAL DEMANDED**
27
    ~~THOMAS SHEPOS, FRANK A. VISCO, ET AL.,~~  Assigned to the Hon. John F. Walter,
28  ~~DONALD G. ABBEY, ET AL., ARMAN GABAEE,~~
    ~~ET AL., MARK GABAEE, ET AL., LEON NEMAN,~~

| | |
|---|---|
| ET AL., MORAD NEMAN, ET AL., YOEL NEMAN, ET AL., JOHN NEMAN, ET AL., DAVID SCHAEFFER, ET AL., ALEX MORADI, ET AL., ISAAC MORADI, ET AL., HOMER HARVEY, ET AL., WILLIAM TATUM, ET AL., AND DOES 1–12. | Courtroom 7A, and Magistrate Judge Maria A. Audero, Courtroom 880 |

Defendants.

THE COUNTY OF LOS ANGELES, THE STATE OF CALIFORNIA, and THE UNITED STATES OF AMERICA ex rel. KAREN GLUCK

     Plaintiffs,

             v.

THOMAS SHEPOS, ARMAN GABAEE, MARK GABAEE, SANCAM, INC., THE CHARLES COMPANY, THE CHARLES COMPANY, INC., EXCEL PROPERTY MANAGEMENT SERVICES, INC., OAKSHIRE, LLC, WILHURST, INC., TOWN INVESTMENTS, LLC, M & A GABAEE, A CALIFORNIA LIMITED PARTNERSHIP, GREENOAK INVESTMENTS, LLC, MAPLE19, LP, URBAN GROVE19, LLC, OPPIDAN, LLC, LEON NEMAN, YOEL NEMAN, JOHN NEMAN, NEMAN BROTHERS & ASSOCIATES, INC., VERTIGO REAL ESTATE HOLDINGS, LP, LEGEND REAL ESTATE MANAGEMENT, INC., DONALD G. ABBEY, NITTANY LION LANDSCAPING, INC. (d/b/a NL Services, Inc. and NL LANDSCAPING SERVICES, Inc.), THE ABBEY COMPANIES LLC (d/b/a THE ABBEY COMPANY LLC), ABBEY-PROPERTIES LLC, DGA-PROPERTIES, LLC, AP-PALMDALE LLC, AP-PALMDALE PLACE LLC, AP-COMMERCE PLAZA LLC, CDCF III PACIFIC COMMERCE PLAZA, LLC, THE ABBEY MANAGEMENT COMPANY, LLC, AP-SIERRA LLC, ABBEY-PROPERTIES II LLC, DGA-PROPERTIES LLC, DGA-PROPERTIES II, LLC, FRANK A. VISCO, VISCO FINANCIAL INC., FRABER PROPERTIES II, LLC, GREGORY HANES, 300 K-6, LLC, and 43917 DIVISION STREET, LLC.

THIRD~~SECOND~~ AMENDED COMPLAINT

1    Defendants.

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

THIRD~~SECOND~~ AMENDED COMPLAINT

## **INTRODUCTION**

1.     Qui Tam Plaintiff Karen Gluck brings this suit against a group of commercial real estate developers, contractors, businesspersons, and a former Los Angeles County employee, ~~Tom~~Thomas Shepos ("Shepos"), who engaged in a decades-long bribery and kickback scheme to defraud Los Angeles County (the "County"), the State of California (the "State"), and the federal government through hundreds of millions of dollars in commercial real estate leases and other significant financial opportunities. This long-running and lucrative scheme would not have been discovered had it not been for the original source of ~~all~~ information related to the fraudulent scheme— ~~Karen~~Ms. Gluck—who, when asked, cooperated fully with FBI investigators, County and State investigators, and the U.S. Attorney's Office, turning over various types of evidence of the bribes received by her now-ex-husband ~~Tom~~ Shepos.

2.     Through the scheme, developers~~/~~, contractors, and businesspersons provided Shepos with (a) cash and bank deposits on a monthly basis; (b) pre-paid credit and gift cards; (c) hundreds of thousands of dollars in free home construction; (d) valuable tickets to concerts and sporting events; (e) plane tickets, hotel stays, and trips to various destinations; and (f) property management contracts for Shepos's side business CT Management. In exchange, developers, contractors, and businesspersons (1) minimized risk by getting assurances of future leases from the County before purchasing property to develop; (2) secured above-market leases, often on a no-bid basis; (3) avoided paying for repairs for which they were contractually obligated; and (4) were paid on fraudulent invoices to the County for inflated utility costs and improvements that were never made.

3.     Ms. Gluck's efforts to discover the truth and her cooperation, at the government's request, ~~in exposing this scheme~~ have resulted in federal criminal proceedings and an extensive County-led investigation. Specifically, the ~~United States~~U.S. Attorney's Office has already indicted four individuals, including

Defendant Arman Gabaee, a developer with over $~~60~~100 million in County leases who pleaded guilty to one count of bribery, and Shepos, who pleaded guilty to multiple offenses and admitted that ~~Arman~~ Gabaee ~~alone~~ provided him with hundreds of thousands of dollars in bribes since 2010 alone. Additionally, the County's ~~own~~ investigation ~~into Shepos's conduct~~ has revealed that Shepos's and Arman Gabaee's federal guilty ~~plea was~~pleas were merely the tip of the iceberg ~~and that~~: Shepos was responsible for hundreds of millions of dollars' worth of contracts ~~that were~~ tainted by fraud, bribery, and corruption. ~~But many~~Yet, other developers~~,~~ contractors ~~in addition to Gabaee~~, and businesspersons—including Defendants here—have ~~thus~~so far avoided accountability.

4.     Ms. Gluck was married to ~~Mr.~~ Shepos and had a young daughter with him when she began to discover some of Shepos's criminal activity and realized the man she thought she had married and ~~the~~her life ~~she thought she~~with him had ~~was~~been a mirage. Shepos tried to convince her that he had a gambling addiction which explained his misconduct, but a psychiatrist ~~the couple agreed to see~~ instead diagnosed Shepos with ~~Anti-Social Personality Disorder~~antisocial personality disorder (*i.e.*, Shepos was a psychopath). The psychiatrist advised Ms. Gluck to "run, not walk" out of her marriage and, in 2011, she tried to do just that by filing for divorce.

5.     During the subsequent years in which Shepos stalled their divorce-related proceedings by filing multiple, fraudulent bankruptcies, Ms. Gluck continued to find additional information about Shepos's illegal activity in connection with his work at the County and in numerous other respects. What she found frightened her: Shepos appeared to have committed acts of tax evasion, money laundering, bribery, corruption, embezzlement, forgery, fraud, and more. Shepos's extensive criminal activity not only lasted ~~during the course of her~~throughout their marriage and after, but ~~began~~it had begun much earlier: Ms. Gluck was shocked to discover that Shepos had a history of embezzling from prior employers and had committed bigamy with

two prior wives before he met Ms. Gluck.

6. After a chance encounter with an assistant U.S. Attorney who worked in major frauds—and who urged Ms. Gluck to "do the right thing"—Ms. Gluck shared what she had discovered with the federal government and later with County and State investigators at the government's request. Ms. Gluck did so freely and without demanding anything in exchange. She did so, despite her own fears and at significant cost to her own peace of mind after years of trauma inflicted by Shepos, because she knew it was indeed the right thing to do.

7. Ms. Gluck ~~still~~ continues to cooperate ~~and help~~with the County, the State, and the federal government—and ultimately, ~~the~~ taxpayers—~~to~~ recover the money fraudulently obtained through Shepos's ~~and the developers'~~ illegal ~~scheme, which also implicated other employees at the County~~schemes.

## **PARTIES**

8. The Plaintiffs ~~consist~~are the County of Los Angeles ~~County~~, the State of California, and the United States ~~of America~~, all of which provided funds that paid for monthly lease payments and related charges under contracts entered into by Los Angeles County that had been procured through various fraudulent acts.

9. The following individuals and entities participated in the fraudulent acts:

> ~~a.~~a) Thomas Shepos is a resident of ~~California and can be found with the address last listed on court documents as~~ ███████ ██████████████████ ~~-~~Palmdale, California. From about February 1998 to about August 2017, Shepos was a high-level public official employed by the County's Chief Executive Office ~~--~~ Real Estate Division.
>
> ~~b.~~b) Arman Gabaee (also known as "Arman Gabay") is a resident of California and is currently incarcerated at ~~United States Penitentiary~~the Federal Correctional Complex, Lompoc, located

~~SECOND~~THIRD AMENDED COMPLAINT

at ~~3901 Klein Blvd.,~~3705 West Farm Road, Lompoc, CA 93436.

~~c.~~c)    Mark Gabaee (also known as "Mark Gabay") is a resident of ~~California and can be found at~~ ██████████ ~~Beverly Hills,~~ ~~CA~~ ██████ California. Mark Gabaee is Arman Gabaee's older brother.

~~d.~~d)    ~~Corsair, LLC~~Sancam, Inc. ("Sancam") is a ~~limited liability~~ ~~company organized under the laws of~~ California corporation with its principal place of business at 9034 W. Sunset ~~Blvd.,~~Boulevard, West Hollywood, CA 90069. Mark Gabaee is its Director, Chief Executive Officer, and President. Sancam was identified as DOE 4 in the Original Complaint.

———The Charles Company is a California general partnership with its principal place of business at 9034 W. Sunset Blvd., West Hollywood, CA 90069.~~organized under the laws~~ Mark and Arman Gabaee are the co-managing partners and co-founders of ~~California~~ the Charles Company, a real-estate development firm. The Charles Company also does business as The Charles Company, Inc., a California corporation with its principal place of business at 9034 W. ~~Sunset Blvd., West Hollywood, CA 90069.~~

~~f.~~e)    ~~Loma Vista LLC is a limited liability company organized under~~ ~~the laws of California with its principal place of business at 9034~~ ~~W.~~ Sunset Blvd., West Hollywood, CA 90069. The Charles Company, Inc. (to the extent it is distinct from the Charles Company) was identified as a DOE Defendant in previous complaints in this action.

~~g.~~f)    Excel Property Management Services, Inc. ("Excel Property Management") is a corporation organized under the laws of California with its principal place of business at 9034 W. Sunset Blvd., West Hollywood, CA 90069. Mark Gabaee is the Director,

4

Chief Executive Officer, Chief Financial Officer, and Secretary of Excel Property Management. John J. Carroll IV ("Carroll") previously acted as Excel Property Management's President. Arman Gabaee previously acted as Excel Property Management's Secretary.

Noble Investments, LLC is a limited liability company organized under the laws of California with its principal place of business at 9034 W. Sunset Blvd., West Hollywood, CA 90069.

Endure, LLC is a limited liability company organized under the laws of California with its principal place of business at 9034 W. Sunset Blvd., West Hollywood, CA 90069.

g)    Oakshire, LLC ("Oakshire") was a Delaware corporation with its principal place of business at 9034 W. Sunset Boulevard, West Hollywood, CA 90069. Oakshire was identified as DOE 1 in the Original Complaint.

j.h)    Wilhurst, Inc. ("Wilhurst") (formerly WDO, Inc.) is a Delaware corporation with its principal place of business at 9034 W. Sunset Boulevard, West Hollywood, CA 90069. Wilhurst was Oakshire's managing member and is Oakshire's successor-in-interest. Mark Gabaee is Wilhurst's Chief Executive Officer, Chief Financial Officer, and President. Arman Gabaee is Wilhurst's Vice President. Oakshire replaces DOE 1 fromWilhurst was identified as DOE 2 in the Original Complaint.

Wilhurst, Inc. ("Wilhurst") is a Delaware corporation with its principal place of business at 11726 San Vicente Boulevard, Suite 235, Los Angeles, CA 90049. Wilhurst is Oakshire's managing member and, on information and belief, Oakshire's successor-in-interest. Mark Gabaee is Wilhurst's Chief Executive Officer and

5

SECONDTHIRD AMENDED COMPLAINT

1    President.  Arman Gabaee is Wilhurst's Vice President.  Wilhurst

2    replaces DOE 2 from the Original Complaint.

3    ——— Town Investments, LLC ("Town Investments") is a California limited

4    liability company with its principal place of business at 9034 W. Sunset

5    Boulevard, West Hollywood, CA 90069. Town Investments replaces

6    DOE 3 from the Original Complaint.

7    m.i)  Sancam Inc. ("Sancam") is a California corporation with its

8    principal place of business at 9034 W. Sunset Boulevard, West

9    Hollywood, CA 90069. Sancam is Town Investments' managing

10   member., and Mark Gabaee is its Chief Executive Officer.

11   Sancam replacesa member. Town Investments was identified as

12   DOE 4 from3 in the Original Complaint.

13   n.j)  M & A Gabaee, LPa California Limited Partnership ("M&A

14   Gabaee") is a limited partnership organized under the laws of

15   California with its principal place of business at 9034 W. Sunset

16   Blvd., West Hollywood, CA 90069. Sancam is M & &A

17   Gabaee's general partner.

18   o.k)  Greenoak Investments, LLC ("Greenoak") is a California limited

19   liability corporation with its principal place of business at 9034

20   W. Sunset Boulevard, West Hollywood, CA 90069. Greenoak's

21   managing member is Sancam. Greenoak replaces DOE 5 from,

22   and its President is Mark Gabaee. Previously, Greenoak's

23   managing member was Coland, Inc., of which Mark Gabaee was

24   President. Greenoak was identified as DOE 5 in the Original

25   Complaint.

26   p.l)  Maple19, LP ("Maple19") is a limited partnership organized

27   under the laws of Delaware, with its principal place of business

28   at 9034 W. Sunset Boulevard, West Hollywood, CA 90069.

SECONDTHIRD AMENDED COMPLAINT

1  Maple19 ~~replaces~~was identified as DOE 6 ~~from~~in the Original

2  Complaint.

3  ~~q.~~m)  Urban Grove19, LLC ("Urban ~~Grovel 9~~Grove19") is a Delaware

4  limited liability corporation with its principal place of business at

5  9034 W. Sunset Boulevard, West Hollywood, CA 90069. Urban

6  ~~Grovel 9~~Grove19 is the general partner of Maple19. Mark Gabaee

7  is  ~~its~~Urban Grove19's  manager.  Urban Grovel9 ~~replaces~~was

8  identified as DOE 7 ~~from~~in the Original Complaint.

9  ~~r.~~n)  Oppidan, LLC ("Oppidan") was a California limited liability

10  corporation with its principal place of business at 9034 W. Sunset

11  Boulevard, West Hollywood, CA 90069. Its managing member

12  was Sancam~~.~~, and Mark and Arman Gabaee were its members.

13  Oppidan ~~replaces~~was identified as DOE 8 ~~from~~in the Original

14  Complaint.

15  ~~s.~~o)  Defendants  ~~Corsair, LLC~~Mark Gabaee, Arman Gabaee,  The

16  Charles Company, ~~Loma Vista LLC,~~The Charles Company, Inc.,

17  Excel Property Management ~~Services, Inc.,~~. M ~~&~~ &A ~~Gabaee, LP,~~

18  ~~Noble Investments, LLC, Endure, LLC~~Gabaee, Oakshire, ~~LLC,~~

19  Wilhurst, ~~Inc.,~~Town Investments, ~~LLC,~~Sancam ~~Inc.,~~, Greenoak

20  ~~Investments, LLC~~, Maple19, ~~LP,~~Urban Grove19, ~~LLC,~~and

21  Oppidan~~, LLC~~ are ~~hereinafter~~collectively referred to as the

22  "Gabaee Defendants."

23  ~~t.~~p)  Leon Neman is a resident of ~~California and can be found at~~ █

24  █ ~~,~~Beverly Hills, ~~CA~~ ████ California.

25  ~~Morad Neman is an individual residing at~~ ████

26  ~~Beverly Hills, CA~~ ████~~.~~

27  ~~v.~~q)  Yoel Neman is a resident of Beverly Hills, California~~and can be~~

28  ~~found at~~ ████~~, Beverly Hills, CA~~ ████.

7

w.r)   John Neman is a resident of Beverly Hills, California and can be found at ████████████ Beverly Hills, CA ███ .. John Neman replaceswas identified as DOE 9 formin the Original Complaint.

x.s)   Neman Brothers & Associates, Inc. ("Neman Brothers") is a corporation organized under the laws of California with its principal place of business at 1525 S. Broadway St., Los Angeles, CA 90015. Leon, Yoel, and John Neman are the Directors of Neman Brothers. Yoel Neman is its Chief Executive Officer, Chief Financial Officer, and Secretary.

y.t)   Vertigo Real Estate Holdings, LP ("Vertigo") is a limited partnership organized under the laws of California with its principal place of business at 1525 S. Broadway St., Los Angeles, CA 90015.

z.u)   Legend Real Estate Management, Inc. ("Legend") is a corporation organized under the laws of California with its principal place of business at 1525 S. Broadway St., Los Angeles, CA 90015. Legend Real Estate is the general partner of Vertigo. Leon, Yoel, and John Neman are Legend's Directors. Leon Neman is also Legend's Chief Executive Officer and Chief Financial Officer. Yoel Neman is Legend's Secretary.

aa.v)   Defendants Leon Neman, Yoel Neman, John Neman, Neman Brothers & Associates, Inc.,, Vertigo Real Estate Holdings, LP, and Legend Real Estate Management, Inc. are hereinafter referred to as the "Neman Defendants."

bb.w) Donald G. Abbey is an individual residing at ███████████ ;a resident of La Quinta, CA ████████ California.

cc.x) Nittany Lion Landscaping, Inc. ("Nittany Lion") is a corporation organized under the laws of California with its principal place of

8

business at 12447 Lewis Street, Suite 203, Garden Grove, CA 92840. Abbey owns Nittany Lion, which also does business as NL Services, Inc. or NL Landscaping Services, Inc. ("NL Services").

AP Palmdale LLC is a limited liability company organized under the laws of California with its principal place of business at 12447 Lewis Street, Suite 03, Garden Grove, CA 92840. Abbey is its Chief Executive Officer.

AP Commerce Plaza LLC is a limited liability company organized under the laws of Delaware with its principal place of business in 14770 E Firestone Blvd Suite 206, La Mirada, CA 90638.

ff.y)  The Abbey Management Company, LLCThe Abbey Companies LLC (operating under the alternate name "The Abbey Company LLC" in California) ("The Abbey Company") is a limited liability company organized under the laws of Delaware with its principal place of business at 12447 Lewis Street, Suite 203, Garden Grove, CA 92840. Abbey is the managing member of the Abbey Company. The Abbey Company was identified as DOE 39 in the Original Complaint.

z)  AP Sierra LLCAbbey-Properties LLC ("Abbey-Properties") is a limited liability company organized under the laws of Delaware with its principal place of business at 12447 Lewis Street, Suite 203, Garden Grove, CA 92840. Its managing member is The Abbey Company.

aa)  DGA-Properties LLC ("DGA-Properties") is a Delaware limited liability company with its principal place of business at 12447 Lewis Street, Suite 203, Garden Grove, CA 92840. Abbey is the

1    Chief Executive Officer of DGA-Properties, and its managing
2    member is Abbey-Properties LLC. DGA-Properties was
3    identified as DOE 11 in the Original Complaint.

4    gg.bb)      AP-Palmdale LLC ("AP-Palmdale") is a limited liability
5    company organized under the laws of California with its principal
6    place of business at 12447 Lewis Street, Suite 203, Garden Grove,
7    CA 92840. Abbey is its AP-Palmdale's Chief Executive Officer.,
8    and its managing member is DGA-Properties.

9    cc)    AP-Palmdale Place LLC ("AP-Palmdale Place') is a Delaware
10    limited liability company with its principal place of business at
11    12447 Lewis Street, Suite 203, Garden Grove, CA 92840. Abbey
12    is AP-Palmdale Place's Chief Executive Officer, and its
13    managing member is DGA-Properties. AP-Palmdale Place is the
14    successor-in-interest to AP-Palmdale. AP-Palmdale Place was
15    identified as DOE 40 in the Original Complaint.

16    dd)    AP-Commerce Plaza LLC ("AP-Commerce Plaza") was a limited
17    liability company organized under the laws of Delaware with its
18    principal place of business in 14770 E Firestone Blvd., Suite 206,
19    La Mirada, CA 90638. Abbey was AP-Commerce Plaza's Chief
20    Executive Officer, and its managing member was Abbey-
21    Properties.

22    ee)    CDCF III Pacific Commerce Plaza, LLC ("CDCF III") was a
23    Delaware limited liability company with its principal place of
24    business at 515 S. Flower Street, 44th Floor, Los Angeles, CA
25    90071. DA Properties LLCCDCF III is a successor-in-interest to
26    AP-Commerce Plaza. CDCF III was identified as DOE 13 in the
27    Original Complaint.

28    ff)    The Abbey Management Company LLC ("The Abbey

Management Company") is a limited liability company organized under the laws of Delaware with its principal place of business at 12447 Lewis Street, Suite 203, Garden Grove, CA 92840. The Abbey Company is the Abbey Management Company's managing member.

hh.gg)    AP-Sierra LLC ("AP-Sierra") is a limited liability company organized under the laws of Delaware with its principal place of business at 310 Golden Shore Suite 300, Long Beach, CA 90802.12447 Lewis Street, Suite 203, Garden Grove, CA 92840. Abbey is AP-Sierra's Chief Executive Officer, and its managing member is DGA-Properties.

Abbey-Properties II LLC ("Abbey-Properties II") is a limited liability company organized under the laws of Delaware on or around December 21, 2021 and registered in California on January 10, 2022 with its principal place of business at 12447 Lewis Street, Suite 203, Garden Grove, CA 92840.

jj.hh)    Abbey-Properties II LLC ("Abbey-Properties II") was a California limited liability company and, as of January 10, 2022, is a Delaware limited liability company with its principal place of business at 12447 Lewis Street, Suite 203, Garden Grove, CA 92840. Abbey-Properties II's managing member is The Abbey Company. Abbey-Properties II replaces DOE 10 fromis the successor-in-interest of two identically named entities. The first "Abbey-Properties II LLC" was organized under the laws of California in or around December 2005 and terminated on or around January 16, 2018. Abbey was both the managing member and Chief Executive Officer of that first predecessor-in-interest. The second "Abbey-Properties II LLC" was organized under the law of Delaware in or around June 2017 and terminated on or

around January 7, 2022. Abbey was the Chief Executive Officer of that second predecessor-in-interest, and its managing member was the Abbey Company. Abbey-Properties II was identified as DOE 10 in the Original Complaint.

DGA-Properties II, LLC ("DGA-Properties") is II") was a Delaware limited liability company with its principal place of business at 12447 Lewis Street,14770 E. Firestone Blvd., Suite 203, Garden Grove206, La Mirada, CA 92840.90638. Abbey was DGA-Properties is AP-Sierra's and AP-Palmdale's managing member. DGA-Properties replaces DOE 11 from the Original Complaint.

ll.ii)   DGA-Properties II, LLC ("DGA-Properties II") is a Delaware limited liability company withII's Chief Executive Officer, and its principal place of business at 12447 Lewis Street, Suite 203, Garden Grove, CA 92840.managing member was Abbey-Properties. DGA-Properties II replaces was identified as DOE 12 fromin the Original Complaint.

CDCF III Pacific Commerce Plaza, LLC ("CDCF III") is a Delaware limited liability company with its principal place of business at 515 S. Flower Street, 44th Floor, Los Angeles, CA 90071. CDCF III replaces DOE 13 from the Original Complaint.

nn.jj)   Defendants AP-Sierra LLCAbbey, Nittany Lion Landscaping, Inc.,, The Abbey Company, Abbey-Properties, DGA-Properties, AP-Palmdale LLC, AP-Palmdale Place, AP-Commerce Plaza LLC,(to which CDCF III is a successor-in-interest), The Abbey Management Co, LLCCompany, AP-Sierra LLC, DA Properties LLC, Abbey-Properties LLC, Abbey-Properties II, and DGA-Properties, DGA-Properties II, and CDCF III Pacific Commerce Plaza, LLC II are hereinafter referred to as the "Abbey

Defendants."

oo.kk)    Frank A. Visco is ~~an individual residing at~~ ███████
███ ~~,~~a resident of Thousand Oaks, ~~CA~~ ███████ California.

pp.ll) Visco Financial Inc. ("Visco Financial") is a California corporation with its principal place of business at 44824 Cedar Avenue, Lancaster, CA 93534. Visco is its Director and Chief Executive Officer. Visco Financial ~~replaces~~was identified as DOE 14 ~~from~~in the Original Complaint.

qq.mm)    Fraber Properties II, LLC ~~("~~(also doing business as Fraber ~~Properties~~II, LLC) ("Fraber II") is a California limited liability company with its principal place of business at 44824 Cedar Avenue, Lancaster, CA 93534. Visco is its manager. Fraber ~~Properties~~ II ~~replaces~~was identified as DOE 15 ~~from~~in the Original Complaint.

rr.nn) Defendants Visco, Visco Financial and Fraber ~~Properties~~ II~~, LLC~~ are hereinafter referred to as the "Visco Defendants."

~~David Schaeffer is an individual residing at~~ ███████~~,~~ ~~Dimmitt, Texas~~ ████ ~~.~~

~~FCG Properties, LLC is a limited liability company organized under the laws of Texas with its principal place of business in Dimmitt, Texas.~~

~~Castaic FCG Properties, LLC is a limited liability company organized under the laws of Texas with its principal place of business at 16150 Parish Hall Dr., Spring, Texas 77379-6630. Schaeffer is its managing member.~~

~~Defendants Castaic FCG Properties, LLC and FCG Properties, LLC are hereinafter referred to as the "Schaeffer Defendants."~~

1   Alex Moradi is a resident of California and can be found at ███
2   ███████, Beverly Hills, CA ████.
3   Isaac Moradi is a resident of California and can be found at ███
4   ███████, Beverly Hills, CA ████.
5   Imperial Hawthorne Limited Partnership is a limited partnership
6   organized under the laws of California with its principal place of
7   business in 9301 Wilshire Blvd., Suite 315, Beverly Hills, CA
8   90210.
9   ICO Investment Group, Inc. is a corporation organized under the
10  laws of California with its principal place of business in 9301
11  Wilshire Blvd., Suite 315, Beverly Hills, CA 90210-6132. Isaac
12  Moradi is its Chief Executive Officer. ICO is the general partner
13  of Imperial Hawthorne Limited Partnership.
14  ICO Vermont, LLC ("ICO Vermont") is a California limited
15  liability company with its principal place of business at 888 W.
16  6th Street, 12th Floor, Los Angeles, CA 90017. ICO Vermont
17  replaces DOE 16 from the Original Complaint.
18  ICO Development, LLC ("ICO Development") is a California
19  limited liability company with its principal place of business at
20  888 W. 6th Street, 12th Floor, Los Angeles, CA 90017. ICO
21  Development replaces DOE 17 from the Original Complaint.
22  Gage Plaza Associates ("Gage Plaza") is a California general
23  partnership with its principal place of business within the state of
24  California. On information and belief, its principal place of
25  business is in the County, and the Moradis are its general partners.
26  Gage Plaza replaces DOE 18 from the Original Complaint.
27  Defendants Imperial Hawthorne Limited Partnership, ICO
28  Investment Group, Inc., ICO Vermont, LLC, ICO Development,

14
SECOND<u>THIRD</u> AMENDED COMPLAINT

1

2

~~LLC, and Gage Plaza Associates are hereinafter referred to as the~~

~~"Moradi Defendants."~~

3   ~~eee.~~oo)      Gregory Hanes ("Hanes") is a resident of California and

4       can be found at 43903 Division Street, Lancaster, CA 93535.

5       Hanes is a landlord for certain properties leased by the County

6       and a construction contractor who has done business with the

7       County. Hanes ~~assisted Shepos in carrying out his bribery~~

8       ~~scheme. Hanes replaces~~was identified as DOE 19 ~~from~~in the

9       Original Complaint.

10  ~~fff.~~pp)      300 K-6, LLC ("300 K-6") is a limited liability company

11       organized under the laws of California with its principal place of

12       business at 43903 Division Street, Lancaster, CA 93535. Hanes

13       is its managing member. 300 K-6 ~~replaces~~was identified as DOE

14       20 ~~from~~in the Original Complaint.

15  ~~ggg.~~qq)      43917 Division Street, LLC ("43917 Division") is a limited

16       liability company organized under the laws of California with its

17       principal place of business at 43903 Division Street, Lancaster,

18       CA 93535. Hanes is its managing member. 43917 ~~replaces~~was

19       identified as DOE 21 ~~from~~in the Original Complaint.

20  ~~hhh.~~rr) Defendants Hanes, 300 K-6, and 43917 Division are hereinafter

21       referred to as the "Hanes Defendants."

22       ~~Homer Harvey is a resident of California and can be found at~~

23       ~~████████████, Los Angeles, Ca 90024. Harvey~~

24       ~~replaces DOE 35 from the Original Complaint.~~

25       ~~William Tatum is a resident of California and can be found at~~

26       ~~██████████████, Los Angeles, CA 90067. Tatum~~

27       ~~replaces DOE 36 from the Original Complaint.~~

28

---

Harvey Capital Corp. ("Harvey Capital") is a California corporation with its principal place of business at 2333 Cotner Avenue, Los Angeles, CA 90064. Harvey Capital replaces DOE 37 from the Original Complaint.

Ball & East, Ltd. ("Ball & East") is a limited partnership organized under the laws of California with its principal place of business at 11835 West Olympic Boulevard, Suite 300, Los Angeles, CA 90064. Harvey, Tatum, and Harvey Capital are Ball & East's general partners. Ball & East replaces DOE 38 from the Original Complaint.

Defendants Harvey Capital and Ball & East are hereinafter referred to as the "Harvey/Tatum Defendants."

Plaintiffs are ignorant of the true names and capacities of the defendants sued herein as Does 1-12 and therefore sue these Defendants by such fictitious names. On information and belief, Does 1-12 includes additional business entities tied to Defendants and used to advance fraudulent acts. Plaintiffs will amend this complaint to allege the true names and capacities of these Defendants when they are ascertained. Plaintiffs are informed and believe that each fictitiously named Defendant is legally liable as alleged herein.

## JURISDICTION AND VENUE

10.    Under 31 U.S.C. § 3732(a), and 28 U.S.C. § 1331, this Court has subject matter jurisdiction over all alleged violations of 31 U.S.C. § 3730, the federal False Claims Act ("FCA"). Under 31 U.S.C. § 3732(b), and 28 U.S.C. § 1332, this Court also has jurisdiction over all alleged violations of Cal. Gov't Code § 12651,

the California False Claims Act ("CFCA").[1]

11.    Venue is proper in this Court under 28 U.S.C. §§ 1391(b)(1), (2), and/or (3).

**FACTS**

**I.    Ms. Gluck Begins to Uncover Shepos's Misconduct.**

**A.    Ms. Gluck's Background.**

11.12. Ms. Gluck was born in New York and raised in Los Angeles by her parents, two working-class immigrants from Europe who owned a small bakery. Throughout her life, Ms. Gluck's parents taught her the importance of hard work, integrity, telling the truth, and doing the right thing.

12.13. Ms. Gluck studied at California State University in Northridge, where she earned a B.A. in Radio and Television with a minor in Journalism.

13.14. After graduating from college, Ms. Gluck embarked on a successful career in the entertainment industry. In the late 1970s, Ms. Gluck worked at the KTTV Channel 11 television station as a research analyst supporting the sales department. Ms. Gluck then accepted an opportunity to work as an assistant associate producer for the 1979 Academy Awards. In the 1980s, Ms. Gluck continued her entertainment career working with well-known manager Marty Litke, who managed notable film and television writers and actors, including Valerie Bertinelli and Cate Capeshaw.Kate Capshaw. Ms. Gluck also helped launch HITS Magazine, a music industry publication. By the late 1980s, Ms. Gluck worked in sales for IDB Communications, a company producing international and domestic live satellite shows focused on news and entertainment. Over the course of her career, Ms. Gluck

---

[1] By virtue of the County's intervention in this case, the County's Amended Complaint in Intervention is the operative complaint with respect to Qui Tam Plaintiff's claims, first alleged in the Original Complaint, under the CFCA on behalf of the County and the State. Qui Tam Plaintiff has "the right to continue as a party" to those CFCA claims, and she elects to do so. Cal. Gov't Code § 12652(b)(3). The County's Amended Complaint in Intervention is incorporated by reference herein.

SECONDTHIRD AMENDED COMPLAINT

also pitched film projects to major studios, produced a seven-site album release event for Bon Jovi, and produced other work in live audio and video projects.

~~14.~~15.By the 1990s, Ms. Gluck became the CEO of her own successful syndication company focused on television specials, including Cirque du Soleil and Black History Month specials. Ms. Gluck was a successful, independent professional who, through years of hard work and perseverance, owned her own entertainment business and a condominium in Santa Monica.

### B. Ms. Gluck Marries Shepos ~~and Becomes the Primary Caregiver for their Daughter and for Ms. Gluck's Ailing Parents~~.

~~15.~~16.Ms. Gluck then met Shepos in 1993 at the airport after attending an event for volunteers for the City of Hope, a cancer treatment center. Shepos was charming and charismatic—they hit it off, exchanged information, and began dating.

~~16.~~17.At that time, Shepos seemed to have very little to his name. Shepos's occupation at the time was running a small property management company called CT Management, which managed a couple of strip mall properties for their owners. Shepos drove an old, beat-up car, claimed to own no real estate, and told Ms. Gluck that he was paying child and spousal support from a prior marriage (though his children from that marriage would not speak to him at the time).

~~17.~~18.Ms. Gluck did not care about Shepos's apparent lack of material success—she fell in love with him, and that was all that mattered to her.

~~18.~~19.In 1993, Shepos moved into Ms. Gluck's condominium in Santa Monica, and in 1996, he and Ms. Gluck were married.

### C. Shepos Begins Working for the County.

~~19.~~20.Only two years after they were married, in 1998, a friend of Ms. Gluck's told Shepos about a job opening in the Real Estate and Leasing Division of the Los Angeles County Chief Executive Office.

~~20.~~21.Ms. Gluck thought the position would be a good fit for Shepos because of his background as a property manager and encouraged him to apply. Shepos

applied and was hired by the County. Even while working for the County, however, Shepos continued to maintain his property management company CT Management on the side and, to the best of Ms. Gluck's knowledge, continued to manage multiple strip- malls that housed restaurants and other businesses.

21.22. Shepos's role with the County gave him the authority to bind the County to real estate transactions, influence County real estate decisions, and manage ongoing commercial relationships relating to real estate. Often, these leases were on behalf of government departments seeking space, such as property for a school or a health clinic. However, Shepos also purchased land on behalf of the County for environmental restoration efforts and other green space initiatives, and he was privy to non-public information as to the County's future development plans. In theory, Shepos should have acted on behalf of the County and its taxpayers and sought public and transparent bids in order to ensure the County paid a fair market rate. In practice, Shepos solicited and accepted bribes in order to actexchange for his acts on behalf of billion-dollar commercial real estate companies, including funneling hundreds of transactions to them on a no-bid basis so that they could bilk taxpayers for above market rents, phantom improvement charges, and inflated management costs and utilities.

**D.    Ms. Gluck Steps Back from Work to Become the Primary Caregiver for Her Daughter and Her Ailing Parents at Shepos's Insistence.**

22.23. At around the same time that Mr.Within a few years after Shepos began working for the County, life circumstances forced Ms. Gluck to leave her professional career in order to become a caretaker for her parents and, a couple of years later, her daughter.

23.24. Between 1997 and 1998, Ms. Gluck's mother became seriously ill and was hospitalized for seven months. During that time, Ms. Gluck cared for her mother daily until she passed away.

24.25. Then in 2000, Shepos and Ms. Gluck had their only child, a daughter.

At Shepos's urging, Ms. Gluck then left her successful career at age 43 to become a stay-at-home mother ~~to Hannah~~.

~~25.~~26. While she was raising their daughter, Ms. Gluck was also taking care of her father, who moved into Ms. Gluck's building in 2000 to be closer to her. Ms. Gluck's father became increasingly reliant on Ms. Gluck to drive, cook, and care for his escalating medical needs.

~~26.~~27. From 2004 to 2008, Ms. Gluck's father was in and out of the hospital with cancer, and Ms. Gluck became his round-the-clock caregiver.

~~27.~~28. While she was caring for her daughter and father, Ms. Gluck was also managing her own long-standing, auto-immune disease that doctors at the time diagnosed as Lupus.

~~28.~~29. Under these circumstances, and at Shepos's repeated insistence, Ms. Gluck focused on caring for herself and her family, stepping back from her career while Shepos ~~became fully responsible for~~took over the family's finances.

~~29.~~30. Ms. Gluck had no reason at that time to distrust Shepos. She believed him to be a family man who, by this point and with Ms. Gluck's help, had repaired his relationship with his now-adult children from his prior marriage and was thrilled to be a father again to their daughter later in life.

~~30.~~31. And Ms. Gluck thought, despite hardships with her health and her father, that she and Shepos had made a beautiful and perfectly happy family together. She believed they had a fairy-tale love story that was the envy of their friends and acquaintances. Her happiness shone through in family photos from the early-to-mid 2000s:

    **E.**    **Shepos Convinces Ms. Gluck to Purchase the Bel Air Property,** ~~which~~**Which (Unbeknownst to Ms. Gluck at the Time) Was a Vehicle for Him to Receive Bribes.**

~~31.~~32. In 2003, while the real estate market was booming, Shepos convinced Ms. Gluck to purchase a property in Bel Air on Roscomare Road, renovate it, and later sell it for a profit.

~~32.~~33. The property was a "fixer upper" which cost around $800,000 to purchase. Shepos convinced Ms. Gluck to take out equity in her Santa Monica condominium, which had appreciated substantially since she purchased it in the early 1990s, to pay the approximately $160,000 down payment. Ms. Gluck agreed.[2]

~~33.~~34. Shepos told Ms. Gluck that he would take out a construction loan to renovate the Roscomare Road property and that, through his work as a property manager with CT Management, he knew various contractors and vendors who could provide discounted services to renovate the property.

~~34.~~35. Ms. Gluck believed Shepos because this statement was consistent with

---

[2] Shepos had also previously convinced Ms. Gluck that she should add Shepos to the grant deed for her condominium, even though it was her separate property from before their marriage. Shepos told her that given her auto-immune disorder, he should be listed as an owner of the condominium to make sure that he could take care of their daughter should Ms. Gluck's health unexpectedly deteriorate.

21
~~SECOND~~THIRD AMENDED COMPLAINT

others he had made since their marriage: he had previously opened a separate P.O. box for his CT Management side business, claiming that he would receive an overwhelming amount of vendor solicitation mail from roofers, painters, and other construction workers and did not want it to clog their home mailbox.

~~35.~~36. Once the renovations began, Ms. Gluck visited the Bel Air property on a near-daily basis and spoke to various workers and contractors who were on site, believing them to be acquaintances of Shepos's through CT Management. (It was not until years later that she would learn otherwise. As detailed in Parts I.G and I.I below, she only later learned that many of the workers she met at the property were associated with County vendors who were, in fact, bribing Shepos).

~~36.~~37. Ms. Gluck was primarily involved with landscaping, interior design features, and working with the architect, but she had little~~-~~to-no insight into the finances underlying the property. That is because (1) Shepos kept a separate bank account for CT Management (which ~~she~~Ms. Gluck would only later learn he used to funnel bribes related to the Roscomare Road property~~)~~); and (2) ~~she~~Ms. Gluck had deferred to Shepos on overseeing their finances in order to focus on her health issues, ~~raise~~raising her daughter, and ~~care~~caring for her father.

**F.    Ms. Gluck Begins to Notice Shepos's Suspicious Behavior.**

~~37.~~38. ~~While working on renovating~~During the renovations on the Bel Air property, Ms. Gluck began to notice that Shepos was becoming increasingly stressed and was taking out his frustration by verbally berating their daughter. Ms. Gluck then began to notice other signs that something was amiss. And those signs led her to recall other things that had struck her as odd over the course of their marriage.

~~38.~~39. For example, Shepos seemed to spend an inordinate amount of time with a man named Frank Visco ~~whom~~who Shepos referred to as one of his "County clients." Visco would frequently call Shepos on weekends (sometimes asking if Shepos wanted to "go for a ride in his Maybach"), and Shepos would travel to Lancaster every Wednesday to meet with Visco and others. Shepos never told Ms.

Gluck why he needed to be in Lancaster during a workday or why he met with Visco so frequently. On one occasion, ~~he~~Shepos borrowed Ms. Gluck's car, which was larger than his, saying that he needed to drive ~~Frank~~ Visco and others to look at some real estate in Tehachapi.

~~39.~~40. Additionally, when Shepos and Ms. Gluck would take occasional weekend trips to Las Vegas, Visco frequently happened to be in Vegas as well, and Shepos would insist on having dinner with Visco or otherwise meeting with him. Visco would pick up the tab for these expensive meals, and Ms. Gluck also noticed Shepos gambling with Visco in a high-limit room at a Las Vegas casino on one occasion. Around 2008, Ms. Gluck also observed Visco visiting the Bel Air property that she and Shepos were renovating.

~~40.~~41. Shepos would ~~also~~ frequently make disturbing comments about Visco being "connected." On one occasion, he showed Ms. Gluck a news article that called Visco the "godfather." Shepos loved the article and told Ms. Gluck that he showed it to Visco and kneeled down to kiss Visco's ring. Ms. Gluck found that Shepos even kept a copy of this article in an envelope with other important documents like the titles to their cars and her father's eulogy, having hand-written a label on the envelope that read, in part, "Visco — newspaper godfather."

~~41.~~42. While Shepos also regularly referred to Visco as his "County client," in reality, Visco was a developer ~~and a vendor who serviced the~~with County contracts. This foreshadowed Shepos's gross distortion of his role and his failure to respect that his client was the County and its taxpayers, not the vendors and developers leasing property to the County.

### **G.    Ms. Gluck Discovers Evidence of Shepos's Inappropriate ~~Relationship~~Relationships with Developers.**

~~42.~~43. Then, in March 2010, while Ms. Gluck was cleaning and organizing her condominium, she discovered multiple alarming documents in a box under Shepos's bedside table: (1) a tax document from the Palm Springs Hotel and Casino with

Shepos's social security number transposed; and (2) credit card statements appearing to show that Shepos had taken out a cash advance of over $48,000 in separate transactions.

43.44. Ms. Gluck was shocked. She did not know that Shepos had been to the Palm Springs Hotel and Casino, nor could she think of any reason why he would have (1) transposed his social security number or (2) taken out such a large cash advance. Ms. Gluck called a close friend, a lawyer, over to the condominium to show her what she had found.

44.45. Ms. Gluck was scared that perhaps someone had stolen Shepos's credit cards or identity. At her friend's urging, and while her friend was present, Ms. Gluck called Shepos frantically asking what had happened and whether his credit card had been stolen. Shepos seemed strangely calm over the phone, told her his cards had not been stolen, and told her he would explain what happened when he got home from work.

45.46. Ms. Gluck confronted Shepos with the documents when he arrived home and again asked what had happened. Shepos seemed off-kilter and began saying things he had never told Ms. Gluck before. Shepos told Ms. Gluck that he and Visco had been gambling in Palm Springs and that Shepos had "loaned" the cash advance of approximately $48,000 to Visco. This made no sense to Ms. Gluck because Visco was a wealthy developer and Shepos was merely a government employee on a public servant's salary.

46.47. Ms. Gluck asked that Shepos write down every time he had gambled with a "County client," as Shepos referred to them. Shepos began writing a note titled "Backwards" which listed, in reverse chronological order, the times he claimed to have gambled with Visco.

47.48. Shepos also listed all the times he claimed to have gambled with another individual: Arman Gabaee. Ms. Gluck recalled that name because she had met Arman Gabaee several times earlier.

48.49.First, on October 13, 2000, the day after Ms. Gluck gave birth to their daughter, Shepos brought Arman Gabaee into the hospital room to meet Ms. Gluck and her newborn baby (and Arman Gabaee presented Ms. Gluck with a large basket filled to the brim with clothes for her baby). Ms. Gluck thought it was very strange for Shepos to bring a "County client" to her hospital room so shortly after she gave birth, but she chalked it up to Shepos's excitement at being a father again.

49.50.Second, and as discussed further below, Ms. Gluck and Shepos also socialized with Arman Gabaee and his cousins, Isaac and Alex Moradi (also Shepos's "County clients"), visiting, attending the House of Blues together on occasion.

50.51.Third, Ms. Gluck and Shepos had on occasion been invited to personal Gabaee family events, including a family funeral and Arman Gabaee's daughter's bat mitzvah.

51.52.Ms. Gluck was shocked to see the note that Shepos had written. This was the final straw for her with respect to Shepos's inappropriate relationship with Visco. She immediately told Shepos that she did not like the influence Visco had on their lives, and told him: "You need to choose. It's me and our daughter and your family, or it's Frank."

52.53.Ms. Gluck told Shepos to call Visco and his boss at the County, Carlos Marquez, in front of her to request that he no longer work on Visco's projects for the County.

53.54.In response, Shepos cried in front of Ms. Gluck for the first time ever, begging and pleading with her to be allowed to continue working with Visco until "September or October" because there was a "big deal" they were working on together. Ms. Gluck insisted that Shepos call Visco, and Shepos appeared afraid to do so, sobbing while repeatedly saying "you know who he knows!" Ms. Gluck assumed this was yet another of Shepos's references to Visco being "the godfather" or "connected."

54.55.Shepos finally called Visco in front of Ms. Gluck, still sobbing, telling

Visco, "Frank, she knows! She knows! Frank, I just wanted to be like you!" Ms. Gluck was shocked, because she thought she knew nothing at all and had no idea what Shepos was talking about. Ms. Gluck did not say so, however, because she hoped that if Shepos believed she knew more than she did, he would begin telling her the truth about his bizarre relationship with Visco.

55.56.Shepos then ended the call with Visco to call his boss at Ms. Gluck's insistence, and for the next 15 minutes Visco appeared to be frantically trying to call Shepos back, repeatedly calling his mobile and home phone numbers.

56.57.Shepos, however, was on the line with his boss at the County, Carlos Marquez. Shepos told Marquez that Ms. Gluck demanded that he no longer work on projects with Visco. While Marquez was on the phone, Shepos again began begging Ms. Gluck to be able to work with Visco just a few more months to complete his "really big project" in September or October.

57.58.Ms. Gluck was in disbelief that Shepos seemed to be choosing Visco, who should merely have been one of many County vendors with whom Shepos did business, over her family. Clearly, there was something more to Visco's relationship with Shepos. But that "something" was unknown to Ms. Gluck did not, at the time, understand what that "something" was.

**H.    Shepos Was~~Is~~ Diagnosed as a Sociopath~~Psychopath,~~ and Gluck Filed~~Files~~ for Divorce After Discovering Evidence that Shepos Received Bribes.**

58.59.After the incident in March 2010, Shepos claimed he was~~blamed~~ a purported gambling addict and that his addiction was the reason~~problem~~ for his verbal abuse towards Hannah~~his and Ms. Gluck's daughter~~ and his frequent gambling with Visco and Gabaee. Shepos begged Ms. Gluck to give him another chance and to stay in the marriage.

59.60.Unbeknownst to Ms. Gluck at the time, Shepos used the notion of having a "gambling addiction" as cover for his illegal bribery schemes; indeed, years

later, as discussed below, he would lie to the FBI by claiming that bribe proceeds were gambling proceeds.

60.61.Ms. Gluck was, however, extremely suspicious that Shepos's claim to be an addict of any kind was a lie. Shepos rarely drank, never did drugs, and exhibited no signs of an addictive personality to Ms. Gluck's knowledge. So the notion that he was a gambling addict was almost laughablemade no sense to her.

61.62.In truth, Shepos's supposed "gambling" and other "addictions"—of which Ms. Gluck saw no evidence during their marriage—were merely a pretext to (1) cover for large sums of money he received; (2) meet people who were actually struggling with addiction and whom he could manipulate into helping with his illicit schemes; and (3) manipulate the courts and others into sympathizing with him and believing he could be "reformed."

62.63.Indeed, years later when going through papers she found (discussed further below), Ms. Gluck found Shepos's hand-written notes to himself, apparently from the morning after she confronted him in March 2010. The notes in Shepos's handwriting are shown below and reveal his cool calculation, noting:

> I'm overwhelmed. I'm scared. I must <u>rationally</u> take steps slow to resolve issues which are coming to bear. . . . . . . Relax and don't get overwhelmed – make a list – set priorities – slow – think . . . . . . . All Right. This is what I have to work with. It's not the best in the world but I will do what I can with what I have!

---

3-9.2010

5³⁰ₐₘ I'm overwhelmed - I'm scared - I must
rationally take steps slow to resolve
issues which are coming to bear.

6⁵⁰ₐₘ    Relax and don't get overwhelmed - make a
list - set priorities - Slow- think -


All Right   This is what I have to work
with    It's not the best in the World
but   I will do what I can with
what I have!

~~Mr.~~

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28



63.64. Shepos's claim to have a gambling addiction was his apparent solution, a way he could explain away his behavior and relationship with Visco without revealing the full truth to Ms. Gluck: that he was involved in a bribery scheme involving multiple developers to give them favorable contracts, inside information, and other benefits from the County.

64.65. And Shepos's plan worked, at least for a time. Because Shepos claimed to have an addiction—and for the sake of their young daughter,—Ms. Gluck insisted that they see a psychiatrist together, hoping that Shepos would seek treatment and finally come clean with whatever the truth actually was.

65.66. Ms. Gluck and Shepos began seeing a psychiatrist named Dr. Richard

Brightman. Shortly thereafter, Dr. Brightman diagnosed Shepos with ~~Anti-Social Personality Disorder~~antisocial personality disorder ("ASPD"). Ms. Gluck had no idea what that meant and initially reacted by saying, "no, that can't be true~~,~~; Tom is a very social person ~~with lots of friends~~."

66.67. Dr. Brightman explained that the ASPD diagnosis actually meant that Shepos was a ***sociopath***psychopath and that, in his view, Ms. Gluck should "run, not walk" out of the marriage. At the very least, Dr. Brightman recommended that Ms. Gluck protect herself financially and lock away any valuables, keepsakes, or items of sentimental value from Shepos.

67.68. Once again, Ms. Gluck later found Shepos's hand-written notes to himself confirming his diagnosis from "Richard," stating, "I read @ least 6 different articles on ASD and it scares me – I shudder at what I read":

68.69.Ms. Gluck shuddered at what she read as well. She quickly began researching what ASPD meant and discovered that people with ASPD have limited capacity for empathy, self-reflection, remorse, or improvement, and that famous examples of people with ASPD include financial criminals like Bernie Madoff (among others)..

69.70.She also learned that the Diagnostic and Statistical Manual ("DSM") defines the disorder as a pervasive pattern of and disregard for and violation of the rights of others, including three or more of the following: (i) engaging in unlawful behaviors; (ii) deceitfulness, such as lying, using aliases, or conning others for personal profit or pleasure; (iii) impulsivity; (iv) irritability and aggressiveness; (v) reckless disregard for safety of self or others; (vi) consistent irresponsibility, such as repeated failure to sustain consistent work behavior or honor financial obligations; and (vii) lack of remorse, such as being indifferent to or rationalizing having hurt, mistreated, or stolen from others. Dr. Brightman told Ms. Gluck that Shepos exhibited **all** of the criteria for ASPD (though a subset would have been enough for the diagnosis).

70.71. Ms. Gluck, in short, began coming to the stunning realization**realizations** that she was married to ~~a mirage~~**an imposter** and a monster, that her seemingly "perfect" life had been a lie, and that in fact she had no idea who her husband truly was.

71.72. In the months that followed—as Ms. Gluck struggled to cope with trauma from these discoveries while remaining strong for the sake of her young daughter—Ms. Gluck started uncovering numerous financial improprieties by Shepos.

72.73. She discovered evidence that Shepos had taken money out of their joint accounts and had **fraudulently** misappropriated her inheritance from her father, who by that point had passed away. Shepos had not only done so alone, but **he** had **also** enlisted the help of Ms. Gluck's own sister. Shepos did so by ~~asking~~**falsifying escrow instructions for the inheritance: after** Ms. Gluck ~~to sign~~**signed those** escrow instructions for the inheritance to be split 50/50 between Ms. Gluck and her sister, ~~only to subsequently white~~**according to the will, Shepos then whited** out the numbers and ~~replace~~**replaced** them with 100% going to Ms. Gluck's sister and 0% going to Ms. Gluck.

73.74. This was confirmed in a post-nuptial agreement that Shepos and Ms. Gluck signed in June 2010, in which Shepos "acknowledge[d] that Karen received or was to receive inherited funds during their marriage, and that he borrowed funds from Karen's father, some of which were wrongfully used by him without Karen's knowledge or consent or as a result of misrepresentations by [Shepos] as to the parties' financial circumstances."

74.75. Ms. Gluck began going through mail that arrived at their house more carefully. Ms. Gluck remembered that Shepos had a P.O. box purportedly because the mailbox at their home was too small and he received a lot of vendor mail for CT Management. When she remembered Shepos's P.O. box, Ms. Gluck demanded a key. Shepos reluctantly gave Ms. Gluck the key.

75.76.When Ms. Gluck visited Shepos's P.O. box, the staff was sorting mail and had left the cover down. The names assigned to each mail slot were visible, and Ms. Gluck saw that Shepos's P.O. box listed in both his name and Arman Gabaee's name. Ms. Gluck could think of no legitimate reason why Shepos and Arman Gabaee, —one of Shepos's "County clients" as he called them, would share a P.O. box.

76.77.Later in 2010, Ms. Gluck was putting away laundry and discovered a wad of $5,000 in cash and an expensive gold watch estimated to be worth over $20,000 in Shepos's sock drawer. Ms. Gluck confronted Shepos about the P.O. box, the money, and the watch.

77.78.Shepos admitted that, for years, Arman Gabaee had been giving him $5,000 a month. Shepos claimed that the watch was a "birthday gift" from Arman Gabaee; Ms. Gluck thought this made no sense because, if that were true, it meant Shepos had been hiding the watch from her for at least 10 months since his birthday. Why would he hide something if it was truly innocuous?

78.79.Ms. Gluck began to understand that she knew little to nothing about what Shepos had been up to financially and decided she would never file joint tax returns with Shepos again as a result. Ms. Gluck retained an attorney and a CPA to help her prepare to file separate tax returns for the first time since their marriage.

79.80.In March 2011, Ms. Gluck learned that Shepos had cashed in an $85,000 insurance policy without her consent. She did not know what he did with the money.

80.81.Additionally, although by now Ms. Gluck and Shepos had sold the Bel Air property for a profit in 2009, Shepos never told her where he deposited the proceeds of the sale. Then, in mid-2011, Ms. Gluck received a letter from the IRS identifying Shepos's unreported income, including gambling proceeds and over $1 million in profits from the sale of the Bel Air property.

81.82.This was the final straw. Ms. Gluck knew she could no longer remain married to Shepos, however much she had hoped to keep her family together for their daughter's sake.

82.83. Shortly thereafter, on June 16, 2011, Ms. Gluck separated from Shepos, and the following month, Ms. Gluck filed for divorce.

## I.     During Divorce Proceedings, Ms. Gluck Begins Piecing Together ~~a Trove of Evidence Revealing~~ Some of ~~Shepos's~~Shepos's Fraud and Corruption.

83.84. During her divorce proceedings, Ms. Gluck obtained some discovery of Shepos's bank accounts and credit cards. Ms. Gluck went to each of the banks at which she and Shepos had maintained joint bank accounts and asked whether Shepos maintained any other separate accounts. Ms. Gluck found several bank accounts and dozens of credit cards she was not aware of during her marriage. The bank statements revealed monthly direct deposits and numerous cash deposits ranging from $4,000 to $8,000. The bank statements also revealed that Shepos had written checks in the amount of $25,000 payable to one of Arman Gabaee's employees, Sarah Withers. Over time, Ms. Gluck learned that Shepos had millions of dollars flowing through bank accounts that Ms. Gluck was not aware of because the accounts belonged to Shepos's separate business, CT Management, and because Ms. Gluck deferred to Shepos on financial matters after her daughter was born.

84.85. Ms. Gluck wondered: how could a County employee who managed a few strip malls through a side business have millions of dollars flowing in and out of his bank accounts? And where had the money gone—the money from Ms. Gluck's inheritance from her father and the proceeds from the sale of the Roscomare house? Ms. Gluck was determined to find out so that, after years as a stay-at-home mom~~, she could support her daughter~~ and now that she and Shepos were separated, she could support her daughter.

85.86. Then, in December 2012, a friend told Ms. Gluck that she needed a table, and Ms. Gluck remembered that she had a table in a storage unit that she and Shepos had shared during their marriage. Ms. Gluck did not have a key to the storage unit, so she asked Shepos to meet her and her friend at the unit. Shepos agreed.

86.87.When Shepos arrived and opened the unit, Ms. Gluck looked up and noticed that, on shelves at the top of the unit, there were boxes and tubs that appeared to be filled with documents and checks. Ms. Gluck suspected that the documents were from the time of their marriage, and ~~Ms. Gluck was hoping~~she hoped to find more financial documents indicating where Shepos had moved money to which Ms. Gluck was entitled (including her inheritance and the proceeds of the sale of the Bel Air home).

87.88.Thinking quickly on her feet, Ms. Gluck told Shepos that it would be too difficult for her to ~~get out~~remove the table ~~and move it herself given how~~ from the packed ~~the~~ storage unit and move it herself. Ms. ~~was and~~Gluck demanded that ~~he~~Shepos give her the key so that she could come back with movers. Shepos appeared reluctant to part with the key but could not articulate a good reason not to give it to Ms. Gluck in front of her friend (and, as Ms. Gluck now knew, people with ASPD care deeply about maintaining a charming "mask" in front of friends and acquaintances to hide their true inner nature). ~~Mr.~~Shepos handed over the key.

88.89.The next day, Ms. Gluck returned with movers to take the table, and she also took the boxes and tubs of documents ~~and~~, which she began to review ~~them~~ carefully at home. Ms. Gluck painstakingly pieced together seemingly small or insignificant clues that began to point to what Ms. Gluck suspected to be corruption on a massive scale.

89.90.Ms. Gluck's review uncovered a startling amount of evidence indicating that Shepos's "County clients," as he called them, had been funneling cash, sporting event tickets, concert tickets, House of Blues memberships, airline tickets, hotel rooms, expensive dinners, and other benefits as bribes for *~~over a decade~~nearly two decades*, including for example:

        ~~a.~~a)   Several 1099s issued to Shepos from the "Neman Brothers" and their business Vertigo. Ms. Gluck knew that Neman Brothers were a "County client" of Shepos. Much like the social security

number on the tax document from the Palm Springs Hotel and Casino, the 1099s from the Neman Brothers had Shepos's social security number transposed.

b.b)   Evidence that Arman Gabaee had been paying for the renovations to theShepos's Bel Air property, including documents indicating that Arman Gabaee's company, M & &A Gabaee, paid for materials from Nichol's Hardware, and that one of Arman Gabaee's employees, Kang Lee, had done structural engineering work for the house.

c.c)   Evidence that Shepos submitted false vouchers to a construction lender indicating that he had paid for materials and services when, in fact, a "County client" associated with Donald Abbey had paid for those materials and services.

d.d)   Documents indicating that Shepos and Arman Gabaee shared an account with Southwest Airlines and had been traveling to Las Vegas together since 1999, with Shepos holding himself out as an employee of M & A Gabaeethe Charles Company and attending conferences paid for by Arman Gabaee.

e.e)   Additional documents regarding Visco, including documents which revealed that Visco had seemingly paid thousands of dollars in connection with a trip to Bacarra Resort that Shepos and Ms. Gluck took to celebrate Shepos's 60th birthday.

90.91.Once Ms. Gluck discovered these additional documents, she also began reviewing old emails that had been sent to a shared email account that she and Shepos jointly used during their marriage, TJS2291@aol.com. Ms. Gluck was a technology neophyte, having left her professional career in the early 2000s (when AOL dial-up was the dominant mode of Internetinternet access,). and had rarely checked the email address herself during the course of her marriage. But when she went back to look

36
SECONDTHIRD AMENDED COMPLAINT

through the emails years later, Ms. Gluck discovered additional evidence of bribery and corruption:

a.a)    Documents suggesting that an associate of ~~Arman~~ Gabaee was funneling bribes to Shepos through Jeff Kurtz, an acquaintance Shepos met in the "Gambler's Anonymous" meetings he attended to keep up the ruse of an addiction and who later became Shepos's roommate.

b.b)    Documents suggesting that Shepos caused County checks to be issued to Visco in connection with repair work completed by Wade Sawyer~~,~~, who owned Sawyer Construction & Associates. Ms. Gluck recalled that Sawyer was another contractor who had ~~done extensive~~performed work on the Bel Air property.

c.c)    Documents suggesting that ~~Arman~~ Gabaee and his cousins ~~Alex and Isaac Moradi were~~ jointly ~~paying~~paid for Shepos's membership at the House of Blues. ~~This reminded Ms. Gluck that, years earlier, Moradi had sent Shepos an expensive and ornate, gold-trimmed vase as a Christmas gift.~~ club.

~~91.~~92.Ms. Gluck also discovered that, in addition to the family email address "TJS2291@aol.com," Shepos had created the nearly identical email address, "TJS2292@aol.com," and attributed it to Ms. Gluck's sister.

~~92.~~93.And on an old phone that belonged to Shepos, Ms. Gluck found some developers' numbers listed under fake names, such as "Dad." Ms. Gluck discovered this by painstakingly researching every number in ~~Shepos'~~Shepos's phone to determine who it truly belonged to.

**J.    Shepos Fraudulently Files for Bankruptcy to Stall Divorce Proceedings, and Ms. Gluck Uncovers More of Shepos's Misconduct.**

~~93.~~94.In 2012, around the time that Ms. Gluck began to uncover more

evidence of Shepos's corruption and criminality from the boxes in the storage unit, Shepos filed a fraudulent bankruptcy in order to stall the approaching divorce trial. Ms. Gluck had to hire a bankruptcy lawyer to challenge Shepos's claim to be bankrupt. This initial bankruptcy petition was rejected, and the divorce proceedings resumed.

94.95. Ms. Gluck continued to piece together the clues she was finding in the boxes of documents, inviting friends over to help her sort through the documents, examine them one- by- one, and attempt to figure out what Shepos had been doing.

95.96. Given the evidence she had by now uncovered in the emails, checks, insurance policies, and other documents from the boxes, Ms. Gluck was concerned that Shepos appeared to have engaged in extensive, criminal misconduct before and during their marriage—what appeared to be acts of wire fraud, bank fraud, insurance fraud, money laundering, bribery, and much more.

96.97. Ms. Gluck was frightened about what she now knew, but was even more frightened by what she still did not know. She asked that the boxes of documents be kept at her divorce attorneys' office rather than at her home. And she also consulted with a criminal lawyer and later hired a retired IRS agent.

97.98. Ms. Gluck asked the former IRS agent to help determine what Shepos had done with the money that he had misappropriated stolen from her, and to prove that Shepos's bankruptcies were fraudulent.

98.99. The investigative efforts of Ms. Gluck and the former IRS agent continued to uncover additional, disturbing evidence of Shepos's criminality, including a history of bigamy and embezzlement before Shepos met Ms. Gluck; his embezzling of over $100,000 from a longstanding CT Management client Dr. George Boris during his marriage to Ms. Gluck; and even deliberately misappropriating the money Ms. Gluck and Shepos had set aside for their daughter's education, leaving her unable to afford tuition at a four-year university. Shepos took these actions at the very same time he was receiving hundreds of thousands of dollars in illicit bribes

from developers who did business with the County.

~~99.~~100.    As Ms. Gluck's investigation continued, a stunning picture continued to emerge: Shepos was indeed a ~~sociopath~~psychopath whose entire life had been permeated by fraud, corruption, and criminality.

## II.    Ms. Gluck Becomes the Original Source of the County, State, and Federal Government's Investigations into Shepos's Far-Reaching Corruption.

### A.    Ms. Gluck ~~Unexpectedly~~ Meets Assistant ~~United States~~U.S. Attorney Ranee Katzenstein, Who Encourages Ms. Gluck to "Do the Right Thing."

~~100.~~101.    In or around April 2014, Ms. Gluck attended a cyber security panel hosted by Loyola Law School.

~~101.~~102.    Ms. Gluck attended the Loyola conference because she had been trying to ~~re-start~~restart her entertainment career and had been working with a team of producers developing a project with famous comic creator Stan Lee. Ms. Gluck and the other producers believed they were the victims of intellectual property theft by someone they had pitched the project to and who later posted similar material online. Ms. Gluck heard about the Loyola Law School cybercrime panel and hoped she might learn something that would help her in deciding what next steps to take regarding the stolen project.

~~102.~~103.    One of the panelists turned out to be Ranee Katzenstein, an Assistant United States Attorney at the Department of Justice. Ms. Katzenstein had a history of working on major frauds, including bankruptcy fraud.

~~103.~~104.    After the panel discussion concluded, Ms. Gluck approached Ms. Katzenstein and introduced herself. Ms. Gluck told Ms. Katzenstein that she recognized Ms. Katzenstein's name because a criminal attorney she had consulted had mentioned Ms. Katzenstein as someone Ms. Gluck may wish to speak to regarding Shepos's misconduct.

~~104.~~105.    Ms. Gluck had not done so at that time, as her only goals were to

39
~~SECOND~~THIRD AMENDED COMPLAINT

(1) finalize her divorce-related proceedings from ~~Mr.~~ Shepos, and (2) identify her funds that Shepos had misappropriated, and which should rightfully be used for their daughter's care and education. ~~However,~~ However, Ms. Gluck now found herself faced with Ms. Katzenstein by chance and in person.

~~105.~~106.    Ms. Katzenstein asked Ms. Gluck how she knew the criminal attorney she had consulted. Ms. Gluck explained that her ex-husband was a County employee who had engaged in misconduct that ultimately led her to consult with a criminal attorney. Ms. Katzenstein then reached for the program that Ms. Gluck was holding for the panel, opened it to the page with Ms. Katzenstein's photograph, and wrote down her phone number. Ms. Katzenstein handed the program back to Ms. Gluck, told Ms. Gluck to please call her, imploring her "do the right thing" and saying "bring it to me" while gesturing toward herself with her hands.

~~106.~~107.    Over the next several months, Ms. Gluck hesitated to call Ms. Katzenstein. Ms. Gluck's life had been turned upside down by Shepos's fraud and criminality, and she was focused on finding the money that Shepos had misappropriated and moving forward with her life parenting their daughter. She had no personal desire at that time to turn the father of her child in to law enforcement, which she feared could only lead to further trauma for their daughter and herself.

~~107.~~108.    But Ms. Gluck also recalled the lessons she had learned from her father, who had taught her the importance of speaking truth and doing the right thing—the very same thing Ms. Katzenstein said to her~~,~~ words that rang in her ears. The more Ms. Gluck reflected on Ms. Katzenstein urging her to "do the right thing," the more certain she became that her parents would have wanted her to tell the truth about what she had found.

~~108.~~109.    Ms. Gluck called Ms. Katzenstein later in 2014, and they spoke on the phone several times. Eventually, Ms. Katzenstein put Ms. Gluck sufficiently at ease that she agreed for Ms. Katzenstein and her colleagues Lawrence Middleton and Michael Chai to meet at Ms. Gluck's divorce attorneys' office to look at some of

the documents Ms. Gluck had found.

109.110.    At the meeting, Ms. Katzenstein and her colleagues reviewed some of the documents that Ms. Gluck had uncovered and expressed interest in taking copies of the papers. But Ms. Gluck hesitated to have her name attached to a report to the government, and Ms. Gluck's divorce lawyers indicated that they would have to document the names of the individuals to whom they released any documents.

110.111.    Ms. Gluck decided that she would take the boxes of documents home so that the government could collect them directly while listing Ms. Gluck as a "Confidential Informant."

111.112.    After several months went by without contact from the government, Ms. Gluck called Ms. Katzenstein again to ask if anyone was going to pick up the documents or else Ms. Gluck would no longer keep them at her home. Ms. Katzenstein seemed surprised that no one had picked up the documents, and she said she would send some people over to pick them up.

112.113.    Ms. Gluck assumed that Ms. Katzenstein would send couriers or file clerks. Instead, in March 2015, two FBI agents, Brian Adkins and Lucas Bauers, came to Ms. Gluck's home and took boxes of documents and electronic devices. Adkins and Bowers gave Ms. Gluck a receipt documenting the items they took.

113.114.    Just over one month later in April 2015, Shepos yet again fraudulently filed for bankruptcy in order to disrupt his divorce-related proceedings with Ms. Gluck.

**B.    Ms. Gluck Continues to Cooperate with the FBI and Provides a Critical Piece of Evidence Triggering Multiple Indictments.**

114.115.    After the FBI came to her condominium in March 2015, Ms. Gluck subsequently met, spoke, and texted with FBI agent Adkins several times over the next year and a half to assist the FBI in its investigation. The FBI would sometimes reach out to Ms. Gluck with questions, and she did her best to answer them.

115.116.    In addition, Ms. Gluck continued to communicate with other personnel from the United States Attorneys' Office. During one of Ms. Gluck's phone calls with Ms. Katzenstein, Ms. Katzenstein put Brandon Fox on the phone. Mr. Fox was an Assistant United States Attorney and the head of the Los Angeles office's criminal division. Mr. Fox asked Ms. Gluck several questions, and Ms. Gluck mentioned that she had hired a retired IRS agent (now investigator) to assist her in gathering evidence concerning Shepos's finances given the second fraudulent bankruptcy he had filed. Mr. Fox asked to meet with Ms. Gluck and the former IRS agent and asked if the former IRS agent would prepare materials summarizing what he had found.

116.117.    At Mr. Fox's request, in or around April 2015, Ms. Gluck and the retired IRS agent visited Mr. Fox's office, met with Mr. Fox and FBI agent Brian Adkins, and provided them with a copy of the report the IRS agent had prepared at Mr. Fox's request. That report was dated April 15, 2015, listed the "subject" as "Thomas Joseph Shepos," and was labeled "In Re: Public Corruption." The report outlined "possible public corruption within the Los Angeles County, Real Estate Division" stemming from an improper "relationship between Thomas Shepos, Lead Acquisition Manager, Real Estate Division and two major real estate developers in the Los Angeles County area"—namely, "Arman Gabay (sic) and Frank Visco."

117.118.    With respect to Arman Gabaee, the report indicated that (1) Arman Gabaee had made payments to Shepos of "$5,000 per month," and (2) an associate of Arman Gabaee named John Carroll had also been serving as a "conduit for funds to get to Shepos from Gabay," funneling bribe money to an acquaintance of Shepos's named "Jeff Kurtz."

118.119.    With respect to Visco, the report indicated that "Visco and Shepos have a personal relationship" which Ms. Gluck believed was "inappropriate because Visco and the Real Estate Division have a very active business relationship." The report also indicated that "Shepos has loaned $50,000 in the past to Visco for

42
SECONDTHIRD AMENDED COMPLAINT

gambling purposes," which is the explanation Shepos provided Ms. Gluck when she confronted him in March 2010 with documents showing a $48,000 cash advance.

119.120.    In addition, the report stated that Shepos's 2012 tax returns falsely claimed a significantly lower amount of gross receipts and therefore income from CT Management than was reflected in Shepos's banking records. And the report stated that Shepos had claimed yet a different income figure for CT Management in filings with the United States Bankruptcy Court in 2012.

120.121.    The report concluded by indicating that "[t]he information reflected above are examples of the potential criminal acts perpetrated by Shepos during the recent past." And, indeedIndeed, these were merely two prominent examples: Ms. Gluck provided FBI Agent BryanBrian Adkins with extensive documents and communications indicating that Mr. Shepos's bribery schemeand kickback schemes involved other developers as well (discussed further below).

121.122.    Ms. Gluck continued to meet with, have phone calls with, and exchange text messages with FBI agentAgent Adkins through 2016, providing him and his colleagues with information about Shepos's bank accounts and transactions, among other things, as requested. Ms. Gluck also allowed the FBI to make a copy of her entire computer hard drive, as she had shared an email address with Shepos.

122.123.    Then, in September 2016, Ms. Gluck and Shepos decided to buy a used car for their daughter for her sixteenth birthday. Ms. Gluck identified the car that their daughter wanted, a six-year-old, used Range Rover and asked Shepos for a check for $25,000 to pay for it. Shepos said he would give Ms. Gluck a cashier's check issued to the owner of the vehicle. Below is a copy of the check Ms. Gluck took:



123.124.     When Shepos gave Ms. Gluck the cashier's check, she immediately became suspicious for several reasons. First, the check was issued from US Bank and, to Ms. Gluck's knowledge at that time, Shepos had no banking relationship with US Bank. Further raising Ms. Gluck's suspicion was that the branch that issued the cashier's check was in Lancaster, where Visco's businesses were based and where Shepos would meet with Visco every Wednesday for years. Based on these suspicious circumstances, and the other extensive evidence of bribery Ms. Gluck had already found, Ms. Gluck believed that the check represented bribe proceeds.

124.125.     Before giving the check to the owner of the vehicle, Ms. Gluck took a picture of the check and texted it to FBI agentAgent Adkins on September 12,

2016, at 1:40 p.m., explaining some of the reasons why she found the check to be suspicious. On the same day at 4:41 p.m., FBI ~~agent~~Agent Adkins responded: "Thank you, Karen. This is helpful":



~~125.~~126.    Unbeknownst to Ms. Gluck at that time, her tip to FBI Agent Adkins brought Shepos's house of cards tumbling down. As indicated in Shepos's plea agreement (attached as Exhibit A and incorporated by reference herein), the FBI

brought Shepos in for questioning because of the check. Shepos initially lied and said the check represented gambling proceeds—the same excuse he had given ~~Ms.~~ Gluck when confronted years earlier—but later told the FBI that the check ~~(purportedly)~~ represented ~~bribe~~bribery proceeds from an electrical contractor, and that he had kept the ~~bribe~~bribery proceeds in an account belonging to "Individual A."

~~126.~~127.    With assistance from Ms. Gluck, the County later learned that "Individual A" was yet another developer named Gregory Hanes—~~one who also, on information and belief, is~~ an associate of Frank Visco's.

~~127.~~128.    Based on Shepos's lie about the check that Ms. Gluck shared with the FBI, the FBI was able to convince Shepos to cooperate (in part), wear a wire, and implicate Arman Gabaee while Shepos was still working for the County.

~~128.~~129.    But Shepos's "cooperation" was a farce: as explained below and established by contemporaneous documents, he continued to lie to the FBI about the nature and scope of his relationship with Arman Gabaee and other developers, and parroted those lies in his plea agreement submitted to this federal court.

### C.    Ms. Gluck Begins Working with County and State Investigators.

~~129.~~130.    In June 2017, two strangers showed up at Ms. Gluck's home and knocked on her door. The strangers informed Ms. Gluck through her door that they were investigators working for the County.

~~130.~~131.    Ms. Gluck called FBI Agent Adkins to ask him if she should speak with the ~~County's~~County's investigators. Adkins told Ms. Gluck that it was her choice whether to speak with the County investigators.

~~131.~~132.    Shortly thereafter, Ms. Gluck agreed to meet with the County's investigators who had shown up at her home with questions about Shepos. The investigator from the County was named Bryan Bell, and he was joined by a colleague Robert Campbell. Ms. Gluck agreed to meet them at a café near her condominium.

~~132.~~133.    During that meeting, Ms. Gluck asked Bell how he had found her.

1  Bell told Ms. Gluck that someone had flagged a suspicious lease for his review and
2  that Shepos was involved in the lease. When Bell looked up Shepos's divorce
3  records, he noted that Ms. Gluck had filed several documents in the divorce case
4  alleging that Shepos had engaged in corruption while employed at the County. Bell
5  and Campbell then showed Ms. Gluck several photographs and asked her to identify
6  anyone she knew, which she did. One was a photograph of Shepos and Visco's long-
7  time assistant Michele Lantz on a boat together (Shepos and Lantz now live together).

8        ~~133.~~134.    Ms. Gluck then agreed to let Bell and Campbell come with her to
9  her condominium to look at some of her documents. Ms. Gluck began showing Bell
10  some of the documents she had found ~~showing evidence of~~evidencing bribery. Bell
11  appeared to be stunned.

12        ~~134.~~135.    Bell and Ms. Gluck stayed in touch after that initial meeting and
13  Ms. Gluck continued to provide Bell with additional information and documents.

14        ~~135.~~136.    In or around September 2017, Bell returned to Ms. Gluck's
15  condominium with a colleague named Amanda Andrews, as well as two investigators
16  from the State of California's Department of Insurance named Pollie Pent and Randy
17  Hudson.

18        ~~136.~~137.    Ms. Gluck told Pent and Hudson about Shepos's bribery scheme.
19  Pent and Hudson also seemed particularly interested in documents showing that
20  Shepos had taken out numerous life insurance policies, that he had ties to multiple
21  casinos in Las Vegas, and that he appeared to be engaged in business of some
22  unknown sort with a large number of dentists. Ms. Gluck continued to communicate
23  with Ms. Pent into 2018.

24        ~~137.~~138.    Ms. Gluck also continued cooperating and communicating with
25  County investigator Bell into 2018. Ms. Gluck came to trust ~~Mr.~~ Bell and endeavored
26  to provide him with the same information she had thought it important enough to
27  provide FBI ~~agent~~Agent Adkins.

28        ~~138.~~139.    However, Bell's communication with Ms. Gluck ended abruptly

47
~~SECOND~~THIRD AMENDED COMPLAINT

after he told Ms. Gluck that he had been offered a pay increase at work to accept a reassignment to another division.

> **D.**    **Shepos Continues to Lie About the Scope and Timing of His Bribery Scheme ~~in an Attempt~~, Attempting to Avoid Responsibility and Deflect Blame ~~on~~onto Ms. Gluck.**

~~139.~~140.    In September 2018, Shepos pleaded guilty to federal criminal charges of making a false statement to a government agent and subscribing to a false tax return.

~~140.~~141.    Ms. Gluck was struck by Shepos's plea agreement because, despite agreeing to cooperate with the government, Shepos was continuing to blatantly lie about the scope of his corruption.

~~141.~~142.    Most notably, Shepos falsely claimed in his plea agreement that while Arman Gabaee "began to seek improper assistance" from Shepos sometime "between 2000 and 2005," Arman Gabaee "did not compensate [Shepos] for assistance and non-public County information at this time" and only "began giving cash payments" to Shepos in "approximately 2010 or 2011."

~~142.~~143.    But Ms. Gluck had found documents making clear that Arman Gabaee's improper bribes of Shepos had begun at least as early as 1999 and continued for years until 2011 when Ms. Gluck filed for divorce.

~~143.~~144.    Ms. Gluck found evidence that Arman Gabaee and Shepos shared an account with Southwest Airlines and would travel to Las Vegas together as far back as 1999.

~~144.~~145.    First, Ms. Gluck found the below Southwest ~~card~~Airlines rewards card dated November 1999 belonging to Arman Gabaee (or "Gabay") in Shepos's boxes of documents:





145.146.    Second, Ms. Gluck found a credit card statement indicating that Shepos and Arman Gabaee had traveled to Las Vegas together inon January 7, 1999, excerpts of which are shown below with Ms. Gluck's contemporaneous highlights from the time that she found the document:

January 7, 1999



146.147.    Third, Ms. Gluck found evidence that Shepos attended a shopping center convention in Las Vegas in May 1999, which ~~Arman~~ Gabaee paid for. Shepos kept a copy of his registration form, in which he held himself out as an executive of "Charles Company," one of ~~Arman~~ Gabaee's businesses. And Shepos ~~also~~ kept a copy of the credit card receipt ~~paying~~showing that Arman Gabaee paid $400 for ~~his~~Shepos's attendance ~~and which was billed to Armnan Gabaee's credit card~~. Excerpts ~~from both sets of documents are shown below:~~



147.148.    Ms. Gluck also found extensive evidence that Arman Gabaee funneled bribes to Shepos through the Roscomare Road ~~properly~~property during the years in which Shepos falsely claimed in his plea agreement he was not receiving any such elicit payments.

148.149.    When Shepos and Ms. Gluck ~~and Mr. Shepos~~ renovated the Bel Air property, they overhauled the ~~back yard~~backyard and did extensive work to two stone stairways leading to an upper level, as shown in the photograph below from an October 20, 2008 appraisal report on the property:



149.150.    In the boxes of documents, Ms. Gluck found contracts with a contractor named Center Line construction to perform the work on Shepos's Bel Air property, directed to Arman Gabaee's company Excel Property management, signed by Shepos, and falsely indicating that instead the work was being done on the Hawthorne Mall (a building that Arman Gabaee leased to the County). The document wasThese documents were dated in or around July 8, 2003—a time when Shepos falsely claimed in his federal plea agreement he was not yet being bribed by Arman Gabaee.

150.151.    Below are excerpts showing the language in just one of many such Center Line Construction contracts, describing work performed on the Roscomare Road property—along with Shepos's signature and handwriting:



On information and belief,



151.152.    Arman Gabaee's company Excel Property Management performed construction work on Shepos's personal property at no charge to Shepos. Then, Arman Gabaee and/or Shepos Shepos (together with Arman Gabaee's brother, Mark Gabaee) sought to have this bribe reimbursed by the County byreimburse the Gabaees for that construction by submitting fraudulent invoices to the County falsely claiming itthat work performed on Shepos's personal property was for work doneimprovements on the Hawthorne mallMall property, which the Gabaees were then leasing to the County.

152.153.    In addition, Gluckbetween 2004 and 2007, Shepos hired a stonemason named Cirilo Rubalcava to perform construction work on the Roscomare houseRoad property.

153.154.    Years later, after Ms. Gluck found the boxes of documents in storage, Ms. Gluck Found hand-writtenhandwritten invoices that Mr. Rubalcava submitted to Shepos. In those invoices, Rubalcava would list his time and fees, explain what portion had already been paid by Gabaee'sthe Gabaees' company Excel Property Management, and advise Shepos what balance was owed, if any. Rubalcava also provided Shepos with copies of the checks he had already received from Excel, Gabaee's company, Property Management for work performed on the house.

154.155.    For instance, in the below invoice, Mr. Rubalcava explained that

his total bill was for $5,730, that he had received two checks from Excel Property on January 22, 2007 for $3,000 and $500, that he had also received a check from Shepos for $2,500, and that he therefore "owe[d] money balance to Tom" of $270:



Mrs.

155.156.    Ms. Gluck found enclosed with this invoice copies of the two checks from Excel Property Management Services, Inc. dated January 22, 2007, to Mr. Rubalcava in the amount of $3,000 and $500. The checks also had a remark that stated "HawsthorneHawthorne," apparently indicating (on informationthat Arman and belief) thatMark Gabaee intended to seek reimbursement from the County itself by falsely claiming that this work was performed on the County'sCounty's leased Hawthorne mall buildingMall property when in fact it was performed on Shepos's Roscomare Road property.

156.157.    Ms. Gluck found similar a similar check from Excel Property Management Services, Inc. to Cirilo Rubalcava from 2004 in the amount of $5,000—squarely during the period in which Shepos falsely claimed in his federal plea agreement that he was not yet being bribed by Arman Gabaee. Copies of all three checks are shown below:



| Date | Invoice | Remark | Prop | GI account | Amount |
|------|---------|--------|------|-----------|--------|
| 01/22/2007 | 011707 | HAWTHORNE | M74 | 6400-12 | 500.00 |
| Vendor: | APR151 | Check No.: 43834 | | | 500.00 |

*50    43834    43834

**EXCEL PROPERTY MANAGEMENT SERVICES, INC.**
P.O. BOX 5357
BEVERLY HILLS, CA 90209
TEL. NO. (310) 247-0900

FARMERS & MERCHANTS BANK
TORRANCE OFFICE
TORRANCE, CA 90505
90-119-1222

PAY    ********$500.00 Dollars

TO THE ORDER OF

DATE    AMOUNT

01/22/2007    $500.00

CIRILO RUBALCAVA
10914 WOODWARD AVENUE
SUNLAND CA 91040

VOID AFTER 60 DAYS

⑈043834⑈ ⑆122201198⑆ 19 00629 2⑈



| Date | Invoice | Remark | Prop | GI account | Amount |
|------|---------|--------|------|-----------|--------|
| 01/22/2007 | 011707 | HAWTHORNE | M74 | 6400-12 | 3,000.00 |
| Vendor: | APR151 | Check No.: 43826 | | | 3,000.00 |

*50    43826    43826

**EXCEL PROPERTY MANAGEMENT SERVICES, INC.**
BEVERLY HILLS, CA 90209
TEL. NO. (310) 247-0900

FARMERS & MERCHANTS BANK
TORRANCE OFFICE
TORRANCE, CA 90505
90-119-1222

PAY    ********$3,000.00 Dollars

TO THE ORDER OF

DATE    AMOUNT

01/22/2007    $3,000.00

CIRILO RUBALCAVA
10914 WOODWARD AVENUE
SUNLAND CA 91040

VOID AFTER 60 DAYS

⑈043826⑈ ⑆122201198⑆ 19 00629 2⑈



| Date | Invoice | Remark | | Prop | Gl account | Amount |
|---|---|---|---|---|---|---|
| 20/2004 | 102004 | HAWTHORNE | | M74 | 6400-12 | 5,000.00 |
| ndor: | APR151 | Check No.: | 26942 | | | 5,000.00 |

26942

EXCEL PROPERTY
MANAGEMENT SERVICES, INC.
P.O. BOX 5357
BEVERLY HILLS, CA 90209
TEL. NO. (310) 247-0900

BANK LEUMI USA
BEVERLY HILLS BRANCH
BEVERLY HILLS, CA 90211
90-3624-1222

26942

PAY ********$5,000.00 Dollars

DATE        AMOUNT

10/20/2004        $5,000.00

TO THE
ORDER OF

CIRILO RUBALCAVA
10914 WOODWARD AVENUE
SUNLAND CA 91040

VOID AFTER 60 DAYS

⑈02694⑉⑈ ⑆122236244⑆ 800275120⑈



| Date | Invoice | Remark | | Prop | Gl account | Amount |
|---|---|---|---|---|---|---|
| 01/22/2007 | 011707 | HAWTHORNE | | M74 | 6400-12 | 500.00 |
| Vendor: | APR151 | Check No.: | 43834 | | | 500.00 |

*50     43834

43834

EXCEL PROPERTY
MANAGEMENT SERVICES, INC.
P.O. BOX 5357
BEVERLY HILLS, CA 90209
TEL. NO. (310) 247-0900

FARMERS & MERCHANTS BANK
TORRANCE OFFICE
TORRANCE, CA 90505
90-119-1222

PAY ********$500.00 Dollars

DATE        AMOUNT

01/22/2007        $500.00

TO THE
ORDER OF

CIRILO RUBALCAVA
10914 WOODWARD AVENUE
SUNLAND CA 91040

VOID AFTER 60 DAYS

⑈043834⑈ ⑆122201198⑆ 19 00629 2⑈

56
SECONDTHIRD AMENDED COMPLAINT



| Date | Invoice | Remark | | Prop | GI account | Amount |
|------|---------|--------|--|------|-----------|--------|
| 01/22/2007 | 011707 | HAWTHORNE | | M74 | 6400-12 | 3,000.00 |
| Vendor: | APR151 | Check No.: | 43826 | | | 3,000.00 |

*50  43826                                                           43826

EXCEL PROPERTY
MANAGEMENT SERVICES, INC.
P.O. BOX 5357
BEVERLY HILLS, CA 90209
TEL. (310) 247-0900

FARMERS & MERCHANTS BANK
TORRANCE OFFICE
TORRANCE, CA 90505
90-119-1222

PAY  ********$3,000.00 Dollars

TO THE
ORDER OF                                    DATE                AMOUNT

                                        01/22/2007            $3,000.00

CIRILO RUBALCAVA
10914 WOODWARD AVENUE
SUNLAND CA 91040                                  VOID AFTER 60 DAYS

⑆043826⑈ ⑈122201198⑉ 19 00629 2⑈

| Date | Invoice | Remark | | Prop | GI account | Amount |
|------|---------|--------|--|------|-----------|--------|
| 10/20/2004 | 102004 | HAWTHORNE | | M74 | 6400-12 | 5,000.00 |
| ndor: | APR151 | Check No.: | 26942 | | | 5,000.00 |

)  26942                                                            26942

EXCEL PROPERTY
MANAGEMENT SERVICES, INC.
P.O. BOX 5357
BEVERLY HILLS, CA 90209
TEL. NO. (310) 247-0900

BANK LEUMI USA
BEVERLY HILLS BRANCH
BEVERLY HILLS, CA 90211
90-3624-1222

PAY  ********$5,000.00 Dollars

TO THE
ORDER OF                                    DATE                AMOUNT

                                        10/20/2004            $5,000.00

CIRILO RUBALCAVA
10914 WOODWARD AVENUE
SUNLAND CA 91040                                  VOID AFTER 60 DAYS

⑆026942⑈ ⑈122236244⑉ 800 275120 1⑈

157.158.    As the above examples show, Shepos received bribes from
Arman Gabaee beginning in 1999, almost as early as he began working for the
County in 1999. Those bribes continued throughout Ms. Gluck's marriage to Mr.
Shepos and for years after—until around August 2017. Shepos's false claimstory
that Arman Gabaee only began bribing him in or around 2010 or 2011—the precise

time when Ms. Gluck first discovered some of ~~Mr.~~ Shepos's misconduct and began taking steps to divorce him—appears to have been a calculated effort on his part to gain sympathy by deflecting blame onto Ms. Gluck.

~~158.~~159.    Indeed, when news of his guilty plea came out, Shepos sent his lawyer out to smear Ms. Gluck publicly, making a false statement to the LA Times that Shepos only began accepting bribes after "a contentious divorce that left him trapped in debt . . . ."

~~159.~~160.    Shepos's "blame the victim" approach is flatly contradicted by the documentary evidence of Gabaee's bribes. Ms. Gluck's discovery of Shepos's criminality, including with Gabaee, is what *caused* her to file for divorce in the first place—not the other way around. And far from being in "debt," Shepos filed for fraudulent bankruptcy at a time when he was secretly receiving hundreds of thousands of dollars in bribes from developers and contractors doing business with the County.

**E.    Since Shepos's Plea, More Evidence Has Come to Light Confirming that Shepos's Fraud and Corruption Was Far-Reaching and Tainted Hundreds of Millions of Dollars ~~of~~in County Contracts.**

~~160.~~161.    Due to Ms. Gluck's ~~contributions~~cooperation, the federal government has indicted numerous other individuals beyond Shepos.

~~161.~~162.    For instance, on April 26, 2019, Arman Gabaee ~~entered into a Plea Agreement and pled~~pleaded guilty to federal program bribery in violation of 18 U.S.C. § 666(a)(2). A true and correct copy of Arman Gabaee's ~~Plea Agreement~~plea agreement is attached ~~hereto~~ as Exhibit B and incorporated by reference herein.

~~162.~~163.    After pleading guilty to one count of bribery, Arman Gabaee was sentenced to four years in prison. ~~When Gabaee was sentenced~~At sentencing, the County submitted a sentencing letter indicating that Shepos's and Arman Gabaee's guilty pleas were only the tip of the iceberg. The County has conducted a wide-ranging investigation, and *the County now believes that hundreds of millions of*

*dollars of contracts for which Shepos was responsible were tainted by fraud, bribery, and corruption*. That wide-ranging investigation was possible only because of Ms. Gluck's efforts to "do the right thing" and share the results of her investigation with the FBI, the State, and the County.

**III.  ~~Shepos' Scheme~~Shepos's Schemes Involved Numerous, Significant Real Estate Developers and Hundreds of Millions of Dollars' Worth of Leases and Agreements.**

~~163.~~164.    As detailed further below, Ms. Gluck's records ~~indicate~~revealed how ~~the~~ developers ~~were able to profit~~profited from leases obtained through ~~the~~ fraudulent ~~scheme~~schemes with Shepos:

~~a.~~a)    Above-Market Leases Worth Hundreds of Millions of Dollars: County leases range between a few hundred thousand dollars per~~-~~year to a few million dollars per~~-~~ year, with 5- and 10-year terms being most common. ~~Developers~~Shepos helped developers obtained these substantial leases at above-market rates, and often on a no-bid basis.

~~b.~~b)    Fraudulent Reimbursements: The leases also included "improvement reimbursements" under which the developers were able to submit for reimbursement expenses they incurred in maintaining the building. Shepos received invoices from developers and simply had the County send reimbursement checks, without any further proof that the work had actually been performed (and in ~~at least~~ some cases, it had not). Developers obtained substantial reimbursements for improvements that were never made.

~~c.~~c)    Maintenance Fees and Utility Costs: The leases ~~also~~ established that the ~~developer~~developers could charge maintenance fees and pass on utility costs to the County. ~~On information and belief,~~

59

theSome developers obtained additional County money to which they were not entitled by passing on inflated maintenance and utility costs to the County.

165.   On behalf of numerous developers over decades, Shepos routinely defrauded the County in exchange for bribes of various kinds, as detailed below. And Shepos went great lengths to conceal his schemes from the County (as well as the federal and State governments, which were also victims of Shepos's fraud). For example, Shepos often funneled bribe proceeds with strawmen, including his roommate Jeff Kurtz and Gregory Hanes.

164.166.    Ms. Gluck's documents and other evidence also identify specific entities and individuals as being most involved in the fraudulent scheme:, including: (A) Mark and Arman Gabaee and their entities (the Gabaee Defendants); (B) Donald Abbey and his entities (the Abbey Defendants); (C) Frank Visco and his entities (the Visco Defendants); (D) Leon, Yoel, and John Neman and their entities (the Neman Defendants); and (E) Gregory Hanes and his entities (the Hanes Defendants):

**A.    Mark Gabaee and Arman Gabaee .**

165.167.    Founded by Mark and Arman Gabaee in 1979, the Charles Company owns 5 million square feet of commercial real estate in Southern California and Nevada. The Charles Company and together with other entities owned and controlled by the Gabaees—has done over $100 million in transactions with the County as part of the Gabaees' fraudulent scheme with Shepos. Evidence of the fraudulentthat scheme includes:is detailed below.

a.168.Based on the evidence provided to the FBI by Ms. Gluck, Arman Gabaee has beenwas indicted by the federal government. Arman Gabaee was recorded offering Shepos a ***$1.1 million residential property as a bribe for a no-bid contract***. In September 2018, Shepos pleadedadmitted in his guilty plea to receiving bribes from Arman Gabaee, and, in exchange, "us[ing] his County position to provide assistance to Gabaee and financially benefit Gabaee's businesses." *See* Ex. A. And

in April 2022, Arman Gabaee pleaded guilty to bribing Shepos. *See* Ex. B. On December 15, 2022, Arman Gabaee began serving his four-year sentence. (And to date, he remains in federal prison.) On January 23, 2023, Shepos received a sentence of 24 months of probation for tax fraud and lying to the FBI about his misconduct.

- ~~Plane tickets for Shepos and~~ Both Arman ~~Gabaee to Las Vegas.~~
- ~~Email to Shepos seeking W-9 information for Shepos's roommate Jeff Kurtz in order to hide bribes.~~
- ~~A P.O. Box jointly held by Shepos and Arman Gabaee.~~
- ~~Email from~~ and Mark Gabaee ~~to Shepos's personal email account intended to reduce Gabaee's financial risk by asking for Shepos's "thoughts" on a property before Gabaee committed to purchasing it.~~
- ~~Charles Company employee emailed Shepos's family email address to notify him~~understood that Shepos ~~and Arman's House of Blues membership cards had arrived.~~
- ~~Shepos used a Southwest Airlines account registered under Arman Gabaee's name.~~

~~h.~~169.~~An~~ invoice for construction material used on Shepos and Gluck's home ~~that~~ was ~~paid by~~ a high-ranking County official with the ability to bind the County to significant real estate contracts and influence the County's real estate decisions. That is why Arman and Mark ~~Gabaee's company, M & A Gabaee.~~ Gabaee bribed him: they intended to corrupt Shepos's influence over the County~~Ms. Gluck has no record of Shepos repaying the Gabaees for the work done~~ for their ~~home construction (the same is true for other developers below).~~own benefit. And for almost two decades, their scheme succeeded.

- ~~An engineering report for Shepos and Ms. Gluck's home prepared and submitted by Gabaee's construction engineer.~~

A Las Vegas convention registration form listing Shepos as an employee of the Charles Company. The registration form was attached to a receipt from Arman Gabaee showing Shepos's registration fee had been paid by Gabaee.

170. Between 1999 and 2017, Arman Gabaee directly paid Shepos hundreds of thousands of dollars' worth of bribes in various forms in exchange for improper, official favors benefitting himself, his brother Mark Gabaee, and the entities they owned and managed—including the Charles Company (doing business as The Charles Company, Inc.), M&A Gabaee, Excel Property Management, Oakshire, Wilhurst, Town Investments, Sancam, Greenoak, Maple19, Urban Grove19, and Oppidan.

171. While Arman Gabaee took the lead on paying many of the bribes to Shepos—including those bribes described in their guilty pleas—Mark Gabaee held the purse strings for the Gabaees' entities. Mark Gabaee was primarily responsible for the Gabaee Defendants' finances and expenses. Thus, Mark Gabaee was not only aware of Arman Gabaee's improper arrangement with Shepos, but he also directly participated in it. Together, as owners, managers, and executives of the entity Gabaee Defendants, Mark and Arman Gabaee controlled and directed the actions of those entities. Mark and Arman Gabaee also funneled bribes to Shepos through their entities, including at least the Charles Company, Excel Property Management, and M&A Gabaee.

172. Indeed, Shepos's fraudulent schemes with the Gabaees and their associates ran deep: for example, Shepos's guilty plea admits that in approximately 2013, he "arranged with a[n] associate of Gabaee's to receive, and did receive, a real estate commission kickback of $35,000, through a third party, for the County's lease of a property on Missouri Avenue." That "associate of Gabaee's" was John Carroll—who has acted as the President of Excel Property Management and another of the Gabaees' real-estate entities, Noble Investment, LP (formerly Noble Investments,

LLC), and as a managing member of the Gabaees' entity (nonparty) Corsair, LLC. And the "third party" named in Shepos's guilty plea was his roommate, Kurtz.

173.  Specifically, around 2013, Shepos, Carroll, and Kurtz concocted a scheme through which Carroll would funnel a real estate commission from one of the County's landlords to Shepos through Kurtz. Shepos recruited Carroll, a licensed real estate broker, to hold himself out as the County's broker in its negotiations of a lease on Missouri Avenue in Los Angeles, California. Shepos then arranged for the County's landlord to pay Carroll a real-estate commission of $77,823.92. After the lease agreement was fully executed, specifically, on May 6, 2014, Carroll emailed the landlord's broker attaching an invoice requesting payment of that commission to Carroll's company Giltner Realty Advisors. The landlord paid Carroll by check dated May 20, 2014 in the amount of $77,823.92.

174.  Shepos and Carroll left an (electronic) paper trail of their scheme with Kurtz: nine months later, on February 25, 2015—Carroll emailed Shepos on his personal email address regarding "W-9," stating: "Need the info for Kurst [sic] as soon as possible." Shepos replied that day, providing Carroll with Kurtz's name, address, and social security number. Carroll then kicked back $35,000 to Shepos through Kurtz—deliberately disguising the kickback to Shepos as Form W-9 income to Kurtz from Giltner Realty Advisors. Neither Carroll nor Shepos ever had any legitimate business dealings with Kurtz.

175.  Rather, Shepos's scheme with Carroll and Kurtz reflects Shepos's fraudulent *modus operandi* of arranging and receiving bribes and kickbacks covertly funneled through strawmen and shell entities. The scheme also reflects the corruption that ran through every level of the Gabaees' business dealings. In other words, it speaks volumes that when Shepos needed a real estate broker to participate in a kickback scheme involving a County real estate transaction, Shepos knew to look no further than the Gabaees' inner circle—specifically, to the Gabaees' longtime associate, John Carroll. Yet, the kickback scheme with Shepos, Carroll, and Kurtz

hardly scratches the surface of Shepos's and the Gabaees' pattern of corrupt dealings.

### 1.    The Gabaee Defendants' Bribes to Shepos.

176.    From at least 1999 until at least 2017, Arman Gabaee, on behalf of Mark Gabaee and the other Gabaee Defendants, gave Shepos cash, gifts, travel, and other things of value in exchange for Shepos's improper assistance with the Gabaee Defendants' real-estate dealings with the County. The Gabaees' entities, including at least the Charles Company, M&A Gabaee, and Excel Property Management, and their respective employees, acted as intermediaries through which Arman and Mark Gabaee bribed Shepos.

### i.    Expensive Trips, Meals, and Gifts.

177.    Beginning in at least 1999, and continuing through 2017, Shepos shared and benefitted from Arman Gabaee's Southwest Airlines account. Not only did Shepos have a Southwest Airlines "Rapids Rewards" card, dated November 1999, with Arman Gabaee's name on it, but from at least 2011 through 2017, Shepos also received hundreds of emails from Southwest Airlines, addressed to "Arman Gabay," and bearing the same "Rapid Rewards" number as the membership card—including, for example, on May 26, 2011 and Arman Gabaee and Shepos regularly traveled together to Las Vegas, where they looked at properties, ate expensive meals, and received spa treatments at Caesars' Palace—all on Arman Gabaee's dime. In May 1999, Arman Gabaee paid Shepos's $400 attendance fee for a shopping center convention in Las Vegas. At that convention, Shepos held himself out as an employee of the Charles Company (despite being a County public official).

178.    In or around January 2006, the Charles Company reimbursed Shepos approximately $15,000 for Los Angeles Dodgers tickets that Shepos had purchased.

179.    In or around April 2006 and April 2008, Arman Gabaee (together with his cousins) jointly paid for Shepos's membership to the House of Blues club. After Arman Gabaee paid for Shepos's membership, on May 22, 2008, a representative of the House of Blues Clubs emailed Shepos saying, "I have Arman Gabay's and your

new membership cards in," and asking where to send them. Shepos replied the next day, requesting that his and Arman Gabaee's membership cards be mailed to Shepos's home address.

180.  On or around December 23, 2008, Arman Gabaee, at Shepos's request, paid for a catered lunch for Shepos and his entire department (around 50 County employees) as a holiday gift to Shepos. On December 11, 2008, the Charles Company employee Millie Grape wrote to Shepos's personal email address, regarding "List for the Holidays": "Just wanted to check in with you regarding the list for the holiday shopping. . . . I will be able to deliver everything before the holiday break." That day, Shepos replied:

> sorry I forgot here is the list:
>
> Thomas Shepos
> Thomas Shepos
> Thomas Shepos
>
> Not really . . . .

181.  After some back and forth, Shepos wrote to Grape later in the day: "I need to talk with arman I believe a gift such as lunch sent in for all staff may be more beneficial . . . I will call him Friday and discuss." On December 15, 2008, Grape replied to Shepos: "Arman is in agreement with you regarding the lunch being sent to your office. Let me know what food is preferred and I will order and have it delivered to your office." Through subsequent emails, Grape confirmed that she would arrange for a catered lunch on December 23, 2008 for 50 County employees courtesy of Arman Gabaee—including, at Shepos's insistence, drinks and "delicious desserts."

182.  Around January 2010, Arman Gabaee gave Shepos a gold watch valued at over $20,000. Well aware that this was far from an appropriate gift for a County employee to receive from the County's landlord, Shepos tucked this expensive watch away in his sock drawer next to a wad of $5,000 in cash—attempting to hide it from

his then-wife, Ms. Gluck.

183.   Arman Gabaee and Shepos also shared a P.O. box—as Ms. Gluck learned in 2010—underscoring Shepos's improper relationship with the Gabaees.

### ii.    Construction on Shepos's Bel Air Home.

184.   Between around 2003 and 2007, Arman and Mark Gabaee, through Excel Property Management and M&A Gabaee, paid for construction materials and renovations on Shepos's personal property on Roscomare Road in Bel Air.

185.   Around July 2003, Shepos entered several contracts with Center Line Construction for construction work on the Roscomare Road property—contracts which falsely indicated that the work would be performed on the Hawthorne Mall, a property that the Gabaees' entity M&A Gabaee was then leasing to the County. Per its contracts with Shepos, Center Line Construction directed invoices for its work to Excel Property Management. At Mark and Arman Gabaee's direction, Excel Property Management paid those invoices for work performed on Shepos's personal property. Then, Mark and Arman Gabaee conspired with Shepos to seek reimbursement from the County for the work performed by Center Line Construction on the Roscomare Road property. At Mark and Arman Gabaee's direction, M&A Gabaee and Excel Property Management submitted false invoices to the County requesting reimbursement for construction work performed on Shepos's personal property—disguised as improvements on the leased Hawthorne Mall property.

186.   Along similar lines, between around 2004 and 2007, Arman and Mark Gabaee directed Excel Property Management to pay for stonemasonry work by Cirilo Rubalcava on Shepos's Roscomare Road property. On October 20, 2004, for example, Excel Property Management gave Rubalcava a check for $5,000 for work performed on Shepos's property. Again, on January 22, 2007, Excel Property Management gave Rubalcava two checks—for $3,000 and $500 respectively—to pay for his work on Shepos's property. An identical notation appeared on all three of those checks: "Hawthorne." That repeating notation indicated that Mark and Arman

Gabaee intended to fraudulently seek reimbursement from the County for Rubalcava's work on the Roscomare Road property through M&A Gabaee and Excel Property Management by submitting invoices falsely claiming that work was performed instead on the Hawthorne Mall property they leased to the County. On April 24, 2007, Excel Property Management cut yet another check to Rubalcava for work performed on Shepos's Roscomare Road property.

187.  In April 2006, Arman and Mark Gabaee, through M&A Gabaee, purchased $4,053.93 of construction materials for Shepos. The invoice for that purchase from Nichols Lumber & Hardware in Baldwin Park, dated April 10, 2006, stated: "Customer: M & A Gabaee . . . Job Address: . . . 1330 Roscoemare [sic] Rd"—referring to Shepos's property at 1330 Roscomare Road.

188.  In addition, between around 2003 and at least 2006, an employee of the Charles Company, Kang Lee, performed structural engineering work on Shepos's Roscomare Road property at Mark and Arman Gabaees' direction and at no cost to Shepos. Lee's work for Shepos is evidenced by a report titled "Structural Calculations," originally dated July 6, 2003, and revised on April 7, 2004; May 10, 2004; and March 27, 2006.

### iii.    Cash Payments.

189.  Beginning in or around 2010 or 2011 until around April 11, 2017, Arman Gabaee made monthly cash payments to Shepos. For around the first six months of these regular cash payments, Arman Gabaee gave Shepos $5,000 per month. After that, the payments continued at approximately $1,000 per month.

190.  For example, Arman Gabaee paid Shepos: (a) $1,500 on December 20, 2016; (b) $1,500 on December 3, 2016; (c) $1,000 on January 27, 2017; (d) $1,000 on March 1, 2017; (e) $900 on March 31, 2017; and (f) $100 on April 11, 2017. Those were just the bribes that occurred during meetings recorded as part of the federal government's criminal investigation.

191.  As described in Arman Gabaee's guilty plea, these cash payments were

1  all bribes and kickbacks to Shepos for the benefit of Arman Gabaee, Mark Gabaee,

2  and their entities.

3              iv.      Offer to Buy a $1.1 Million House.

4        192.   Around 2016, while Arman and Mark Gabaee, through their entities,

5  were redeveloping their Hawthorne Mall property in Hawthorne, California, they

6  attempted to lease that space to the County. A proposed lease anticipated a 10-year

7  term during which the County would have paid the Gabaees (through their entities)

8  over $45 million in rent and reimbursable tenant improvements.

9        193.   In an effort to secure this lease, around December 2016, Arman Gabaee

10  offered to bribe Shepos—in addition to the ongoing monthly cash payments—by

11  buying Shepos a residential property in Northern California. Arman Gabaee offered

12  to buy Shepos a property on Barnes Road in Santa Rosa, California listed at

13  $1,199,000. Arman Gabaee also offered to buy Shepos a property on Annadel

14  Heights Drive, also in Santa Rosa, listed at $1,199,000. Arman Gabaee made several

15  offers on that Annadel Heights Drive property, intending to purchase it for Shepos as

16  a bribe. But the FBI intervened, arresting Arman Gabaee before he could close the

17  deal.

18              2.      Shepos's Official Favors to the Gabaee Defendants.

19        194.   In exchange for the bribes detailed above, Shepos:

20              a)      gave the Gabaee Defendants nonpublic information about the

21                      Countys' leasing needs and development plans;

22              b)      pressured County departments to complete official requests for

23                      office space so that Shepos could fast-track formal lease

24                      negotiations with the Gabaee Defendants;

25              c)      pretended to engage in the ordinary bidding process for County

26                      leases while secretly promising the Gabaee Defendants favorable

27                      treatment and ensuring they won lucrative County leases;

28              d)      pressured subordinate County employees into drafting leases for

the Gabaee Defendants;

    e)    used his influence within the County to cover the Gabaee Defendants' tracks by ensuring that their tainted leases looked legitimate;

    f)    secured favorable, often above-market leases for the Gabaee Defendants; and

    g)    "ran interference" for the Gabaee Defendants on maintenance and other issues relating to their leases and ensured those issues were resolved favorably to the Gabaee Defendants—and to the County's detriment.

195.  During the period when the Gabaees were bribing Shepos, they often called or emailed Shepos to ask him whether the County would lease certain properties before the Gabaees purchased them. Shepos obliged. That insider information was highly valuable to the Gabaee Defendants because it allowed them to reduce or eliminate the typical risks of investing in real estate. Thanks to their inside man (Shepos), the Gabaees and their entities could invest in properties they knew that the County would be willing to rent for millions of dollars over many years—guaranteeing steady income. Conversely, the Gabaees could avoid riskier investments in properties that Shepos told them did not fit into the County's (nonpublic) plans.

k.196.Numerous emails ~~involving Shepos providing County information to the Gabaees~~ between Shepos (using his personal email address~~.~~) and the Gabaee Defendants evidence the Gabaee Defendants seeking, and Shepos improperly providing, nonpublic County information, for example:

    a)    On May 7, 2013, Charles Company employee AJ Jaranilla emailed Shepos attaching marketing materials for the Hawthorne Mall.

    b)    On July 24, 2013, Shepos emailed Millie Grape, a Charles

Company employee, stating "please give to Mark," and attaching a scanned copy of the County's internal file relating to its lease of a property from Abbey's entity AP-Commerce Plaza.

c)      On November 22, 2013, Charles Company employee Jack Kurchian emailed Grape saying, "Please forward this to Tom's personal email." Grape did so that day. And on November 25, 2013, Shepos replied, promising to review the attachment.

d)      On September 8, 2014, Mark Gabaee emailed Shepos attaching a listing for an industrial building for sale on Earle Avenue in Rosemead, California—presumably seeking Shepos's advice about whether the Gabaees (or one of their entities) should purchase that building. The next day, Shepos replied: "scheduled walk thru at Earle location at 3PM Tuesday 9/16"—indicating that Shepos planned to tour the building on the Gabaees' behalf and let them know whether the County would rent that space.

e)      On May 8, 2015, Grape emailed Shepos attaching photos of a property, on behalf of "AG," meaning Arman Gabaee.

f)      On December 1, 2015, Mark Gabaee emailed Shepos attaching a real estate listing for a truck terminal on East 26th Street in Vernon, California, saying, "I am offered the subject and I would appreciate your thoughts."

197.    As just one example of Shepos running interference for the Gabaee Defendants, in 2011, when significant maintenance issues arose in properties the Gabaees were leasing to the County, Shepos covered for them. The County departments using those properties had raised concerns about broken elevators, leaking roofs, and similar maintenance issues. Shepos helped Arman and Mark Gabaee by wrongly deflecting blame away from the Gabaees and onto independent contractors—buying time for the Gabaees to resolve the issues. Notably, Mark

Gabaee directly participated in these discussions with Arman Gabaee and Shepos about the plot for Shepos to run interference with the County on these maintenance issues.

### 3. The Gabaee Defendants' Tainted County Contracts.

198. During the period when the Gabaees and their entities were bribing Shepos, the County entered into and renewed several lease agreements with the Gabaee Defendants in order to house County departments and programs. The County paid for these leases using money that originated from a mixture of federal, state, and County grant funds.

#### i. 3220 Rosemead Boulevard, Building A, Suite No. 2A.

199. On or about November 4, 1997, the County and M&A Gabaee entered into a lease agreement for 3220 Rosemead Boulevard, Building A, Suite No. 2A in El Monte, California (Lease No. 71124). The County used this space to house the District Attorney.

200. Under the lease agreement, the County agreed to pay monthly rent of $5,500—totaling $462,000 over its seven-year term. At all times, the County made monthly payments as they were due under the lease, in part with federal funds.

201. On or about September 7, 1999, the County and M&A Gabaee entered into Amendment No. 1 to the lease agreement. The amendment increased the square footage of space rented at the property, thereby increasing the monthly rent to $11,567—totaling additional payments in excess of $376,154.

202. This amendment was signed during the period when Arman Gabaee was bribing Shepos on behalf of himself, Mark Gabaee, and the other Gabaee Defendants, including M&A Gabaee. By this time, at a minimum, Arman Gabaee was paying for Shepos's travel, including trips to Las Vegas. Amendment No. 1 was signed by Mark Gabaee on behalf of Sancam as General Partner of M&A Gabaee.

203. Section 23.S of the lease agreement, which term was renewed by virtue of Amendment No. 1, contains an express acknowledgment that County employees

are forbidden from soliciting consideration "in any form" from landlords and that the lease agreement would be immediately terminable "if it is found that consideration, in any form, was offered or given by Lessor, either directly or through an intermediary, to any County officer, employee or agent with the intent of securing the Agreement or securing favorable treatment with respect to the award, amendment or extension of the Agreement or the making of any determinations with respect to the Lessor's performance pursuant to the Agreement."

204.    Shepos was involved with negotiating and securing approval of Amendment No. 1 to the Lease.

205.    The amended lease was in effect from September 7, 1999 to April 19, 2005. During this period, the County paid monthly rent to M&A Gabaee, using a mixture of County, State, and federal funds.

206.    In Lease No. 71125 and its amendment, the Gabaees, M&A Gabaee, and Sancam made the false representation that they (and the other Gabaee Defendants) had not and would not engage in bribery, and in turn, obtained lucrative government contracts based on those misrepresentations.

207.    Moreover, each invoice submitted pursuant to County leases or other agreements impliedly certified that the Gabaee Defendants would comply with California law, which forbids County employees from receiving bribes or having a financial interest in any such contract. *See* Cal. Gov. Code § 1090. The Gabaees alongEvery invoice submitted by the Gabaee Defendants knowingly included a false implied certification that the Gabaee Defendants had complied with Donald Abbey and others  paid these legal requirements.

208.    Had the County known Arman Gabaee was paying bribes to Shepos in exchange for and executed the construction of Shepos's help in negotiating and securing the lease amendment and other preferential treatment of the Gabaee Defendants, the County would never have entered the amendment to the lease or made rent payments thereunder.

### ii.        3220 Rosemead Boulevard, Building G.

209.   On or about January 15, 2002, the County and ~~Ms. Gluck's~~M&A Gabaee entered into a lease agreement for 3220 Rosemead Boulevard, Building G in El Monte, California (Lease No. L-0793). The County used this space to house the District Attorney.

210.   Under the lease agreement, the County agreed to pay a monthly rent of $2,485—totaling $89,460 over its three-year term. At all times, the County made monthly payments as they were due under the lease, in part with federal funds.

211.   Shepos was involved with negotiating and securing approval of this lease, and the lease agreement was signed during the period when Arman Gabaee was making bribe payments to Shepos on behalf of himself, Mark Gabaee, and the other Gabaee Defendants, including M&A Gabaee. The lease agreement was signed by Mark Gabaee on behalf of Sancam as General Partner of M&A Gabaee.

212.   Section 26 of the lease agreement contains an express acknowledgment by M&A Gabaee that County employees are forbidden from soliciting consideration "in any form" from landlords and that landlords "shall not offer or give, either[] directly or through an intermediary, consideration in any form, to a County officer, employee or agent for the purpose of securing favorable treatment with respect to the award of the Lease."

213.   On or about April 19, 2005, the County and Town Investments entered into a lease agreement for 3220 Rosemead Boulevard in El Monte, California (Lease No. 75257). This lease agreement extended the terms of the previous two leases (Lease Nos. 71124 and L-0793), merged the two agreements into a single lease agreement, and increased the County's monthly rent by $1,953 per month. The lease agreement was signed by Mark Gabaee on behalf of Sancam as Managing Member of Town Investments.

214.   Under the new lease agreement (Lease No. 75257), the County agreed to pay a monthly rent of $16,611.75—totaling $996,705 over its five-year term.

215.   On or about July 6, 2010, the County and Town Investments entered into Amendment No. 1 to the lease agreement (Lease No. 75257). The amendment extended the term of the lease for five years and set a monthly rent at $18,588.92, with yearly increases to rent—totaling payments in excess of $1,115,335. The amendment was signed by Mark Gabaee on behalf of Town Investments. At all times, the County made monthly payments as they were due under the new lease, in part with federal funds.

1.216. These leases and amendment were signed during the period when Arman Gabaee was paying bribes—including travel and construction on Shepos's home.—to Shepos on behalf of himself, Mark Gabaee, and the other Gabaee Defendants, including M&A Gabaee, Town Investments, and Sancam.

217.   Section 28 of the lease agreement contains an express acknowledgment by Town Investments that County employees are forbidden from soliciting consideration "in any form" from landlords and that landlords "shall not offer or give, either[] directly or through an intermediary, consideration in any form, to a County officer, employee or agent for the purpose of securing favorable treatment with respect to the award of the lease."

218.   Shepos was instrumental in negotiating and securing approval of these leases and amendments. For example, Shepos authored the Board letter stating "**IT IS RECOMMENDED THAT YOUR BOARD**" take five specific actions: (i) "Approve and instruct the Chairman to sign a ten year full service lease with M&A Gabaee"; (ii) "Approve and instruct the Chairman to sign Amendment No. 1 to Lease No. 71124, with Lessor for office space located at 3220 Rosemead Boulevard, Suite B"; "Authorize the Director of the Internal Services Department (ISD) to acquire a telephone system for DPSS and relocate the telephone system for the DA"; (iii) "find that the project will not have a significant effect on the environment, and find that the Negative Declaration reflects the independent judgment of the County and approve the Negative Declaration"; and (iv) "Approve the projects and authorize the

CAO and ISD to implement the projects."

219.   Further, Shepos authored a Board letter stating "**IT IS RECOMMENDED THAT YOUR BOARD**" take three specific actions: (i) "Approve and instruct the Chairman to sign the attached lease with Town Investments (Landlord)"; (ii) "Find that the lease renewal is categorically exempt from the California Environmental Quality Act (CEQA)"; and (iii) "Approve the project and authorize the Chief Administrative Office (CAO) and DA to implement the project."

220.   Shepos also obtained the Board's approval for Amendment No. 1 to the lease, authoring a Board letter with the "recommendation" that the Board find the lease exempt from CEQA and "[a]pprove and instruct the Chair to sign the lease amendment with Town Investment [sic] LLC (Lessor)."

221.   The lease agreements and amendment were in effect from January 15, 2002 until July 5, 2015. During this period, the County paid monthly rent to M&A Gabaee and/or Town Investments, using a mixture of County, State, and federal funds.

222.   Through these County leases and amendments, the Gabaees, M&A Gabaee, Town Investments, and Sancam made and renewed the false representation that they (and the other Gabaee Defendants) had not and would not engage in bribery, and in turn, obtained lucrative government contracts based on those misrepresentations.

223.   Moreover, each invoice submitted pursuant to County leases or other agreements impliedly certified that the Gabaee Defendants would comply with California law, which forbids County employees from receiving bribes or having a financial interest in any such contract. *See* Cal. Gov. Code § 1090. Every invoice submitted by the Gabaee Defendants knowingly included a false implied certification that the Gabaee Defendants had complied with these legal requirements.

224.   Had the County known that Arman Gabaee was paying bribes to Shepos

in exchange for Shepos's help in negotiating the lease documents, Shepos's recommendations for Board approval and other preferential treatment of the Gabaee Defendants, the County would never have entered into these leases or amendments, nor would it have made payments thereunder.

### iii.    3220 Rosemead Boulevard, Building A.

225.   On or about May 5, 1998, the County and M&A Gabaee entered into a lease agreement for 3220 Rosemead Boulevard, Building A in El Monte, California (Lease No. 71378). The County used this space to house the Department of Public Social Services. Mark Gabaee signed this lease on behalf of Sancam as General Partner of M&A Gabaee.

226.   Under the lease agreement, the County agreed to pay a monthly rent of $20,435—totaling $2,452,200 over its ten-year term. Throughout the term, the County made monthly payments as they were due under the lease, in part with federal funds.

227.   On or about August 5, 2008, the County, at Shepos's recommendation, exercised an option to renew the lease for a five-year term at a monthly rent of $26,418—totaling approximately $1.6 million over its five-year term.

228.   On or about July 30, 2013, the County and Town Investments entered into Amendment No. 1 to the lease agreement. The amendment extended the term of the lease for five years and set a monthly rent at $28,328, with yearly increases to rent—totaling payments in excess of $1,699,680. Mark Gabaee signed Amendment No. 1 on behalf of Town Investments.

229.   The 2008 lease renewal option and the 2013 amendment were signed during the period when Arman Gabaee was paying bribes—including travel, extravagant gifts, construction on Shepos's home, and monthly cash payments—to Shepos on behalf of himself, Mark Gabaee, and the other Gabaee Defendants, including M&A Gabaee and Town Investments.

230.   Shepos was instrumental in negotiating and securing approval of this

lease. For example, Shepos authored the Board letter recommending approval of the lease and that the Board take four specific actions: (i) "Find that the project is exempt from the California Environmental Quality Act (CEQA)"; (ii) "Approve a ten-year lease with M&A Gabaee"; (iii) "Authorize the Director of Internal Services Department (ISD) to acquire a telephone system for the facility"; and (iv) "Approve the project and authorize the Chief Administrative Officer to implement the project."

231.   Shepos also authored the Board letter recommending the exercise of the five-year renewal option, recommending that the Board: (i) "Find that the lease renewal is categorically exempt from California Environmental Quality Act (CEQA)"; and "Exercise the option to renew the lease for a five-year term with Town Investment, LLC." Additionally, Shepos authored the Board Letter recommending the adoption of Amendment No. 1, further extending the lease term by five years, specifically recommending that the Board: (i) "Approve and instruct the Chairman to sign an amendment for a five-year extension of the lease with Town Investments, LLC" and (ii) "Authorize the Chief Executive Office and the Director of Public Social Services to implement the project upon Board approval."

232.   Shepos further authored a memorandum directing the Rent/Budget Administration to commence rent payments pursuant to the lease, as well as payments for the cost of electricity used during the tenancy.

233.   The lease was in effect from May 5, 1998 until August 4, 2018. During this period, the County paid monthly rent to Town Investments, using a mixture of County, State, and federal funds.

234.   Section 23.S of the lease, which was renewed by virtue of Amendment No. 1, prohibits County employees from soliciting consideration "in any form" from landlords and notes that the lease agreement would be immediately terminable "if it is found that consideration, in any form, was offered or given by Lessor, either directly or through an intermediary, to any County officer, employee or agent with the intent of securing the Agreement or securing favorable treatment with respect to

the award, amendment or extension of the Agreement or the making of any determinations with respect to the Lessor's performance pursuant to the Agreement."

235. Through this lease, renewal, and amendment, the Gabaees, M&A Gabaee, Town Investments, and Sancam made and renewed the false representation that they (and the other Gabaee Defendants) had not and would not engage in bribery, and in turn, obtained lucrative government contracts based on those misrepresentations.

236. Moreover, each invoice submitted pursuant to County leases or other agreements impliedly certified that the Gabaee Defendants would comply with California law, which forbids County employees from receiving bribes or having a financial interest in any such contract. *See* Cal. Gov. Code § 1090. Every invoice submitted by the Gabaee Defendants knowingly included a false implied certification that the Gabaee Defendants had complied with these legal requirements.

237. Had the County known that Arman Gabaee was paying bribes to Shepos in exchange for Shepos's help in negotiating the lease documents, Shepos's recommendations for Board approval and other preferential treatment of the Gabaee Defendants, the County would never have exercised the 2008 lease renewal option or entered the 2013 amendment, nor would it have made payments thereunder.

### iv.    3216 Rosemead Boulevard.

238. On or about September 7, 1999, the County and M&A Gabaee entered into a lease agreement for 3216 Rosemead Boulevard in El Monte, California (Lease No. 72387). The County used this space to house the Department of Public Social Services. The lease was signed by Mark Gabaee on behalf of Sancam as General Partner of M&A Gabaee.

239. Under the lease agreement, the County agreed to pay a monthly rent of $54,386.80—totaling $6.5 million over its ten-year term. At all times, the County made monthly payments as they were due under the lease, in part with federal funds.

240. On or about July 13, 2010, the County, at Shepos's recommendation,

exercised an option to renew the lease for a five-year term at a monthly rent of $70,433—totaling approximately $4.2 million over its five-year term.

241.   On or about November 15, 2016, the County and M&A Gabaee entered into Amendment No. 1 to the lease agreement. The amendment extended the term of the lease for five years and set a monthly rent at $77,396.60, with yearly increases to rent—totaling payments in excess of $4.6 million. Amendment No. 1 was signed by Mark Gabaee on behalf of M&A Gabaee.

242.   The lease agreement in 1999, the exercise of the renewal option in 2010, and Amendment No. 1 in 2016 were all signed during periods when Arman Gabaee was paying bribes to Shepos—including travel, extravagant gifts, construction on Shepos's home, and monthly cash payments—on behalf of himself, Mark Gabaee, and the other Gabaee Defendants.

243.   Section 29 of the lease agreement contains an express acknowledgment by M&A Gabaee that County employees are forbidden from soliciting consideration "in any form" from landlords and that landlords "shall not offer or give, either[] directly or through an intermediary, consideration in any form, to a County officer, employee or agent for the purpose of securing favorable treatment with respect to the award of the lease."

244.   Shepos was instrumental in negotiating and securing this lease and its renewal and amendment. For example, Shepos authored the Board letter setting forth his recommendation that the Board exercise the five-year renewal option, stating "**IT IS RECOMMENDED THAT YOUR BOARD**" take two specific actions: (i) "Find that the lease renewal is categorically exempt from the California Environmental Quality Act"; and (ii) "Exercise the option to renew the lease for a five-year term with Town Investment, LLC."

245.   The lease was in effect from September 7, 1999 until November 30, 2021. During this period, the County paid monthly rent to M&A Gabaee, using a mixture of County, State, and federal funds.

246.   Through this lease and its renewal and amendment, the Gabaees, M&A Gabaee, and Sancam made the false representation that they (and the other Gabaee Defendants) had not and would not engage in bribery, and in turn, obtained lucrative government contracts based on those misrepresentations.

247.   Moreover, each invoice submitted pursuant to County leases or other agreements impliedly certified that the Gabaee Defendants would comply with California law, which forbids County employees from receiving bribes or having a financial interest in any such contract. *See* Cal. Gov. Code § 1090. Every invoice submitted by the Gabaee Defendants knowingly included a false implied certification that the Gabaee Defendants had complied with these legal requirements.

248.   Had the County known that Arman Gabaee was paying bribes to Shepos in exchange for Shepos's help in negotiating the lease documents, Shepos's recommendations for Board approval, and other preferential treatment of the Gabaee Defendants, the County would never have entered the lease, exercised the 2010 renewal option, or entered the 2016 amendment, nor would it have made payments thereunder.

### v.      9107 Wilshire Boulevard.

249.   On or about March 23, 2016, the County and Oakshire entered into a lease agreement for 9107 Wilshire Boulevard in Los Angeles, California (Lease No. L-1244). The County used this space to house the Department of Mental Health, which provides critical mental health services such as assessments, case management, crisis intervention, medication support, peer support, and other rehabilitative services.

250.   Under this lease, the County agreed to pay a monthly rent of $24,000, plus $12,960 per month, for a period of sixty days—totaling payments of $73,920. After the initial sixty-day term, the County continued to occupy the premises until June 2019 as a holdover tenant. During this period, the County made monthly payments as they were due, in part with federal funds.

251.    This lease agreement was signed during the period when Arman Gabaee was paying bribes to Shepos on behalf of himself, Mark Gabaee, and the other Gabaee Defendants—travel, extravagant gifts, construction on Shepos's home, and monthly cash payments. The lease was signed by Arman Gabaee on behalf of Wilhurst as Managing Member of Oakshire.

252.    Section 32 of the lease agreement contains an express acknowledgment by Oakshire that County employees are forbidden from soliciting consideration "in any form" from landlords and that landlords "shall not offer or give, either directly or through an intermediary, consideration in any form to a County officer, employee or agent for the purpose of securing favorable treatment with respect to the award of the Lease."

253.    The lease was in effect from March 23, 2016 to June 9, 2019. During this period, the County paid monthly rent to Oakshire, using a mixture of County, States, and federal funds.

254.    Through this lease, the Gabaees, Oakshire, and Wilhurst made the false representation that they (and the other Gabaee Defendants) had not and would not engage in bribery, and in turn, obtained lucrative government contracts based on those misrepresentations.

255.    Moreover, each invoice submitted pursuant to County leases or other agreements impliedly certified that the Gabaee Defendants would comply with California law, which forbids County employees from receiving bribes or having a financial interest in any such contract. *See* Cal. Gov. Code § 1090. Every invoice submitted by the Gabaee Defendants knowingly included a false implied certification that the Gabaee Defendants had complied with these legal requirements.

256.    Had the County known that Arman Gabaee was paying bribes to Shepos in exchange for Shepos's help in negotiating and securing the lease, and his other preferential treatment of the Gabaee Defendants, the County would never have entered the lease or made payments thereunder.

### vi.      12000 Hawthorne Boulevard.

257.   On or about September 25, 2000, the County and M&A Gabaee entered into a lease agreement for 12000 Hawthorne Boulevard in Hawthorne, California (Lease No. 73655). The County used this space to house the Department of Public Social Services.

258.   Under the lease agreement, the County agreed to pay a monthly rent of $On information and belief,232,743—totaling $27.9 million over its ten-year term. At all times, the County made monthly payments as they were due under the lease, using a mixture of County, State, and federal funds.

259.   The lease also provided the County the option to occupy a secondary premises for an additional $35,650 per month.

260.   On or about January 13, 2004, the County and M&A Gabaee entered into a Memorandum of Acceptance of Expansion Space, whereby the County took possession of the secondary premises (4300 West 12th Street) as of December 1, 2003, resulting in additional payments of approximately $2.9 million over the remainder of the lease term.

261.   On or about July 5, 2011, the County and M&A Gabaee entered into Amendment No. 1 to the lease agreement. The amendment extended the term of the lease for five years and set a monthly rent at $273,722, with yearly increases—totaling payments in excess of $16.4 million.

262.   The lease agreement in 2000, the Memorandum of Acceptance of Expansion Space in 2004, and Amendment No. 1 in 2011 were signed during periods when Arman Gabaee was paying bribes to Shepos on behalf of himself, Mark Gabaee, and the other Gabaee Defendants—travel, extravagant gifts, construction on Shepos's home, and monthly cash payments. The lease agreement, the Memorandum of Acceptance of Expansion of Space, and Amendment No. 1 were all signed by Mark Gabaee on behalf of Sancam as General Partner of M&A Gabaee.

263.   Section   23.R   of   the   lease   agreement   contains   an   express

acknowledgment by M&A Gabaee that County employees are forbidden from soliciting consideration "in any form" from landlords and that the lease agreement would be immediately terminable if consideration "was offered or given by Lessor, either directly or through an intermediary, to any County officer, employee or agent with the intent of securing the Agreement or securing favorable treatment with respect to the award, amendment or extension of the Agreement or the making of any determinations with respect to the Lessor's performance pursuant to the Agreement."

264. Shepos was instrumental in negotiating and securing approval of the lease, its amendment, and the Memorandum of Acceptance of Expansion Space. He authored a Board letter stating, "**IT IS RECOMMENDED THAT YOUR BOARD**," among other things, "Approve and instruct the Mayor, Los Angeles County, to sign the attached ten-year lease with M & A Gabaee (Lessor)." He also authored a letter stating his "recommendation [] to exercise an option to renew the lease term for an additional five-year period . . . ."

265. The lease was in effect from September 25, 2000 until August 31, 2017. During this period, the County paid monthly rent to M&A Gabaee, using a mixture of County, State, and federal funds.

266. In their County lease and amendments, the Gabaees, M&A Gabaee, and Sancam made the false representation that they (and the other Gabaee Defendants) had not and would not engage in bribery, and in turn, obtained lucrative government contracts based on those misrepresentations.

267. Moreover, each invoice submitted pursuant to County leases or other agreements impliedly certified that the Gabaee Defendants would comply with California law, which forbids County employees from receiving bribes or having a financial interest in any such contract. *See* Cal. Gov. Code § 1090. Every invoice submitted by the Gabaee Defendants knowingly included a false implied certification that the Gabaee Defendants had complied with these legal requirements.

268. Had the County known that Arman Gabaee was paying bribes to Shepos

in exchange for Shepos's help in negotiating and securing the lease, Shepos's recommendations for Board approval, and other preferential treatment of the Gabaee Defendants, the County would never have entered the lease, Amendment No. 1, or the Memorandum of Acceptance of Expansion Space, nor would it have made payments thereunder.

### vii.    532 East Colorado Boulevard.

269.    On or about May 18, 1999, the County and M&A Gabaee entered into a lease agreement for 532 E. Colorado Boulevard in Pasadena, California (Lease No. 72116). The County used this space to house the Department of Children and Family Services.

270.    Under the lease agreement, the County agreed to pay monthly rent of $116,631—totaling $14 million over its ten-year term. At all times, the County made monthly payments as they were due under the lease.

271.    The lease also provided the County the option to occupy a secondary premises for an additional $35,650 per month.

272.    On or about February 16, 2010, the County, at Shepos's recommendation, exercised an option to renew the lease for a five-year term with Greenoak as the counterparty, at a monthly rent of $33,418—totaling approximately $2 million over its five-year term.

273.    On or about December 8, 2015, the County and M&A Gabaee entered into Amendment No. 1 to the lease agreement. The amendment extended the term of the lease for five years and set a monthly rent at $176,811.62, with yearly rent increases—totaling payments in excess of $10.6 million.

274.    The lease agreement in 1999, the 2010 renewal option, and Amendment No. 1 in 2015, were signed during periods when Arman Gabaee was paying bribes to Shepos on behalf of himself, Mark Gabaee, and the other Gabaee Defendants—travel, extravagant gifts, construction on Shepos's home, and monthly cash payments. The lease agreement and Amendment No. 1 were both signed by Mark

Gabaee on behalf of Sancam as the General Partner of M&A Gabaee.

275. Section 22.R of the lease agreement contains an express acknowledgment by M&A Gabaee that County employees are forbidden from soliciting consideration "in any form" from landlords and that the lease agreement would be immediately terminable if consideration "was offered or given by Lessor, either directly or through an intermediary, to any County officer, employee or agent with the intent of securing the Agreement or securing favorable treatment with respect to the award, amendment or extension of the Agreement or the making of any determinations with respect to the Lessor's performance pursuant to the Agreement."

276. Shepos authored the Board letter recommending approval of the five-year lease renewal, stating, "**IT IS RECOMMENDED THAT YOUR BOARD**" take two specific actions: (i) "Find that the lease renewal is categorically exempt from the California Environmental Quality Act pursuant to Class 1, of the Environmental Document Reporting Procedures and Guidelines"; and (ii) "Exercise the option to renew the lease for a five-year term with Greenoak Investments, LLC (Lessor)."

277. Shepos also authored the Board letter recommending approval of Amendment 1 in 2015, stating, "**IT IS RECOMMENDED THAT THE BOARD**" take three specific actions: (i) "Find that the proposed lease amendment is categorically exempt from the provisions of the California Environmental Quality Act"; (ii) "Approve and instruct the Chairwoman to sign the five-year lease amendment with M&A Gabaee"; and (iii) "Authorize the Chief Executive Officer and the Director of Children and Family Services to implement the lease amendment."

278. Shepos also authored a memorandum directing commencement of rent payments under the original lease, which was adopted at Shepos's recommendation. The lease was in effect from May 18, 1999 until December 31, 2020. During this period, the County paid monthly rent to M&A Gabaee, using a mixture of County,

State, and federal funds.

279.    Through this lease and its renewal and amendment, the Gabaees, M&A Gabaee, Greenoak, and Sancam made and adopted the false representation that they (and the other Gabaee Defendants) had not and would not engage in bribery, and in turn, obtained lucrative government contracts based on those misrepresentations.

280.    Moreover, each invoice submitted pursuant to County leases or other agreements impliedly certified that the Gabaee Defendants would comply with California law, which forbids County employees from receiving bribes or having a financial interest in any such contract. *See* Cal. Gov. Code § 1090. Every invoice submitted by the Gabaee Defendants knowingly included a false implied certification that the Gabaee Defendants had complied with these legal requirements.

281.    Had the County known that Arman Gabaee was paying bribes to Shepos in exchange for Shepos's help in negotiating and securing the lease documents, Shepos's recommendations for Board approval, and other preferential treatment of the Gabaee Defendants, the County would never have entered the lease, the renewal option or Amendment No. 1, nor would it have made payments thereunder.

**viii.        15531 Ventura Boulevard.**

282.    On or about July 28, 1992, the County and M&A Gabaee entered into a lease agreement for 15531 Ventura Boulevard in Sherman Oaks, California (Lease No. 66261). The County used this space to house the District Attorney and Department of Child Support Services, which enforces child support and medical support orders, establishes parentage, and collects and disburses support payments.

283.    Under the lease agreement, the County agreed to pay a monthly rent of $80,692—totaling $9.7 million over its ten-year term. At all times, the County made monthly payments as they were due under the lease, using a mixture of County, State, and federal funds.

284.    On or about October 1, 2002, the County and M&A Gabaee entered into Amendment No. 2 to the lease agreement. The amendment extended the term of the

lease for five years and set a monthly rent at $94,286.29—totaling payments in excess of $5.6 million.

285.  On or about December 18, 2007, the County and M&A Gabaee entered into Amendment No. 3 to the lease agreement. The amendment extended the term of the lease for five years and set a monthly rent at $111,837.15, providing for annual increases in rent—totaling payments in excess of $6.7 million.

286.  On or about April 2, 2013, the County and M&A Gabaee entered into Amendment No. 4 to the lease agreement. The amendment extended the term of the lease for five years and set a monthly rent at $125,257.59, providing for annual increases in rent—totaling payments in excess of $7.5 million.

287.  Amendment No. 2 in 2002, Amendment No. 3 in 2007, and Amendment No. 4 in 2013 were signed during periods when Arman Gabaee was paying bribes to Shepos on behalf of himself, Mark Gabaee, and the other Gabaee Defendants— travel, extravagant gifts, construction on Shepos's home, and monthly cash payments. Amendment No. 2 was signed by Mark and Arman Gabaee on behalf of M&A Gabaee. Amendment Nos. 3 and 4 were signed by Mark Gabaee on behalf of Sancam as General Partner of M&A Gabaee.

288.  Shepos was directly involved in negotiating and securing the lease amendments outlined above. For example, Shepos directed a subordinate to author a Board letter recommending approval of Amendment No. 2, and Shepos himself authored Board letters recommending approval of Amendment Nos. 3 and 4. In the Board letter recommending Amendment No. 3, Shepos stated: "**IT IS RECOMMENDED THAT YOUR BOARD**" take two specific actions: (i) "Approve Amendment No. 3 to renew the lease for a five-year term with M&A Gabaee, L.P."; and (ii) "Find that this Amendment No. 3 is exempt from the provisions of the California Environmental Quality Act (CEQA)." Shepos made nearly identical recommendations with respect to Amendment No. 4.

289.  The lease was in effect from July 28, 1992 until November 7, 2015.

During this period, the County paid monthly rent to M&A Gabaee, using a mixture of County, State, and federal funds.

290.    In this lease and amendments, the Gabaees, M&A Gabaee, and Sancam made the false representation that they (and the other Gabaee Defendants) had not and would not engage in bribery, and in turn, obtained lucrative government contracts based on those misrepresentations.

291.    Moreover, each invoice submitted pursuant to County leases or other agreements impliedly certified that the Gabaee Defendants would comply with California law, which forbids County employees from receiving bribes or having a financial interest in any such contract. *See* Cal. Gov. Code § 1090. Every invoice submitted by the Gabaee Defendants knowingly included a false implied certification that the Gabaee Defendants had complied with these legal requirements.

292.    Had the County known that Arman Gabaee was paying bribes to Shepos in exchange for Shepos's help in negotiating and securing the lease amendments, Shepos's recommendations for Board approval, and other preferential treatment of the Gabaee Defendants, the County would not have entered Amendment Nos. 2, 3, or 4, nor would it have made payments thereunder.

### ix.    2910 West Beverly Boulevard.

293.    On or about March 14, 1969, the County entered into a lease agreement for 2910 West Beverly Boulevard in Los Angeles, California (Lease No. 14714) with non-party the Oswin Company.

294.    Oppidan acquired the subject property at 2910 West Beverly Boulevard in or around October 2000.

295.    On or about February 20, 2007, the County and Oppidan entered into Amendment No. 4 to the lease agreement. The amendment extended the term of the lease for five years and set a monthly rent at $66,815 per month, providing for annual increases in rent—totaling payments in excess of $4 million. At all times, the County made monthly payments as they were due under the lease, in part with federal funds.

296.   Shepos authored a Board letter recommending that the Board "Approve and instruct the Chairman to sign the attached Amendment No. 4 with OPPIDAN, LLC, to extend the term of Lease No. 14714 for a five-year period . . . ."

297.   Amendment No. 4 in 2007 was signed during a period when Arman Gabaee was paying bribes to Shepos on behalf of himself, Mark Gabaee, and the other Gabaee Defendants—travel, extravagant gifts, and renovations on Shepos's home. Indeed, the County signed Amendment No. 4 approximately one month after the Gabaees, through the Charles Company, reimbursed Shepos for nearly $15,000 in Dodgers tickets. Amendment No. 4 was signed by Mark Gabaee on behalf of Sancam as Managing Member of Oppidan.

298.   The lease was in effect until November 30, 2011. From the time the County entered Amendment No. 4 in February 2006 until November 30, 2011, the County paid monthly rent to Oppidan, using a mixture of County, State, and federal funds.

299.   Through this lease and amendments, the Gabaees, Oppidan, and Sancam made and adopted the false representation that they (and the other Gabaee Defendants) had not and would not engage in bribery, and in turn, obtained lucrative government contracts based on those misrepresentations.

300.   Moreover, each invoice submitted pursuant to County leases or other agreements impliedly certified that the Gabaee Defendants would comply with California law, which forbids County employees from receiving bribes or having a financial interest in any such contract. *See* Cal. Gov. Code § 1090. Every invoice submitted by the Gabaee Defendants knowingly included a false implied certification that the Gabaee Defendants had complied with these legal requirements.

301.   Had the County known that Arman Gabaee was paying bribes to Shepos in exchange for Shepos's help in negotiating and securing the lease amendment, Shepos's recommendations for Board approval, and other preferential treatment of the Gabaee Defendants, the County would not have entered Amendment No. 4, nor

1  would it have made payments thereunder.

2  **x.    3303 North Broadway Street.**

3  302.   On or about October 4, 2016, the County and Oppidan entered into a

4  lease agreement for 3303 North Broadway Street in Los Angeles, California (Lease

5  No. 78530). The County used this space to house the Department of Mental Health.

6  303.   Under the lease agreement, the County agreed to pay a monthly rent of

7  $129,487.93—totaling $23.3 million over its fifteen-year term. At all times, the

8  County made monthly payments as they were due under the lease, in part with federal

9  funds.

10  304.   In or about February 2020, Oppidan assigned "all of its right, title and

11  interest" in the foregoing lease to Maple19.

12  305. Section 32.2 of the lease agreement contains an express

13  acknowledgment by Oppidan that landlords "shall not offer or give, either directly or

14  through an intermediary, consideration in any form to a County officer, employee or

15  agent for the purpose of securing favorable treatment with respect to the award of the

16  Lease."

17  306.   This lease agreement was signed during a period when Arman Gabaee

18  was paying bribes to Shepos on behalf of himself, Mark Gabaee, and the other

19  Gabaee Defendants— travel, extravagant gifts, renovations on Shepos's home, and

20  monthly cash payments. The lease was signed by Mark Gabaee on behalf of Sancam

21  as Managing Member of Oppidan.

22  307.   As Oppidan's successor-in-interest, Maple19 is liable for Oppidan's

23  misconduct and assumed Oppidan's obligations and representations under the lease.

24  308.   Shepos was instrumental in negotiating and securing approval of this

25  lease. For example, he authored a Board letter stating, "**IT IS RECOMMENDED**

26  **THAT THE BOARD**," among other things, "Approve and instruct the Chair to sign

27  the lease with OPPIDAN, LLC (Landlord)."

28  309.   The County entered the lease on October 4, 2016 and had a fifteen-year

term. The County paid monthly rent to Oppidan and/or Maple19 when due pursuant to the terms of the lease, in part with federal funds.

310.   In their County lease, the Gabaees, Oppidan, Sancam, and Maple19 made and adopted the false representation that they (and the other Gabaee Defendants) had not and would not engage in bribery, and in turn, obtained lucrative government contracts based on those misrepresentations.

311.   Moreover, each invoice submitted pursuant to County leases or other agreements impliedly certified that the Gabaee Defendants would comply with California law, which forbids County employees from receiving bribes or having a financial interest in any such contract. *See* Cal. Gov. Code § 1090. Every invoice submitted by the Gabaee Defendants knowingly included a false implied certification that the Gabaee Defendants had complied with these legal requirements.

312.   Had the County known that Arman Gabaee was paying bribes to Shepos in exchange for Shepos's help in negotiating and securing the lease documents, Shepos's recommendations for Board approval, and other preferential treatment of the Gabaee Defendants, the County would never have entered this lease, nor would it have made payments thereunder.

### 4.    The Gabaees and Shepos Concealed Their Scheme.

313.   Arman Gabaee, Mark Gabaee, and Shepos mutually agreed, and then took steps, to conceal their bribery scheme. Specifically, Arman Gabaee and Shepos often met in person to discuss their improper arrangement—avoiding reducing their bribery scheme to writing. When the Gabaees and their employees did communicate with Shepos in writing—for example, to improperly received nonpublic County information—they were careful to hide their communications from the County by using Shepos's personal email address. For years, Shepos hid cash and gifts he received from Arman Gabaee from his then-wife, Ms. Gluck. Shepos did not report any of that cash or those gifts on his Statement of Economic Interest Form 700s (a State form requiring State and local government officials to disclose certain financial

interests, personal assets, and income that could be materially affected by their own official acts). Nor did he otherwise inform the County about the things of value he received from the Gabaees. Arman and Mark Gabaee also used their entities and employees as intermediaries to funnel bribes to Shepos.

314.   In their leases with the County, the Gabaee Defendants represented—and repeatedly reaffirmed—their understanding that County employees like Shepos were prohibited from having any financial interest in County contracts and that landlords (including the Gabaee Defendants) are prohibited from giving County employees any consideration in exchange for favorable treatment. The County relied on those representations by the Gabaee Defendants in paying rent under their leases with the Gabaee Defendants.

**5.     The  Gabaee  Defendants'  Agency  and  Alter-Ego Relationships.**

~~166.~~315.     As detailed above, the Gabaees acted as executives and managers of the entity Gabaee Defendants. Arman and Mark Gabaee bribed Shepos, including through at least M&A Gabaee, Excel Property Management, and the Charles Company, for the benefit of each of the other Gabaee Defendants. In addition, Mark Gabaee signed leases with the County on behalf of the other Gabaee Defendants. These facts show that the Gabaees own, control, and/or direct the actions of the ~~other Gabaee Defendants~~Charles Company (doing business as The Charles Company, Inc.), M&A Gabaee, Excel Property Management, Oakshire, Wilhurst, Town Investments, Sancam, Greenoak, Maple19, Urban Grove19, and Oppidan, who, in doing the acts alleged herein, acted at their direction and/or with their permission, knowledge, consent, or ratification.

~~167.~~316.     ~~In the alternative, on information and belief, the Gabaees were alter egos of the other Gabaee Defendants~~In the alternative, based on the facts described above—including that the Gabaees acted as executives and managers of the entity Gabaee Defendants; that Arman and Mark Gabaee bribed Shepos, including through

at least M&A Gabaee, Excel Property Management, and the Charles Company, for the benefit of each of the other Gabaee Defendants; and Mark Gabaee signed leases with the County on behalf of the other Gabaee Defendants—the Gabaees were alter egos of the Charles Company (doing business as The Charles Company, Inc.), M&A Gabaee, Excel Property Management, Oakshire, Wilhurst, Town Investments, Sancam, Greenoak, Maple19, Urban Grove19, and Oppidan; the Gabaees dominated and controlled the other Gabaee Defendants; a unity of interest and ownership existed between the Gabaees and the other Gabaee Defendants; the other Gabaee Defendants were mere shells and conduits for the Gabaees' affairs; the other Gabaee Defendants were inadequately capitalized; the Gabaees and the other Gabaee Defendants failed to abide by the formalities of corporate existence; and the Gabaees used the other Gabaee Defendants' assets as their own and, in doing the things alleged herein, acted with such a unity of interest that the separate personalities of these corporate entities do not in reality exist and honoring their separate identities would bring about an inequitable result. The Gabaee Defendants did not respect corporate formalities because they used their companies as mere shells to carry out their bribery scheme. As one example, M&A Gabaee and Excel Property Management both paid bribes in connection with the Roscomare Road property, which (on information and belief) were intended to induce Shepos to provide illicit benefits to the Gabaees, and their companies, and their relatives/associates. As another example, the Moradis and Gabaees directed employees of the Moradi Charles Company to participate in their bribery scheme by emailing Shepos on his personal email address to request nonpublic County information on behalf of the entity Gabaee Defendants.

The County entered into several lease agreements with the Gabaee Defendants in order to house County departments and programs. While these leases were paid for by the County, the money the County used originated from a mixture of federal, state, and/or County grant funds.

1    ~~For example, on or about May 5, 1998, the County and M & A Gabaee~~
2    ~~entered into a lease agreement for 3220 Rosemead Boulevard, Building A in El Monte, California~~
3    ~~(Lease No. 71378). The County used this space to house the Department of Public Social Services.~~
4    ~~Under the lease agreement, the County agreed to pay a monthly rent of $20,435—~~
5    ~~totaling $2,452,200 over its ten-year term.~~
6    ~~171.1.~~On or about August 5, 2008, the County, at Shepos's recommendation,
7    ~~exercised an option to renew the lease for a five-year term at a monthly rent of~~
8    ~~$26,418—totaling approximately $1.6 million over its five-year term.~~
9    ~~On or about July 30, 2013, the County and Town Investments entered into~~
10   ~~Amendment No. 1 to the lease agreement. The amendment extended the term of the lease for five~~
11   ~~years and set a monthly rent at $28,328, with yearly increases to rent—totaling payments in excess~~
12   ~~of $1,699,680.~~
13   ~~The County made payments to the Gabaees under Lease No. 71378~~
14   ~~using a mixture of federal, state, and County funds.~~
15   ~~Section 23.S of the lease prohibits County employees from soliciting~~
16   ~~consideration "in any form" from landlords and notes that the lease agreement would~~
17   ~~be immediately terminable "if it is found that consideration, in any form, was offered~~
18   ~~or given by Lessor, either directly or through an intermediary, to any County officer,~~
19   ~~employee or agent with the intent of securing the Agreement or securing favorable~~
20   ~~treatment with respect to the award, amendment or extension of the Agreement or~~
21   ~~the making of any determinations with respect to the Lessor's performance pursuant~~
22   ~~to the Agreement."~~

23   **B.    Donald G. Abbey.**

24   ~~175.~~317.    Donald Abbey runs one of the largest commercial real estate
25   development companies in the country. Through the Abbey Company and dozens of
26   project-specific LLCs, Donald Abbey has done ~~a large number of~~numerous
27   transactions with the County. The evidence of Abbey's involvement in the bribery
28   scheme ~~includes the following~~is detailed below.

318.   ~~Donald~~Shepos and Abbey— met in or around the early 2000s. They had both attended Penn State University and bonded over their shared alma mater. After their first meeting, Shepos invited Abbey to do business with the County.

319.   Abbey understood that Shepos was a high-ranking County employee with authority to bind the County to significant contracts and influence the County's real estate decisions. Thus, Abbey bribed Shepos intending to corrupt Shepos's influence over the County for Abbey's own (and his entities') benefit.

### 1.    The Abbey Defendants' Bribes.

~~176.~~320.    In exchange for Shepos's help securing three County leases for the Abbey Defendants—in 2004, 2006, and 2007, respectively—Abbey and his entities bribed Shepos with free home renovations to his property in Bel Air. Not only did Abbey, through his entities (and along with the Gabaees— ~~paid~~), pay for and ~~executed~~execute the construction of ~~Shepos's~~Shepos's and Ms. Gluck's home, ~~including providing~~but Abbey also provided Shepos with a Home Depot credit card. billed to, and paid for by, Abbey's company NL Services. Credit card statements dated between May 2005 and December 2005 indicate that during that time period alone, Shepos spent up to hundreds of dollars per month on construction materials at Home Depot—all of which was billed to and paid for by NL Services (courtesy of Abbey).

321.   On August 12, 2005—around one year after Shepos authored a letter to the County Board of Supervisors recommending approval of the Abbey Defendants' first County lease—Shepos signed a proposal contract with NL Services to perform home renovations on his Roscomare Road property in exchange for $476,500. That proposal contract indicates that it was submitted by President of NL Services, Sam Aldrich. Abbey caused NL Services to enter into the proposal contract—which resulted in a massive financial benefit to Shepos in the form of hundreds of thousands of dollars' worth of labor and material—in exchange for his improper help securing County leases for the Abbey Defendants.

177.322.    Shepos's records showindicate that Abbey's construction company NL Services and landscaping company Nittany Lion Landscaping issued Shepos invoices for performed approximately $480,000. On information and belief, worth of renovations on Shepos's Roscomare Road property. Shepos received that labor and material as a bribe from Donald Abbey and never actually paid any invoices.

178.323.    Abbey's company NL Landscaping Services, Inc. provided Shepos with a check for $25,000, dated November 23, 2005, made out to CME Windows & Doors, the company that supplied the windows and doors for theShepos's Roscomare Road houseproperty.

179.324.    Shepos then gave thethat check to CME Windows & Doors as a "deposit check to place window & door order."

180.325.    Shepos then submitted a false claim to Indy Mac Bank on his home construction loan, indicating that the $25,000 check was one that he had paid and asking that he be reimbursed from the construction loan. Indy Mac Bank indeed reimbursed Shepos $25,000 even though it had been paid by NL Landscaping Services, Inc. rather than by Shepos.

181.326.    Below are excerpts showing (a) the $25,000 check from NL Landscaping Services, Inc.; (b) Shepos's hand-writinghandwriting on an invoice he paid to CME Windows & Doors; (c) Shepos's letter to IndyMac bank requesting



96
SECONDTHIRD AMENDED COMPLAINT

reimbursements, including for the $25,000 window and door order; and (d) a deposit to Shepos's bank account a few days later from IndyMac bank.







1    ~~On information and belief, Abbey owns, controls, and/or directs the actions of the~~

2    ~~other Abbey Defendants~~

3

4

5

6

7

8

9

10

11

12



13

14

15

16

17

18

19

20

21

22    327.   Abbey bribed Shepos through Nittany Lion (doing business as NL

23    Services) for the benefit of his other companies, The Abbey Company, Abbey-

24    Properties, DGA-Properties, AP-Palmdale, AP-Palmdale Place, AP-Commerce

25    Plaza (to which CDCF III is a successor-in-interest), The Abbey Management

26    Company, AP-Sierra, Abbey-Properties II, and DGA-Properties II.

27         **2.    The Abbey Defendants' Tainted County Contracts.**

28    328.   During the period when Abbey and Nittany Lion (doing business as NL

Services) were bribing Shepos, the County entered into and renewed several lease agreements with the Abbey Defendants in order to house County departments and programs. The County paid for these leases using money that originated from a mixture of federal, state, and County grant funds.

### i.    39959 Sierra Highway.

329.   On or about May 18, 2004, the County and AP-Sierra entered into a lease agreement for 39959 Sierra Highway in Palmdale, California (Lease No. 74876). The County used this space to house the Department of Children and Family Services. Before the County began to occupy the space, the County and Abbey signed a work letter, pursuant to which Abbey would provide tenant improvements to the property before the County moved in. Per the work letter, the tenant representative was Shepos, and the landlord representative was Abbey.

330.   The lease commenced on March 1, 2005 and set a monthly rent of $71,775, with bi-annual rent increases over ten years—totaling payments to AP-Sierra of approximately $9.1 million (including $2.4 million in County-funded tenant improvements). The lease also provided for the County to purchase $1.5 million in furniture from AP-Sierra. Abbey-Properties executed the lease on behalf of DGA-Properties which, in turn, executed the lease on behalf of AP-Sierra.

331.   Shepos represented the County as the real property agent on this lease. Indeed, Shepos was instrumental in negotiating and securing approval of this lease. Among other things, he authored the Board letter recommending approval of the lease, prepared an Initial Study and Negative Declaration pursuant to CEQA determining that the project would not significantly affect the environment, and represented the County as the counterparty to Abbey in connection with County funded improvements on the property.

332.   Specifically, the Board letter recommended that the Board "[a]pprove and instruct the Chairman to sign the attached ten-year lease and addendum with AP-Sierra LLC, Landlord, for the occupancy of 49,500 rentable square feet of office

1   space," and "[a]uthorize the Chief Administrative Office (CAO) to acquire financing

2   for furniture systems for DCFS at a cost not to exceed $1,500,000."

3       333.   Section 32(b) of the lease contains an express acknowledgement by AP-

4   Sierra that County employees are forbidden from soliciting consideration "in any

5   form" from landlords and that landlords "shall not offer or give [] consideration in

6   any form to a County officer, employee or agent for the purpose of securing favorable

7   treatment with respect to the award of the Lease."

8       334.   Abbey entered into the lease with the intent to pay Shepos bribes in

9   exchange for the business opportunity with the County. The Abbey Defendants

10  performed free renovations on Shepos's home in exchange for Shepos's help in

11  negotiating and securing approval of the lease and any amendments thereto.

12      335.   On or about February 3, 2015, the County and AP-Sierra entered into an

13  amendment to the lease. The amendment extended the term of the lease for a period

14  of five years and increased the monthly rent to $79,200 for the first year; $81,180 for

15  the second year; $83,160 for the third year; $85,140 for the fourth year and $87,120

16  for the fifth year—totaling approximately $5 million over the full term.

17      336.   At all times, the County made monthly payments as they were due under

18  the lease, using a mixture of County, State, and federal funds.

19      337.  Abbey-Properties executed the amendment on behalf of DGA-

20  Properties, which, in turn, executed the lease on behalf of AP-Sierra. Abbey signed

21  the amendment.

22      338.   Through their County lease and amendment, Abbey, AP-Sierra, DGA-

23  Properties, and Abbey-Properties made the false representation that they (and the

24  other Abbey Defendants) had not and would not engage in bribery, and in turn,

25  obtained lucrative government contracts based on those misrepresentations.

26      339.   Moreover, each invoice submitted pursuant to County leases or other

27  agreements impliedly certified that the Abbey Defendants would comply with

28  California law, which forbids County employees from receiving bribes or having a

financial interest in any such contract. *See* Cal. Gov. Code § 1090. Every invoice submitted by the Abbey Defendants knowingly included a false implied certification that the Abbey Defendants had complied with these legal requirements.

340.   Had the County known Abbey and the entity Abbey Defendants were bribing Shepos in exchange for Shepos's help in negotiating and securing the lease and amendment, Shepos's recommendations for Board approval, and other preferential treatment of the Abbey Defendants, the County would never have entered the lease or amendment, nor would it have made payments thereunder.

### ii.       2323 East Palmdale Boulevard.

341.   On or about October 10, 2006, the County and AP-Palmdale—of which Abbey is the Chief Executive Officer—entered into a lease agreement for 2323 East Palmdale Boulevard in Palmdale, California (Lease No. 75892). The County used this space to house the Department of Mental Health.

342.   Before the County occupied the space, Abbey and the County signed a work letter, under which Abbey would provide tenant improvements to the property prior to the County's move-in. Per the work letter, Shepos was the tenant representative, and Abbey was the landlord representative.

343.   Under this lease, the County agreed to pay AP-Palmdale: a base monthly rent of $14,808 with fixed, periodic rent increases during its term; a one-time payment of over $100,000 for tenant improvements; and $350,000 in furniture—totaling payments to AP-Palmdale of over $2.3 million over the ten-year term.

344.   The lease was in effect for ten years (until October 2016), during which time the County paid AP-Palmdale monthly rent as it was due, along with the $100,000 for tenant improvements and $350,000 in furniture costs—all using a mixture of County, State, and federal funds. After the initial term, the County continued to occupy the property until April 2020 as a holdover tenant, and as of February 2018, paid rent to AP-Palmdale Place, AP-Palmdale's successor-in-interest.

345.   Shepos was instrumental in negotiating and securing approval of this lease. Among other things, he authored a Board letter recommending approval of the lease, prepared an Initial Study and Negative Declaration pursuant to CEQA determining that the project would not significantly affect the environment, and represented the County as the counterparty to AP-Palmdale in connection with County-funded improvements on the property. Shepos did this because he had received, and was continuing to receive, hundreds of thousands of dollars in free renovations of his Bel Air residence from Abbey. The Board letter specifically recommended that the Board "[a]pprove and instruct the Mayor to sign the attached ten-year lease with AP-Palmdale, LLC, Landlord, for the occupancy of 9,255 rentable square feet of office space…plus a one-time payment of $107,550 for additional Tenant Improvements (TI) and $350,000 for furniture." The Board letter attached the Negative Declaration Shepos authored finding that "the project will not have a significant effect on the environment."

346.   The County made payments to the AP-Palmdale for Lease No. 75892 using a mixture of Federal, State, and County funds.

347.   Section 32(b) of the lease prohibits County employees from soliciting consideration "in any form" from landlords and states that landlords "shall not offer or give [] consideration in any form to a County officer, employee or agent for the purpose of securing favorable treatment with respect to the award of the Lease."

348.   The lease was signed by the Abbey Defendants at the time Abbey was bribing Shepos in exchange for Shepos's influence on County leases.

349.   In their County lease and renewal, Abbey, AP-Plaza, AP-Palmdale, and AP-Palmdale Place (as AP-Palmdale's successor-in-interest) made and adopted the false representation that they (and the other Abbey Defendants) had not and would not engage in bribery, and in turn, obtained lucrative government contracts based on those misrepresentations.

350.   Moreover, each invoice submitted pursuant to County leases or other

agreements impliedly certified that the Abbey Defendants would comply with California law, which forbids County employees from receiving bribes or having a financial interest in any such contract. *See* Cal. Gov. Code § 1090. Every invoice submitted by the Abbey Defendants knowingly included a false implied certification that the Abbey Defendants had complied with these legal requirements.

351.  Had the County known Abbey and the entity Abbey Defendants were bribing Shepos in exchange for Shepos's help in negotiating and securing the lease, Shepos's recommendations for Board approval and other preferential treatment of the Abbey Defendants, the County would not have entered the lease, nor would it have made payments thereunder.

### iii.    5701 South Eastern Avenue.

352.  On or about August 21, 2007, the County and AP-Commerce (to which Defendant CDCF III is the successor-in-interest) entered into a lease agreement for 5701 South Eastern Avenue in Commerce, California (Lease No. 76324). The County used this space to house the Department of Child Support Services.

353.  Abbey-Properties II executed the lease on behalf of AP-Commerce. Abbey signed the lease on behalf of Abbey-Properties II.

354.  Under this lease, the County agreed to pay a base rent of $131,430 per month for the first year, with annual rent increases over the seven-year term—totaling approximately $12 million in rent payments. At all times, the County made monthly rent payments under the lease as they were due, using a mixture of County, State, and federal funds.

355.  Like the County's other leases, Section 31(b) of the 5701 South Eastern Avenue lease contains an express acknowledgment that County employees are forbidden from soliciting consideration "in any form" from landlords and that landlords "shall not offer or give [] consideration in any form to a County officer, employee or agent for the purpose of securing favorable treatment with respect to the award of the Lease."

356.   Shepos was instrumental in negotiating and securing approval of the lease. Among other things, according to the County's subsequent investigation, stemming from information the County received from Ms. Gluck, Shepos was the County point-person with CBRE, the commercial agent, and he oversaw rent payment and space adjustments for the property. Shepos did these things in exchange for the hundreds of thousands of dollars in home renovations Abbey provided him. Abbey signed the lease knowing that it was procured as a result of his bribery.

357.   The original lease was in effect from August 21, 2007 to August 20, 2014, during which time the County paid monthly rent as it was due, using a mixture of County, State, and federal funds.

358.   On or about July 13, 2010, the County and AP-Commerce entered into the First Amendment to the lease, reducing the size of the rented premises by 3,111 square feet and reducing the rent proportionately.

359.   From August 2014 to March 2018, the County leased the property on a month-to-month holdover basis, paying over $6 million in rent.

360.   On July 11, 2014, Shepos authored a memorandum to the County Section Head, Rent/Budget Administration providing notice that the monthly rental payments "will continue on a month-to-month holdover effective August 21, 2014" at a monthly rate of $149,108.83.

361.   On or about March 20, 2018, the County and CDCF III entered into a Second Amendment to Lease, extending its term by a period of seven years at a monthly rent of $54,584.20, with annual rent increases of up to 3%—totaling payments to CDCF III in an amount of at least $4.6 million.

362.   In their County lease and amendments, Abbey, AP-Commerce (to which Defendant CDCF III is the successor-in-interest), and Abbey-Properties II made the false representation that they (and the other Abbey Defendants) had not and would not engage in bribery, and in turn, obtained lucrative government contracts based on those misrepresentations.

363.   Moreover, each invoice submitted pursuant to County leases or other agreements impliedly certified that the Abbey Defendants would comply with California law, which forbids County employees from receiving bribes or having a financial interest in any such contract. *See* Cal. Gov. Code § 1090. Every invoice submitted by the Abbey Defendants knowingly included a false implied certification that the Abbey Defendants had complied with these legal requirements.

364.   Had the County known Abbey and the entity Abbey Defendants were bribing Shepos in exchange for Shepos's help in negotiating and securing the lease and other preferential treatment of the Abbey Defendants, the County would not have entered the lease or amendments thereto, nor would it have made payments thereunder.

### 3.    Abbey and Shepos Concealed Their Scheme.

365.   Shepos and Abbey mutually agreed, and took steps, to conceal their bribery scheme. Rather than paying Shepos directly, Abbey indirectly funded renovations to Shepos's home using Abbey's construction and landscaping company Nittany Lion (doing business as NL Services). Abbey caused NL services to enter a proposal contract and subsequently invoice Shepos in order to give their arrangement the false appearance of legitimacy. But Abbey never intended to collect any payment from Shepos for the hundreds of thousands of dollars of labor and materials Abbey provided to Shepos through his NL Landscaping and NL Services. Shepos never disclosed his home-renovation dealings with Abbey to the County.

366.   In their leases with the County, the Abbey Defendants represented—and repeatedly reaffirmed—their understanding that County employees like Shepos were prohibited from having any financial interest in County contracts and that landlords (including the Abbey Defendants) are prohibited from giving County employees any consideration in exchange for favorable treatment. The County relied on those representations by the Abbey Defendants in paying rent under their leases with the Abbey Defendants.

**4.    The Abbey Defendants' Agency and Alter-Ego Relationships.**

182.367.    Based on Abbey's ownership and respective management roles within each of the other Abbey Defendants, and the actions those companies took at Abbey's direction, all detailed above, Abbey owns, controls, and/or directs the actions of Nittany Lion (doing business as NL Services), The Abbey Company, Abbey-Properties, DGA-Properties, AP-Palmdale, AP-Palmdale Place, AP-Commerce Plaza (to which CDCF III is a successor-in-interest), The Abbey Management Company, AP-Sierra, Abbey-Properties II, and DGA-Properties II, who, in doing the acts alleged herein, acted at their direction and/or with their permission, knowledge, consent or ratification.

183.368.    In the alternative, on information and belief,  based on Abbey's ownership and respective management roles within each of the other Abbey Defendants, and the actions those companies took at Abbey's direction, detailed above  Abbey was the alter ego of the other Abbey Defendants; Abbey dominated and controlled the other Abbey Defendants; a unity of interest and ownership existed between Abbey and the other Abbey Defendants; the other Abbey Defendants were mere shells and conduits for Abbey's affairs; the other Abbey Defendants were inadequately capitalized; Abbey and the other Abbey Defendants failed to abide by the formalities of corporate existence; and Abbey used the other Abbey Defendants' assets as their own and, in doing the things alleged herein, acted with such a unity of interest that the separate personalities of these corporate entities do not in reality exist and honoring their separate identities would bring about an inequitable result. The Abbey Defendants did not respect corporate formalities because they used their companies as mere shells to carry out their bribery scheme. As one example, NL Landscaping paid bribes in Services, at Abbey's direction, gave Shepos labor and material in connection with the Roscomare Road property, which (on information and belief) were intended to induce Shepos to provide illicit benefits to the any of the Abbey Defendants or as bribes in exchange for Shepos's help securing County leases

benefitting Abbey's other entities associated with Abbey.

The County entered into several lease agreements with the Abbey Defendants in order to house certain County departments and programs. While these leases were paid for by the County, the money the County used originated from a mixture of County, federal, and/or state grant dollars.

185.1.For example, on or about October 10, 2006, the County and AP-Palmdale—of which Abbey is the Chief Executive Officer—entered into a lease agreement for 2323 East Palmdale Boulevard in Palmdale, California (Lease No. 75892). The County used this space to house the Department of Mental Health.

Under this lease, the County agreed to pay AP-Palmdale: a base monthly rent of $14,808 with fixed, periodic rent increases during its term; a one-time payment of over $100,000 for tenant improvements; and $350,000 in furniture—totaling payments to AP-Palmdale of over $2.3 million over the ten-year term.

187.1.The County made payments to the AP-Palmdale for Lease No. 75892 using a mixture of Federal, State, and County funds.

Section 32(b) of the lease prohibits County employees from soliciting consideration "in any form" from landlords and states that landlords "shall not offer or give [] consideration in any form to a County officer, employee or agent for the purpose of securing favorable treatment with respect to the award of the Lease."

**C.    Frank A. Visco.**

189.369.    Lancaster, California businessman Frank Visco played a significant role in organizing the bribery scheme, including organizing the no-bid deals in the Antelope Valley. Shepos met with Visco each Wednesday in Lancaster to coordinate their fraudulent conduct. Visco was compensated, in part, by other commercial real estate entities and contractors for arranging no-bid deals on their behalf.

370.    David Schaeffer is an example of an individual who receivedVisco

understood that Shepos was a high-ranking County employee with authority to bind the County to significant contracts through Visco and in turn provided compensation to Visco. The influence the County's contractreal estate decisions. Thus, Visco bribed Shepos intending to corrupt Shepos's influence over the County for the Castaic Library was awarded to a Texas entity owned by David Schaeffer, yet his own benefit.

### 1.    Visco's Improper Relationship with Shepos.

371.   As described above, Shepos and Visco received County checkshad a strange and improper relationship. Visco often called Shepos on weekends, sometimes inviting Shepos to go for alleged tenant improvements to a P.O. boxrides in his Maybach. At least once, Visco visited Shepos at the Bel Air property during the renovations.

190.372.    Beginning in Lancaster, Californiathe late 1990s or early 2000s, Visco paid for Shepos's trips to various destinations, where they frequented resorts and casinos tougher. Shepos and Visco attended a golf tournament together in September 2007. They traveled to casinos, resorts, and other destinations, including Las Vegas in 2008, Palm Springs in 2009, and Santa Barbara in 2010. And they gambled together frequently over the years—including at least four or five times at Agua Caliente in Palm Springs.

On information and belief, Gregory Hanes is another associate of Visco with whom Visco advanced the bribery scheme. Visco and Shepos worked with other individuals who, on information and belief, included Hanes, to facilitate illicit payments to Shepos and payments from other property developers for obtaining no-bid contracts from the County. Hanes and Visco engaged in real estate transactions in the Antelope Valley with each other.

The evidence of Visco's involvement in the bribery scheme includes:

373.   Shepos accidentally called Ms. Gluck during a meeting with Visco in LancasterOn information and belief, Visco also gave Shepos cash payments—

including, for example, payments of $27,500 in or around November 2008, and $18,500 in or around November 2009. The basis for this informed belief is a handwritten note that Shepos gave to Ms. Gluck, and which he explained to her was a list of gambling trips and transactions with both Visco and Arman Gabaee. In particular, Shepos's handwritten note stated: "Nov 09 . . . W/F [Frank] . . . 18500" and "Nov 08 PS [Palm Springs] W/F . . . 27,500." In the same note, Shepos affirmed those dates and dollar amounts of Visco's payments: "11/17/08 . . . Frank $27,500" and "Nov 09 . . . 18,500 . . . Frank."

374. In January 2010, Shepos celebrated his birthday with Ms. Gluck and some friends at a high-end spa resort, which resulted in a substantial invoice. Ms. Gluck discovered that invoice years later, which revealed that their room had been booked under Frank Visco's name, and Visco had covered their weekend by providing Shepos with a $5,000 gift certificate.

375. In or around 2012, Visco gave Shepos frequent flyer miles allowing Shepos to upgrade his flight to New Orleans.

376. Shepos also took out a $1 million life insurance policy for his daughter from Visco's company, Visco Financial Insurance Services. Shepos's name was misspelled "Stepos" on that policy. A few years later, Shepos cashed in the policy without Ms. Gluck's knowledge.

a.377. Rather than representing the County in Visco's real estate transactions with the County—which was Shepos's job—Shepos instead referred to Visco as a "County client." For years, Shepos traveled to Lancaster to meet with Visco every Wednesday. During one of these meetings, Shepos accidentally called Ms. Gluck and left a voicemail. Visco can be heard on the recording saying, "no bid." Visco and Shepos also discussed cash payments. and square footage. Shepos suggested makingmentioned "Marissa"—referring to the payments in the namedaughter of Visco's secretary's daughter, employee Michelle Lantz—to which Visco replied, "get the family out."

On behalf of FCG Properties, a company to which he has no known legal connection, Visco submitted improvement reimbursement forms with invoices from his construction company. Shepos approved the reimbursement requests and made the reimbursements payable to Frank Visco directly made to his P.O. box.

Visco provided Shepos trips to various destinations where together they frequented resorts and casinos.

d.378. Shepos Deepening Shepos's strange and improper ties with Visco, Shepos developed a romantic relationship and took frequent trips with Frank an employee of Visco's employeecompany Visco Financial, Michele Lantz.

379.   Lantz has worked with Visco since the late 1990s, around the time when Shepos met them both. After Shepos's and Ms. Gluck's 2011 separation and her subsequent divorce filing, Shepos and Lantz developed a romantic relationship. At that time and continuing until around April 2017, Shepos had significant influence over Visco's real estate transactions with the County. Shepos and Lantz have remained in a romantic relationship since approximately 2012. During that time, they have attended several parties at Visco's home.

380.   Around July 2014, Shepos and Lantz vacationed at the Ritz-Carlton in Saint Thomas. In July 2015, Lantz gave Shepos Dodgers tickets. Shepos and Lantz also traveled together to Nashville in April 2016 and Los Cabos, Mexico in May 2017. And between 2018 and 2019, Shepos and Lantz took many other trips throughout the United States and internationally, including to Hawaii, New York, Italy, and Berlin.

381.  Shepos leveraged his close ties to Visco—a prominent, wealthy developer—to offer favors to other businesspersons in the Lancaster area. For example, on October 13, 2008, the owner of Antelope Valley Equipment & Truck Parts, emailed Shepos complaining about the company's problems obtaining

approvals from the City of Lancaster relating to its property. The owner asked if Shepos could help by getting Visco to talk to Rex Parris, the Mayor of Lancaster, on behalf of the Company. Shepos replied: "will contact visco tomorrow."

382.   In exchange for Visco's cash payments and gifts, Shepos ensured that the Visco Defendants received lucrative County contracts. From 2004 through 2016, Shepos authored at least ten letters to the County Board of Supervisors, plus related correspondence, recommending Visco for various projects. All told, Shepos authored and signed more than 100 memoranda approving and requesting payments to Visco totaling over $5 million.

**2.    The Visco Defendants' Tainted County Contracts.**

383.   During the period when Visco was bribing Shepos, the County entered into and renewed several lease agreements involving Visco in order to house certain County departments and programs. The County paid for these leases using money originating from a mixture of federal, State, and County grant funds.

**i.    335 & 349 East Avenue K-6.**

384.   Since 1987, the County has leased property from Visco, in his personal capacity, located at 335 and 349 East Avenue K-6 in Lancaster, California (Lease No. 58046). The County used this property to house departments that provide critical services to its citizens, including: the Department of Public Social Services, the Department of Public Works, the Department of Children and Family Services, the Department of Mental Health, and the Antelope Valley Health Center (which operates under the Department of Health Services).

385.   In November 1987, the County entered into a Donation Agreement whereby Visco would donate the property under Lease No. 58046 to the County 25 years after the lease commenced, in exchange for a plaque commemorating Visco (Donation Agreement No. 58048).

386.   After Shepos and Visco developed an improper relationship, Shepos became involved in this lease. Shepos negotiated and oversaw the making of

amendments to the lease and Donation Agreement. On or about October 19, 2004, the County and Visco entered into Amendment No. 2 to Lease No. 58046. Amendment No. 2 to the lease shortened the lease period by several months and authorized tenant improvements for DPSS up to $1,530,000, payable by the County to Visco as additional rent. Shepos was the County's work letter representative in connection with these tenant improvements.

387.  Shepos authored the Board letter recommending Amendment No. 2 to the lease. The Board letter stated, "**IT IS RECOMMENDED THAT YOUR BOARD**: "Approve and instruct the Chairman to sign the Amendment No. 2 with Frank A. Visco (Lessor) to shorten the term of Lease No. 58046 and Donation Agreement No. 58048," and "Authorize the CAO and DPSS to reimburse the Lessor for Tenant Improvements (TI) in an amount not to exceed $1,530,000."

388.  On or about October 19, 2004, the County and Visco also entered into Amendment No. 1 to the Donation Agreement No. 58048, which moved up the date by which Visco would transfer the property to the County to align with the lease termination date.

389.  Amendment No. 2 to Lease 58046 and Amendment No. 1 to Donation Agreement No. 58048 were signed by Visco during the period where Shepos and Visco were participating in the bribery scheme, as alleged in detail above.

390.  The County paid monthly rent to Visco on this lease—in part with federal funds—from November 3, 1987 to December 16, 2013, when ownership transferred to the County. All of the County's payments to Visco from October 2004 to December 2013 were tainted by Shepos's and Visco's bribery scheme.

391.  Through Lease No. 58046 and its amendments and renewals, Visco made the false representation that he had not and would not engage in bribery, and in turn, obtained lucrative government contracts based on those misrepresentations.

392.  Moreover, each invoice submitted pursuant to County leases or other agreements impliedly certified that the Visco Defendants would comply with

113<br>SECOND THIRD AMENDED COMPLAINT

California law, which forbids County employees from receiving bribes or having a financial interest in any such contract. *See* Cal. Gov. Code § 1090. Every invoice submitted by the Visco Defendants knowingly included a false implied certification that the Visco Defendants had complied with these legal requirements.

393.   Had the County known Visco was paying bribes to Shepos in exchange for Shepos's help in negotiating and securing these amendments and other preferential treatment of the Visco Defendants, the County would not have entered into Amendment No. 2 to Lease 58046 or Amendment No. 1 to the Donation Agreement No. 58048, and it would not have made rent payments thereunder.

### ii.      251 East Avenue K-6.

394.   On or about September 10, 1991, the County and Visco, in his personal capacity, entered into a lease for 251 East Avenue K-6 in Lancaster, California (Lease No. 65436). The County used the space to house the Office of the Assessor and the Department of Mental Health.

395.   On or about April 8, 2008, the County and Visco entered into Amendment No. 1 to this lease authorizing payments to Visco of up to $250,000 in tenant improvements and basic structural maintenance for the property. Shepos controlled this project and participated in the negotiation and making of this amendment. He also prepared a recommendation that the Board authorize and approve the amendment.

396.   Specifically, Shepos's Board letter recommended the authorization of "$250,000,000 in expenditures" used for TI. Shepos recommended that the Board "[f]ind that this Lease Amendment No. 1 is exempt from the provisions of California Environmental Quality Act (CEQA), and "[a]pprove and instruct the Chair to sign the attached Amendment No. 1 with Frank A. Visco (Lessor)."

397.   Approximately seven months after the County and Visco entered into Amendment No. 1, and in exchange for Shepos's assistance therewith, Visco paid Shepos $27,500 in cash.

398.   The County paid Visco monthly rent under this lease using a mixture of County, State, and federal funds until the lease expired in February 2017. The County's payments to Visco from April 2008 to February 2017 were tainted by the bribery scheme.

399.   Through Lease No. 65436 and its amendment, Visco made the false representation that they had not and would not engage in bribery, and in turn, obtained lucrative government contracts based on those misrepresentations.

400.   Moreover, each invoice submitted pursuant to County leases or other agreements impliedly certified that the Visco Defendants would comply with California law, which forbids County employees from receiving bribes or having a financial interest in any such contract. *See* Cal. Gov. Code § 1090. Every invoice submitted by the Visco Defendants knowingly included a false implied certification that the Visco Defendants had complied with these legal requirements.

401.   Had the County known that Visco was paying bribes to Shepos in exchange for Shepos's help in negotiating and securing the amendment, Shepos's recommendation for Board approval and other preferential treatment of the Visco Defendants, the County would not have entered into Amendment No. 1, nor would it have made payments thereunder.

### iii.   335-337 East Avenue K-10.

402.   On or about May 30, 2006, the County and Visco, in his personal capacity, entered into a lease agreement for 335-337 East Avenue K-10 in Lancaster, California (Lease No. 75678). The County used this space to house the Department of Public Social Services, the Department of Agricultural Commissioner/Weights and Measures, the Department of Military and Veterans Affairs, and the Housing Authority.

403.   Under this lease, the County agreed to pay Visco monthly rent of $43,859.60—totaling approximately $8 million over the fifteen-year term. At all times, the County made monthly payments as they were due under the lease, using a

mixture of County, State, and federal funds.

404.   Section 31(b) of the lease contains an express acknowledgement by Visco that County employees are forbidden from soliciting consideration "in any form" from landlords and that landlords "shall not offer or give [] consideration in any form to a County officer, employee or agent for the purpose of securing favorable treatment with respect to the award of the Lease." Visco signed this during the period when he was paying Shepos bribes, as alleged in detail above.

405.   Shepos was instrumental in negotiating and securing approval of this lease. Among other things, he: recommended that the Board approve the lease, prepared an Initial Study and Negative Declaration pursuant to CEQA determining that the project would not significantly affect the environment, and represented the County as the counterparty to Visco in connection with $1.5 million in County-funded improvements on the property.

406.   Specifically, Shepos authored a Board letter recommending that the Board "[a]pprove and instruct the Mayor to sign the attached 15-year lease with Frank. A Visco, Landlord" and authorize the Chief Administrative Office "to reimburse the landlord and acquire substitute financing for furniture systems for DPSS at a cost not to exceed $600,000."

407.   On or about December 8, 2009, approximately one month after Visco paid Shepos $18,500 in cash in exchange for Shepos's assistance, the County and Visco entered into Amendment No. 1 to the lease. This amendment expanded the space occupied by the County by 3,126 square feet and increased the County's rent payments by over $1 million.

408.   Shepos was heavily involved in negotiating and securing Amendment No. 1. For example, he recommended that the Board "find that the project will not have a significant effect on the environment" and "[a]pprove and instruct the Chair to sign Amendment No. 1 to Lease No. 75678 with Frank A. Visco (Landlord) for the occupancy of 3,126 rentable square feet of office space."

409.    From January 1, 2007 to May 29, 2021, the County made monthly rental payments pursuant to this lease, using a mixture of County, State, and federal funds.

410.    Through Lease No. 75678 and its amendment, Visco made the false representation that they had not and would not engage in bribery, and in turn, obtained lucrative government contracts based on those misrepresentations.

411.    Moreover, each invoice submitted pursuant to County leases or other agreements impliedly certified that the Visco Defendants would comply with California law, which forbids County employees from receiving bribes or having a financial interest in any such contract. *See* Cal. Gov. Code § 1090. Every invoice submitted by the Visco Defendants knowingly included a false implied certification that the Visco Defendants had complied with these legal requirements.

412.    Had the County known that Visco was paying bribes to Shepos in exchange for Shepos's help in negotiating and securing the lease and amendment, Shepos's recommendations for Board approval, and other preferential treatment of the Visco Defendants, the County would never have entered the lease or Amendment No. 1, nor would it have made payments thereunder.

### iv.    The Castaic Library.

413.    In or around January 2008, the County entered into a lease agreement for 27971 Sloan Canyon Road in Castaic, California with a series of entities as to whom the successor-in-interest is nonparty Castaic FCG (Lease No. 76453). This property houses the Castaic Library (a branch of the Los Angeles County Library), which provides library services to over 3.4 million County residents in a service area extending over 3,000 square miles.

414.    Section 31(b) of the lease contains an express acknowledgment that County employees are forbidden from soliciting consideration "in any form" from landlords and that landlords "shall not offer or give [] consideration in any form to a County officer, employee or agent for the purpose of securing favorable treatment with respect to the award of the Lease."

415.   The County's lease with Castaic FCG was later amended to provide for tenant improvements, payable by the County to Castaic FCG, in an amount of up to $1,968,120. The contract authorized an administrative fee of 3% on the tenant improvements.

416.   In or around January 2013, Castaic FCG transferred its right to perform these tenant improvements, and its concomitant right to payment, to Visco Financial, whose CEO was Visco. This assignment required approval by the County and was orchestrated by Shepos. Shepos recommended to the Board that Visco Financial be awarded the contract for the tenant improvements. In doing so, Shepos circumvented a competitive bidding process. Visco Financial was not a licensed contractor and subsequently subcontracted the work to Sawyer Construction & Associates. At the time Shepos made this recommendation to the Board, he was taking bribes from Visco and had been doing so for years.

417.   Shepos was also responsible for approving requests for payment for tenant improvements under the contract with Visco Financial. In December 2014, Shepos authored at least ten memoranda to the County's Section Head for Rent/Budget Administration, directing the County to "make a lump sum payment" to Visco personally for tenant improvements. The amounts Shepos approved repeatedly exceeded what was permitted under the contract or what had been authorized by the Board. For example, although the contract only permitted tenant improvements of up to $1,968,120, Shepos arranged for payments to Visco Financial totaling $2,542,449—an excess of over $570,000. Further, although the contract only permitted payment for telephone, data, and low-voltage system implementation of up to $200,000, Shepos arranged for payments to Visco Financial totaling $448,056— more than double what the contract allowed. And although the contract only permitted a 3% administrative fee for tenant improvements, Visco Financial submitted 12% in fees (over $300,000) for approval. Shepos approved the 12% fee when he had no authority to do so. Shepos also approved fees based on services that

did not qualify for payment under the contract.

418. The County paid these fees directly to Visco personally—in part with federal funds—sending the payments to his P.O. box in Lancaster.

419. At the time Visco's fees were approved by the County, Shepos was taking bribes from Visco and had been doing so for years.

420. Had the County known that Visco was paying bribes to Shepos in exchange for Shepos's help in negotiating and securing the assignment, Shepos's recommendation for Board approval, Shepos's approval of inflated invoices, and other preferential treatment of the Visco Defendants, the County would not have approved Visco Financial for the improvement project or made any payments to Visco Financial in connection with the assignment.

421. Each invoice submitted pursuant to County leases or other agreements impliedly certified that the Visco Defendants would comply with California law, which forbids County employees from receiving bribes or having a financial interest in any such contract. *See* Cal. Gov. Code § 1090. Every invoice submitted by the Visco Defendants knowingly included a false implied certification that the Visco Defendants had complied with these legal requirements.

### v.    43423 Division Street.

422. On or about May 21, 2013, the County entered into a lease agreement with Fraber II, a company managed by Visco, for 43423 Division Street in Lancaster, California (Lease No. 77946) to house the County's Probation Department.

423. The lease has a base monthly rent of $24,150, totaling approximately $2.3 million in rent payments to Fraber II over an eight-year term.

424. Shepos took out numerous life insurance policiesThe lease was in effect from May 21, 2013 until May 20, 2021. The County paid Fraber II monthly rent through May 20, 2021, using a mixture of County, State, and federal funds.

425. Section 31(b) of the lease prohibits County employees from soliciting consideration "in any form" from landlords and states that landlords "shall not offer

1  or give [] consideration in any form to a County officer, employee or agent for the

2  purpose of securing favorable treatment with respect to the award of the Lease."

3  c.426. Visco's insurance company,Shepos was instrumental in the making of

4  this contract and provided Visco Financial Insurance Serviceswith non-public

5  County information in order to make it happen. Specifically, he told Visco the County

6  needed a space for its Probation Department in Lancaster and asked if Visco knew

7  anyone who might be willing to do a deal and work with the City of Lancaster. A few

8  weeks later, Visco and Shepos made an arrangement for the County to lease Visco's

9  property. Shepos was the County's agent with respect to the lease transaction.

10  In January 2010, Ms. Gluck celebrated Shepos's 60th birthday at

11  a high-end spa resort, which resulted in a substantial invoice.

12  Several years later Ms. Gluck discovered the invoice for the

13  weekend at the spa resort, which revealed a room for Frank Visco

14  and a $5,000 gift certificate provided  on information and

15  belief  by Visco covering the charges on the bill.

16  Contracts indicating that Shepos purchased land on behalf of the

17  County directly from Visco. According to the contract, the land

18  was purchased to ensure a certain portion of the county remained

19  in a natural state.

20  427.  On information and beliefShepos also authored a Board letter

21  recommending approval of the lease with Visco. Specifically, the Board letter

22  recommended that the Board "find that the project will not have a significant effect

23  on the environment," and "[a]pprove and instruct the chairman to sign the eight-year

24  lease with Fraber II, LLC…for the occupancy of 13,800 rentable square feet of office

25  space and 52 parking spaces." Shepos also authored the Negative Declaration to the

26  Board determining that "the project will not have a significant effect on the

27  environment." Shepos recommended the Board approve the lease because he had

28  received and was continuing to receive cash and other benefits from Visco.

428.   Additionally, Shepos served as the County's representative for the Work Letter supplementing the lease that approved tenant improvements in the amount of $1,035,000 payable to Fraber II, LLC.

429.   In Lease No. 77946, Visco and Fraber II made the false representation that they (and the other Visco Defendants) had not and would not engage in bribery, and in turn, obtained lucrative government contracts based on those misrepresentations.

430.   Moreover, each invoice submitted pursuant to County leases or other agreements impliedly certified that the Visco Defendants would comply with California law, which forbids County employees from receiving bribes or having a financial interest in any such contract. *See* Cal. Gov. Code § 1090. Every invoice submitted by the Visco Defendants knowingly included a false implied certification that the Visco Defendants had complied with these legal requirements.

431.   Had the County known that Visco was paying bribes to Shepos in exchange for Shepos's help in negotiating and securing the lease, Shepos's recommendation for Board approval and other preferential treatment of the Visco Defendants, the County would not have entered the lease and the tenant improvement work contract, nor would it have made payments thereunder.

**3.     Visco and Shepos Concealed Their Scheme.**

432.   Shepos and Visco mutually agreed to take steps (and did take steps) to conceal the bribery scheme. They met in person to discuss their scheme, rather than putting anything in writing. Shepos hid Visco's cash bribes from Ms. Gluck. Shepos did not report the cash or gifts he received from Visco on his Form 700s, or through any other means that could have provided the County with visibility into the scheme.

433.   In their leases with the County, as outlined above, the Visco Defendants also represented and affirmed their understanding that County employees like Shepos are prohibited from having any financial interest in County leases, and that landlords are prohibited from giving County employees like Shepos any consideration in

exchange for favorable treatment. The County relied on these representations and confirmations from the Visco Defendants.

**4.    The Visco Defendants' Agency and Alter-Ego Relationships.**

193.434.    Based on Visco's ownership and respective management roles within each of the other Visco Defendants, and the actions those entities took at Visco's direction, all detailed above, Visco owns, controls, and/or directs the actions of the other Visco Defendants who, in doing the acts alleged herein, acted at their direction and/or with their permission, knowledge, consent or ratification.

194.435.    In the alternative, on information and belief, based on Visco's ownership and respective management roles within each of the other Visco Defendants, and the actions those entities took at Visco's direction, all detailed above Visco was the alter ego of the other Visco Defendants; Visco dominated and controlled the other Visco Defendants; a unity of interest and ownership existed between Visco and the other Visco Defendants; the other Visco Defendants were mere shells and conduits for Visco's affairs; the other Visco Defendants were inadequately capitalized; Visco and the other Visco Defendants failed to abide by the formalities of corporate existence; and Visco used the other Visco Defendants' assets as their own and, in doing the things alleged herein, acted with such a unity of interest that the separate personalities of these corporate entities do not in reality exist and honoring their separate identities would bring about an inequitable result. The Visco Defendants did not respect corporate formalities because they used their companies as mere shells to carry out their bribery scheme. As one example, Visco provided Shepos with various trips and gifts, including a $5,000 gift certificate, which (on information and belief) were intended to induce Shepos to provide illicit benefits to the any of the Visco Defendants or other entities associated with Visco, such as lucrative County leases and Shepos's approvingapproval of fraudulent reimbursement requests for invoices fromunder Visco's construction company but which were made payable directly to ViscoCounty contracts.

The County entered into several lease agreements involving Visco in order to house certain County departments and programs. While these leases were paid for by the County, on information and belief, the money the County used originated from a mixture of County, federal, and/or state grant funds.

196.1.For example, on or about May 21, 2013, the County entered into a lease agreement with Fraber II (which, on information and belief, is Fraber Properties II, LLC), a company managed by Visco, for 43423 Division Street in Lancaster, California (Lease No. 77946) to house the County's Probation Department.

197.1.The lease has a base monthly rent of $24,150, totaling approximately $2.3 million in rent payments to Fraber II over an eight-year term.

198.1.Section 31(b) of the lease prohibits County employees from soliciting consideration "in any form" from landlords and states that landlords "shall not offer or give [] consideration in any form to a County officer, employee or agent for the purpose of securing favorable treatment with respect to the award of the Lease."

David Schaeffer

David Schaeffer, a property developer, participated in the bribery scheme by compensating other Defendants who in turn provided government officials with bribes to award no-bid contracts to Schaeffer.

The evidence against Schaeffer's efforts to secure above-market leases through bribery includes:

Schaeffer entered into a lease agreement with the County through his entity FCG Properties. Despite his company having no known legal connection with Frank Visco, Schaeffer's entity submitted improvement reimbursement forms with invoices from Visco's construction company. Shepos approved the reimbursement requests and made the reimbursements payable to Frank Visco directly—made to his P.O. box—rather than to Schaeffer or FCG

Properties. Schaeffer repeated a similar scheme through another one of his entities: Castaic FCG Properties, LLC

On information and belief, Shepos went to Texas to meet with Schaeffer or his associates. Shepos called Ms. Gluck's daughter while he was on one such trip and the number from which he called appeared to be from a bank in the town where FCG's address is located.

On information and belief, Schaeffer owns, controls, and/or directs the actions of the other Schaeffer Defendants who, in doing the acts alleged herein, acted at their direction and/or with their permission, knowledge, consent or ratification.

In the alternative, on information and belief, Schaeffer is an alter ego of the other Schaeffer Defendants; Schaeffer dominated and controlled the other Schaeffer Defendants; a unity of interest and ownership existed between Schaeffer and the other Schaeffer Defendants; the other Schaeffer Defendants were mere shells and conduits for the affairs of Schaeffer; the other Schaeffer Defendants were inadequately capitalized; Schaeffer and the other Schaeffer Defendants failed to abide by the formalities of corporate existence; and Schaeffer used the other Schaeffer Defendants' assets as their own and, in doing the things alleged herein, acted with such a unity of interest that the separate personalities of these corporate entities do not in reality exist and honoring their separate identities would bring about an inequitable result. The Schaeffer Defendants did not respect corporate formalities because they used their companies as mere shells to carry out their bribery scheme. As one example, FCG Properties submitted reimbursement requests, which Shepos approved, that were made payable directly to Frank Visco, despite Visco having no legal or corporate relationship to Schaeffer or FCG Properties.

For example, on or around January 2008, the County entered into a lease agreement with a series of entities succeeded-in-interest by Castaic FCG (Lease No. 76453) for 27971 Sloan Canyon Road in Castaic, California. This property houses

the Castaic Library, a branch of the LA County Library. Visco and Shepos conspired to obtain the County's approval for Castaic FCG's bid.

The lease expressly states that County employees are forbidden from soliciting consideration "in any form" from landlords and that landlords "shall not offer or give [] consideration in any form to a County officer, employee or agent for the purpose of securing favorable treatment with respect to the award of the Lease."

The lease was amended to provide for improvements paid for by the County to Castaic FCG in an amount of up to $1,968,120 and authorized an administrative fee of 3% on the improvements. On or around January 2013, Castaic FCG transferred its right to perform these improvements and its right to payment to Visco Financial. This assignment required approval by the County, which Shepos secured.

Schaeffer conspired with Visco to transfer the contract to Visco.

Shepos was responsible for approving requests for payment for improvements under the contract and repeatedly approved amounts that exceeded the limits stated in the contract or approved by the Board. Shepos also authored a letter to the Board on October 2013, recommending that the County acquire the Castaic Library, which the County purchased for $2.4 million.

In total, Shepos authored and signed more than 100 memoranda approving and requesting payments to the Visco Defendants of more than $5 million in association with the Castaic Library lease. And in return, Shepos received unlawful bribes and kickbacks.

Alex and Isaac Moradi

Founded in 1966, Alex and Isaac Moradi's ICO Group owns over 3,000,000 square feet of commercial real estate. The Moradis are also relatives of Arman and Mark Gabaee, owners of the Charles Company. Alex and Isaac Moradi have done millions of dollars in lease transactions with the County. The evidence of the Moradis' involvement in the bribery scheme includes:



1          Alex Moradi emailed Shepos's family email address, "WE can
2     pick up bldg. for good price" and asked whether Shepos would be
3     able to line up a County need before Moradi would decide to
4     move forward with the purchase.
5          Alex Moradi emailed Shepos's family email address, "Does
6     County have need for space in Santa Clarita? Great opportunity
7     there!" Shepos responded, "Yes contact me."
8          A May 2008 email from Alex Moradi's executive assistant at ICO
9     Development, Inc. to Shepos's personal email address regarding
10    "HOB Membership," stating, "So I heard the good news, Arman
11    did join the membership after all," and asking, "am I right to
12    assume we will now work on a credit for Alex like you had
13    mentioned?" On information and belief, this was regarding the
14    HOB membership which the Moradis and the Gabaees paid for.
15         Alex and Isaac Moradi sent an ornate gold vase to Shepos as a
16    holiday gift.
17    As the above shows, the Moradis and the Gabaees were conspiring with
18 each other to bribe Shepos through the House of Blues Membership. On information
19 and belief, the Moradis and the Gabaees, who are related, along with the Gabaee and
20 Moradi Defendants, were conspiring with each other to bribe Shepos and any bribes
21 any of them provided Shepos were meant to benefit one another. Thus, on
22 information and belief, bribes that Gabaee provided Shepos were meant to and did
23 secure illicit benefits from Shepos flowing to both the Gabaee Defendants and the
24 Moradi Defendants.
25    On information and belief, the Moradis own, control, and/or direct the
26 actions of the other Moradi Defendants who, in doing the acts alleged herein, acted
27 at their direction and/or with their permission, knowledge, consent or ratification.
28

1  Further, the Moradis worked directly with the Gabaees to enrich Shepos and advance

2  their scheme.

3          In the alternative, on information and belief, the Moradis were alter egos

4  of the other Moradi Defendants; the Moradi dominated and controlled the other

5  Moradi Defendants; a unity of interest and ownership existed between the Moradis

6  and the other Moradi Defendants; the other Moradi Defendants were mere shells and

7  conduits for the Moradis' affairs; the other Moradi Defendants were inadequately

8  capitalized; the Moradis and the other Moradi Defendants failed to abide by the

9  formalities of corporate existence; and the Moradis used the other Moradi

10  Defendants' assets as their own and, in doing the things alleged herein, acted with

11  such a unity of interest that the separate personalities of these corporate entities do

12  not in reality exist and honoring their separate identities would bring about an

13  inequitable result. The Moradi Defendants did not respect corporate formalities

14  because they used their companies as mere shells to carry out their bribery scheme.

15  As one example, Moradi Defendants bribed Shepos through the House of Blues

16  Membership, which (on information and belief) were intended to induce Shepos to

17  provide illicit benefits to the any of the Moradi Defendants or other entities associated

18  with the Moradis.

19          The County entered into several lease agreements with the Moradis to

20  house certain County departments and programs. While these leases were paid for by

21  the County, the money the County used originated from a mixture of County, federal,

22  and/or state grant funds.

23      214.1.For example, on or about August 19, 1997, the County and Isaac Moradi

24  entered into a lease agreement for 2415 West 6th Street in Los Angeles, California

25  (Lease No. 70957). The County used this space to house the Department of Public

26  Social Services.

27          Under the lease agreement, the County agreed to pay a monthly rent of

28  $39,293.80 totaling over $4.7 million over the ten-year term. This term was

1  ~~extended to 2008, with the County paying Isaac Moradi an additional $3.3 million in~~

2  ~~rent.~~

3          ~~On or about July 15, 2014, the County and Isaac Moradi entered into~~

4  ~~Amendment No. 2 to the lease agreement. The amendment extended the term of the~~

5  ~~lease for five years and set monthly rent at $78,587.60, with bi-yearly increases to~~

6  ~~rent over ten years totaling payments to Isaac Moradi of approximately $4.7~~

7  ~~million.~~

8          ~~The County made payments to Isaac Moradi under Lease No. 70957~~

9  ~~using a mix of Federal, State, and County funds.~~

10      ~~F.~~**D.**   **The Neman Brothers** ~~.~~

11      ~~218.~~**436.**   The Neman brothers—Leon, Yoel, and John—own Neman

12  Brothers & Associates Inc., a wholesale fabric business operating out of New York

13  and Los Angeles. The ~~brothers~~Nemans also own commercial real estate through

14  holding companies such as Vertigo Real Estate Holdings LP and Legend Real Estate

15  Management, Inc. ~~The evidence of the Nemans' involvement in the bribery scheme~~

16  ~~includes:~~

17          ~~The Neman brothers did multiple transactions with Los Angeles~~

18                  ~~County.~~

19      **437.**   ~~Shepos~~The Nemans understood that Shepos was a high-ranking County

20  employee with authority to bind the County to significant contracts and influence the

21  County's real estate decisions. For years, the Neman Defendants paid Shepos in cash

22  and checks—both directly to Shepos and to his side business CT Management—in

23  exchange for nonpublic County information and Shepos's help securing a lucrative

24  County lease in Palmdale, California.

25      **438.**   In 1998, for example, Neman Brothers paid Shepos $4,058. In 1999,

26  Neman Brothers paid Shepos $4,531.93. In 2001, Neman Brothers paid Shepos

27  $2,945. In 2006, Vertigo paid Shepos $5,000 through CT Management. And in 2010,

28  Vertigo again paid Shepos $5,000 through CT Management. These payments from

the Neman Defendants—all at the Nemans' direction—are memorialized in contemporaneous Form 1099s issued to Shepos.

b.439.On June 1, 2010, Shepos (using his personal email address) emailed Leon Neman with bribe instructions by noting, "instructing him to "make any commissions payable to CT Management as has been done in the past."

440.   On or around September 1, 2010, Shepos deposited a check for $5,000 from Legend—signed by Leon Neman—and made payable to CT Management, into his bank account.

441.   In total, the Nemans, through their entities, have paid Shepos at least $26,545 during Shepos's tenure as a County employee—and without any legitimate business purpose. Those payments were bribes, which the Nemans intended to influence Shepos to provide nonpublic information about the County's leasing needs and help them secure a lucrative County lease benefitting the Nemans.

442.   On or about October 20, 1999, the County and the Neman brothers, in their personal capacities, entered into a lease agreement for 1529 East Palmdale Boulevard in Palmdale, California (Lease No. 72555). The County used this space to house the Department of Mental Health and the Sheriff's Department.

443.   Under this lease, the County agreed to pay a monthly rent of $11,848.75 for a period of ten years—totaling payments of approximately $1.4 million.Multiple Form 1099s documenting The lease had two five-year renewal options. Throughout the term of the lease—including its subsequent renewals—the County made monthly rent payments as they became due, using a mixture of County, State, and federal funds.

444.   Shepos was the real property agent associated with the lease. Indeed, Shepos was instrumental in negotiating and securing approval of the lease. When the County needed a site to house the Department of Mental Health, Shepos steered the business to the Nemans, who had been unsuccessful in renting out their Palmdale space. Shepos also authored the Board letter recommending approval of the lease.

Specifically, the Board letter recommended that the Board "[a]pprove and instruct the Chairman to sign the attached ten year lease with John Neman, Yoel Neman and Leon Neman (Lessors), for 7,656 rentable square feet of office space," and "find that the project will not have a significant effect on the environment."

445.   In June 2010, the County renewed the lease for a five-year term. Shepos authored the Board letter recommending that the Board "[e]xercise the option to renew the lease for a five-year term with John Neman, Leon Neman, and Yoel Neman (Lessors) for 9,479 rentable square feet of office space and 28 parking spaces."

446.   After the initial 10-year term and the first five-year renewal, the County exercised its second option to renew the lease for another five years, under the same terms and conditions, with the rent adjusted for inflation per the U.S. Bureau of Labor Statistics' Consumer Price Index ("CPI").

447.   When the second renewal term lapsed, the County continued to occupy the premises until September 30, 2023 as a holdover tenant. During this period, the County made monthly rental payments as they were due, using a mixture of County, State, and federal funds.

448.   In exchange for Shepos's assistance in securing the Neman Lease, the Nemans bribed Shepos and gave him kickbacks in the form of cash payments between 1998 and 2010. As set forth above, the Neman Defendants were paying Shepos thousands of dollars both during the time when they negotiated the lease with the County and for years thereafter.

449.   Section 31(b) of the lease prohibits County employees from soliciting consideration "in any form" from landlords and states that landlords "shall not offer or give, either [] directly or through an intermediary, consideration, in any form, to a County officer, employee or agent for the purpose of securing favorable treatment with respect to the award of the lease."

450.   ~~from various~~In their County lease and renewals, the Nemans made the false representation that they (and the other Neman Defendants) had not and would

1  not engage in bribery, and in turn, obtained lucrative government contracts based on
2  those misrepresentations.

3      451.  Moreover, each invoice submitted pursuant to County leases or other
4  agreements impliedly certified that the Neman Defendants would comply with
5  California law, which forbids County employees from receiving bribes or having a
6  financial interest in any such contract. *See* Cal. Gov. Code § 1090. Every invoice
7  submitted by the Neman Defendants knowingly included a false implied certification
8  that the Neman Defendants had complied with these legal requirements.

9      452.  Had the County known the Neman Defendants were bribing Shepos and
10  paying him kickbacks in exchange for Shepos's help in negotiating and securing the
11  lease, Shepos's recommendations for Board approval, and other preferential
12  treatment of the Neman Defendants, the County would never have entered the Neman
13  Lease, nor would it have made payments thereunder.

14      c.453. Shepos and the Nemans mutually agreed, and took steps, to conceal their
15  bribery scheme. Rather than paying Shepos directly, the Nemans indirectly bribed
16  Shepos through their entities, Neman Brothers entities including the wholesale
17  fabric company to ., Vertigo, and Legend. Shepos disguised many of these bribe
18  payments by receiving them through his side business, CT Management. Shepos
19  never disclosed the payments he received from the Neman' entities to the County.

20      454.  On information and belief, the Neman brothersIn their lease with the
21  County, the Nemans represented and affirmed their understanding that County
22  employees like Shepos were prohibited from having any financial interest in County
23  contracts and that landlords (including the Nemans) are prohibited from giving
24  County employees any consideration in exchange for favorable treatment. The
25  County relied on those representations by the Nemans in paying rent under their
26  leases.

27      219.455.  Based on the Nemans' ownership and respective management
28  roles within each of the other Neman Defendants, and the actions those entities took

at the Nemans' direction, all detailed above, Leon, Yoel, and John Neman own, control, and/or ~~direct~~directs the actions of ~~the other~~ Neman ~~Defendants~~Brothers, Vertigo, and Legend, who, in doing the acts alleged herein, acted at their direction and/or with their permission, knowledge, consent or ratification.

~~220.~~456.    ~~In the alternative, on information and belief,~~ In the alternative— based on the Nemans' ownership and respective management roles within each of the other Neman Defendants, and the actions those companies took at Leon, John, and Yoel Nemans' direction, detailed above— the Neman brothers were alter egos of the other Neman Defendants; the Neman brothers dominated and controlled the other Neman Defendants; a unity of interest and ownership existed between the Neman and the other Neman Defendants; the other Neman Defendants were mere shells and conduits for the Neman brothers' affairs; the other Neman Defendants were inadequately capitalized; the Neman and the other Neman Defendants failed to abide by the formalities of corporate existence; and the Neman brothers used the other Neman Defendants' assets as their own and, in doing the things alleged herein, acted with such a unity of interest that the separate personalities of these corporate entities do not in reality exist and honoring their separate identities would bring about an inequitable result. The Neman Defendants did not respect corporate formalities because they used their companies as mere shells to carry out their bribery scheme. As one example, ~~the~~ Neman ~~Defendants~~Brothers, Legend, and Vertigo paid bribes to Shepos and CT Management, which ~~(on information and belief)~~ were intended to induce Shepos to provide ~~illicit benefits to~~the Neman Defendants with nonpublic information and secure a lucrative County lease for the ~~any of the Neman Defendants or other entities associated with the Neman brothers~~Nemans.

~~The County entered into several lease agreements with the Neman Defendants to house certain County departments and programs. While these leases were paid for by the County, the money the County used originated from a mixture of County, federal, and/or state grant funds.~~

1    ~~For example, on~~ or about October 20, 1999, the County and the Neman brothers,

2    in their personal capacities, entered into a lease agreement for 1529 East Palmdale Boulevard in

3    Palmdale, California (Lease No. 72555). The County used this space to house the Department of

4    Mental Health.

5    ~~Under this lease, the County agreed to pay a monthly rent of $11,848.75 for a period~~

6    of ten years — totaling payments of approximately $1.4 million.

7    ~~The County made payments to the Neman brothers under Lease No.~~

8    72555 using a mixture of Federal, State, and County funds.

9    ~~225.1.~~Section 31(b) of the lease prohibits County employees from soliciting

10   consideration "in any form" from landlords and states that landlords "shall not offer

11   or give, either [] directly or through an intermediary, consideration, in any form, to a

12   County officer, employee or agent for the purpose of securing favorable treatment

13   with respect to the award of the lease."

14   **~~G.~~E.   Gregory Hanes~~.~~**

15   ~~226.~~457.    Gregory Hanes, a real estate developer in Lancaster, California,

16   operates limited liability companies 300 K-6 and 43917 Division~~.~~ as the managing

17   member of both LLCs.

18   458.   ~~Hanes worked with~~ In or around 2010, after Shepos ~~and, on~~ had helped

19   Visco obtain several lucrative County leases, Visco introduced Shepos to his

20   longtime associate Hanes, also a wealthy developer in Lancaster.

21   459.   Shepos and Hanes became fast friends. According to the County's

22   subsequent investigation, stemming from information ~~and belief, other Defendants~~

23   ~~to launder money for their bribery schemes in order to conceal them. The evidence~~

24   ~~of~~the County received from Ms. Gluck, Hanes considered Shepos "a good friend"

25   with an "extraordinary personality."

26   460.   Around 2013 or 2014, Hanes invited Shepos to vacation with him and

27   his son on a cross-country road trip. Shepos accepted and flew to New Orleans, where

28   Shepos stayed as a guest in Hanes's ~~involvement~~son's hotel rooms in New Orleans,

1   then in Memphis, and then in theSt. Louis. During this vacation, Hanes paid for
2   Shepos's hotel room and meals.

3          **1.     Hanes's Storage and Laundering of Bribery Proceeds.**

4          461.   Hanes funneled hundreds of thousands of dollars in bribery proceeds to
5   Shepos—including bribes from several other Defendants—helping conceal those
6   bribes by storing large sums of cash for Shepos. In exchange, Shepos helped Hanes
7   obtain lucrative County leases and tenant-improvements projects.

8          227.462.   Hanes understood that Shepos was a high-ranking County
9   employee with authority to bind the County to significant contracts and influence the
10  County's real estate decisions. Thus, Hanes helped Shepos conceal bribery scheme
11  includes:proceeds intending to corrupt Shepos's influence over the County for
12  Hanes's own (and his entities') benefit.

13                 Hanes is referred to as "Individual A" in Shepos's Plea
14                 Agreement.

15         b.463.Shepos provided Hanes hundreds of thousands of dollars representing
16  proceeds from his bribery schemes to store in bank accounts under Hanes's and his
17  entities' names.

18         464.   Hanes funneledis referred to as "Individual A" in Shepos's guilty plea,
19  which is attached as Exhibit A and incorporated by reference herein. In that plea
20  agreement, Shepos admitted to giving Hanes cash to store for him on multiple
21  occasions, including approximately $150,000 on one occasion, and on another
22  occasion, between $25,000 and $40,000.

23         465.   On yet another occasion, according to the County's subsequent
24  investigation, stemming from information the County received from Ms. Gluck,
25  Shepos gave Hanes $128,000 in cash to store in Hanes's safe—telling Hanes it was
26  a "real estate commission" that he needed to hide from his then-wife, Ms. Gluck. In
27  Shepos's plea agreement, he admitted that he had "arranged to receive improper
28  kickbacks from real estate commissions on properties leased by the County." Ex. A,

at 15. According to the County's subsequent investigation, stemming from information the County received from Ms. Gluck, Hanes agreed to store cash from Shepos's real estate commission kickbacks in his office safe in a bank bag with Shepos's name and the amount of money listed on the outside.

466.   According to the County's subsequent investigation, stemming from information the County received from Ms. Gluck, Hanes said he agreed to store cash that Shepos received as "real estate commissions" as a "favor."

467.   Hanes also helped Shepos launder bribe proceeds by funneling bribes to Shepos from other developers and ~~business owners, including through the $25,000~~ contractors. For example, on multiple occasions after approximately August 2013, at Shepos's direction, Hanes cashed $25,000 checks from an electrical contractor who was bribing Shepos in connection with County contracts. According to the County's subsequent investigation, stemming from information the County received from Ms. Gluck, the electrical contractor wrote the checks to Hanes or his entities with falsified memo lines, and Hanes cashed those checks to store the cash proceeds in Shepos's bank bag in Hanes's safe.

~~c.~~468. On another occasion, at Shepos's direction, Hanes deposited a cashier's check ~~discovered by Gluck~~from the electrical contractor for Shepos into Hanes's own bank account, and then used the funds to purchase a cashier's check for Shepos. According to the County's subsequent investigation, stemming from information the County received from Ms. Gluck, Hanes admitted that no one else had access to his US Bank account, and he signed the withdrawal slip for that cashier's check. In Shepos's plea agreement, he admitted to using the cashier's check—which reflected bribe proceeds—to buy his daughter a car.

**2.    ~~In~~ The Hanes Defendants' Tainted County Contracts.**

469.   During the period when Hanes was storing and laundering bribe proceeds for Shepos, the County entered into and renewed several lease agreements involving Hanes in order to house certain County departments and programs. The

County paid for these leases using money originating from a mixture of federal, State, and County grant funds.

470.   Shepos negotiated Hanes's real estate contracts with the County on the County's behalf, and Shepos recommended that the Board approve those contracts—all of which were signed while Shepos and the Hanes Defendants were engaged in the scheme described above. Shepos also acted as the County's agent in overseeing and approving millions of dollars in renovations and tenant improvements on the properties Hanes leased to the County.

### i.      300 East Avenue K-6.

471.   Through his company, 300 K-6, Hanes owned a building adjacent to Visco's properties on East Avenue K-6 in Lancaster. Immediately after Visco introduced them, Shepos began negotiating directly with Hanes to lease the property for the Department of Children and Family Services ("DCFS").

472.   In or around January 2010, Shepos prepared an Initial Study and Negative Declaration pursuant to CEQA determining that the lease project would not significantly affect the environment. The Initial Study, which was posted publicly on January 15, 2010, states that it was "prepared by Thomas Shepos of the Los Angeles County Chief Executive Office, Real Estate Division," and "completed on January 14, 2010." The Negative Declaration, which was also completed on January 14, 2010, and posted publicly on January 15, 2010, lists Shepos as the Real Property Agent.

473.   Shepos then authored a Board letter, which was submitted to the Board on March 30, 2010, stating "**IT IS RECOMMENDED THAT YOUR BOARD**" take several specific actions, including: (i) find "that there is no substantial evidence that the project will have a significant effect on the environment"; (ii) "find that the Negative Declaration reflects the independent judgment and analysis of the Board and adopt the Negative Declaration"; (iii) "[a]pprove and instruct the Chair to sign the lease with Gregory Hanes (Landlord) for 11,000 rentable square feet of office space located at 300 East Avenue K-6, Lancaster, for [DCFS] at a maximum annual

first year rent of $592,680," which included annual base rent of $262,680 and reimbursement of lump sum payments of $55,000 for tenant improvements and $270,000 for furniture expenses; and (iv) authorize the landlord, "at the discretion ofthe Chief Executive Officer, to acquire telephone, data and low voltage systems for [DCFS] at a cost not to exceed $300,000," reimbursable by the County in addition to other tenant improvements.

474.   On or about March 30, 2010, the Board adopted Shepos's recommendations, and the County entered into a lease agreement with Hanes, in his personal capacity, for 300 East Avenue K-6 in Lancaster, California (Lease No. 77260), under which the County agreed to pay a base monthly rent of $21,890 for a period of five years—totaling payments of approximately $1.3 million. At all times, the County made monthly rent payments as they were due under the lease, in part with federal funds.

475.   As Shepos recommended, the lease also authorized reimbursement of up to $55,000 for tenant improvements, and up to $270,000 in furniture expenses. 300. Shepos was the primary County employee who oversaw all of the tenant improvements, and he dealt directly with Hanes. According to the County's subsequent investigation, stemming from information the County received from Ms. Gluck, Shepos and Hanes spoke daily, and every Wednesday, Shepos visited the property. Shepos often spent the entire day with Hanes, and Visco would meet with them for lunch prepared by Hanes's chef.

476.   During the first year of the lease, the County reimbursed Hanes for tenant improvements and furniture expenses pursuant to the terms of the lease that Shepos negotiated on its behalf, in addition to hundreds of thousands of dollars in additional tenant improvements above those authorized by the lease. These additional tenant improvements were reimbursed at Shepos's direction.

477.   On November 8, 2010, Shepos authored a memorandum directing the County's Rent/Budget Administration Section to "reimburse landlord Gregory Hanes

in the amount of $52,946 for the over standard Tenant Improvements for 300 East Avenue K-6."

478.    On June 21, 2011, Shepos authored a memorandum informing the County's Rent/Budget Administration Section that additional "expenses ha[d] been reconciled and TI reimbursement payments shall commence." It further directed that "[f]urniture expenses in the amount of $281,234.76 shall be reimbursed over 60 months at an amortization rate of 8%, resulting in a monthly reimbursement payment of $5,702.43" and therefore "[t]he total monthly payment shall increase to $27,592.43 by combining the reimbursement payment of $5,702.43 with the monthly base rental payment of $21,890.00." The memorandum further stated that "A LUMP SUM PAYMENT MAY BE REQUIRED FOR PAYMENTS IN ARREARS."

479.    On June 21, 2011, Shepos authored a memorandum directing the County's Rent/Budget Administration Section to "make a lump sum payment to pay off Tenant Improvements in the amount of $251,895.56." The memorandum included a note stating "[h]old check for Thomas Shepos, Real Property Agent."

480.    Shepos subsequently negotiated to amend the lease with Hanes, and he authored a letter recommending that the Board approve the amendment. Specifically, the letter, which was submitted to the Board on October 30, 2012, stated "IT IS RECOMMENDED THAT THE BOARD" take three specific actions, including: (i) "[a]pprove and instruct the Chairman to sign the lease amendment with Gregory Hanes (Landlord), for [DCFS] to add approximately 35,000 rentable square feet of space to the 11,000 rentable square feet square space of existing space located at 300 East Avenue K-6, Lancaster, at an annual first year base rent of $1,076,400, plus first year payment of $1,400,000 reimbursement for additional tenant improvements, furniture, and change order allowances via lump sum, or amortized at 332,660 annually over a five-year period"; (ii) "[f]ind that the lease amendment is categorically exempt from the provisions of the California Environmental Quality Act"; and (iii) authorize the landlord, "at the discretion of the Chief Executive

1    Officer, to acquire telephone systems for [DCFS] at a cost not to exceed $1,200,000,"

2    reimbursable by the County in addition to other tenant improvements.

3    481. On or about October 30, 2012, the Board adopted Shepos's

4    recommendations, and the County and Hanes entered into Amendment No. 1 to the

5    lease. The amendment expanded the scope of the lease to a secondary premises of

6    35,000 additional square feet and extended the lease term through October 14, 2020

7    at a monthly rent of $89,700—totaling in excess of $8 million. The amendment also

8    authorized reimbursement of $1.4 million in additional tenant improvements, as

9    Shepos recommended.

10   482. As with the initial lease, Shepos acted as the County's agent in

11   overseeing the tenant improvements on the additional space, and he authored

12   numerous memoranda directing the County to make reimbursement payments to

13   Hanes.

14   483. On April 15, 2013, Shepos authored a memorandum that directed the

15   County's Rent/Budget Administration Section to "make a lump sum payment to pay

16   off furniture in the amount of $1,095,140.45," and again included a note stating

17   "[h]old check for Thomas Shepos, Real Property Agent."

18   484. On May 9, 2013, Shepos authored three memoranda to the County's

19   Rent/Budget Administration Section:

20          a)    The first memorandum directed the County's Rent/Budget

21                Administration Section to "make a lump sum payment to pay off

22                Tenant Improvements . . . in the amount of $307,213.34." This

23                memorandum also included a note stating "[h]old check for

24                Thomas Shepos, Real Property Agent."

25          b)    The second memorandum directed the County's Rent/Budget

26                Administration Section to "make a lump sum payment to pay off

27                CCTV System (Security) . . . in the amount of $39,850.75."

28                Again, the memorandum included a note stating "[h]old check for

139
SECONDTHIRD AMENDED COMPLAINT

Thomas Shepos, Real Property Agent."

    c)    The third memorandum advised the County's Rent/Budget Administration Section that "Rental Payments shall be increased to $89,700.00 pursuant to the DCFS expansion as approved by the Board of Supervisors on October 30, 2012." Notably, this expansion and rent increase was approved pursuant to the Board recommendation letter authored by Shepos on October 30, 2012, as alleged in detail above.

485.   On July 11, 2013, Shepos authored yet another a memorandum directing the County's Rent/Budget Administration Section to "make a lump sum payment to pay off Tenant Improvements in the amount of $2,500.00."

486.   Shepos subsequently negotiated to further amend the lease with Hanes, and he authored a letter recommending that the Board approve the second amendment. Specifically, the letter, which was submitted to the Board on November 1, 2016, stated "**IT IS RECOMMENDED THAT THE BOARD**" take three specific actions, including: (i) "[a]pprove and instruct the Chairman to sign the lease amendment with Gregory Hanes (Landlord), for [DCFS] at 300 East Avenue K-6, Lancaster, to extend the normal working hours by one hour to start at 6:00 a.m. and allow the County to reimburse the Landlord for after-hours heating ventilation and air conditioning at the rate of $45.00 per hour as additional rent"; (ii) "[f]ind that the proposed lease amendment is categorically exempt from the provisions of the California Environmental Quality Act"; and (iii) "[a]uthorize and direct the Chief Executive Officer, or her designee, to execute any other ancillary documentation necessary to effectuate the lease amendment, and authorize the Chief Executive Officer and the Director of [DCFS] to take actions necessary and appropriate to implement the project."

487. On or about November 1, 2016, the Board adopted Shepos's recommendations, and the County and 300 K-6 entered into Amendment No. 2 to the

lease. The Landlord's Work Letter attached to Amendment No. 2 authorized $1,190,000 in additional tenant improvements and listed Shepos as the County's Work Letter Representative.

488.    On December 22, 2016, Shepos authored a memorandum directing the County's Rent/Budget Administration Section to make a lump sum payment in the amount of $23,850.00 to reimburse 300 K-6 "for after-hours HVAC for June through October 2016."

489. Section 31(b) of the lease agreement contains an express acknowledgment by Hanes that County employees are forbidden from soliciting consideration "in any form" from a landlord "with the implication, suggestion or statement that the landlord's provision of the consideration may secure more favorable treatment for the landlord in the award of the Lease or that landlord's failure to provide such consideration may negatively affect the County's consideration of the landlord's offer to lease." It further provides that "[a] landlord shall not offer or give, either directly or through an intermediary, consideration in any form to a County officer, employee or agent for the purpose of securing favorable treatment with respect to the award of the Lease."

490.    Neither Amendment No. 1 nor Amendment No. 2 altered or invalidated Hanes's express acknowledgment in section 31(b), which was reaffirmed by Hanes through his execution of both amendments.

491.    The lease and both amendments were signed during the period when the Hanes Defendants were participating in Shepos's bribery scheme—storing and laundering money for Shepos in exchange, Hanes for lucrative County contracts, as set forth above.

492. As alleged in detail above, Shepos negotiated the lease and its amendments, authored the Board letters recommending approval of the five-year lease and its amendments, oversaw the tenant improvements, and authored numerous memoranda directing the County's Rent/Budget Administration Section to make rent

and reimbursement payments under this lease.

493.   In their County lease, Hanes and 300 K-6 made the false representation that they had not and would not engage in bribery, and in turn, obtained lucrative County leases, including but not limited to government contracts based on those misrepresentations.

494.   Moreover, each invoice submitted pursuant to County leases or other agreements impliedly certified that the Hanes Defendants would comply with California law, which forbids County employees from receiving bribes or having a financial interest in any such contract. *See* Cal. Gov. Code § 1090. Every invoice submitted by the Hanes Defendants knowingly included a false implied certification that the Hanes Defendants had complied with these legal requirements.

495.   Had the County known that Hanes was storing and laundering cash for Shepos in exchange for Shepos's help in negotiating and securing the lease and amendments, Shepos's recommendations for Board approval, and other preferential treatment of the Hanes Defendants, the County would not have entered the lease, Amendment No. 1, or Amendment No. 2, nor would it have made payments thereunder.

**ii.     43917 North Division Street.**

496.   After successfully orchestrating the lease for DCFS at 300 East Avenue K-6, Shepos then offered for lease by the County another property Hanes owned, through his entity 43917 Division.

d.497.On or about June 16, 2015, the County and 43917 Division entered into a lease agreement for 43917 North Division Street in Lancaster, California (Lease No. 78386) and 300 East Avenue K-6 in Lancaster, California (Lease No. 77260).). The County used thisthe space to house the County's Probation Department of Children and Family Services.

498.   For example, in 2010Under this lease, the County entered into a five-year lease with Hanes for 300 E. Avenue K-6. The lease provided agreed to pay a

base monthly rent of $21,890 per month, 27,125—totaling in excess of $2.6 million over its eight-year term. The base monthly rent payments were also subject to annual CPI adjustments of up to 4%. Additionally, the lease provided for tenant improvementimprovements in the amount of $1,085,000, with a change order allowance of $770,000, and a furniture allowance of $27577,500, as well as $475,000. The lease was paid for with a mix of Federal, State, and telephone, data, and low voltage systems, all reimbursable by the County.

228.499.    At all times, the County made monthly rent payments—in part with federal funds—as they were due under the lease terms Shepos negotiated, including increased rent payments pursuant to the provision requiring annual CPI adjustments. Specifically, pursuant to Section 5 of the lease, the County's rent payments increased to: (i) $27,840.03 on September 1, 2017; (ii) $28,916.38 on September 1, 2018; (iii) $29,774.55 on September 1, 2019; (iv) $30,374.97 on September 1, 2020; (v) $31,459.97 on September 1, 2021; and (vi) $32,544.97 on September 1, 2022.

500.    On information and beliefThe County also made numerous reimbursement payments to 43917 Division pursuant to the terms of the lease and memoranda authored or approved by Shepos directing such payments.

501.    For example, on February 9, 2016, Shepos directed another CEO-RED employee, Scott Garrett, to author a memorandum directing the County's Rent/Budget Administration Section to make a lump sum progress payment of $171,098.48 as reimbursement for low voltage costs pursuant to the lease.

502.    On April 29, 2016, Shepos approved another memorandum directing the County's Rent/Budget Administration Section to make a lump sum progress payment of $260,943.84 as reimbursement for additional tenant improvements pursuant to the lease. Over the next few months, the County made additional lump sum progress payments of $241,524.35 (on June 2, 2016) and $485,500.82 (on July 7, 2016) as reimbursement for further tenant improvements. On July 6, 2016, the County also

made a payment of $193,020.85 as reimbursement for low voltage costs pursuant to the lease.

503.   Similarly, on September 22, 2016, Shepos approved a memorandum directing the County's Rent/Budget Administration Section to make a lump sum progress payment of $174,449.74 to reimburse additional tenant improvements pursuant to the lease.

504.   On July 18, 2017, Shepos also authored a memorandum directing the County's Rent/Budget Administration Section to make a payment of $5,576.52 as reimbursement for low voltage costs pursuant to the lease.

505.   Section 31(b) of the lease contains an express acknowledgment by 43917 Division that County officers and employees may not solicit consideration "in any form" from a landlord to secure favorable treatment for the landlord. Under the same provision, 43917 Division agreed that it "shall not offer or give [] consideration in any form to a County officer, employee or agent for the purpose of securing favorable treatment with respect to the award of the Lease.

506.   Shepos negotiated the lease on behalf of the County, and he directed or approved hundreds of thousands of dollars in reimbursement payments under the lease, all during the period when the Hanes Defendants were participating in Shepos's bribery scheme, as set forth above.

507.   In their County lease, Hanes and 43917 Division made the false representation that they had not and would not engage in bribery, and in turn, obtained lucrative government contracts based on those misrepresentations.

508.   Moreover, each invoice submitted pursuant to County leases or other agreements impliedly certified that the Hanes Defendants would comply with California law, which forbids County employees from receiving bribes or having a financial interest in any such contract. *See* Cal. Gov. Code § 1090. Every invoice submitted by the Hanes Defendants knowingly included a false implied certification that the Hanes Defendants had complied with these legal requirements.

509.  Had the County known that Hanes was storing and laundering cash for Shepos in exchange for Shepos's help in negotiating and securing the lease and other preferential treatment of the Hanes Defendants, the County would not have entered the lease, nor would it have made payments thereunder.

### 3.    Hanes and Shepos Concealed Their Bribery and Money-Laundering Scheme.

510.  As alleged above, Hanes is referred to as "Individual A" in Shepos's plea agreement. Shepos and the Hanes Defendants mutually agreed to take steps (and did take steps) to conceal the bribery scheme and their money laundering. Shepos never disclosed to the County that he had a personal financial relationship with Hanes, or that Hanes was assisting him by funneling bribe payments to him from other County contractors.

511.  In their leases with the County, as outlined above, the Hanes Defendants also represented and affirmed their understanding that County employees like Shepos are prohibited from having any financial interest in County leases, and that landlords are prohibited from giving County employees like Shepos any consideration in exchange for favorable treatment. The County relied on these representations and confirmations from the Hanes Defendants.

### 4.    The Hanes Defendants' Agency and Alter-Ego Relationships.

229.512.    Based on Hanes's ownership and management role within the other Hanes Defendants, 300 K-6 and 43917 Division, and the actions those entities took at Hanes's direction, all detailed above, Hanes owns, controls, and/or directs the actions of the other Hanes Defendants who, in doing the acts alleged herein, acted at their direction and/or with their permission, knowledge, consent or ratification.

In the alternative, based on information Hanes's ownership and belief, management role within the other Hanes Defendants, 300 K-6 and 43917 Division, and the actions those entities took at Hanes's direction, all detailed above Hanes was the alter ego of the other Hanes Defendants; Hanes dominated and controlled the other Hanes Defendants; a unity of interest

and ownership existed between Hanes and the other Hanes Defendants; the other Hanes Defendants were mere shells and conduits for Hanes's affairs; the other Hanes Defendants were inadequately capitalized; Hanes and the other Hanes Defendants failed to abide by the formalities of corporate existence; and Hanes used the other Hanes Defendants' assets as their own and, in doing the things alleged herein, acted with such a unity of interest that the separate personalities of these corporate entities do not in reality exist and honoring their separate identities would bring about an inequitable result. The Hanes Defendants did not respect corporate formalities because they used their companies as mere shells to carry out their bribery scheme. As one example, Shepos stored hundreds of thousands of dollars from his bribery schemes in bank accounts under the Hanes Defendants' names, which (on information and belief) Hanes permitted in order to induce Shepos to provide illicit benefits to the any of the Hanes Defendants or other entities associated with Hanes.

On information and belief, Hanes also conspired with the Visco Defendants. On information and belief, Hanes was the alter ego of the Visco Defendants, dominated and controlled such Defendants, shared a unity of interest and ownership with such Defendants, and used those other Defendants' assets as his own (and vice versa).

The Harvey/Tatum Defendants

The Harvey/Tatum Defendants own and operate multiple commercial buildings within Los Angeles County and participated in and profited from a similar bribery scheme with Shepos.

On or about August 20, 2013, the County and Ball & East—of which Harvey, Tatum, and Harvey Capital are general partners—entered into a lease agreement for 11151 Missouri Avenue, Los Angeles, California (Lease No. 78019, incorporated by reference herein) to house the County's Probation Department.

Under the lease, the County agreed to pay a monthly rent of $31,359.60 for a period of eight years, which totaled to approximately $3,000,000.

146
SECONDTHIRD AMENDED COMPLAINT

Section 28(a) of the lease agreement states County employees are forbidden from soliciting consideration "in any form" from landlords and that landlords "shall not offer or give, either directly or through an intermediary, consideration in any form to a County officer, employee or agent for the purpose of securing favorable treatment with respect to the award of the Lease."

Shepos illegally helped the Harvey/Tatum Defendants secure the lease in part by writing a letter to the Board, recommending approval of the lease.

In return, the Harvey/Tatum Defendants paid Shepos $35,000.

On information and belief, Harvey and Tatum own, control, and/or direct the actions of the other Harvey/Tatum Defendants who, in doing the acts alleged herein, acted at their direction and/or with their permission, knowledge, consent or ratification.

239.513.    In the alternative, on information and belief, Harvey and Tatum were the alter egos of the other Harvey/Tatum Defendants; Harvey and Tatum dominated and controlled the other Harvey/Tatum Defendants; a unity of interest and ownership existed between Harvey and Tatum and the other Harvey/Tatum Defendants; the other Harvey/Tatum Defendants were mere shells and conduits for Harvey's and Tatum's affairs; the other Harvey/Tatum Defendants were inadequately capitalized; Harvey and Tatum and the other Harvey/Tatum Defendants failed to abide by the formalities of corporate existence; and Harvey and Tatum used the other Harvey/Tatum Defendants' assets as their own and, in doing the things alleged herein, acted with such a unity of interest that the separate personalities of these corporate entities do not in reality exist and honoring their separate identities would bring about an inequitable result. The Harvey/TatumHanes Defendants did not respect corporate formalities because they used their companies as mere shells to carry out their bribery scheme. As one example, the Harvey/Tatum Defendants paidHanes stored hundreds of thousands of dollars for Shepos $35,000, which (on information, derived from Shepos's bribery schemes with other developers and

1    belief) was intended businesspersons, and laundered bribery proceeds for Shepos by

2    cashing checks made out to Hanes's entities—all to induce Shepos to provide illicit

3    benefits to the any of the Harvey/Tatum Defendants or other entities associated with

4    Harvey and Tatum Hanes and his entities, 300 K-6 and 43917 Division.

5                                 \*      \*      \*

6          In addition to procuring contracts through fraudulent conduct and

7    bribery, each Defendant made false statements in connection with the execution of

8    each lease. On information and belief, each lease executed by Defendants contained

9    the following — or substantially similar — representation: "Landlord acknowledges

10    that it is aware of the following provisions: [...] A landlord shall not offer or give,

11    either directly or through an intermediary, consideration in any form to a County

12    officer, employee or agent for the purpose of securing favorable treatment with

13    respect to the award of the Lease." Each Defendant made the false representation that

14    he had not and would not engage in bribery, and in turn, obtained lucrative

15    government contracts based in part on those false misrepresentations.

16         514.   Moreover, each invoice submitted pursuant to County leases or other

17    agreements impliedly certified that the contractor On information and belief—based

18    on Hanes's longtime association with Visco, and Visco's introduction of Hanes to

19    Shepos, seemingly for the purpose of facilitating an improper relationship between

20    Hanes and Shepos resembling the improper relationship between Visco and

21    Shepos—the Hanes Defendants also conspired with the Visco Defendants.

22          would comply with California law, which forbids County employees from

23    receiving bribes or having a financial interest in any such contract. *See* Cal. Gov. Code § 1090.

24    Every invoice submitted by Defendants knowingly included a false implied

25    certification that Defendants had complied with these legal requirements.

26 **IV.**     **Ms. Gluck Is the Original Source of Multiple Federal Indictments and the**

27          **County's Far-Reaching Investigation.**

28         242. 515.     As noted described above, Ms. Gluck cooperated with the federal

government, disclosing documents and electronic devices and meeting with FBI agents on numerous occasions. Ms. Gluck's cooperation directly led to the indictments of, and guilty pleas from, at least Shepos and Arman Gabaee.

243.516.    Ms. Gluck also cooperated with the County and its investigators, meeting with agent Bell on many occasions and disclosing evidence to assist him in his investigation. Ms. Gluck's assistance triggered the County's investigation revealing that Shepos tainted hundreds of millions of dollars of County contracts with his fraud and corruption.

244.517.    Ms. Gluck also cooperated with—and was the original source of information about Shepos's bribery schemes provided to—State investigators Pollie Pent and Randy Hudson, who visited Ms. Gluck along with County investigator Bell.

245.518.    Ms. Gluck's Original Complaint, filed on March 11, 2019, exposed Shepos's bribery scheme and revealed that he was at the center of a multi-pronged conspiracy involving numerous government contractors, a shared modus operandi, and coordination of the scheme with Frank Visco and his associates.

246.519.    Ms. Gluck alleged that Shepos provided those who bribed him with broad-ranging benefits, including contracts; "non-public information" as to the County's future plans; "above market rents, phantom improvement charges, and inflated management costs and utilities"; payments "on fraudulent invoices to the County for inflated utility costs and improvements that were never made"; and more. Dkt. 1 ¶¶ 2, 9, 17.

247.520.    Ms. Gluck's Original Complaint outlined the ways in which she had cooperated with the FBI in 2015 and 2016 and County and State investigators beginning in 2017, naming specific individuals she met with from each agency. Dkt. 1 ¶¶ 27-30. Ms. Gluck also explained that the information she provided to the FBI (and subsequently to County and State investigators) is what "resulted in the indictment of Arman Gabaee, the initiation of a County investigation into Tom Shepos's deals for the County, and the guilty plea of Tom Shepos . . . ." *Id.* ¶ 32.

248.521.    Ms. Gluck's Original Complaint also made clear that while the facts underlying her complaint included those in Shepos's guilty plea, her complaint was not so limited. Instead, Ms. Gluck alleged that Shepos's bribery scheme included numerous Defendants other than those named in federal indictments and also included DOE Defendants who "advance[d] fraudulent acts" carried out by Shepos but whose identities were not yet known. *Id.* ¶ 6.

249.522.    Ms. Gluck described Shepos's *modus operandi* in connection with his bribery scheme in great detail: that he received bribes in numerous forms ranging from "cash and bank deposits," to "hundreds of thousands of dollars in free home construction," to "tickets to concerts and sporting events," and more. *Id.* ¶ 2. Ms. Gluck also explained how Shepos went to great lengths to conceal such bribes, including by hiding them in the names of other individuals. *Id.* ¶ 19 (noting one example in which he hid a bribe under the name of his "roommates").

250.523.    Ms. Gluck satisfied her obligation as a relator to provide material evidence to the government after filing her qui tam action.

251.524.    Based on the foregoing, Ms. Gluck is an original source of the information underlying this Complaint because, at the very least, she (a) voluntarily disclosed to Los Angeles County, the federal government, and the State the information on which the allegations are based and (b) has knowledge that is independent of, and materially adds to, any previous public disclosure relating to these allegations and provided those facts to Los Angeles County before filing this action.

## FIRST CLAIM FOR RELIEF

(on behalf of the United States of America against Shepos, the Gabaee Defendants, the Abbey Defendants, the Visco Defendants, the Neman Defendants, and the Hanes Defendants)

Violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A)
(on behalf of Los Angeles County and the State of California)

~~Violation of the California False Claims Act, California Government Code~~
~~§ 12651(a)(1)~~

~~252.~~525.    The allegations contained in paragraphs 1 through ~~251~~524 are incorporated in full as if set forth herein.

~~253.~~526.    The allegations contained in the County of Los Angeles' Amended Complaint in Intervention are incorporated in full as if set forth herein.

527.    Through the acts described above, the Defendants, their agents, and employees, knowingly presented and caused to be presented materially false and fraudulent claims to the County, State, and federal governments, and knowingly failed to disclose material facts, in order to obtain payment and approval from the ~~Plaintiffs.~~County, State, and federal governments. Defendants presented false and fraudulent claims in not only obtaining leases and related contracts from the County, but also each time Defendants submitted invoices pursuant to an existing lease or contract.

528.    The County, State, and federal governments, unaware of the falsity of the claims made and submitted by the Defendants, their agents, and employees, and as a result thereof paid money that they otherwise would not have paid.

529.    By reason of the payments made by the County, State, and federal governments as a result of the Defendants' fraud, the County, State, and federal governments each suffered millions of dollars in damages.

530.    Wherefore, Qui Tam Plaintiff prays for relief as set forth below.

**SECOND CLAIM FOR RELIEF**

(on behalf of the United States of America against Shepos, the Gabaee Defendants, the Abbey Defendants, the Visco Defendants, the Neman Defendants, and the Hanes Defendants)

Violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B)

531.    The allegations contained in paragraphs 1 through 524 are incorporated in full as if set forth herein.

532.   The allegations contained in the County of Los Angeles' Amended Complaint in Intervention are incorporated in full as if set forth herein.

254.533.    Through the acts described above, the Defendants, their agents, and employees, knowingly made, used, and caused to be made and used materially false records and statements, which also omitted material facts, in order to induce the County, State, and federal governments to approve and pay false and fraudulent claims. agreementDefendants made and used false and fraudulent records and statements in not only obtaining leases and related contracts from the County, but also each time Defendants submitted invoices pursuant to an existing lease or contract.

255.534.    The County, State, and federal governments, unaware of the falsity of the claims made and submitted by the Defendants, their agents, and employees, and as a result thereof paid money that they otherwise would not have paid.

256.535.    By reason of the payments made by the County, State, and federal governments as a result of the Defendants' fraud, the County, State, and federal governments each suffered millions of dollars in damages and continue to be damaged.

Under California Government Code § 1090(a), the County and State may void the contracts with the Defendants, and the County and State are entitled to recover one hundred percent of the consideration they have paid without restoring any benefits received under the contracts.

258.536.    Wherefore, Plaintiffs prayQui Tam Plaintiff prays for relief as set forth below.

---

# ~~SECOND~~THIRD CLAIM FOR RELIEF

(on behalf of the United States of America against Shepos, the Gabaee Defendants,

the Abbey Defendants, the Visco Defendants, the Neman Defendants, and the

Hanes Defendants)

Violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(C)
~~(on behalf of Los Angeles County and the State of California)~~
~~Violation of the California False Claims Act, California Government Code~~
~~§ 12651(a)(2)~~

~~259.~~537.    The allegations contained in paragraphs 1 through ~~251~~524 are incorporated in full as if set forth herein.

538.    The allegations contained in the County of Los Angeles' Amended Complaint in Intervention are incorporated in full as if set forth herein.

~~——~~Through the acts described above, the Defendants, their agents, and employees, conspired to knowingly make, use, and cause to be made and used materially false records and statements, which also omitted material facts, in order to induce the County, State, and federal governments to approve and pay false and fraudulent claims. ~~Complaint in Intervention are incorporated in full as if set forth herein.~~

~~261.~~539.    ~~Through the acts described above, the Defendants, their agents, and employees, knowingly made, used, and caused to be made and used materially false records and statements, which also omitted material facts, in order to induce the County, State, and federal governments to approve and pay false and fraudulent claims. Defendants made and used~~Defendants conspired to make false and fraudulent records and statements in not only obtaining leases and related contracts from the County, but also each time Defendants submitted invoices pursuant to an existing lease ~~agreement~~or contract.

~~262.~~540.    The County, State, and federal governments, unaware of the falsity of the records, statements, and claims made and submitted by the Defendants, their agents, and employees, and as a result thereof paid money that they otherwise would not have paid.

263.541.    By reason of the payments made by the County, State, and federal governments as a result of the Defendants' fraud, the County, State, and federal governments have each suffered millions of dollars in damages and continue to be damaged.

Under California Government Code § 1090(a), the County and State may void the contracts with the Defendants, and the County and State are entitled to recover one hundred percent of the consideration they have paid without restoring any benefits received under the contracts.

265.542.    Wherefore, Plaintiffs prayQui Tam Plaintiff prays for relief as set forth below.

### THIRD CLAIM FOR RELIEF
(on behalf of Los Angeles County and the State of California)
Violation of the California False Claims Act, California Government Code
§ 12651(a)(3)

The allegations contained in paragraphs 1 through 251 are incorporated in full as if set forth herein.

267.1.The allegations contained in the County of Los Angeles' Complaint in Intervention are incorporated in full as if set forth herein.

Through the acts described above, the Defendants, their agents, and employees, conspired to knowingly make, use, and cause to be made and used materially false records and statements, which also omitted material facts, in order to induce the County, State, and federal governments to approve and pay false and fraudulent claims. Defendants conspired to make false and fraudulent records and statements in not only obtaining leases from the County, but also each time Defendants submitted invoices pursuant to an existing lease agreement.

The County, State, and federal governments, unaware of the falsity of the records, statements, and claims made and submitted by the Defendants, their agents, and employees, and as a result thereof paid money that they otherwise would not have paid.

154
SECONDTHIRD AMENDED COMPLAINT



1    By reason of the payments made by the County, State, and federal
2  governments as a result of the Defendants' fraud, the County, State, and federal
3  governments have suffered millions of dollars in damages and continue to be
4  damaged.

5    Under California Government Code § 1090(a), the County and State
6  may void the contracts with the Defendants, and the County and State are entitled to
7  recover one-hundred percent of the consideration they have paid without restoring
8  any benefits received under the contracts.

9    Wherefore, Plaintiffs pray for relief as set forth below.

10    **FOURTH CLAIM FOR RELIEF**

11    **(on behalf of the United States of America)**

12    Violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A)

13    The allegations contained in paragraphs 1 through 251 are incorporated
14  in full as if set forth herein.

15    The allegations contained in the County of Los Angeles' Complaint in
16  Intervention are incorporated in full as if set forth herein.

17    Through the acts described above, the Defendants, their agents, and
18  employees, knowingly presented and caused to be presented materially false and
19  fraudulent claims to the County, State, and federal governments, and knowingly
20  failed to disclose material facts, in order to obtain payment and approval from the
21  Plaintiffs. Defendants presented false and fraudulent claims in not only obtaining
22  leases from the County, but also each time Defendants submitted invoices pursuant
23  to an existing lease agreement.

24    276.1.The County, State, and federal governments, unaware of the falsity of
25  the claims made and submitted by the Defendants, their agents, and employees, and
26  as a result thereof paid money that they otherwise would not have paid.

27

28



By reason of the payments made by the County, State, and federal governments as a result of the Defendants' fraud, the County, State, and federal governments suffered millions of dollars in damages and continue to be damaged.

Wherefore, Plaintiffs pray for relief as set forth below.

## FIFTH CLAIM FOR RELIEF

(on behalf of the United States of America)

Violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B)

The allegations contained in paragraphs 1 through 251 are incorporated in full as if set forth herein.

280.1.The allegations contained in the County of Los Angeles' Complaint in Intervention are incorporated in full as if set forth herein.

Through the acts described above, the Defendants, their agents, and employees, knowingly made, used, and caused to be made and used materially false records and statements, which also omitted material facts, in order to induce the County, State, and federal governments to approve and pay false and fraudulent claims. Defendants made and used false and fraudulent records and statements in not only obtaining leases from the County, but also each time Defendants submitted invoices pursuant to an existing lease agreement.

The County, State, and federal governments, unaware of the falsity of the claims made and submitted by the Defendants, their agents, and employees, and as a result thereof paid money that they otherwise would not have paid.

By reason of the payments made by the County, State, and federal governments as a result of the Defendants' fraud, the County, State, and federal governments suffered millions of dollars in damages and continue to be damaged.

Wherefore, Plaintiffs pray for relief as set forth below.

**SIXTH CLAIM FOR RELIEF**

**(on behalf of the United States of America)**

Violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(C)

The allegations contained in paragraphs 1 through 251 are incorporated in full as if set forth herein.

The allegations contained in the County of Los Angeles' Complaint in Intervention are incorporated in full as if set forth herein.

Through the acts described above, the Defendants, their agents, and employees, conspired to knowingly make, use, and cause to be made and used materially false records and statements, which also omitted material facts, in order to induce the County, State, and federal governments to approve and pay false and fraudulent claims. Defendants conspired to make false and fraudulent records and statements in not only obtaining leases from the County, but also each time Defendants submitted invoices pursuant to an existing lease agreement.

The County, State, and federal governments, unaware of the falsity of the records, statements, and claims made and submitted by the Defendants, their agents, and employees, and as a result thereof paid money that they otherwise would not have paid.

By reason of the payments made by the County, State, and federal governments as a result of the Defendants' fraud, the County, State, and federal governments have suffered millions of dollars in damages and continue to be damaged.

Wherefore, Plaintiffs pray for relief as set forth below.

## PRAYER FOR RELIEF

292.543.    Qui Tam Plaintiff prays for judgment against the Defendants, and each of them, as follows:

a.a)    For damages in an amount equal to three times the amount of damages the County, State, and federal governmentsgovernment

sustained as a result of the Defendants' unlawful conduct (which damages may include money recoverable under California Government Code § 1090(a));;

b.b)    For civil monetary penalties for each false and fraudulent claim submitted to the County, State, and federal governments;

c.c)    For attorneys' fees and costs, including the Qui Tam Plaintiffs' attorneys' fees and costs;

d.d)    For an order awarding the Qui Tam Plaintiff the maximum awards allowed by the California False Claims Act and federal False Claims Act; and

e.e)    For such other further relief as the Court may deem just and proper.

## JURY DEMAND

293.544.    Qui Tam Plaintiff Karen Gluck demands a trial by jury.

Dated: ~~August 19~~November 22, 2024  SUSMAN GODFREY L.L.P.

By: */s/ Connor Cohen*
Connor Cohen

SUSMAN GODFREY LLP
Amanda Bonn (Bar No. 270891)
*abonn@susmangodfrey.com*
~~Argie Mina (Bar No. 331617)~~
~~*amina@susmangodfrey.com*~~
Connor Cohen (Bar No. 354686)
*ccohen@susmangodfrey.com*
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Telephone: +1.310.789.3100
Facsimile: +1.310.789.3150

Rocco Magni (pro hac vice)
*rmagni@susmangodfrey.com*
David Peterson (pro hac vice)
*dpeterson@susmangodfrey.com*
1000 Louisiana, Suite 5100
Houston, TX 77002
Telephone: +1.713.651.9366
Facsimile: +1.713.654.6666

*Attorneys for Qui Tam Plaintiff Karen Gluck*