1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**DERRYBERRY & ASSOCIATES LLP**
ATTORNEYS AT LAW
41240 11th Street West, Suite A
Palmdale, California 93551
(661) 945-6115; FAX (661) 948-4772
civil@derryberrylawyers.com

R. Steven Derryberry
State Bar No. 245234
Kimberly R. Rose-McCaslin
State Bar No. 248428

Attorneys for Defendants Gregory Hanes; 300 K-6, LLC and 43917 Division Street, LLC

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

LOS ANGELES COUNTY, THE STATE OF CALIFORNIA AND THE UNITED STATES OF AMERICA ex rel. KAREN GLUCK,

Plaintiffs,

v.

THOMAS SHEPOS; et al.

Defendants.

Case No. 2:19-cv-01773- JFW-MAA

**VOLUME OF EVIDENCE IN SUPPORT OF DEFENDANT GREGORY HANES' (AND ASSOCIATED ENTITIES) NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT**

Filed Concurrently with the Notice of Motion and Motion; Statement of Uncontroverted Material Facts; Declaration of Kimberly R. Rose-McCaslin, Esq.; [Proposed] Judgment

DERRYBERRY & ASSOCIATES LLP
Attorneys at Law

EXHIBIT 1



# County of Los Angeles
# **CHIEF EXECUTIVE OFFICE**

Kenneth Hahn Hall of Administration
500 West Temple Street, Room 713, Los Angeles, California 90012
(213) 974-1101
http://ceo.lacounty.gov

WILLIAM T FUJIOKA
Chief Executive Officer

March 30, 2010

The Honorable Board of Supervisors
County of Los Angeles
383 Kenneth Hahn Hall of Administration
500 West Temple Street
Los Angeles, CA 90012

Dear Supervisors:

**ADOPTED**

BOARD OF SUPERVISORS
COUNTY OF LOS ANGELES

21          MARCH 30, 2010

*Sachi A. Hamai*
SACHI A. HAMAI
EXECUTIVE OFFICER

Board of Supervisors
GLORIA MOLINA
First District

MARK RIDLEY-THOMAS
Second District

ZEV YAROSLAVSKY
Third District

DON KNABE
Fourth District

MICHAEL D. ANTONOVICH
Fifth District

### FIVE-YEAR LEASE
### DEPARTMENT OF CHILDREN AND FAMILY SERVICES
### 300 EAST AVENUE K-6, LANCASTER
### (FIFTH DISTRICT) (3 VOTES)

## SUBJECT

This recommendation is for a five-year lease of 11,000 square feet of office space and 40 parking spaces for the Department of Children and Family Services (DCFS).

## IT IS RECOMMENDED THAT YOUR BOARD:

1. Consider the Negative Declaration for the project for which no comments were received during the public review period, find on the basis of the whole record before the Board that there is no substantial evidence that the project will have a significant effect on the environment, find that the Negative Declaration reflects the independent judgment and analysis of the Board and adopt the Negative Declaration.

2. Find that the proposed project has no effect on fish and wildlife and authorize the Chief Executive Office to complete and file a Certificate of Fee Exemption for the project with the County Clerk.

3. Approve and instruct the Chair to sign the lease with Gregory Hanes (Landlord) for 11,000 rentable square feet of office space located at 300 East Avenue K-6, Lancaster, for the Department of Children and Family Services at a maximum annual first year rent of $592,680. The rental cost is 70.23 percent funded by State and Federal subvention and 29.77 percent net County cost.

*"To Enrich Lives Through Effective And Caring Service"*

*Please Conserve Paper – This Document and Copies are Two-Sided
Intra-County Correspondence Sent Electronically Only*

The Honorable Board of Supervisors
March 30, 2010
Page 2

4.  Authorize the Chief Executive Office and the Department of Children and Family Services to reimburse the Landlord for additional tenant improvements of $55,000, payable in lump sum within 60 days of completion and furniture allowances in the amount not to exceed $275,000 payable in lump sum or amortized at 8 percent over the initial five-year term.

5.  Authorize the Landlord and/or the Director of Internal Services Department, at the discretion of the Chief Executive Officer to acquire telephone, data and low voltage systems for the Department of Children and Family Services at a cost not to exceed $300,000 for 300 East Avenue K-6. At the discretion of the Chief Executive Officer, all or part of the telephone, data, and low voltage systems will be paid in lump sum, in addition to other tenant improvements.

## PURPOSE/JUSTIFICATION OF RECOMMENDED ACTION

DCFS currently occupies 18,410 rentable square feet of office space at 1150 West Avenue J, Lancaster and 2,669 rentable square feet of office space at 251 East Avenue K-6, Lancaster that have exceeded capacity and are overcrowded. The Department has submitted a Space Request for additional space that would accommodate their needs until such time as the combined staff can be relocated to a larger, more suitable location. The lease at 1150 West Avenue J expires in 2013. The recommended location at 300 East Avenue K-6, Lancaster is adjacent to the existing DCFS site located at 251 East Avenue K-6, and offers DCFS the ability to increase service delivery to the community by having an additional office directly in the community. This additional office will help relieve overcrowding in the existing facilities and will provide the same services as the existing two offices.

The Lancaster SPA I offices provide comprehensive and direct child protection services. Their primary goal is to maintain the family unit; however, when this is not possible the secondary goal is to reduce the timeline to permanency for children in their care and reliance on out-of-home care. DCFS Adoption units are responsible for case management which involves assessing the child's adoptability in finalizing a child's adoption. DCFS Revenue Enhancement units provide support to the social workers by assisting in finding placements for children who must be assigned to out-of-home care. In addition, there are smaller units that are designed to enhance direct services to the children and families which include, Family Group/Team Decision Making and the Department of Mental Health/Children's Services, who provide mental health assessment for foster care children.

The Honorable Board of Supervisors
March 30, 2010
Page 3

## Implementation of Strategic Plan Goals

The Countywide Strategic Plan directs that we address Children, Family, and Adult Well-Being (Goal 2). In this case, we have enhanced economic and social outcomes through integrated, cost-effective and client-centered supportive services in accordance with the Strategic Asset Management Principles, as further outlined in Attachment A.

## FISCAL IMPACT/FINANCING

The maximum first year rental cost will be \$592,680, if furniture (\$275,000) and additional Tenant Improvement (TI) (\$55,000) are reimbursed in lump sum. The rent for the second year will be \$262,680 and remains flat throughout the balance of the five-year term.

| 300 EAST AVENUE K-6 | PROPOSED LEASE |
|---|---|
| AREA (SQUARE FEET) | 11,000 |
| TERM | Five years  upon Board approval |
| ANNUAL BASE RENT | \$262,680 (\$23.88/ sq. ft.) |
| TI | A maximum of \$715,000 (\$65 per sq. ft) provided as part of the Base Rent |
| ADDITIONAL TI | \$55,000 (\$5 per sq. ft.) payable in lump sum within 60 days |
| FURNITURE REIMBURSEMENT | \$275,000 amortized at 8% over the initial five years of the lease or payable in a lump sum payment within 60 days of acceptance. |
| FIRST YEAR MAXIMUM ANNUAL RENT | \$592,680* |
| PARKING INCLUDED IN RENT | 40 spaces |
| CANCELLATION | Anytime after the 48th month upon 90 days prior written notice |
| OPTION TO RENEW | Two five-year options |
| RENTAL ADJUSTMENT | Flat during the five-year term |

* Maximum first year rent would be \$592,680 if furniture (\$275,000) and additional TI (\$55,000) are reimbursed in lump sum.

Sufficient funding for the proposed lease is included in the 2009-10 Rent Expense budget. Sufficient funding is available in DCFS' operating budget to cover the proposed lease costs which will be billed back to DCFS.

The first year maximum annual lease cost for DCFS is \$592,680, which is approximately 70.23 percent subvention funded and 29.77 percent net County cost.

GLUCKQT_13982

The Honorable Board of Supervisors
March 30, 2010
Page 4

## FACTS AND PROVISIONS/LEGAL REQUIREMENTS

The lease contains the following terms and conditions:

- The term commences upon Board approval and expires five years thereafter.

- There is a cancellation anytime after the 48th month upon 90 days written notice and reimbursement of the unamortized Tenant Improvements which are amortized at 8 percent over the 60 month term of the lease.

- The base rent includes TI to a maximum of $715,000 to build out the shell space. The lease includes parking for 40 vehicles.

- Furniture costs to a maximum of $275,000 can be amortized at 8% over the initial 5 year term or payable in lump sum.

- Additional TI of $55,000, if needed, reimbursed within 60 days of commencement.

- The lease is modified full service whereby Landlord is responsible for all operating costs except janitorial which will be separately provided and paid by the County.

- The rent remains flat during the five-year term.

- There are two five-year options to renew. The first option term is at $1.59 per square foot and the second option term is at $1.79 per square foot.

The Chief Executive Office (CEO) Real Estate staff surveyed the County areas that best could service this need of the department to determine the market rate of comparable sites. Based upon said survey, staff has established that the base rental range including TI and parking for office space is between $24 and $32 per square foot per year modified full service. Thus, the base annual rent of $23.88 per square foot for the base lease cost, modified full service, is below the market range. Attachment B shows County-owned and leased facilities within the search area for these programs and there is space available at 1150 W Avenue J, Lancaster. However, the space is not habitable and the cost to refurbish the 12,314 square feet would not be cost-effective when compared to the costs associated with the proposed lease which is expected to be short term until the three groups of DCFS staff can be re-consolidated.

The Department of Public Works has not inspected this facility as it was built in 2009 and meets the requirements for County use by exceeding the 1994 seismic standards and meets ADA compliance.

Notification letters have been sent to the City of Lancaster pursuant to Government Code Sections 25351 and 65402.

The Honorable Board of Supervisors
March 30, 2010
Page 5

## NEGATIVE DECLARATION/ENVIRONMENTAL IMPACT REPORT

The CEO has made an initial study of the environmental factors and has concluded that
this project will have no significant impact on the environment and no adverse effect on
wildlife resources. Accordingly, a Negative Declaration has been prepared and a notice
posted at the site as required by the California Environmental Quality Act (CEQA) and
Section 15072 of the CEQA Guidelines. Copies of the completed Initial Study, the
resulting Negative Declaration, and the Notice of Preparation of Negative Declaration as
posted are attached. No comments to the Negative Declaration were received during
the public comment period. A fee must be paid to the State Department of Fish and
Game when certain notices are filed with the Registrar-Recorder/County Clerk. The
California Department of Fish and Game has determined that the project does not affect
fish, wildlife and habitat, and payment of a CEQA filing is not required.

## IMPACT ON CURRENT SERVICES (OR PROJECTS)

There will be no disruption of services as this is a lease to acquire additional space for
existing staff that is located in the service area. DCFS concurs with the proposed lease.

## CONCLUSION

It is requested that the Executive Officer, Board of Supervisors return two certified
copies of the Minute Order and the adopted stamped Board letter to the CEO, Real
Estate Division, 222 South Hill Street, Los Angeles, CA 90012.

Respectfully submitted,

WILLIAM T FUJIOKA
Chief Executive Officer

WTF:SK:WLD
CEM:TS:hd

Attachments

c: Executive Office, Board of Supervisors
   Internal Services Department
   County Counsel
   Auditor-Controller
   Department of Children and Family Services

300eavenuek6dcfs b

Attachment A

## DEPARTMENT OF CHILDREN AND FAMILY SERVICES
### 300 EAST AVENUE K-6, LANCASTER
### Asset Management Principles Compliance Form[1]

| 1. | Occupancy | | Yes | No | N/A |
|---|---|---|---|---|---|
| | A | Does lease consolidate administrative functions?[2] | | | X |
| | B | Does lease co-locate with other functions to better serve clients?[1]  **The additional office will help relieve overcrowding in the existing facilities and will provide the same services as the existing two offices.** | | X | |
| | C | Does this lease centralize business support functions?[2] | | | X |
| | D | Does this lease meet the guideline of 200 sq. ft of space per person?[2] | X | | |
| 2. | Capital | | | | |
| | A | Is it a substantial net County cost (NCC) program?  **The lease cost for DCFS is 70.23 percent State and Federal funded and 29.77 percent NCC.** | | X | |
| | B | Is this a long term County program? | X | | |
| | C | If yes to 2 A or B; is it a capital lease or an operating lease with an option to buy? | | X | |
| | D | If no, are there any suitable County-owned facilities available? **Yes, there is vacant County-owned space at 1110 w Avenue J, Lancaster.** | X | | |
| | E | If yes, why is lease being recommended over occupancy in County-owned space? **The County-owned space is not habitable as it exists and the cost to rehab the space to meet the DCFS requirements is not cost effective when compared to the proposed lease.** | X | | |
| | F | Is Building Description Report attached as Attachment B? | X | | |
| | G | Was build-to-suit or capital project considered? **The proposed space is available at a competitive rate and DCFS requested space that could be used to help alleviate overcrowding; therefore, a capital project is not under consideration at this time.** | | X | |
| 3. | Portfolio Management | | | | |
| | A | Did department utilize CEO Space Request Evaluation (SRE)? | X | | |
| | B | Was the space need justified? | X | | |
| | C | If a renewal lease, was co-location with other County departments considered? | | | X |
| | D | Why was this program not co-located? | | | |
| | | 1. ____  The program clientele requires a "stand alone" facility. | | | |
| | | 2. _X_  No suitable County occupied properties in project area. | | | |
| | | 3. ____  No County-owned facilities available for the project. | | | |
| | | 4. ____  Could not get City clearance or approval. | | | |
| | | 5. ____  The Program is being co-located. | | | |
| | E | Is lease a full service lease?[2] **Landlord would not provide Janitorial Services.** | | X | |
| | F | Has growth projection been considered in space request? | X | | |
| | G | Has the Dept. of Public Works completed seismic review/approval? **Not  required, built in 2009 and meets current requirements.** | | | X |
| | | [1]As approved by the Board of Supervisors 11/17/98 | | | |
| | | [2]If not, why not?           Please bold any written responses. | | | |

Attachment B

## SPACE SEARCH WITHIN FIVE MILES OF
## 1150 WEST AVENUE J, AND 251 EAST AVENUE K-6, LANCASTER
## DEPARTMENT OF CHILDREN AND FAMILY SERVICES

| Loco | Name | Address | Gross SQFT | Net SQFT | Ownership | SQFT Available |
|------|------|---------|-----------|----------|-----------|----------------|
| A623 | LANCASTER DCFS REGIONAL OFFICE | 1150 W AVENUE J, LANCASTER 93534 | 18,410 | 18,410 | LEASED | NONE |
| A294 | LANCASTER COURTHOUSE-JURY ASSEMBLY ROOM | 1040 W AVENUE J, LANCASTER 93534 | 1,440 | 1,296 | OWNED | NONE |
| A445 | FIRE-LANCASTER FIRE PREVENTION SUBOFFICE | 44933 N FERN AVE, LANCASTER 93534 | 30 | 30 | GRATIS USE | NONE |
| Y247 | DCSS-ANTELOPE VALLEY SENIOR CENTER | 777 W JACKMAN ST, LANCASTER 93534 | 9,424 | 6,965 | OWNED | NONE |
| Y397 | PUBLIC LIBRARY-LANCASTER LIBRARY | 601 W LANCASTER BLVD, LANCASTER 93534 | 48,721 | 43,850 | OWNED | NONE |
| A623 | DCFS - F.I.L.P. | 1420 W AVENUE I, LANCASTER 93534 | 194 | 184 | LEASED | NONE |
| A297 | SHERIFF-LANCASTER ADMINISTRATIVE OFFICE | 501 W LANCASTER BLVD, LANCASTER 93534 | 7,557 | 6,801 | PERMIT | NONE |
| Y373 | PW WWD#04-NORTH ADMINISTRATION BUILDING | 419 W AVENUE J, LANCASTER 93534 | 4,128 | 3,446 | OWNED | NONE |
| A192 | PROBATION-ANTELOPE VALLEY AREA OFFICES | 321 E AVENUE K-4, LANCASTER 93535 | 6,400 | 6,080 | LEASED | NONE |
| 0302 | PW-SEWER MAINTENANCE NORTH YARD OFFICE | 45712 N DIVISION ST, LANCASTER 93534 | 864 | 821 | OWNED | NONE |
| A079 | ASSESSOR-LANCASTER REGIONAL OFFICES | 251 E AVENUE K-6, LANCASTER 93534 | 15,338 | 13,712 | LEASED | NONE |
| A623 | DCFS FILP | 251 E AVENUE K-6, LANCASTER 93534 | 2,669 | 2,357 | LEASED | NONE |
| X495 | PW-WATERWORKS NORTH MAINTENANCE AREA HQ BLDG | 260 E AVENUE K-8, LANCASTER 93535-4527 | 13,200 | 11,155 | OWNED | NONE |
| X542 | PW-WATERWORKS NORTH MAINT AREA OFFICE | 260 E AVENUE K-8, LANCASTER 93535-4527 | 2,000 | 1,900 | OWNED | NONE |
| A008 | ANTELOPE VALLEY SERVICE CENTER-BUILDING B | 335 E AVENUE K-6 , LANCASTER 93534 | 51,000 | 42,592 | LEASED | NONE |
| A433 | ANTELOPE VALLEY SERVICE CENTER-BUILDING A | 349 E AVENUE K-6, LANCASTER 93534 | 51,000 | 33,932 | LEASED | NONE |
| A642 | DPSS-LANCASTER GR/GROW OFFICE | 335 E AVENUE K-10, LANCASTER 93535-4539 | 22,040 | 20,938 | LEASED | NONE |
| A035 | BOARD OF SUP-5TH DISTRICT FIELD OFFICE | 1113 W AVENUE M-4, PALMDALE 93550 | 1,241 | 1,164 | LEASED | NONE |
| 4122 | ANIMAL CONTROL #5-ADMINISTRATION | 5210 W AVENUE I, LANCASTER 93536 | 2,237 | 788 | OWNED | NONE |
| 4586 | LANCASTER COURTHOUSE SEVICES BLDG | 1110 W AVENUE J, LANCASTER 93534 | 18,488 | 12,314 | OWNED | 12,314 |

GLUCKQT_13986

**DATE POSTED – January 15, 2010**

## NOTICE OF PREPARATION OF NEGATIVE DECLARATION

This notice is provided as required by the California Environmental quality Act and California Administrative Code Title 14 Division 6, Section 15072 (a) (2) B.

A Negative Declaration has been prepared for this site based on an Initial Study which consists of completion and signing of an Environmental Information Form showing background information as follows:

1.  Name of Proponent - County of Los Angeles
    Chief Executive Office

2.  Address/Phone No. - 222 South Hill Street, 3rd Floor
    Los Angeles, California 90012

    Agent                 Telephone
    Thomas Shepos         (213) 974-4364

3.  Date Information Form Submitted –      January 14, 2010

4.  Agency Requiring Information Form -    Los Angeles County
                                           Chief Executive Office
                                           Real Estate Division

5.  Name of Proposal, if Applicable -

6.  Address of Facility Involved –     3oo East Avenue K-6
                                       Lancaster, CA  93535

Interested parties may obtain a copy of the Negative Declaration and the completed Environmental Information Form/Initial Study by contacting the Real Property Agent indicated under 2 above and referring to the proposal by name or to the facility by address.

Si necesita informacion en espanol, por favor de comunicarse con Carlos Marquez, para asistencia en obtener una traduccion al numero (213) 974-4163.

# FILED

JAN 1 5 2010

DEAN C. LOGAN
REGISTRAR-RECORDER/COUNTY CLERK
J. MERINO                    DEPUTY

THIS NOTICE WAS POSTED
ON ___ JAN 1 5 2010 ___
UNTIL ___ FEB 1 7 2010 ___
REGISTRAR-RECORDER/COUNTY CLERK

10 0036962

## NEGATIVE DECLARATION

Department Name:      Children and Family Services
Project:              Annex for Regional Office

Pursuant to Section 15072, California Environmental Quality Act and California Administrative Code Title 14, Division 6

1.   Description of Project

     The leasing of existing office space in an existing commercial building to be used by the County of Los Angeles, Department of Children and Familyl Services as an administrative office.

2.   a.   Location of Project (plot plan attached)

          300 East Avenue K-16
          Lancaster, CA  93535

     b.   Name of Project Proponent

          County of Los Angeles
          Chief Executive Office
          222 South Hill Street, 3rd Floor
          Los Angeles, CA 90012

3.   Finding for Negative Declaration

     It has been determined that this project will not have a significant effect on the environment based on information shown in the attached Environmental Information Form dated January 14, 2010 which constitutes the Initial Study of this project.

4.   Initial Study

     An Initial Study leading to this Negative Declaration has been prepared by the Chief Executive Office and is attached hereto.

5.   Mitigation Measures Included in Project

     None required.

| Date | Real Property Agent | Telephone |
|------|--------------------|-----------|
| January 14, 2010 | Thomas Shepos | (213) 974-4364 |

**10  0036962**

GLUCKQT_13988

**COUNTY OF LOS ANGELES
CHIEF EXECUTIVE OFFICE**

**FIVE-YEAR LEASE**

**NEGATIVE DECLARATION**

I.    Location and Description of the Project

The proposed project is for the County of Los Angeles to lease facilities at 300 East Avenue K-6, Lancaster, California, which will be used by the Department of Children and Family Services for carrying out its general administrative functions. The facility, located in the Fifth Supervisorial District approximately 74 miles from the Los Angeles Civic Center, includes 11,000 square feet of office space. The Department shall have use of 40 off-street parking spaces for staff and available parking for visitors. The Landlord has no expansion plans beyond the scope of this project.

II.    Finding of No Significant Effect

Based on the attached initial study, it has been determined that the project will not have a significant effect on the environment.

III.    Mitigation Measures

None required.

10 0036962

GLUCKQT_13989

EXHIBIT 2



**County of Los Angeles**
# CHIEF EXECUTIVE OFFICE
Kenneth Hahn Hall of Administration
500 West Temple Street, Room 713, Los Angeles, California 90012
(213) 974-1101
http://ceo.lacounty.gov

WILLIAM T FUJIOKA
Chief Executive Officer

Board of Supervisors
GLORIA MOLINA
First District

MARK RIDLEY-THOMAS
Second District

ZEV YAROSLAVSKY
Third District

DON KNABE
Fourth District

MICHAEL D. ANTONOVICH
Fifth District

October 30, 2012

**ADOPTED**
**BOARD OF SUPERVISORS**
**COUNTY OF LOS ANGELES**

**15**        OCT 30 2012

The Honorable Board of Supervisors
County of Los Angeles
383 Kenneth Hahn Hall of Administration
500 West Temple Street
Los Angeles, CA 90012

*Sachi A. Hamai*
SACHI A. HAMAI
EXECUTIVE OFFICER

Dear Supervisors:

## AMENDMENT NO. 1, LEASE NO. 77260
## DEPARTMENT OF CHILDREN AND FAMILY SERVICES
## 300 EAST AVENUE K-6, LANCASTER
## (FIFTH DISTRICT) (3 VOTES)

### SUBJECT

This recommendation is to amend Lease No. 77260 to expand the Department of Children and Family Services premises with the addition of approximately 35,000 rentable square feet of space, extend the term of the Lease for an additional five-year term, and commence new monthly rent upon completion and acceptance of tenant improvements by the County.

### IT IS RECOMMENDED THAT THE BOARD:

1. Find that the lease amendment is categorically exempt from the provisions of the California Environmental Quality Act pursuant to Class 1 of the Environmental Document Reporting Procedures and Guidelines adopted by the Board of Supervisors on November 17, 1987, and Section 15301 of the State of California Environmental Quality Act Guidelines (Existing Facilities)

2. Approve and instruct the Chairman to sign the lease amendment with Gregory Hanes (Landlord), for the Department of Children and Family Services to add approximately 35,000 rentable square feet of space to the 11,000 rentable square feet of existing space located at 300 East Avenue K-6, Lancaster, at an annual first year base rent of $1,076,400, plus first year payment of $1,400,000 reimbursement for additional tenant improvements, furniture, and change order allowances via lump sum, or amortized at $332,660 annually over a five-year period. The rental cost is funded at approximately 70 percent through Federal and State subvention and 30 percent net County cost.

*"To Enrich Lives Through Effective And Caring Service"*

*Please Conserve Paper – This Document and Copies are Two-Sided*
*Intra-County Correspondence Sent Electronically Only*

COLA0085437

The Honorable Board of Supervisors
October 30, 2012
Page 2

3. Authorize the Landlord and/or Director of Internal Services, at the discretion of the Chief Executive Officer to acquire telephone systems for the Department of Children and Family Services at a cost not to exceed $1,200,000, and either all or part of the telephone, data, and low voltage systems may be paid in lump sum or financed over a 60-month term not to exceed $243,317 per year, in addition to other tenant improvement allowances.

## PURPOSE/JUSTIFICATION OF RECOMMENDED ACTION

The Department of Children and Family Services (DCFS) submitted a Space Request for expansion space that would consolidate staff into a central location to better serve clients throughout the Lancaster/northern Antelope Valley area. The lease at 1150 West Avenue J, where DCFS currently occupies 18,410 square feet (sq. ft.) of office space expires in mid July 2013. The recommended location at 300 East Avenue K-6, Lancaster allows DCFS to expand and co-locate in office space improved and occupied by DCFS in October 2010. DCFS also occupies a 2,669 rentable sq. ft. at 251 East Avenue K-6, adjacent to the recommended location, which DCFS hopes to backfill with another program.

The Lancaster DCFS office provides comprehensive and direct child protection services. The primary goal is to maintain the family unit, however, when this is not possible, the secondary goal is to reduce the timeline to permanency for children in their care and reliance on out-of-home care. DCFS Adoption Units are responsible for case management, which involves assessing the child's adoptability and finalizing a child's adoption. DCFS Revenue Enhancement units provide support to the social workers by assisting in finding placements for children who must be assigned to out-of-home care. In addition, there are smaller units that are designed to enhance direct services to children and families which include, Family Group/Team Decision Making and the Department of Mental Health/Children's Services, who provide mental health assessment for foster care children.

The lease amendment increases the size of the premises at 300 East Avenue K-6. The amendment requests: 1) an additional 35,000 square feet, which will increase the total DCFS space to 46,000 square feet, 2) extend the term of the Lease for an additional five-year term, and 3) authority to reimburse the Landlord for tenant improvements (TI) and furniture up to $1,400,000. The establishment of a larger and centralized location in Lancaster is consistent with DCFS' long-range service plan to better serve the needs of the local population in the surrounding service area.

COLA0085438

The Honorable Board of Supervisors
October 30, 2012
Page 3

## Implementation of Strategic Plan Goals

The Countywide Strategic Plan Goal of Operational Effectiveness (Goal 1) directs that we ensure the timely delivery of customer-oriented and efficient public service, and the Integrated Services Delivery (Goal 3), which maximizes our resources through the integration of services. In this case, we have enhanced economic and social outcomes through integrated, cost-effective, and client-centered supportive services by expanding DCFS' presence in a leased space. The lease amendment is in conformance with the Asset Management Principles as outlined in Attachment A.

## FISCAL IMPACT/FINANCING

The monthly rent under the lease amendment will be a $1.95 per square foot modified full-service wherein the County pays for its own day porter and janitorial services and the Landlord will pay for electricity consumption and monthly maintenance costs for the interior and exterior of the premises. The monthly/annual base rent remains fixed through the new eight-year term.

The first year cost to add the additional space shall not exceed $1,078,400 in total base rent per the terms and conditions of the lease amendment. The County may lump sum or reimburse the Landlord for the reimbursable TI allowance and change orders up to $1,400,000. If amortized, the annual payment would be $332,660 annually.

| 300 EAST AVENUE K-6 | LEASE NO. 77260 300 E Avenue K-6 | AMENDMENT NO. 1 | Changes |
|---|---|---|---|
| Area - sq. ft. | 11,000 sq. ft. | 35,000 sq. ft. | +35,000 sq. ft. |
| Term | 11/15/10-11/14/2015 | 11/15/2015-11/14/2020 Upon board approval | Extend lease term to 5 years through 11/14/2020 |
| Annual Base Rent | $262,680 | $819,000* | +$819,000 |
| Additional Tenant Improvements | Paid in full | $1,400,000 or ($332,660 annually for five years) | $1,400,000 or ($332,660 annually for five years) |
| Parking | 40 spaces | 200 spaces | +200 spaces |
| Cancellation | County may cancel any time after 48th month upon 90 days prior written notice | County may cancel any time after 60th month upon 90 days prior written notice | Any time after 60th month upon 90 days written notice |
| Rental Adjustment | Fixed | Fixed through 11/14/2020 | Fixed through 11/14/2020 |

*Includes $1,225,000 of TI provided by Landlord in the Base Rent

The total estimated cost for the telephone, data, and low voltage system enhancements will not exceed $1,200,000. The current telephone system is upgradeable to the current Voice over Internet Protocol (VoIP) and data network systems that are sufficiently robust to allow for future voice, data, and video convergence. Should the Landlord be able to provide the aforementioned work at a cost at or below the County's cost, the recommendation herein allows for the payment of these costs to the Landlord, or at the discretion of the Chief Executive Office (CEO), all or part of these costs may be paid to the Landlord on a lump sum basis.

COLA0085439

The Honorable Board of Supervisors
October 30, 2012
Page 4

The project also includes funding of $1,400,000 for the acquisition of furniture, additional TIs, and a change order allowance.

In the event of cancellation, the County would be required to reimburse the Landlord its prorated share of the base tenant improvements amortized over the remaining years of the lease at 7 percent.

## FACTS AND PROVISIONS/LEGAL REQUIREMENTS

The proposed amendment will provide for approximately 46,000 rentable square feet of space and 240 parking spaces, in the buildings located at 300 East Avenue K-8, Lancaster. The lease amendment contains the following provisions.

- The amendment commences upon Board approval and ends November 14, 2020.

- The lease amendment is on a modified full-service basis, whereby the County will be responsible for all janitorial and day porter costs. The Landlord will pay for electricity consumption and monthly maintenance costs of the interior and exterior of the premises.

- Base year rent remains fixed thru the term of the Lease.

- Base TIs of $1,225,000 are included in the base rent.

- Additional TI, furniture, and change order allowances totaling $1,400,000 in reimbursable TI funds are available. Any amount utilized for TI will be paid back in lump sum or amortized at 7 percent annually, upon acceptance of the improvements by the County.

- The Landlord will provide 240 parking spaces which are sufficient to meet the parking needs of the department and clients.

- A cancellation provision is provided in the lease amendment which allows the County to cancel any time after the 60th month upon 90 days prior written notice.

CEO-Real Estate staff surveyed the Lancaster and surrounding area to determine the market rate of comparable sites. Based upon said survey, staff has established that the base rental range for similar property is between $35 and $37 per square foot per year, modified full-service, including parking and TI's. Thus, the base annual rent of $23.40 per square foot for the base lease cost is below market rate for this area. Attachment B shows County-owned and leased facilities within the search area and none are available to house the expansion.

COLA0085440

The Honorable Board of Supervisors
October 30, 2012
Page 5

## NEGATIVE DECLARATION/ENVIRONMENTAL IMPACT REPORT

The CEO has made an initial study of environmental factors and has concluded that this project is exempt from CEQA pursuant to Class 1 of the Environmental Document Reporting Procedures and Guidelines adopted by the Board on November 17, 1987, and Section 15301 of the State CEQA Guidelines.

## IMPACT ON CURRENT SERVICES (OR PROJECTS)

There will be no disruption of services to the public as the amendment to incorporate approximately 35,000 rentable square feet of office space does not impact the space currently occupied by DCFS at each of their existing locations.

## CONCLUSION

It is requested that the Executive Officer of the Board of Supervisors return four copies of the lease amendment, two certified copies of the Minute Order, and the adopted, stamped Board letter to the CEO, Real Estate Division, 222 South Hill Street, 4th Floor, Los Angeles, CA 90012

Respectfully submitted,

WILLIAM T FUJIOKA
Chief Executive Officer

WTF:RLR:CMM
CEM:TS:ls

Attachments

c:  Executive Office, Board of Supervisors
    County Counsel
    Auditor Controller
    Children and Family Services
    Internal Services

COLA0085441

Attachment A

**DEPARTMENT OF CHILDREN AND FAMILY SERVICES**
**300 EAST AVENUE K-6, LANCASTER**
Asset Management Principles Compliance Form[1]

| 1. | | Occupancy | Yes | No | N/A |
|---|---|---|---|---|---|
| | A | Does lease consolidate administrative functions?[2] | | | x |
| | B | Does lease co-locate with other functions to better serve clients?[3]  The additional office will help relieve overcrowding in the existing facilities and will provide the same services as the existing two offices. | x | | |
| | C | Does the lease centralize business support functions?[2] | | | x |
| | D | Does the lease meet the guideline of 260 sq. ft of space per person?[3] | x | | |
| 2. | | Capital | | | |
| | A | Is it a substantial net County cost (NCC) program?  The lease cost for DCFS is 70.23 percent State and Federal funded and 29.77 percent NCC. | | x | |
| | B | Is this a long term County program? | x | | |
| | C | If yes to 2 A or B, is it a capital lease or an operating lease with an option to buy? | | x | |
| | D | If no, are there any suitable County-owned facilities available? Yes, there is vacant County-owned space at 1110 W Avenue J, Lancaster. | x | | |
| | E | If yes, why is lease being recommended over occupancy in County-owned space? The County-owned space is not habitable as it exists and the cost to rehab the space to meet the DCFS requirements is not cost-effective when compared to the proposed lease. | x | | |
| | F | Is Building Description Report attached as Attachment B? | x | | |
| | G | Was build-to-suit or capital project considered?  The proposed space is available at a competitive rate and DCFS requested space that could be used to help alleviate overcrowding; therefore, a capital project is not under consideration at this time. | | x | |
| 3. | | Portfolio Management | | | |
| | A | Did department utilize CEO Space Request Evaluation (SRE)? | x | | |
| | B | Was the space need justified? | x | | |
| | C | If a renewal lease, was co-location with other County departments considered? | x | | |
| | D | Why was this program not co-located? | | | |
| | | 1 ____ The program clientele requires a "stand alone" facility. | | | |
| | | 2 ____ No suitable County occupied properties in project area. | | | |
| | | 3 ____ No County-owned facilities available for the project. | | | |
| | | 4 ____ Could not get City clearance or approval. | | | |
| | | 5 _X_ The Program is being co-located. | | | |
| | E | Is lease a full service lease?[4]  Landlord would not provide Janitorial Services. | | x | |
| | F | Has growth projection been considered in space request? | x | | |
| | G | Has the Dept. of Public Works completed seismic review/approval? Not required, built in 2009 and meets current requirements | | | x |
| | | As approved by the Board of Supervisors 11/17/98 | | | |
| | | If not, why not?                    Please bold any written responses | | | |

Attachment B

## SPACE SEARCH WITHIN FIVE MILES OF
## 1160 WEST AVENUE J, AND 251 EAST AVENUE K-6, LANCASTER
## DEPARTMENT OF CHILDREN AND FAMILY SERVICES

| LACO | Name | Address | Gross SQFT | Net SQFT | Ownership | SQFT Available |
|---|---|---|---|---|---|---|
| A623 | LANCASTER DCFS REGIONAL OFFICE | 1150 W AVENUE J, LANCASTER 93534 | 18,410 | 18,410 | LEASED | NONE |
| A447 | LANCASTER DCFS REGIONAL OFFICE ANNEX | 300 E AVENUE K-6, LANCASTER 93534 | 45,000 | 45,000 | LEASED | 35,000 |
| A294 | LANCASTER COURTHOUSE -JURY ASSEMBLY ROOM | 1040 W AVENUE J, LANCASTER 93534 | 1,440 | 1,296 | OWNED | NONE |
| A445 | FIRE-LANCASTER FIRE PREVENTION SUBOFFICE | 44933 N FERN AVE, LANCASTER 93534 | 30 | 20 | GRATIS USE | NONE |
| Y247 | DCSS-ANTELOPE VALLEY SENIOR CENTER | 777 W JACKMAN ST, LANCASTER 93534 | 9,424 | 8,965 | OWNED | NONE |
| Y397 | PUBLIC LIBRARY-LANCASTER LIBRARY | 601 W LANCASTER BLVD, LANCASTER 93534 | 48,721 | 43,850 | OWNED | NONE |
| A623 | DCFS FTLP | 1420 W AVENUE I, LANCASTER 93531 | 191 | 184 | LEASED | NONE |
| A387 | SHERIFF-LANCASTER ADMINISTRATIVE OFFICE | 501 W LANCASTER BLVD, LANCASTER 93534 | 7,557 | 6,801 | PERMIT | NONE |
| Y373 | PW-WAD904-NORTH ADMINISTRATION BUILDING | 419 W AVENUE J, LANCASTER 93534 | 4,126 | 3,446 | OWNED | NONE |
| A192 | PROBATION-ANTELOPE VALLEY AREA OFFICES | 132 E AVENUE K-4, LANCASTER 93535 | 6,403 | 6,350 | LEASED | NONE |
| C302 | PW-SEWER MAINTENANCE NORTH YARD OFFICE | 45712 N DIVISION ST, LANCASTER 93534 | 864 | 821 | OWNED | NONE |
| A079 | ASSESSOR-LANCASTER REGIONAL OFFICES | 251 E AVENUE K-6, LANCASTER 93534 | 10,309 | 10,712 | LEASED | NONE |
| A623 | DCFS FTLP | 251 E AVENUE K-6, LANCASTER 93534 | 2,669 | 2,357 | LEASED | NONE |
| X495 | PW-WATERWORKS NORTH MAINTENANCE AREA HQ BLDG | 350 E AVENUE K-8, LANCASTER 93535-4527 | 13,200 | 11,155 | OWNED | NONE |
| X542 | PW-WATERWORKS NORTH MAINT AREA OFFICE | 280 E AVENUE K-8, LANCASTER 93535-4527 | 2,000 | 1,900 | OWNED | NONE |
| A088 | ANTELOPE VALLEY SERVICE CENTER-BUILDING B | 335 E AVENUE K-6, LANCASTER 93534 | 51,000 | 43,592 | LEASED | NONE |
| A493 | ANTELOPE VALLEY SERVICE CENTER-BUILDING A | 349 E AVENUE K-6, LANCASTER 93534 | 51,000 | 35,002 | LEASED | NONE |
| A642 | DPSS-LANCASTER GR/GROW OFFICE | 335 E AVENUE K-10, LANCASTER 93535-4529 | 22,040 | 20,938 | LEASED | NONE |
| A033 | BOARD OF SUPV-5 DISTRICT FIELD OFFICE | 1112 W AVENUE M-4, PALMDALE 93550 | 1,241 | 1,164 | LEASED | NONE |
| 4122 | ANIMAL CONTROL AG-ADMINISTRATION | 5210 W AVENUE I, LANCASTER 93536 | 9,297 | 788 | OWNED | NONE |
| 4088 | LANCASTER COURTHOUSE SERVICE BLDG | 1110 W AVENUE J, LANCASTER 93534 | 16,489 | 12,314 | OWNED | 12,314 |

EXHIBIT 3

| | |
|---|---|
| **From:** | Rachel Brock |
| **Sent:** | Thursday, December 15, 2016 3:10 PM PST |
| **To:** | Michael Samsing; Tom Shepos |
| **CC:** | Cristina Morales |
| **Subject:** | RE: Lancaster Site Space |

Understood, thank you.

Rachel H. Brock, Facility Agent
Property Management
626-691-1684

**From:** Michael Samsing
**Sent:** Thursday, December 15, 2016 3:05 PM
**To:** Tom Shepos <tshepos@ceo.lacounty.gov>; Rachel Brock <BROCKR@dcfs.lacounty.gov>
**Subject:** RE: Lancaster Site Space

Rachel,

Before we go too far out looking for space, we need a SRE and space program that clearly identifies what the space needs are, where the search area should be and what leases we may be looking to cancel.

Mike

**From:** Tom Shepos
**Sent:** Thursday, December 15, 2016 10:46 AM
**To:** Rachel Brock
**Cc:** Michael Samsing
**Subject:** RE: Lancaster Site Space

The site at 300 E Avenue K-6 could provide approximately 35,000 square feet of ancillary space in addition to the 44,000 square feet of existing space. The parcel could provide additional building square footage beyond the 80,000 square feet but then could not then meet the necessary parking requirement. The total 80,000 square feet of space proposed has sufficient land to allow parking required under the code. I have a plan that was provided by the Landlord that shows what the additional 35,000 square feet of space would layout incorporating the existing buildings. Please make arrangements to have the plan retrieved from me at your convenience.

Should the department provide an SRE and it was approved RED could then look for the additional 100,000 to 120,000 square feet of space DCFS may be needing.

Thomas Shepos
Section Manager, Lease Acquisitions
222 S Hill Street
Los Angeles CA 90012
(213) 974-4364

COLA0023872

| | |
|---|---|
| **From:** | Rachel Brock |
| **Sent:** | Thursday, December 15, 2016 10:30 AM PST |
| **To:** | Tom Shepos |
| **CC:** | Cristina Morales; Venus Crittenden; Steve Erickson |
| **Subject:** | FW: Lancaster Site Space |

Hi Tom,

This is to follow-up on Priscilla's question from early November 2016 regarding moving the Palmdale staff, including expansion to 300 E. Avenue K-6, Lancaster. Is this doable? We are talking about adding a minimum of 120,000 sq. ft., which would include additional ancillary space.

Thank you.

Rachel H. Brock, Facility Agent
Property Management
Department of Children & Family Services
725 S. Grand Avenue
Glendora, CA 91740
Office: 626-691-1684
Fax: 626-691-1123
brockr@dcfs.lacounty.gov

**From:** Priscilla Gonzalez
**Sent:** Wednesday, November 09, 2016 5:02 PM
**To:** Tom Shepos <tshepos@ceo.lacounty.gov>
**Cc:** Cristina Morales <MoralC2@dcfs.lacounty.gov>; Rachel Brock <BROCKR@dcfs.lacounty.gov>; Venus Crittenden <crittv@dcfs.lacounty.gov>; Steve Erickson <ErickS@dcfs.lacounty.gov>
**Subject:** Lancaster Site Space

Hi Tom,

We are looking for an additional 120,000 – 150,00 square feet, which does not include the current Lancaster space.

Thank you,

Priscilla Gonzalez

**From:** Tom Shepos
**Sent:** Wednesday, November 09, 2016 4:26 PM
**To:** Priscilla Gonzalez <Gonzpr@dcfs.lacounty.gov>
**Subject:** RE: Lancaster Site Space

COLA0023231

EXHIBIT 4



SACH HARDT
Chief Executive Officer

## County of Los Angeles
## CHIEF EXECUTIVE OFFICE

Kenneth Hahn Hall of Administration
500 West Temple Street, Room 713, Los Angeles, California 90012
(213) 974-1101
http://ceo.lacounty.gov

"To Enrich Lives Through Effective And Caring Service"

Board of Supervisors
HILDA L. SOLIS
First District

MARK RIDLEY-THOMAS
Second District

SHEILA KUEHL
Third District

DON KNABE
Fourth District

MICHAEL D. ANTONOVICH
Fifth District

November 01, 2016

The Honorable Board of Supervisors
County of Los Angeles
383 Kenneth Hahn Hall of Administration
500 West Temple Street
Los Angeles, California 90012

Dear Supervisors:



ADOPTED
BOARD OF SUPERVISORS
COUNTY OF LOS ANGELES

# 1 9        NOV # 1 2016

LORI GLASGOW
EXECUTIVE OFFICER

## LEASE AMENDMENT
## DEPARTMENT OF CHILDREN AND FAMILY SERVICES
## 300 EAST AVENUE K-6, LANCASTER
## (FIFTH DISTRICT)
## (3 VOTES)

## SUBJECT

A lease amendment to extend the normal working hours and to allow the County as tenant to reimburse the Landlord for after-hours heating and air conditioning costs.

## IT IS RECOMMENDED THAT THE BOARD:

1. Find that the proposed lease amendment is categorically exempt from the provisions of the California Environmental Quality Act pursuant to Class 1 of the Environmental Document reporting Procedures and Guidelines adopted by the Board of Supervisors on November 17, 1987, and Section 15301 of the State of California Environmental Quality Act Guidelines (Existing Facilities).

2. Approve and instruct the Chair to sign the lease amendment with Gregory Hanes (Landlord), for the Department of Children and Family Services at 300 East Avenue K-6, Lancaster, to extend the normal working hours by one hour to start at 6:00 a.m. and allow the County to reimburse the Landlord for after-hours heating ventilation and air conditioning at the rate of $45.00 per hour as additional rent. The costs for the Department of Children and Family Services are approximately 69 percent funded from State and federal funds, and 31 percent is net County cost.

COLA0049114

The Honorable Board of Supervisors
11/1/2016
Page 2

3. Authorize and direct the Chief Executive Officer, or her designee, to execute any other ancillary documentation necessary to effectuate the lease amendment, and authorize the Chief Executive Officer and the Director of Children and Family Services to take actions necessary and appropriate to implement the project. The lease amendment will be effective upon approval by the Board of Supervisors, and continue through the end of the lease.

## PURPOSE/JUSTIFICATION OF RECOMMENDED ACTION

The proposed lease amendment is intended to provide a safe and comfortable working environment for the County staff. Heating, ventilation, and air conditioning (HVAC) is provided during the normal working hours of 7:00 a.m. through 7:00 p.m. as defined in the lease. Due to the extreme weather conditions in the Lancaster area, the Department of Children and Family Services (DCFS) is requesting authority to run the HVAC after normal working hours, as needed, to provide a comfortable working environment during the times when the tenant or its vendors use the facility after hours. The after-hours HVAC provision allows the tenant to reimburse Gregory Hanes (Landlord) for the extended usage. Currently, the after-hours usage is anticipated for the janitorial services during the summer at five hours per day, Monday through Friday. The Landlord has also offered to extend the normal working hours by one hour, turning the HVAC on one hour earlier in the morning at no charge to the County for the comfort of the staff.

### Implementation of Strategic Plan Goals

The Countywide Strategic Plan Goal of Community Support and Responsiveness (Goal 2) directs that we enrich lives of Los Angeles County residents by providing enhanced services, and effectively planning and responding to economic, social, and environmental challenges. The proposed lease amendment is in conformance with the Asset Management Principles as outlined in Attachment A.

## FISCAL IMPACT/FINANCING

The anticipated after-hours cost of HVAC would be five hours per day at $45 per hour or $225 per day, or approximately $4,500 per month during the summer season. DCFS has sufficient funding in its Fiscal Year (FY) 2016-17 operating budget to cover the projected costs. The costs for DCFS are approximately 69 percent funded from State and federal funds and 31 percent is net County cost. Attachment B is an overview of the proposed lease costs.

## FACTS AND PROVISIONS/LEGAL REQUIREMENTS

The proposed lease amendment contains the following provisions:

- The normal operating hours will be 6:00 a.m. to 7:00 p.m.
- The Landlord will provide after-hours HVAC upon request at a rate of $45 per hour.

This lease amendment is to add services only and not to extend the term or add square footage, so the County's facility location policy, adopted by the Board of Supervisors on July 24, 2012, is not applicable as outlined in Attachment C.

COLA0049115

The Honorable Board of Supervisors
11/1/2016
Page 3

## ENVIRONMENTAL DOCUMENTATION

The lease amendment is exempt from California Environmental Quality Act Guidelines (CEQA) pursuant to Class 1, of the Environmental Document Reporting Procedures and Guidelines adopted by the Board, and Section 15301 of the State CEQA Guidelines.

## IMPACT ON CURRENT SERVICES (OR PROJECTS)

The provision of a more comfortable indoor climate within the leased premises will facilitate the delivery of services to the public and the ability of the janitorial staff to perform their work in a healthy environment.

## CONCLUSION

It is requested that the Executive Office, Board of Supervisors, return three originals of the executed lease amendment, two certified copies of the Minute Order, and the adopted, stamped Board letter to the CEO, Real Estate Division at 222 South Hill Street, 4th Floor, Los Angeles, CA 90012 for further processing.

Respectfully submitted,

SACHI A. HAMAI
Chief Executive Officer

SAH:DPH:CMM
SDH:SG:ns

Enclosures

c:    Executive Office, Board of Supervisors
      County Counsel
      Auditor-Controller
      Children and Family Services

ATTACHMENT A

## DEPARTMENT OF CHILDREN & FAMILY SERVICES
### 300 EAST AVENUE K-6, LANCASTER
Asset Management Principles Compliance Form[1]

| | | | Yes | No | N/A |
|---|---|---|---|---|---|
| 1. | | Occupancy  (Modifying terms of existing lease; no changes to term or square footage) | | | |
| | A | Does lease consolidate administrative functions? | | | X |
| | B | Does lease co-locate with other functions to better serve clients?[2] | X | | |
| | C | Does this lease centralize business support functions? | | | X |
| | D | Does this lease meet the guideline of 200 sq. ft. of space per person?[2] | X | | |
| | E | Does lease meet the 4/1000 sq. ft. parking ratio guideline?[2] | X | | |
| | F | Does public parking and mass-transit exist to facilitate employee, client and visitor access to the proposed lease location? | X | | |
| 2. | | Capital | | | |
| | A | Is it a substantial net County cost (NCC) program? The lease cost for DCFS is 59 Percent State and Federal funded and 31 percent NCC. | | X | |
| | B | Is this a long term County program? | X | | |
| | C | If yes to 2 A or B; is it a capital lease or an operating lease with an option to buy? | | X | |
| | D | If no, are there any suitable County-owned facilities available? | | X | |
| | E | If yes, why is lease being recommended over occupancy in County-owned space? | | | X |
| | F | Is Building Description Report attached as Attachment C? | | | X |
| | G | Was build-to-suit or capital project considered? | | X | |
| 3. | | Portfolio Management | | | |
| | A | Did department utilize CEO Space Request Evaluation (SRE)? | | | X |
| | B | Was the space need justified? | | | X |
| | C | If a renewal lease, was co-location with other County departments considered? | | | X |
| | D | Why was this program not co-located? | | | X |
| | | 1. ___  The program of entire requires a 'stand alone' facility. | | | |
| | | 2. ___  No suitable County occupied properties in project area. | | | |
| | | 3. ___  No County-owned facilities available for the project. | | | |
| | | 4. ___  Could not get City clearance or approval. | | | |
| | | 5. ___  The Program is being co-located. | | | |
| | E | Is lease a full service lease? | X | | |
| | F | Has growth projection been considered in space request? | | | X |
| | G | Has the Dept. of Public Works completed seismic review/approval? Not required. Built in 2009 and meets current requirements. | | | X |
| | | [1] As approved by the Board of Supervisors - 1/17/95 | | | |
| | | [2] If not, why not? | | | |

ATTACHMENT B

## FISCAL IMPACT / FINANCING
## OVERVIEW OF LEASE CHANGES

| DCFS SPA 1 OFFICES | EXISTING LEASE 300 E. AVE. K-8, LANCASTER | PROPOSED AMENDMENT 300 E. AVE. K-6, LANCASTER | CHANGE |
|---|---|---|---|
| Area (square feet) | 11,000 | 11,000 | None |
| Term | (5/15/2013–10/14/2020) Approx'ly 7.5 years | (5/15/2013–10/14/2020) Approx'ly 7.5 years | None |
| Annual Rent | $1,076,400 | $1,094,400 | $18,000 projected cost for after-hrs. HVAC (4 months @ $4,500) |
| Tenant Improvements (in Base Rent) | $1,225,000 ($35/sq.ft– Premises 2) | -0- | No further tenant improvements required |
| Cancellation | County may cancel any time after 60th month on 90 days' prior written notice | County may cancel any time after 60th month on 90 days' prior written notice | None |
| Parking | 200 spaces | 200 spaces | None |
| Option to Renew | 2 5-yr options on 90 days' notice | 2 5-yr options on 90 days' notice | None |
| Rental Adjustment | Fixed through 11/14/2020 (expiration of 1st term) | Fixed through 11/14/2020 (expiration of 1st term) | None |

COLA0049118

ATTACHMENT C

## FACILITY LOCATION POLICY ANALYSIS

**Proposed lease amendment:**    Lease amendment to extend the normal working hours and to allow the Lessee to reimburse Lessor for after-hours heating and air conditioning (HVAC) costs and special maintenance requests. No extension of term or addition of space.

A. **Establish Service Function Category** – DCFS SPA 1 offices.

B. **Determination of the Service Area** – The proposed amendment will allow DCFS to provide staff and vendors with extended hours of HVAC during extreme weather and to request and reimburse the Lessor for special alteration projects.

C. **Apply Location Selection Criteria to Service Area Data  N/A (existing lease is not being renewed or expanded)**

  • Need for proximity to service area and population: N/A

  • Need for proximity to existing County facilities: N/A

  • Need for proximity to Los Angeles Civic Center: N/A

  • Economic Development Potential: N/A

  • Proximity to public transportation: N/A

  • Availability of affordable housing for County employees: N/A

  • Use of historic buildings: N/A

  • Availability and compatibility of existing buildings: N/A

  • Compatibility with local land use plans: N/A

  • Estimated acquisition/construction and ongoing operational costs:
    It is anticipated that the after-hours HVAC usage at the rate of $45/hour will be used during the summer months to provide relief for evening janitorial services at 5 hours per day Monday through Friday at a projected cost of $4,500 per month or $18,000 for the summer season.

D. **Analyze results and identify location alternatives**  N/A

E. **Determine benefits and drawbacks of each alternative based upon functional needs, service area, cost and other Location Selection Criteria** N/A

COLA0004119



**County of Los Angeles**
# CHIEF EXECUTIVE OFFICE
Kenneth Hahn Hall of Administration
500 West Temple Street, Room 713, Los Angeles, California 90012
(213) 974-1101
http://ceo.lacounty.gov

WILLIAM T FUJIOKA
Chief Executive Officer

Board of Supervisors
GLORIA MOLINA
First District

MARK RIDLEY-THOMAS
Second District

ZEV YAROSLAVSKY
Third District

DON KNABE
Fourth District

MICHAEL D. ANTONOVICH
Fifth District

October 30, 2012

**ADOPTED**
**BOARD OF SUPERVISORS**
COUNTY OF LOS ANGELES

**1 5**       OCT 30 2012

The Honorable Board of Supervisors
County of Los Angeles
383 Kenneth Hahn Hall of Administration
500 West Temple Street
Los Angeles, CA 90012

SACHI A. HAMAI
EXECUTIVE OFFICER

Dear Supervisors:

## AMENDMENT NO. 1, LEASE NO. 77260
## DEPARTMENT OF CHILDREN AND FAMILY SERVICES
## 300 EAST AVENUE K-6, LANCASTER
## (FIFTH DISTRICT) (3 VOTES)

### SUBJECT

This recommendation is to amend Lease No. 77260 to expand the Department of Children and Family Services premises with the addition of approximately 35,000 rentable square feet of space, extend the term of the Lease for an additional five-year term, and commence new monthly rent upon completion and acceptance of tenant improvements by the County.

### IT IS RECOMMENDED THAT THE BOARD:

1. Find that the lease amendment is categorically exempt from the provisions of the California Environmental Quality Act pursuant to Class 1 of the Environmental Document Reporting Procedures and Guidelines adopted by the Board of Supervisors on November 17, 1987, and Section 15301 of the State of California Environmental Quality Act Guidelines (Existing Facilities)

2. Approve and instruct the Chairman to sign the lease amendment with Gregory Hanes (Landlord), for the Department of Children and Family Services to add approximately 35,000 rentable square feet of space to the 11,000 rentable square feet of existing space located at 300 East Avenue K-6, Lancaster, at an annual first year base rent of $1,076,400, plus first year payment of $1,400,000 reimbursement for additional tenant improvements, furniture, and change order allowances via lump sum, or amortized at $332,660 annually over a five-year period. The rental cost is funded at approximately 70 percent through Federal and State subvention and 30 percent net County cost.

"To Enrich Lives Through Effective And Caring Service"

*Please Conserve Paper – This Document and Copies are Two-Sided*
*Intra-County Correspondence Sent Electronically Only*

COLA0049120

The Honorable Board of Supervisors
October 30, 2012
Page 2

    3. Authorize the Landlord and/or Director of Internal Services, at the discretion of the Chief Executive Officer to acquire telephone systems for the Department of Children and Family Services at a cost not to exceed $1,200,000, and either all or part of the telephone, data, and low voltage systems may be paid in lump sum or financed over a 60-month term not to exceed $243,317 per year, in addition to other tenant improvement allowances.

## PURPOSE/JUSTIFICATION OF RECOMMENDED ACTION

The Department of Children and Family Services (DCFS) submitted a Space Request for expansion space that would consolidate staff into a central location to better serve clients throughout the Lancaster/northern Antelope Valley area. The lease at 1150 West Avenue J, where DCFS currently occupies 18,410 square feet (sq. ft.) of office space expires in mid July 2013. The recommended location at 300 East Avenue K-6, Lancaster allows DCFS to expand and co-locate in office space improved and occupied by DCFS in October 2010. DCFS also occupies a 2,669 rentable sq. ft. at 251 East Avenue K-6, adjacent to the recommended location, which DCFS hopes to backfill with another program.

The Lancaster DCFS office provides comprehensive and direct child protection services. The primary goal is to maintain the family unit, however, when this is not possible, the secondary goal is to reduce the timeline to permanency for children in their care and reliance on out-of-home care. DCFS Adoption Units are responsible for case management, which involves assessing the child's adoptability and finalizing a child's adoption. DCFS Revenue Enhancement units provide support to the social workers by assisting in finding placements for children who must be assigned to out-of-home care. In addition, there are smaller units that are designed to enhance direct services to children and families which include, Family Group/Team Decision Making and the Department of Mental Health/Children's Services, who provide mental health assessment for foster care children.

The lease amendment increases the size of the premises at 300 East Avenue K-6. The amendment requests: 1) an additional 35,000 square feet which will increase the total DCFS space to 46,000 square feet, 2) extend the term of the Lease for an additional five-year term, and 3) authority to reimburse the Landlord for tenant improvements (TI) and furniture up to $1,400,000. The establishment of a larger and centralized location in Lancaster is consistent with DCFS' long-range service plan to better serve the needs of the local population in the surrounding service area.

The Honorable Board of Supervisors
October 30, 2012
Page 3

## Implementation of Strategic Plan Goals

The Countywide Strategic Plan Goal of Operational Effectiveness (Goal 1) directs that we ensure the timely delivery of customer-oriented and efficient public service, and the Integrated Services Delivery (Goal 3), which maximizes our resources through the integration of services. In this case, we have enhanced economic and social outcomes through integrated, cost-effective, and client-centered supportive services by expanding DCFS' presence in a leased space. The lease amendment is in conformance with the Asset Management Principles as outlined in Attachment A.

## FISCAL IMPACT/FINANCING

The monthly rent under the lease amendment will be a $1.95 per square foot modified full-service wherein the County pays for its own day porter and janitorial services and the Landlord will pay for electricity consumption and monthly maintenance costs for the interior and exterior of the premises. The monthly/annual base rent remains fixed through the new eight-year term.

The first year cost to add the additional space shall not exceed $1,078,400 in total base rent per the terms and conditions of the lease amendment. The County may lump sum or reimburse the Landlord for the reimbursable TI allowance and change orders up to $1,400,000. If amortized, the annual payment would be $332,660 annually.

| 300 EAST AVENUE K-6 | LEASE NO. 77260 300 E Avenue K-6 | AMENDMENT NO. 1 | Changes |
|---|---|---|---|
| Area - sq. ft | 11,000 sq. ft. | 35,000 sq. ft | +35,000 sq. ft |
| Term | 11/15/10-11/14/2015 | 11/15/2015-11/14/2020 Upon board approval | Extend lease term to 5 years through 11/14/2020 |
| Annual Base Rent | $262,680 | $819,000* | +$819,000 |
| Additional Tenant Improvements | Paid in full | $1,400,000 or ($332,660 annually for five years) | $1,400,000 or ($332,660 annually for five years) |
| Parking | 40 spaces | 200 spaces | +200 spaces |
| Cancellation | County may cancel any time after 48th month upon 90 days prior written notice | County may cancel any time after 60th month upon 90 days prior written notice | Any time after 60th month upon 90 days written notice |
| Rental Adjustment | Fixed | Fixed through 11/14/2020 | Fixed through 11/14/2020 |

*Includes $1,225,000 of TI provided by Landlord in the Base Rent

The total estimated cost for the telephone, data, and low voltage system enhancements will not exceed $1,200,000. The current telephone system is upgradeable to the current Voice over Internet Protocol (VoIP) and data network systems that are sufficiently robust to allow for future voice, data, and video convergence. Should the Landlord be able to provide the aforementioned work at a cost at or below the County's cost, the recommendation herein allows for the payment of these costs to the Landlord, or at the discretion of the Chief Executive Office (CEO), all or part of these costs may be paid to the Landlord on a lump sum basis.

COLA0049122

The Honorable Board of Supervisors
October 30, 2012
Page 4

The project also includes funding of $1,400,000 for the acquisition of furniture, additional TIs, and a change order allowance.

In the event of cancellation, the County would be required to reimburse the Landlord its prorated share of the base tenant improvements amortized over the remaining years of the lease at 7 percent.

## FACTS AND PROVISIONS/LEGAL REQUIREMENTS

The proposed amendment will provide for approximately 46,000 rentable square feet of space and 240 parking spaces, in the buildings located at 300 East Avenue K-6, Lancaster. The lease amendment contains the following provisions

- The amendment commences upon Board approval and ends November 14, 2020

- The lease amendment is on a modified full-service basis, whereby the County will be responsible for all janitorial and day porter costs. The Landlord will pay for electricity consumption and monthly maintenance costs of the interior and exterior of the premises.

- Base year rent remains fixed thru the term of the Lease.

- Base TIs of $1,225,000 are included in the base rent.

- Additional TI, furniture, and change order allowances totaling $1,400,000 in reimbursable TI funds are available. Any amount utilized for TI will be paid back in lump sum or amortized at 7 percent annually, upon acceptance of the improvements by the County.

- The Landlord will provide 240 parking spaces which are sufficient to meet the parking needs of the department and clients.

- A cancellation provision is provided in the lease amendment which allows the County to cancel any time after the 60th month upon 90 days prior written notice.

CEO-Real Estate staff surveyed the Lancaster and surrounding area to determine the market rate of comparable sites. Based upon said survey, staff has established that the base rental range for similar property is between $35 and $37 per square foot per year, modified full-service, including parking and TI's. Thus, the base annual rent of $23.40 per square foot for the base lease cost is below market rate for this area. Attachment B shows County-owned and leased facilities within the search area and none are available to house the expansion.

COLA0049123

The Honorable Board of Supervisors
October 30, 2012
Page 5

## NEGATIVE DECLARATION/ENVIRONMENTAL IMPACT REPORT

The CEO has made an initial study of environmental factors and has concluded that this project is exempt from CEQA pursuant to Class 1 of the Environmental Document Reporting Procedures and Guidelines adopted by the Board on November 17, 1987, and Section 15301 of the State CEQA Guidelines.

## IMPACT ON CURRENT SERVICES (OR PROJECTS)

There will be no disruption of services to the public as the amendment to incorporate approximately 35,000 rentable square feet of office space does not impact the space currently occupied by DCFS at each of their existing locations.

## CONCLUSION

It is requested that the Executive Officer of the Board of Supervisors return four copies of the lease amendment, two certified copies of the Minute Order, and the adopted, stamped Board letter to the CEO, Real Estate Division, 222 South Hill Street, 4th Floor, Los Angeles, CA 90012.

Respectfully submitted,

WILLIAM T FUJIOKA
Chief Executive Officer

WTF:RLR:CMM
CEM:TS:ls

Attachments

c:  Executive Office, Board of Supervisors
County Counsel
Auditor Controller
Children and Family Services
Internal Services

BL 3006 avenue b6 amend · d3ffs

COLA0049124

Attachment A

**DEPARTMENT OF CHILDREN AND FAMILY SERVICES**
**300 EAST AVENUE K-6, LANCASTER**
Asset Management Principles Compliance Form[1]

| 1. | | Occupancy | Yes | No | N/A |
|---|---|---|---|---|---|
| | A | Does lease consolidate administrative functions?[2] | | | X |
| | B | Does lease co-locate with other functions to better serve clients?[3] The additional office will help relieve overcrowding in the existing facilities and will provide the same services as the existing two offices. | X | | |
| | C | Does the lease centralize business support functions?[4] | | | X |
| | D | Does the lease meet the guideline of 200 sq ft of space per person?[5] | X | | |
| 2. | | Capital | | | |
| | A | Is it a substantial net County cost (NCC) program? The lease cost for DCFS is 70-23 percent State and Federal funded and 29-77 percent NCC. | | X | |
| | B | Is it a long term County program? | X | | |
| | C | If yes to 2 A or B, is it a capital lease or an operating lease with an option to buy? | | X | |
| | D | If no, are there any suitable County-owned facilities available? Yes, there is vacant County-owned space at 1110 W Avenue J, Lancaster. | X | | |
| | E | If yes, why is lease being recommended over occupancy in County-owned space? The County-owned space is not habitable as it exists and the cost to rehab the space to meet the DCFS requirements is not cost-effective when compared to the proposed lease. | X | | |
| | F | Is Building Description Report attached as Attachment B? | X | | |
| | G | Was bide-to-suit or capital project considered? The proposed space is available at a competitive rate and DCFS requested space that could be used to help alleviate overcrowding; therefore, a capital project is not under consideration at this time. | | X | |
| 3. | | Portfolio Management | | | |
| | A | Did department utilize CEO Space Request Evaluation (SRE)? | X | | |
| | B | Was the space need justified? | X | | |
| | C | If a renewal lease, was co-location with other County departments considered? | X | | |
| | D | Why was the program not co-located? | | | |
| | | 1 ___ The program clientele requires a "stand alone" facility. | | | |
| | | 2 ___ No suitable County occupied properties in project area. | | | |
| | | 3 ___ No County-owned facilities available for the project | | | |
| | | 4 ___ Could not get City clearance or approval | | | |
| | | 5 _X_ The Program is being co-located | | | |
| | E | Is lease a full service lease?[6] Landlord would not provide Janitorial Services. | | X | |
| | F | Has growth projection been considered in space request? | X | | |
| | G | Has the Dept of Public Works completed seismic review/approval? Not required, built in 2009 and meets current requirements. | | | X |
| | | [1] As approved by the Board of Supervisors 11/17/98 | | | |
| | | [2] Incl, sq/ ft?         Please bold any written responses | | | |

Attachment B

## SPACE SEARCH WITHIN FIVE MILES OF
## 1150 WEST AVENUE J, AND 251 EAST AVENUE K-6, LANCASTER
## DEPARTMENT OF CHILDREN AND FAMILY SERVICES

| LACD | Name | Address | Gross SQFT | Net SQFT | Ownership | SQFT Available |
|---|---|---|---|---|---|---|
| A023 | LANCASTER DCFS REGIONAL OFFICE | 1150 W AVENUE J, LANCASTER 93534 | 15,410 | 13,410 | LEASED | NONE |
| A887 | LANCASTER DCFS REGIONAL OFFICE ANNEX | 300 E AVENUE K-6 LANCASTER 93534 | 46,300 | 46,000 | LEASED | 35,000 |
| A294 | LANCASTER COURTHOUSE -JURY ASSEMBLY ROOM | 1040 W AVENUE J, LANCASTER 93534 | 1,440 | 1,256 | OWNED | NONE |
| A365 | FIRE LANCASTER FIRE PREVENTION SUBOFFICE | 44933 N FERN AVE, LANCASTER 93534 | 30 | 30 | GRATIS USE | NONE |
| Y247 | DCSS-ANTELOPE VALLEY SENIOR CENTER | 777 W JACKMAN ST, LANCASTER 93534 | 9,424 | 8,066 | OWNED | NONC |
| Y397 | PUBLIC LIBRARY-LANCASTER LIBRARY | 601 W LANCASTER BLVD, LANCASTER 93534 | 48,721 | 43,850 | OWNED | NONE |
| A023 | DCFS - F L P | 1420 W AVENUE I, LANCASTER 93534 | 191 | 184 | LEASED | NONE |
| A597 | SHERIFF-LANCASTER ADMINISTRATIVE OFFICE | 501 W LANCASTER BLVD, LANCASTER 93534 | 7,597 | 6,801 | PERMIT | NONE |
| Y373 | PW-WMD#04-NORTH ADMINISTRATION BUILDING | 415 W AVENUE J, LANCASTER 93534 | 4,120 | 3,446 | OWNED | NONE |
| A792 | PROBATION-ANTELOPE VALLEY AREA OFFICES | 321 E AVENUE K-4, LANCASTER 93535 | 6,4C0 | 6,080 | LEASED | NONE |
| 0502 | PW-SEWER MAINTENANCE NORTH YARD OFFICE | 45712 N DIVISION ST, LANCASTER 93534 | 664 | 621 | OWNED | NONE |
| A379 | ASSESSOR-LANCASTER REGIONAL OFFICES | 251 E AVENUE K-6 LANCASTER 93534 | 15,328 | 13,772 | LEASED | NONE |
| A527 | DCFS FILE | 251 E AVENUE K-3 LANDASTER 93534 | 2,560 | 2,357 | LEASED | NONE |
| X495 | PW-WATERWORKS NORTH MAINTENANCE AREA HQ BLDG | 260 E AVENUE K-8  LANCASTER 93535-4527 | 11,200 | 11,165 | OWNED | NONE |
| X542 | PW-WATERWORKS NORTH MAINT AREA OFFICE | 200 E AVENUE K-8 LANCASTER 93535-4527 | 2,030 | 1,900 | OWNED | NONE |
| A035 | ANTELOPE VALLEY SERVICE CENTER- BUILDING B | 335 F AVENUE K-6  LANCASTER 93534 | 51,500 | 42,592 | LEASED | NONE |
| A433 | ANTELOPE VALLEY SERVICE CENTER- BUILDING A | 349 E AVENUE K-6, LANCASTER 93534 | 51,000 | 33,932 | LEASED | NONE |
| A642 | DPSS-LANCASTER GR/GROW OFFICE | 535 E AVENUE K-10  LANCASTER 93535-4529 | 22,040 | 20,678 | LEASED | NONE |
| A035 | BOARD OF SUP-5TH DISTRICT FIELD OFFICE | 1113 W AVENUE M-4, PALMDALE 93550 | 1,241 | 1,184 | LEASED | NONE |
| 4122 | ANIMAL CONTROL 45-ADMINISTRATION | 5210 W AVENUE I, LANCASTER 93536 | 2,237 | 788 | OWNED | NONE |
| 4386 | LANCASTER COURTHOUSE SEVICES BLDG | 1110 W AVENUE J LANCASTER 93534 | 13,405 | 12,314 | OWNED | 12,314 |



County of Los Angeles
# CHIEF EXECUTIVE OFFICE
Kenneth Hahn Hall of Administration
500 West Temple Street, Room 713, Los Angeles, California 90012
(213) 974-1101
http://ceo.lacounty.gov

WILLIAM T FUJIOKA
Chief Executive Officer

Board of Supervisors
GLORIA MOLINA
First District

MARK RIDLEY-THOMAS
Second District

March 30, 2010



ZEV YAROSLAVSKY
Third District

DON KNABE
Fourth District

The Honorable Board of Supervisors
County of Los Angeles
383 Kenneth Hahn Hall of Administration
500 West Temple Street
Los Angeles, CA 90012

MICHAEL D. ANTONOVICH
Fifth District

2 1              MAR 3 0 2010

Dear Supervisors:

SACHI A. HAMAI
EXECUTIVE OFFICER

**FIVE-YEAR LEASE**
**DEPARTMENT OF CHILDREN AND FAMILY SERVICES**
**300 EAST AVENUE K-6, LANCASTER**
**(FIFTH DISTRICT) (3 VOTES)**

## SUBJECT

This recommendation is for a five-year lease of 11,000 square feet of office space and 40 parking spaces for the Department of Children and Family Services (DCFS).

## IT IS RECOMMENDED THAT YOUR BOARD:

1. Consider the Negative Declaration for the project for which no comments were received during the public review period, find on the basis of the whole record before the Board that there is no substantial evidence that the project will have a significant effect on the environment, find that the Negative Declaration reflects the independent judgment and analysis of the Board and adopt the Negative Declaration.

2. Find that the proposed project has no effect on fish and wildlife and authorize the Chief Executive Office to complete and file a Certificate of Fee Exemption for the project with the County Clerk.

3. Approve and instruct the Chair to sign the lease with Gregory Hanes (Landlord) for 11,000 rentable square feet of office space located at 300 East Avenue K-6, Lancaster, for the Department of Children and Family Services at a maximum annual first year rent of $592,680. The rental cost is 70.23 percent funded by State and Federal subvention and 29.77 percent net County cost.

*"To Enrich Lives Through Effective And Caring Service"*

*Please Conserve Paper – This Document and Copies are Two-Sided*
*Intra-County Correspondence Sent Electronically Only*

COLA0049127

The Honorable Board of Supervisors
March 30, 2010
Page 2

4. Authorize the Chief Executive Office and the Department of Children and Family Services to reimburse the Landlord for additional tenant improvements of $55,000, payable in lump sum within 60 days of completion and furniture allowances in the amount not to exceed $275,000 payable in lump sum or amortized at 8 percent over the initial five-year term.

5. Authorize the Landlord and/or the Director of Internal Services Department, at the discretion of the Chief Executive Officer to acquire telephone, data and low voltage systems for the Department of Children and Family Services at a cost not to exceed $300,000 for 300 East Avenue K-6. At the discretion of the Chief Executive Officer, all or part of the telephone, data, and low voltage systems will be paid in lump sum, in addition to other tenant improvements.

## PURPOSE/JUSTIFICATION OF RECOMMENDED ACTION

DCFS currently occupies 18,410 rentable square feet of office space at 1150 West Avenue J, Lancaster and 2,669 rentable square feet of office space at 251 East Avenue K-6, Lancaster that have exceeded capacity and are overcrowded. The Department has submitted a Space Request for additional space that would accommodate their needs until such time as the combined staff can be relocated to a larger, more suitable location. The lease at 1150 West Avenue J expires in 2013. The recommended location at 300 East Avenue K-6, Lancaster is adjacent to the existing DCFS site located at 251 East Avenue K-6, and offers DCFS the ability to increase service delivery to the community by having an additional office directly in the community. This additional office will help relieve overcrowding in the existing facilities and will provide the same services as the existing two offices.

The Lancaster SPA I offices provide comprehensive and direct child protection services. Their primary goal is to maintain the family unit; however, when this is not possible the secondary goal is to reduce the timeline to permanency for children in their care and reliance on out-of-home care. DCFS Adoption units are responsible for case management which involves assessing the child's adoptability in finalizing a child's adoption. DCFS Revenue Enhancement units provide support to the social workers by assisting in finding placements for children who must be assigned to out-of-home care. In addition, there are smaller units that are designed to enhance direct services to the children and families which include, Family Group/Team Decision Making and the Department of Mental Health/Children's Services, who provide mental health assessment for foster care children.

COLA0049128

The Honorable Board of Supervisors
March 30, 2010
Page 3

## Implementation of Strategic Plan Goals

The Countywide Strategic Plan directs that we address Children, Family, and Adult Well-Being (Goal 2). In this case, we have enhanced economic and social outcomes through integrated, cost-effective and client-centered supportive services in accordance with the Strategic Asset Management Principles, as further outlined in Attachment A.

## FISCAL IMPACT/FINANCING

The maximum first year rental cost will be $592,680, if furniture ($275,000) and additional Tenant Improvement (TI) ($55,000) are reimbursed in lump sum. The rent for the second year will be $262,680 and remains flat throughout the balance of the five-year term.

| 300 EAST AVENUE K-6 | PROPOSED LEASE |
|---|---|
| AREA (SQUARE FEET) | 11,000 |
| TERM | Five years upon Board approval |
| ANNUAL BASE RENT | $262,680 ($23.88/ sq. ft.) |
| TI | A maximum of $715,000 ($65 per sq. ft) provided as part of the Base Rent |
| ADDITIONAL TI | $55,000 ($5 per sq. ft.) payable in lump sum within 60 days |
| FURNITURE REIMBURSEMENT | $275,000 amortized at 8% over the initial five years of the lease or payable in a lump sum payment within 60 days of acceptance. |
| FIRST YEAR MAXIMUM ANNUAL RENT | $592,680* |
| PARKING INCLUDED IN RENT | 40 spaces |
| CANCELLATION | Anytime after the 48th month upon 90 days prior written notice |
| OPTION TO RENEW | Two five-year options |
| RENTAL ADJUSTMENT | Flat during the five-year term |

\* Maximum first year rent would be $592,680 if furniture ($275,000) and additional TI ($55,000) are reimbursed in lump sum.

Sufficient funding for the proposed lease is included in the 2009-10 Rent Expense budget. Sufficient funding is available in DCFS' operating budget to cover the proposed lease costs which will be billed back to DCFS.

The first year maximum annual lease cost for DCFS is $592,680, which is approximately 70.23 percent subvention funded and 29.77 percent net County cost.

COLA0049129

The Honorable Board of Supervisors
March 30, 2010
Page 4

## FACTS AND PROVISIONS/LEGAL REQUIREMENTS

The lease contains the following terms and conditions:

- The term commences upon Board approval and expires five years thereafter.

- There is a cancellation anytime after the 48th month upon 90 days written notice and reimbursement of the unamortized Tenant Improvements which are amortized at 8 percent over the 60 month term of the lease.

- The base rent includes TI to a maximum of $715,000 to build out the shell space. The lease includes parking for 40 vehicles.

- Furniture costs to a maximum of $275,000 can be amortized at 8% over the initial 5 year term or payable in lump sum.

- Additional TI of $55,000, if needed, reimbursed within 60 days of commencement.

- The lease is modified full service whereby Landlord is responsible for all operating costs except janitorial which will be separately provided and paid by the County.

- The rent remains flat during the five-year term.

- There are two five-year options to renew. The first option term is at $1.59 per square foot and the second option term is at $1.79 per square foot.

The Chief Executive Office (CEO) Real Estate staff surveyed the County areas that best could service this need of the department to determine the market rate of comparable sites. Based upon said survey, staff has established that the base rental range including TI and parking for office space is between $24 and $32 per square foot per year modified full service. Thus, the base annual rent of $23.88 per square foot for the base lease cost, modified full service, is below the market range. Attachment B shows County-owned and leased facilities within the search area for these programs and there is space available at 1150 W Avenue J, Lancaster. However, the space is not habitable and the cost to refurbish the 12,314 square feet would not be cost-effective when compared with the costs associated with the proposed lease which is expected to be short term until the three groups of DCFS staff can be re-consolidated.

The Department of Public Works has not inspected this facility as it was built in 2009 and meets the requirements for County use by exceeding the 1994 seismic standards and meets ADA compliance.

Notification letters have been sent to the City of Lancaster pursuant to Government Code Sections 25351 and 65402.

COLA0049130

The Honorable Board of Supervisors
March 30, 2010
Page 5

## NEGATIVE DECLARATION/ENVIRONMENTAL IMPACT REPORT

The CEO has made an initial study of the environmental factors and has concluded that this project will have no significant impact on the environment and no adverse effect on wildlife resources. Accordingly, a Negative Declaration has been prepared and a notice posted at the site as required by the California Environmental Quality Act (CEQA) and Section 15072 of the CEQA Guidelines. Copies of the completed Initial Study, the resulting Negative Declaration, and the Notice of Preparation of Negative Declaration as posted are attached. No comments to the Negative Declaration were received during the public comment period. A fee must be paid to the State Department of Fish and Game when certain notices are filed with the Registrar-Recorder/County Clerk. The California Department of Fish and Game has determined that the project does not affect fish, wildlife and habitat, and payment of a CEQA filing is not required.

## IMPACT ON CURRENT SERVICES (OR PROJECTS)

There will be no disruption of services as this is a lease to acquire additional space for existing staff that is located in the service area. DCFS concurs with the proposed lease.

## CONCLUSION

It is requested that the Executive Officer, Board of Supervisors return two certified copies of the Minute Order and the adopted stamped Board letter to the CEO, Real Estate Division, 222 South Hill Street, Los Angeles, CA 90012.

Respectfully submitted,

WILLIAM T FUJIOKA
Chief Executive Officer

WTF:SK:WLD
CEM:TS:hd

Attachments

c: Executive Office, Board of Supervisors
   Internal Services Department
   County Counsel
   Auditor-Controller
   Department of Children and Family Services

300eavenuek6dcfs.b

COLA0049131

Attachment A

**DEPARTMENT OF CHILDREN AND FAMILY SERVICES**
**300 EAST AVENUE K-6, LANCASTER**
**Asset Management Principles Compliance Form**[1]

| 1. | | Occupancy | Yes | No | N/A |
|---|---|---|---|---|---|
| | A | Does lease consolidate administrative functions?[2] | | | X |
| | B | Does lease co-locate with other functions to better serve clients?[2] **The additional office will help relieve overcrowding in the existing facilities and will provide the same services as the existing two offices.** | | X | |
| | C | Does this lease centralize business support functions?[2] | | | X |
| | D | Does this lease meet the guideline of 200 sq. ft of space per person?[2] | X | | |
| 2. | | Capital | | | |
| | A | Is it a substantial net County cost (NCC) program? **The lease cost for DCFS is 70.23 percent State and Federal funded and 29.77 percent NCC.** | | X | |
| | B | Is this a long term County program? | X | | |
| | C | If yes to 2 A or B; is it a capital lease or an operating lease with an option to buy? | | X | |
| | D | If no, are there any suitable County-owned facilities available? **Yes, there is vacant County-owned space at 1110 w Avenue J, Lancaster.** | X | | |
| | E | If yes, why is lease being recommended over occupancy in County-owned space? **The County-owned space is not habitable as it exists and the cost to rehab the space to meet the DCFS requirements is not cost effective when compared to the proposed lease.** | X | | |
| | F | Is Building Description Report attached as Attachment B? | X | | |
| | G | Was build-to-suit or capital project considered? **The proposed space is available at a competitive rate and DCFS requested space that could be used to help alleviate overcrowding; therefore, a capital project is not under consideration at this time.** | | X | |
| 3. | | Portfolio Management | | | |
| | A | Did department utilize CEO Space Request Evaluation (SRE)? | X | | |
| | B | Was the space need justified? | X | | |
| | C | If a renewal lease, was co-location with other County departments considered? | | | X |
| | D | Why was this program not co-located? | | | |
| | | 1. ____   The program clientele requires a "stand alone" facility. | | | |
| | | 2. _X_   No suitable County occupied properties in project area. | | | |
| | | 3. ____   No County-owned facilities available for the project. | | | |
| | | 4. ____   Could not get City clearance or approval. | | | |
| | | 5. ____   The Program is being co-located. | | | |
| | E | Is lease a full service lease?[2] **Landlord would not provide Janitorial Services.** | | X | |
| | F | Has growth projection been considered in space request? | X | | |
| | G | Has the Dept. of Public Works completed seismic review/approval? **Not required, built in 2009 and meets current requirements.** | | | X |
| | | [1]As approved by the Board of Supervisors 11/17/98 | | | |
| | | [2]If not, why not?   Please **bold** any written responses. | | | |

COLA0049132

Attachment B

## SPACE SEARCH WITHIN FIVE MILES OF
## 1150 WEST AVENUE J, AND 251 EAST AVENUE K-6, LANCASTER
## DEPARTMENT OF CHILDREN AND FAMILY SERVICES

| Loco | Name | Address | Gross SQFT | Net SQFT | Ownership | SQFT Available |
|------|------|---------|-----------|----------|-----------|----------------|
| A623 | LANCASTER DCFS REGIONAL OFFICE | 1150 W AVENUE J, LANCASTER 93534 | 18,410 | 18,410 | LEASED | NONE |
| A294 | LANCASTER COURTHOUSE-JURY ASSEMBLY ROOM | 1040 W AVENUE J, LANCASTER 93534 | 1,440 | 1,296 | OWNED | NONE |
| A445 | FIRE-LANCASTER FIRE PREVENTION SUBOFFICE | 44933 N FERN AVE, LANCASTER 93534 | 30 | 30 | GRATIS USE | NONE |
| Y247 | DCSS-ANTELOPE VALLEY SENIOR CENTER | 777 W JACKMAN ST, LANCASTER 93534 | 9,424 | 6,965 | OWNED | NONE |
| Y397 | PUBLIC LIBRARY-LANCASTER LIBRARY | 601 W LANCASTER BLVD, LANCASTER 93534 | 48,721 | 43,850 | OWNED | NONE |
| A623 | DCFS - F.I.L.P. | 1420 W AVENUE I, LANCASTER 93534 | 194 | 184 | LEASED | NONE |
| A297 | SHERIFF-LANCASTER ADMINISTRATIVE OFFICE | 501 W LANCASTER BLVD, LANCASTER 93534 | 7,557 | 6,801 | PERMIT | NONE |
| Y373 | PW WWD#04-NORTH ADMINISTRATION BUILDING | 419 W AVENUE J, LANCASTER 93534 | 4,128 | 3,446 | OWNED | NONE |
| A192 | PROBATION-ANTELOPE VALLEY AREA OFFICES | 321 E AVENUE K-4, LANCASTER 93535 | 6,400 | 6,080 | LEASED | NONE |
| 0302 | PW-SEWER MAINTENANCE NORTH YARD OFFICE | 45712 N DIVISION ST, LANCASTER 93534 | 864 | 821 | OWNED | NONE |
| A079 | ASSESSOR-LANCASTER REGIONAL OFFICES | 251 E AVENUE K-6, LANCASTER 93534 | 15,338 | 13,712 | LEASED | NONE |
| A623 | DCFS FILP | 251 E AVENUE K-6, LANCASTER 93534 | 2,669 | 2,357 | LEASED | NONE |
| X495 | PW-WATERWORKS NORTH MAINTENANCE AREA HQ BLDG | 260 E AVENUE K-8, LANCASTER 93535-4527 | 13,200 | 11,155 | OWNED | NONE |
| X542 | PW-WATERWORKS NORTH MAINT AREA OFFICE | 260 E AVENUE K-8, LANCASTER 93535-4527 | 2,000 | 1,900 | OWNED | NONE |
| A008 | ANTELOPE VALLEY SERVICE CENTER-BUILDING B | 335 E AVENUE K-6 , LANCASTER 93534 | 51,000 | 42,592 | LEASED | NONE |
| A433 | ANTELOPE VALLEY SERVICE CENTER-BUILDING A | 349 E AVENUE K-6, LANCASTER 93534 | 51,000 | 33,932 | LEASED | NONE |
| A642 | DPSS-LANCASTER GR/GROW OFFICE | 335 E AVENUE K-10, LANCASTER 93535-4539 | 22,040 | 20,938 | LEASED | NONE |
| A035 | BOARD OF SUP-5TH DISTRICT FIELD OFFICE | 1113 W AVENUE M-4, PALMDALE 93550 | 1,241 | 1,164 | LEASED | NONE |
| 4122 | ANIMAL CONTROL #5-ADMINISTRATION | 5210 W AVENUE I, LANCASTER 93536 | 2,237 | 788 | OWNED | NONE |
| 4586 | LANCASTER COURTHOUSE SEVICES BLDG | 1110 W AVENUE J, LANCASTER 93534 | 18,488 | 12,314 | OWNED | 12,314 |

COLA0049133

**DATE POSTED – January 15, 2010**

## NOTICE OF PREPARATION OF NEGATIVE DECLARATION

This notice is provided as required by the California Environmental quality Act and California Administrative Code Title 14 Division 6, Section 15072 (a) (2) B.

A Negative Declaration has been prepared for this site based on an Initial Study which consists of completion and signing of an Environmental Information Form showing background information as follows:

1.   Name of Proponent - County of Los Angeles
             Chief Executive Office

2.   Address/Phone No. - 222 South Hill Street, 3rd Floor
             Los Angeles, California 90012

                    Agent              Telephone
                    Thomas Shepos      (213) 974-4364

3.   Date Information Form Submitted –      January 14, 2010

4.   Agency Requiring Information Form -   Los Angeles County
                                          Chief Executive Office
                                          Real Estate Division

5.   Name of Proposal, if Applicable -

6.   Address of Facility Involved –   3oo East Avenue K-6
                                      Lancaster, CA  93535

Interested parties may obtain a copy of the Negative Declaration and the completed Environmental Information Form/Initial Study by contacting the Real Property Agent indicated under 2 above and referring to the proposal by name or to the facility by address.

Si necesita informacion en espanol, por favor de comunicarse con Carlos Marquez, para asistencia en obtener una traduccion al numero (213) 974-4163.

# FILED

JAN **1 5** 2010

DEAN C. LOGAN
REGISTRAR-RECORDER/COUNTY CLERK
J. MERINO                        DEPUTY

THIS NOTICE WAS POSTED
ON ___**JAN 1 5 2010**___
UNTIL __**FEB 1 7 2010**__
REGISTRAR-RECORDER/COUNTY CLERK

**10  0036962**

COLA0049134

## NEGATIVE DECLARATION

Department Name:       Children and Family Services
Project:               Annex for Regional Office

Pursuant to Section 15072, California Environmental Quality Act and California Administrative Code Title 14, Division 6

1.    Description of Project

      The leasing of existing office space in an existing commercial building to be used by the County of Los Angeles, Department of Children and Familyl Services as an administrative office.

2.    a.    Location of Project (plot plan attached)

            300 East Avenue K-16
            Lancaster, CA  93535

      b.    Name of Project Proponent

            County of Los Angeles
            Chief Executive Office
            222 South Hill Street, 3rd Floor
            Los Angeles, CA 90012

3.    Finding for Negative Declaration

      It has been determined that this project will not have a significant effect on the environment based on information shown in the attached Environmental Information Form dated January 14, 2010 which constitutes the Initial Study of this project.

4.    Initial Study

      An Initial Study leading to this Negative Declaration has been prepared by the Chief Executive Office and is attached hereto.

5.    Mitigation Measures Included in Project

      None required.

Date                  Real Property Agent        Telephone
January 14, 2010      Thomas Shepos              (213) 974-4364

10  0036962

COLA0049135

**COUNTY OF LOS ANGELES
CHIEF EXECUTIVE OFFICE**

**FIVE-YEAR LEASE**

**NEGATIVE DECLARATION**

I.    Location and Description of the Project

The proposed project is for the County of Los Angeles to lease facilities at 300 East Avenue K-6, Lancaster, California, which will be used by the Department of Children and Family Services for carrying out its general administrative functions.  The facility, located in the Fifth Supervisorial District approximately 74 miles from the Los Angeles Civic Center, includes 11,000 square feet of office space.  The Department shall have use of 40 off-street parking spaces for staff and available parking for visitors.  The Landlord has no expansion plans beyond the scope of this project.

II.    Finding of No Significant Effect

Based on the attached initial study, it has been determined that the project will not have a significant effect on the environment.

III.    Mitigation Measures

None required.

10 0036962

COLA0049136

## INITIAL STUDY

I.   Location and Description of Project

These proposed leased premises are located at 300 East Avenue K-6,
Lancaster, located in the Fifth Supervisorial District approximately 74 miles
northwest of the Los Angeles Civic Center and 6 West of the 14 freeway. (See
attached map)

The building to be used is owned by Gregory Hanes and is intended for use as
Light Industrial/office space.   Located at the site are 40 off-street parking
spaces for Children and Family Services' use and ample public parking located
within the on-site parking lot and surrounding area.

This project consists of leasing this facility for 5 years in which will be located
Department of Children and Family Services' offices.  It is anticipated that an
average of 45 employees will be occupying the premises with the maximum
employee occupancy anticipated to be 40 per day.   In addition to the
employees, it is anticipated that an average of 15 members of the public per
day will be visiting the facility for normal administrative purposes.  Interior tenant
improvements and furnishings, will be performed for this project.

II.   Compatibility with General Plan

This project site is currently designated as Regional Center Commercial in the
City of Lancaster General Plan and zoned LRSP.  The proposed project would
be consistent with these designations.

III.  Environmental Setting

The project site is located in an area of commercial type facilities.  The site
includes approximately 46,396 square feet of developed property.  The site is
bordered by Gingham Drive on the South side, East Avenue K-6 on the west
side, and Commercial/Light Industrial space on the North and south sides.

IV.  Identification of Environmental Effects

A.   The impact of the proposed project on existing land forms will be
negligible as no reshaping of the soil nor excavation nor foundations, utility
lines, sewer lines or water lines is anticipated.

B.   The project will not conflict with adopted environmental plans and goals of
the City of Lancaster.

COLA0049137

C.  The project will not have a substantial demonstrable negative aesthetic effect on the site. The existing facility will be continued to be maintained as part of the lease arrangement.

D.  No rare or endangered species of animal or plant or the habitat of the species will be affected by the project. Nor will it interfere substantially with the movement of any resident fish or wildlife species or migratory fish or wildlife species.

E.  The project will not breach published national, state or local standards relating to solid waste or litter control.

F.  Development will not substantially degrade water quality, contaminate water supply, substantially degrade or deplete ground water resources, or interfere substantially with ground water recharge.

G.  There are no known archeological sites existing at the project site.

H.  The proposed project will not induce substantial growth or concentration of population.

I.  The project will not cause a substantial increase to existing traffic. Nor will it affect the carrying capacity of the present street system. This is a government use of private property for legal services purposes. The County's use is in conformance with uses approved by the City of Lancaster.

J.  The project will not displace any persons from the site.

K.  The project will not substantially increase the ambient noise levels to adjoining areas. Noise generated by the proposed County use does not exceed that previously experienced in the area when occupied by private tenants.

L.  The proposed developed project will not cause flooding, erosion or siltation.

M.  The project will not expose people or structures to major geologic hazards.

N.  The project will not expend a sewer trunk line. All necessary utilities are available currently to the facility.

O.  No significant increased energy consumption is anticipated by the County's use of the premises as compared to previous uses.

COLA0049138

P.   The project will not disrupt or divide the physical arrangement of established community; nor will it conflict with established recreational, educational, religious or scientific uses of the area.

Q.   No public health or safety hazard or potential public health or safety hazard will be created by this project.

R.   The project will not violate any ambient air quality standard, contribute substantially to an existing or projected air quality violation, or expose sensitive receptors to substantial pollutant concentrations.

V.   Discussions of Ways to Mitigate Significant Effects

The proposed project is not expected to create any significant effects on the environment. To mitigate any effects upon the surrounding community the following measures will be implemented:

A.   None Required.

VI.   Initial Study Preparation

This study was prepared by Thomas Shepos of the Los Angeles County Chief Executive Office, Real Estate Division. This study was completed on January 14, 2010.

COLA0049139

All Suburban-Revised 10/1/01

## CHIEF ADMINISTRATIVE OFFICE
## LEASE ANALYSIS SUMMARY

| | | | |
|---|---|---|---|
| Project # | | Department | DCFS |
| Agent | Thomas Shepos | Program | Adminidstrative |

Date 11/15/2010
District 5th

**Lease Premises**
Address   300 East Avenue K-6.Lancaster

**Lessor Identification**

| | |
|---|---|
| Name | Gregory Hanes |
| Contact | Greg Hanes |
| Address | 43917 Division Street |
| City | Lancaster        Zip 93535 |
| Telephone | 661-723-0779 |
| Fax | 661-723-1734 |

**Property Manager Identification**

| | |
|---|---|
| Name | Same as Lessor |
| Contact | |
| Address | |
| City | Zip |
| Telephone | |
| E-mail | |

### LEASE OBLIGATIONS AND ANNUAL OCCUPANCY COST ANALYSIS

| Cleaning | | Lessor | | County |
|---|---|---|---|---|
| Cleaning-Services | ⇕ | 0.00 | _ | 0.93 |
| Cleaning-Supplies | ⇕ | 0.00 | _ | 0.11 |
| Cleaning-Trash | ⇕ | 0.05 | _ | 0.00 |
| **Repair and Maintenance** | | | | |
| Electircal-Lamp&Tubes | ⇕ | 0.03 | _ | 0.00 |
| Electrical-Systems | ⇕ | 0.03 | _ | 0.00 |
| HAVC-Equipment | ⇕ | 0.11 | _ | 0.00 |
| HVAC-Servicing | ⇕ | 0.01 | _ | 0.00 |
| Plumbing-Exposed | ⇕ | 0.02 | _ | 0.00 |
| Plumbing-Concealed | ⇕ | 0.01 | _ | 0.00 |
| Plumbing-Waste | ⇕ | 0.01 | _ | 0.00 |
| Exterior-Repainting | ⇕ | 0.04 | _ | 0.00 |
| Exterior-Glass | ⇕ | 0.04 | _ | 0.00 |
| Interior-Maintenance | ⇕ | 0.30 | _ | 0.00 |
| Structural & Roof | ⇕ | 0.03 | _ | 0.00 |
| Fire-Life & Safety | ⇕ | 0.08 | _ | 0.00 |
| Elevators | ⇕ | 0.18 | _ | 0.00 |
| **Utilities** | | | | |
| Electric | _ | 2.15 | ⇕ | 0.00 |
| Gas | _ | 0.10 | ⇕ | 0.00 |
| Water-Sewer | _ | 0.09 | ⇕ | 0.00 |
| **Miscellaneous** | | | | |
| Road & Grounds | ⇕ | 0.14 | _ | 0.00 |
| Security | ⇕ | 1.23 | _ | 0.00 |
| Administration 1=full 2=split | 2 | 0.69 | 2 | 0.68 |
| Real Estate Tax | ⇕ | 1.60 | _ | 0.00 |
| Building Insurance | _ | 0.39 | ⇕ | 0.00 |
| **Tenant Improvements** | | | | |
| County-1 | _ | n/a | _ | n/a |
| County-2 | _ | n/a | _ | n/a |
| County-3 | _ | n/a | _ | n/a |
| Lessor | _ | 1.48 | _ | n/a |
| **Parking** | | | | |
| County/Lessor | _ | n/a | _ | n/a |
| **Total Costs** | | 8.81 | | 1.72 |
| **Basic Space Rate[2]** | + | 15.07 | | |
| **Totals[1]** | = | 23.88 | | 1.72 |
| | | | + | 23.88 |
| | | | | $25.60 |

| Terms & Conditions | Amounts | Notes |
|---|---|---|
| Lease Term  7  yrs. | 60 | Months |
| Square Feet Leased | 11,000 | |
| Monthly Rent/Sq. Ft. | $1.99 | |
| Monthly Adj. To Rent | $0.00 | |
| Monthly Rent | $21,890.00 | |
| Annual Rent | $262,680.00 | |
| Term Rent | $1,313,400.00 | |

**Lease & Building Facts**

| | |
|---|---|
| Right to Cancel | After 48 months w/90 days notice |
| Option to Renew | two, 5-year Options |
| Option to Purchase | None |
| Type of Building | single story /tilt-up |
| Type of Walls | concrete/drywall |
| Type of Ceiling | Drop Ceiling |
| Type of Lighting | Flourscent |
| Type of Floor | concrete/carpet&VCT |
| Thomas Guide | 4105-J2 |
| Assessor's Parcel # | 3126-032-070 |
| CPI Adjustment | flat |
| Zoning | Commercial office |
| Building Sq. Ft. | 377,011 |

**Improvements - Detail**

| Paid By | Loan Amount | Interest Rate | #per. | #Pmts | Annual Payment | |
|---|---|---|---|---|---|---|
| County-1 | $0 | 6.00% | 12 | 84 | $0.00 | If needed |
| County-2 | $0 | 0.00% | 12 | 60 | $0.00 | |
| County-3 | $0 | 0.00% | 12 | 60 | $0.00 | |
| Lessor | | 6.00% | 12 | 84 | | |

**Monthly Parking Costs - Detail**           Annual Parking Cost

| County Paid Parking | # of Spaces | 0 | $0.00 | $0 |
|---|---|---|---|---|
| Lessor Paid Parking | # of Spaces | 0 | $0.00 | $0 |

**Comments:**

1.Adjusted annual rent divided by sq. ft.   2.Rent minus Lessor Costs

**CAO**
**LEASE FACT SHEET**

| Department: | Children and Family Services | Subvention: | NCC/GR 70.23%GROW |
|---|---|---|---|
| Address: | 300 East Avenue K-6, Lancaster | Job No.: | 74VY98953 |
| Assessor Parcel No. | 3126-032-067 | Supervisor District: | 5 |

**LEASE INFORMATION:**

[ X ] New          [ ] Re-Lease          [ ] Amendment          [ ] Option to Renew

Alterations:    [ ] No  [ X ] Yes      [ X ] Additional Cost  $55,000

[ X ] Lump Sum $55,000 (if needed)

[ X ] Amortized  $275,000 @ 8%

[ X] Included in Rental $ 715,000

Percent of building occupied by County Department(s):  100  %

Property tax information:

| | | |
|---|---|---|
| Current assessed value: | $ | 2,516,600 |
| Latest real property tax amount: | $ | 22,815 |
| Amount of real property tax paid by County: | $ | 0 |

No. of other County leases with proposed lessor: None

**LEASE STRUCTURE:  OPERATING VS. CAPITAL:**

Estimated Market Value of Property:

| | | |
|---|---|---|
| Land: | $ | 654,000 |
| Improvements: | $ | 2,296,000 |
| Total: | $ | 2,950,000 |

**PRESENT VALUE (PV) OF INCOME OVER TERM:**      Monthly Base Rental Rate $22,890 (NNN Basis) x 12 X number of years guaranteed in term discounted by 5.32% = Present Value

NOT APPLICABLE (Part of  44,000 square foot of Building)    _____    _____

Present Value Market   = % of Fair Market Value
Estimated Market Value

=          (Operating Lease)

**LEASE COST COMPARISON:**

| | Monthly Lease Amount | No. of Sq. Ft. | Cost per Sq. Ft. |
|---|---|---|---|
| Proposed | $     23,890 | 11,000 | $     1.99 |
| Previous | $     N/A | N/A | N/A |
| Difference | $ | 0 | $     0 |
| % Change | 100% | 100% | |

**APPROVALS:**

| | | | | | |
|---|---|---|---|---|---|
| Board Office No. | 5 | Deputy: | Kathryn Barger-Leibrich | Date: | 12/10/09 |
| REMC Date: | N/A | Project | Michele Vercoutere | Date: | 11/14/09 |

[G:\LEASEFACTSHT-300EAVENUEK6.DOC

COLA0049141

EXHIBIT 5



SACHI A. HAMAI
Interim Chief Executive Officer

# County of Los Angeles
# CHIEF EXECUTIVE OFFICE

Kenneth Hahn Hall of Administration
500 West Temple Street, Room 713, Los Angeles, California 90012
(213) 974-1101
http://ceo.lacounty.gov

Board of Supervisors
HILDA L. SOLIS
First District

MARK RIDLEY-THOMAS
Second District

SHEILA KUEHL
Third District

DON KNABE
Fourth District

MICHAEL D. ANTONOVICH
Fifth District

*"To Enrich Lives Through Effective And Caring Service"*

June 16, 2015

The Honorable Board of Supervisors
County of Los Angeles
383 Kenneth Hahn Hall of Administration
500 West Temple Street
Los Angeles, California 90012

Dear Supervisors:

**ADOPTED**
BOARD OF SUPERVISORS
COUNTY OF LOS ANGELES

16        JUN 16 2015

PATRICK OGAWA
ACTING EXECUTIVE OFFICER

### NEW LEASE
### PROBATION DEPARTMENT
### 43917 DIVISION STREET, LANCASTER
### (FIFTH DISTRICT)
### (3 VOTES)

## SUBJECT

A new eight-year lease for 15,500 rentable square feet of office space and 50 on-site parking spaces for the Probation Department.

## IT IS RECOMMENDED THAT THE BOARD:

1. Find that the proposed lease is categorically exempt from the provisions of the California Environmental Quality Act pursuant to Class 1 of the Environmental Document Reporting Procedures and Guidelines adopted by the Board of Supervisors per Section 15301 of the State of California Environmental Quality Act Guidelines (Existing Facilities).

2. Approve and instruct the Mayor to sign the eight-year lease with 43917 Division Street, LLC (Landlord) for the Probation Department to occupy 15,500 rentable square feet of office space and 50 on-site parking spaces at 43917 Division Street, Lancaster, at a maximum annual first year cost of $325,500 and a maximum lump sum of $1,162,500 in tenant improvements and change orders. The lease costs are 100 percent net County cost.

3. Authorize the Internal Services Department, or the Landlord, at the direction of the Chief Executive Office, to acquire and install telephone, data, and low voltage systems at a cost not to exceed $475,000.

COLA0037496

The Honorable Board of Supervisors
6/16/2015
Page 2

4.  Authorize the Interim Chief Executive Officer and the Chief Probation Officer to implement the project. The new lease will be effective upon approval by the Board of Supervisors and the new term will commence upon completion of the tenant improvements by the Lessor and acceptance by the County.

## PURPOSE/JUSTIFICATION OF RECOMMENDED ACTION

The Probation Department submitted a Space Request for expansion space that would consolidate staff into a central location to better serve clients throughout the Lancaster/northern Antelope Valley area. The lease at 321 E. Ave. K-4, Lancaster, where Probation currently occupies 6,400 square feet of office space, expired on October 19, 2014. The recommended location at 43917 Division, Lancaster, allows Probation to expand the Antelope Valley Juvenile Program to include: a juvenile day reporting center, investigation, supervision, school-based programs, Intensive Gang Supervision program, Camp to Community Transition program, Community Detention Program, Transitional/Independent Living program, and other programs. An eight-year lease is being recommended because of the on-going need for the above mentioned programs; the City of Lancaster's approval of the site as a viable location for these programs; and the tenant improvements required to accommodate the program at the new facility, the cost of which would not be justified for a short-term lease.

### Implementation of Strategic Plan Goals

The Countywide Strategic Plan Goal of Operational Effectiveness/Fiscal Sustainability (Goal 1) directs that we maximize the effectiveness of processes, structure, operations, and strong fiscal management to support timely delivery of customer-oriented and efficient public services, and the Goal of Integrated Services Delivery (Goal 3) directs that we maximize opportunities to measurably improve client and community outcomes and leverage resources through the continuous integration of health, community, and public safety services that provide office space for the delivery of services to post-release supervised persons that reside in the area. The proposed lease supports these goals by providing a location that would allow the Probation Department to expand the Antelope Valley Juvenile Program as described above. The proposed lease is in conformance with the Asset Management Principles as outlined in Attachment A.

## FISCAL IMPACT/FINANCING

The lease will provide the County with 15,500 rentable square feet of office space and 50 on-site parking spaces at an initial modified full-service monthly rent of $27,125, or $325,500 annually, i.e. $1.75/$21.00 per square foot per month/year. The County is responsible for utilities and janitorial services and supplies. The Landlord has agreed to contribute $10 per square foot or $155,000 towards the initial tenant improvements (TI's) and the County will reimburse the landlord for the additional TI's to a maximum of $70 per square foot, or $1,085,000 and the change order allowance of $77,500, or $5 per square foot, to be paid in lump sum payments. The Juvenile office is a 100 percent Net County Cost operation.

Sufficient funding for the proposed lease is included in the Fiscal Year (FY) 2015-16 Rent Expense budget and will be charged back to the Probation Department. Sufficient funding is available in the Probation's operating budget to cover the proposed lease costs. Attachment B is an overview of the lease costs.

## FACTS AND PROVISIONS/LEGAL REQUIREMENTS

The proposed lease will provide for 15,500 rentable square feet and 50 on-site parking spaces. The new lease contains the following terms and conditions:

COLA0037497

The Honorable Board of Supervisors
6/16/2015
Page 3

- The new rent and eight-year term will commence upon approval by the Board of Supervisors and acceptance of the tenant improvements.

- The proposed lease is a modified full-service agreement whereby the Lessor is responsible for maintenance and the County is responsible to pay for all utilities and janitorial services and supplies.

- The rent under the new lease is subject to annual Consumer Price Index (CPI) adjustments capped at 4 percent.

- The Lessor will provide a non-reimbursable base TI allowance of $10 per square foot, or $155,000.

- The Lessor will also provide a reimbursable additional TI allowance of $70 per square foot, or $1,085,000, and a change order allowance of $5 per square foot, or $77,500, payable in a lump sum.

- There is a cancellation provision on the seventh anniversary of the commencement date.

The Chief Executive Office (CEO) Real Estate Division conducted a survey within the project area to determine the availability of comparable and more economical sites. Based upon said survey, staff has established that the base rental range for similar space and terms is between $19 and $24 per square foot per year. Thus the base annual rent of $21 for the proposed lease represents a rate at the mid-range for the area. The proposed facility provides the only viable space to house Probation's Juvenile program within the service area. Attachment C shows County-owned and leased facilities within the search area for these programs and none are available to house these programs.

The Department of Public Works is not required to inspect this facility since it was built in 2005. The leased premises are in compliance with building codes and are being inspected for compliance with the Americans with Disabilities Act (ADA). Any required ADA upgrades will be completed upon receipt of the inspection report. Notification letters have been sent pursuant to Government Code Sections 25351 and 65402.

The new Probation facility will continue to provide a central location consistent with the County's Facility Location Policy adopted by the Board of Supervisors on July 24, 2012, as outlined in Attachment D.

A childcare facility is not feasible for the department at the proposed leased premises.

## ENVIRONMENTAL DOCUMENTATION

The CEO has concluded that this project is exempt from California Environmental Quality Act Guidelines (CEQA) pursuant to Class 1, of the Environmental Document Reporting Procedures and Guidelines adopted by the Board of Supervisors, and Section 15301 of the State CEQA Guidelines.

## IMPACT ON CURRENT SERVICES (OR PROJECTS)

The proposed new lease will adequately provide the necessary office space for this County requirement.

COLA0037498

The Honorable Board of Supervisors
6/16/2015
Page 4

## CONCLUSION

It is requested that the Executive Office, Board of Supervisors, return four originals of the executed lease, two certified copies of the Minute Order, and the adopted, stamped Board letter to the CEO, Real Estate Division, 222 South Hill Street, Fourth Floor, Los Angeles, CA 90012.

Respectfully submitted,

*Sachi A. Hamai*

SACHI A. HAMAI
Interim Chief Executive Officer


SAH:TT:CMM
SDH:SG:ns

Enclosures

c:   Executive Office, Board of Supervisors
     County Counsel
     Auditor-Controller
     Internal Services
     Probation

COLA0037499

ATTACHMENT A

## PROBATION DEPARTMENT
### 43917 DIVISION STREET, LANCASTER

### Asset Management Principles Compliance Form[1]

| 1. | | Occupancy | Yes | No | N/A |
|---|---|---|---|---|---|
| | A | Does lease consolidate administrative functions?[2] | X | | |
| | B | Does lease co-locate with other functions to better serve clients? [2] | X | | |
| | C | Does this lease centralize business support functions?[2] | | | X |
| | D | Does this lease meet the guideline of 200 sq. ft of space per person?[2] | X | | |
| 2. | | Capital | | | |
| | A | Is it a substantial net County cost (NCC) program?    100% | X | | |
| | B | Is this a long term County program? | X | | |
| | C | If yes to 2 A or B; is it a capital lease or an operating lease with an option to buy? | | | X |
| | D | If no, are there any suitable County-owned facilities available? | | X | |
| | E | If yes, why is lease being recommended over occupancy in County-owned space? | | | X |
| | F | Is Building Description Report attached as Attachment C? | X | | |
| | G | Was build-to-suit or capital project considered? | | X | |
| 3. | | Portfolio Management | | | |
| | A | Did department utilize CEO Space Request Evaluation (SRE)? | X | | |
| | B | Was the space need justified? | X | | |
| | C | If a renewal lease, was co-location with other County departments considered? | | | X |
| | D | Why was this program not co-located? | | | |
| | | 1.  _X_   The program clientele requires a "stand alone" facility. | | | |
| | | 2. ___   No suitable County occupied properties in project area. | | | |
| | | 3.  _X_   No County-owned facilities available for the project. | | | |
| | | 4. ___   Could not get City clearance or approval. | | | |
| | | 5. ___   The Program is being co-located. | | | |
| | E | Is lease a full service lease?[2] **This is a modified full service lease. County pays for utilities, janitorial and supplies as landlord is unwilling to pay for these items.** | | X | |
| | F | Has growth projection been considered in space request?  . | X | | |
| | G | Has the Dept. of Public Works completed seismic review/approval?  Built after 1987 | | X | |
| | | [1]As approved by the Board of Supervisors 11/17/98 | | | |
| | | [2]If not, why not? | | | |

ATTACHMENT B

## FISCAL IMPACT/FINANCING
## OVERVIEW OF LEASE CHANGES

| 43917 DIVISION, LANCASTER | EXISTING LEASE | PROPOSED LEASE | CHANGE |
|---|---|---|---|
| Area (Square feet) | N/A | 15,500 | N/A |
| Term | N/A | 8 years | N/A |
| Annual Base Rent | N/A | $325,500 ($21/sq. ft.) | N/A |
| Cancellation | N/A | Any time after 7 years upon 90 days prior written notice | N/A |
| Parking (included in rent) | N/A | 50 | N/A |
| Option to Renew | N/A | Two five-year options | N/A |
| Annual Base Rental Adjustment | N/A | Annual CPI adjustments capped at 4% | N/A |
| TI Allowance Non-reimbursable | N/A | $155,000 ($10/sq. ft.) | N/A |
| TI Allowance Reimbursable Lump Sum | N/A | $1,085,000 ($70/sq. ft.) | N/A |
| TI Change Order Allowance Reimbursable | N/A | $77,000 ($5/sq. ft.) | N/A |

COLA0037501

**ATTACHMENT C**

## PROBATION DEPARTMENT
## 43917 DIVISION STREET

### Five-mile radius search from 43917 Division Street, Lancaster

| Loca | Name | Address | Gross SQFT | Net SQFT | Ownership | SQFT Available |
|------|------|---------|-----------|----------|-----------|----------------|
| A623 | LANCASTER DCFS REGIONAL OFFICE | 1150 W AVENUE J, LANCASTER 93534 | 16,410 | 16,410 | LEASED | NONE |
| A294 | LANCASTER COURTHOUSE-JURY ASSEMBLY ROOM | 1040 W AVENUE J, LANCASTER 93534 | 1,440 | 1,296 | OWNED | NONE |
| A445 | FIRE-LANCASTER FIRE PREVENTION SUBOFFICE | 44933 N FERN AVE, LANCASTER 93534 | 30 | 30 | GRATIS USE | NONE |
| Y247 | DCSS-ANTELOPE VALLEY SENIOR CENTER | 777 W JACKMAN ST, LANCASTER 93534 | 8,434 | 6,965 | OWNED | NONE |
| Y397 | PUBLIC LIBRARY-LANCASTER LIBRARY | 601 W LANCASTER BLVD, LANCASTER 93534 | 48,721 | 43,850 | OWNED | NONE |
| A623 | DCFS - F.I.L.P. | 1420 W AVENUE I, LANCASTER 93534 | 194 | 184 | LEASED | NONE |
| A297 | SHERIFF-LANCASTER ADMINISTRATIVE OFFICE | 501 W LANCASTER BLVD, LANCASTER 93534 | 7,557 | 6,801 | PERMIT | NONE |
| Y373 | PW WWD#04-NORTH ADMINISTRATION BUILDING | 419 W AVENUE J, LANCASTER 93534 | 4,125 | 3,446 | OWNED | NONE |
| A192 | PROBATION-ANTELOPE VALLEY AREA OFFICES | 321 E AVENUE K-4, LANCASTER 93535 | 6,400 | 6,080 | LEASED | NONE |
| 0302 | PW-SEWER MAINTENANCE NORTH YARD OFFICE | 45712 N DIVISION ST, LANCASTER 93534 | 884 | 821 | OWNED | NONE |
| A079 | ASSESSOR-LANCASTER REGIONAL OFFICES | 251 E AVENUE K-6, LANCASTER 93534 | 15,938 | 14,712 | LEASED | NONE |
| A623 | DCFS FILP | 251 E AVENUE K-6, LANCASTER 93534 | 2,689 | 2,357 | LEASED | NONE |
| X495 | PW-WATERWORKS NORTH MAINTENANCE AREA HQ BLDG | 260 E AVENUE K-8, LANCASTER 93535-4527 | 13,100 | 11,155 | OWNED | NONE |
| X542 | PW-WATERWORKS NORTH MAINT AREA OFFICE | 260 E AVENUE K-8, LANCASTER 93535-4527 | 2,000 | 1,900 | OWNED | NONE |
| A008 | ANTELOPE VALLEY SERVICE CENTER-BUILDING B | 335 E AVENUE K-6, LANCASTER 93534 | 51,000 | 42,502 | LEASED | NONE |
| A433 | ANTELOPE VALLEY SERVICE CENTER-BUILDING A | 349 E AVENUE K-6, LANCASTER 93534 | 51,000 | 33,932 | LEASED | NONE |
| A642 | DPSS-LANCASTER GR/GROW OFFICE | 335 E AVENUE K-10, LANCASTER 93535-4559 | 22,040 | 20,538 | LEASED | NONE |
| A035 | BOARD OF SUP-5TH DISTRICT FIELD OFFICE | 1113 W AVENUE M-4, PALMDALE 93550 | 1,241 | 1,184 | LEASED | NONE |
| 4122 | ANIMAL CONTROL #5-ADMINISTRATION | 5210 W AVENUE I, LANCASTER 93536 | 2,237 | 755 | OWNED | NONE |
| 4586 | LANCASTER COURTHOUSE SEVICES BLDG | 1110 W AVENUE J, LANCASTER 93534 | 16,488 | 12,314 | OWNED | 12,314 |
| 0059 | PW Road -Div #551 Maintenance | 4859 W Avenue L-12, Quartz Hill | 1,250 | 1,125 | OWNED | NONE |
| 0620 | Public Library-Quartz Hill | 42018 N 50Th St., Quartz Hill | 3,635 | 3,291 | LEASED | NONE |
| A035 | Board of Supervisors 5th District Field Office | 1113 W 4th Street W., Lancaster | 1,241 | 1,184 | LEASED | NONE |
| X511 | Antelope Valley Courthouse | 42011 4th Street, W., Lancaster | 389,000 | 287,610 | FINANCED | NONE |
| A125 | Lake Los Angeles Library | 16921 E Avenue 0, Palmdale | 3,245 | 2,921 | LEASED | NONE |
| A126 | Lake Los Angeles Clinic | 16921 E Avenue 0, Palmdale | 2,457 | 2,211 | LEASED | NONE |
| A509 | Palmdale Courthouse | 38256 Sierra Highway, Palmdale | 18,528 | 16,256 | OWNED | NONE |

COLA0037502

ATTACHMENT D

**FACILITY LOCATION POLICY ANALYSIS**

**Proposed Lease:**   (New) Eight-Year Lease for the Department of Probation – 43917 Division St., Lancaster – 5th District – Option to cancel after 84 months (7 years)

A. **Establish Service Function Category –** Regional and local public service function

B. **Determination of the Service Area –**The proposed lease will allow the Probation Department to consolidate the Probation Department Juvenile programs serving the Antelope Valley region to include: investigation, supervision, school-based programs, intensive gang supervision Camp to Community Transition Program, Community Detention Program, Transitional Living Program and other programs.

C. **Apply Location Selection Criteria to Service Area Data**

- <u>Need for proximity to service area and population</u>: Probation Juvenile programs are most effective when located in the same geographic area as its consumers, providers and stakeholders.

- <u>Need for proximity to existing County facilities</u>: N/A

- <u>Need for proximity to Los Angeles Civic Center</u>: N/A

- <u>Economic Development Potential</u>: Lancaster is considered one of the fastest-growing cities in Los Angeles County with the greater Antelope Valley region expected to reach 1,000,000 people by 2030. Lancaster offers abundant improved sites ready for rapid development for commercial and industrial property and is considered a low cost leader in Los Angeles County for development.

- <u>Proximity to public transportation</u>: The location is adequately served by Lancaster Transit services.

- <u>Availability of affordable housing for County employees</u>: The surrounding area provides for affordable rental opportunities.

- <u>Use of historic buildings</u>: N/A

- <u>Availability and compatibility of existing buildings</u>: There are no existing County buildings available to meet the Department's service needs.

COLA0037503

- <u>Compatibility with local land use plans</u>: The City of Lancaster Director of Development has provided formal approval of the proposed Probation facility as being consistent with the building's use and zoning for delivery of Juvenile Probation services at this location. The Department of Public Works is not required to inspect the facility since it was built in 2005. Notification letters have been sent pursuant to Government Code Sections 25351 and 65402.

- <u>Estimated acquisition/construction and ongoing operational costs</u>: The initial annual base rent of $325,500, plus the maximum cost of the additional tenant improvement allowances and change orders in the amount of $1,162,500 to be paid in lump sum comprises the total annual lease costs for the facility. Sufficient funding for the proposed lease is included in the Fiscal Year (FY) 2015-16 Rent Expense Budget and will be charged back to Probation. Probation has sufficient funding in its FY 2015-16 operating budget to cover the proposed lease costs, which are 100 percent funded by the County. Attachment B is an overview of the lease costs. In addition, telephone, data, and low voltage systems will be installed by County ISD or the landlord at a cost not to exceed $450,000.

**D. Analyze results and identify location alternatives**

The Chief Executive Office (CEO) Real Estate Division (RED) conducted a survey within the project area to determine the availability of comparable and more economical sites. Based upon said survey, staff has established that the base rental range for similar space and terms is between $19 and $24 per square foot per year. Thus the base annual rent of $21 for the proposed lease represents a rate at the mid-range for the area. The proposed facility provides the only viable space to house Probation's Juvenile program within the service area. Attachment C shows County-owned and leased facilities within the search area for these programs and none are available to house these programs.

**E. Determine benefits and drawbacks of each alternative based upon functional needs, service area, cost and other Location Selection Criteria**

The other viable location alternatives to house these programs did not meet City requirements; therefore it was determined that 43917 Division Street was the best option. The new Probation facility will continue to provide a central location consistent with the County's Facility Location Policy adopted by the Board of Supervisors on July 24, 2012.

COLA0037504

EXHIBIT 6

1                    UNITED STATES DISTRICT COURT

2         CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

3

4    THE COUNTY OF LOS ANGELES,    )
     THE STATE OF CALIFORNIA, and  )
5    THE UNITED STATES OF AMERICA  )
     ex rel. KAREN GLUCK,          )
6                                  )
                  Plaintiffs,      )
7                                  )
       vs.                         )Case No. 2:19-cv-01773-
8                                  )         PA-MAAx
     THOMAS SHEPOS, et al.,        )
9                                  )
                  Defendants.      )
10   _____ )

11

12      VIDEOTAPED DEPOSITION OF THOMAS JOSEPH SHEPOS

13                        Volume II

14

15

16                 Monday, December 22, 2025

17                 10:01 a.m. - 5:49 p.m.

18

19

20                 515 South Flower Street
                        41st Floor
                 Los Angeles, California 90071

21

22

23   Reported by:
     Marceline F. Noble
24   CSR No. 3024

25   Job No. 334024

                                                            346

Thomas Joseph Shepos                                      December 22, 2025

```
 1    their restrictions were such that they didn't want      16:46:29

 2    the County on the other side of Lancaster.  They        16:46:34

 3    wanted us in or near where we already were.             16:46:38

 4          Greg's facility is not in -- next to, but it      16:46:44

 5    is within a reasonable distance of the other County     16:46:51

 6    facilities in that market.                              16:46:55

 7       Q.  Who is Scott Garrett?                            16:46:59

 8       A.  Scott Garrett was a real property agent that     16:47:01

 9    may still work for the County, that took over what I    16:47:08

10    was doing in Palmdale/Lancaster as we started           16:47:12

11    transitioning and allowing people to get more           16:47:20

12    experience.                                             16:47:22

13       Q.  So you were his supervisor then in or around     16:47:23

14    the time of this Probation lease?                       16:47:26

15       A.  Either directly or indirectly.                   16:47:28

16       Q.  So it wouldn't be unusual that you would         16:47:30

17    direct Scott -- or Mr. Garrett to execute a             16:47:32

18    memorandum directing payment as it related to this      16:47:38

19    particular lease?                                       16:47:41

20       A.  That's correct.                                  16:47:42

21       Q.  Okay.  And we've discussed at length the         16:47:43

22    standard process from beginning to end on securing      16:48:03

23    these leases, the chain it runs up before it gets to    16:48:07

24    the Board of Supervisors.                               16:48:12

25          Did -- this lease with Mr. Hanes for the          16:48:14
```

580

| | | |
|---|---|---|
| 1 | Probation building on Division, did that vary from | 16:48:17 |
| 2 | that process to any degree? | 16:48:20 |
| 3 | A.  No. | 16:48:21 |
| 4 | Q.  Okay.  Jumping back to the K-6 property, | 16:48:28 |
| 5 | this one relates to the Second Amendment that was | 16:48:33 |
| 6 | drafted for this particular property. | 16:48:36 |
| 7 | Do you have an independent recollection of | 16:48:38 |
| 8 | there being a need to adjust the working hours that | 16:48:41 |
| 9 | the County would be actually utilizing that facility | 16:48:47 |
| 10 | for? | 16:48:49 |
| 11 | A.  I recall that there had to be some | 16:48:50 |
| 12 | adjustments for use.  And -- and if I remember | 16:48:55 |
| 13 | correctly, their staff was coming in early.  Like the | 16:49:03 |
| 14 | normal business hours might be 8:00 to 5:00, but | 16:49:09 |
| 15 | their staff was coming in at 4:00 in the morning. | 16:49:13 |
| 16 | And they wanted to make sure that we had to | 16:49:16 |
| 17 | adjust those hours because the air conditioning and | 16:49:18 |
| 18 | lights had to be on and available to the staff that | 16:49:25 |
| 19 | was coming in at that time or staying beyond what | 16:49:29 |
| 20 | were originally considered the hours that would -- | 16:49:33 |
| 21 | that were originally determined for a working force. | 16:49:36 |
| 22 | Q.  Okay.  Do you recall any other reason for | 16:49:39 |
| 23 | that Second Amendment to the K-6 lease? | 16:50:05 |
| 24 | A.  Not specific. | 16:50:09 |
| 25 | Q.  And the same questions as what I asked for | 16:50:13 |

581

Thomas Joseph Shepos                                                December 22, 2025

```
 1    the Division Street lease, both the original K-6        16:50:18

 2    lease, the First Amendment and the Second Amendment.    16:50:21

 3         Do you -- do you know, was there any               16:50:25

 4    variation in the negotiation and execution process     16:50:28

 5    for either the original lease, the First Amendment or   16:50:32

 6    the Second Amendment?                                   16:50:37

 7    A.   No.  They would have still followed the same       16:50:37

 8    procedure as it relates to leasing and the signoff      16:50:40

 9    and process of lease or amendment.                      16:50:43

10    Q.   Okay.  And would that be the same for tenant       16:50:45

11    improvements?                                           16:50:49

12    A.   Yes.                                               16:50:49

13    Q.   At some point, your relationship with              16:51:09

14    Mr. Hanes grew to one that was more of a personal       16:51:11

15    relationship than a professional relationship; is      16:51:15

16    that correct?                                           16:51:18

17    A.   I would say we had a professional                  16:51:19

18    relationship as it related to the County and the        16:51:21

19    buildings, as well as a personal relationship.         16:51:26

20    Q.   And earlier you testified to the fact that         16:51:28

21    that tends to happen, particularly in the Antelope      16:51:32

22    Valley because you travel up weekly, you spend the      16:51:36

23    whole day there, you visit with each of your            16:51:38

24    landlords; is that correct?                             16:51:40

25    A.   That's right.                                      16:51:41
```

582

| | | |
|---|---|---|
| 1 | That Plea Agreement involved false | 16:58:50 |
| 2 | statements that you made to federal agents and false | 16:58:55 |
| 3 | tax -- tax returns; is that correct? | 16:58:58 |
| 4 | A. Yes. | 16:58:59 |
| 5 | Q. Okay. You did not plead guilty to any | 16:59:00 |
| 6 | bribery involving Gregory Hanes; correct? | 16:59:02 |
| 7 | A. That's correct. | 16:59:05 |
| 8 | Q. To your knowledge, was there any criminal | 16:59:06 |
| 9 | charges that were ever filed against Gregory Hanes | 16:59:09 |
| 10 | related to any of the involvement with the County of | 16:59:13 |
| 11 | Los Angeles bribery scheme? | 16:59:17 |
| 12 | A. No. | 16:59:18 |
| 13 | Q. Do you know if there were any criminal | 16:59:20 |
| 14 | charges that were ever filed against anyone related | 16:59:22 |
| 15 | to any of Mr. Hanes' other entities? | 16:59:25 |
| 16 | A. No. | 16:59:28 |
| 17 | Q. So the bribery scheme that I just mentioned, | 16:59:31 |
| 18 | that identifies specific individuals; correct? | 16:59:34 |
| 19 | A. Yes. | 16:59:37 |
| 20 | Q. Okay. That would be Arman Gabay? | 16:59:39 |
| 21 | A. Yes. | 16:59:41 |
| 22 | Q. And then an individual that's -- that's | 16:59:41 |
| 23 | noted in the Plea Agreement as being an electrical | 16:59:44 |
| 24 | contractor. | 16:59:47 |
| 25 | A. Correct. | 16:59:47 |

588

Thomas Joseph Shepos                                December 22, 2025

```
 1        Q.  Again, does not reference Mr. Hanes as being    16:59:48

 2   an individual that was part of those particular          16:59:52

 3   allegations.                                             16:59:54

 4        A.  That is correct.                                16:59:55

 5        Q.  Okay.  Not identified as being a bribe payer    16:59:55

 6   of any kind; correct?                                    17:00:01

 7        A.  That is correct.                                17:00:03

 8        Q.  Okay.  So your Plea Agreement does, however,    17:00:03

 9   refer to an individual A.                                17:00:06

10        That individual A is not named in the Plea          17:00:08

11   Agreement, though; is that correct?                      17:00:11

12        A.  That is correct.                                17:00:12

13        Q.  Okay.  And individual A is not described as     17:00:13

14   being someone who paid a bribe in the Plea Agreement;    17:00:17

15   correct?                                                 17:00:23

16        A.  That is correct.                                17:00:23

17        Q.  Does it state or -- let me rephrase that.       17:00:23

18        The Plea Agreement does not state that              17:00:26

19   individual A received any sort of County favors in       17:00:28

20   exchange for anything that individual A did; is that     17:00:31

21   correct?                                                 17:00:34

22        A.  That is --                                      17:00:34

23        MS. SYPEK:  Objection.  Document speaks for         17:00:36

24   itself.                                                  17:00:37

25        THE WITNESS:  That is correct.                      17:00:38
```

589

Thomas Joseph Shepos                                    December 22, 2025

```
 1    conversations with the County about your deposition,    10:07:10

 2    either Friday or today?                                 10:07:13

 3        A.  No.                                             10:07:15

 4        Q.  Okay.  Prior to your deposition on Friday,      10:07:15

 5    did you have any conversations about-- with the         10:07:17

 6    County about that deposition?                           10:07:21

 7        A.  No.                                             10:07:22

 8        Q.  Okay.  So I know I asked you a number of        10:07:26

 9    questions in the morning on Friday, and then we had a   10:07:29

10    few other folks ask you some questions.                 10:07:33

11            But going back to our discussion, do you        10:07:35

12    remember that we left off talking about Exhibit 4,      10:07:35

13    which was a flow chart of the County lease              10:07:38

14    acquisition process?                                    10:07:42

15        A.  Yes.                                            10:07:44

16        Q.  Okay.  And we talked about how there was a      10:07:45

17    lot of checks and approvals needed for large leases,    10:07:50

18    renewals, and amendments.                               10:07:54

19            You remember that conversation?                 10:07:55

20        A.  Yes.                                            10:07:56

21        Q.  And it's fair to say that this process we       10:07:56

22    went through does require a lot of checks, approvals    10:07:59

23    for large leases, renewals and amendments.              10:08:02

24        A.  Yes.                                            10:08:05

25        Q.  Okay.  So when you were a real property         10:08:07
```

                                                                    355

| | | |
|---|---|---|
| 1 | agent, specifically a Principal Real Property Agent | 10:08:12 |
| 2 | between the time frame of 2003 and 2013, before the | 10:08:17 |
| 3 | lease was approved, it would need to have been | 10:08:21 |
| 4 | reviewed by your supervisor, which would have been | 10:08:25 |
| 5 | the Chief Program Specialist; correct? | 10:08:27 |
| 6 |     A.  Yes. | 10:08:27 |
| 7 |     Q.  Okay.  And it would also have been -- need | 10:08:32 |
| 8 | to have been approved by your supervisor's | 10:08:35 |
| 9 | supervisor, which was the Director of Leasing; | 10:08:37 |
| 10 | correct? | 10:08:41 |
| 11 |     A.  Yes. | 10:08:41 |
| 12 |     Q.  And that lease would need to have been | 10:08:42 |
| 13 | approved by the department that was going to be the | 10:08:45 |
| 14 | tenant in the building; correct? | 10:08:48 |
| 15 |     A.  Yes. | 10:08:50 |
| 16 |     Q.  And that lease would have had to have been | 10:08:51 |
| 17 | approved by County Counsel? | 10:08:53 |
| 18 |     A.  Yes. | 10:08:56 |
| 19 |     Q.  And that lease would have had to have been | 10:08:57 |
| 20 | approved by the Real Estate Management Commission? | 10:08:59 |
| 21 |     A.  If it met the criteria for specific leases, | 10:09:02 |
| 22 | which was a certain period of term.  And over a | 10:09:08 |
| 23 | certain dollar amount, it would have gone to the Real | 10:09:11 |
| 24 | Estate Commission, that's correct. | 10:09:14 |
| 25 |     Q.  Right. | 10:09:15 |

356

Thomas Joseph Shepos                                    December 22, 2025

```
 1          And we're talking -- we -- we usually refer    10:09:15

 2    to those -- I think last time, we referred to them as  10:09:17

 3    large leases, renewals, and amendments; right?         10:09:18

 4       A.  Correct.                                        10:09:21

 5       Q.  Okay.  And those large leases, renewals, and    10:09:21

 6    amendments that you worked on when you were a          10:09:25

 7    Principal Property Agent, would have needed to have    10:09:27

 8    been approved by the Real Estate Management            10:09:29

 9    Commission.                                            10:09:31

10       A.  Yes.                                            10:09:31

11       Q.  And they also would have had to have been      10:09:31

12    approved by the Board of Supervisors.                  10:09:34

13       A.  Yes.                                            10:09:36

14       Q.  Okay.  Could any of those individuals or       10:09:38

15    groups of people that we just discussed -- Chief      10:09:39

16    Program Specialist, Director of Leasing, the          10:09:42

17    department tenant, County Counsel, the Real Estate    10:09:46

18    Management Commission, or the Board of Supervisors,   10:09:50

19    could any of them have stopped the lease from being  10:09:55

20    finalized if they didn't think the lease was to the  10:09:58

21    benefit of the County?                                10:10:01

22       A.  I would say yes.                                10:10:02

23       Q.  And that's because this process is designed    10:10:05

24    to ensure the County always gets a favorable lease in 10:10:07

25    these deals; correct?                                  10:10:11
```

357

```
 1       A.  Yes.                                    10:10:12

 2       Q.  We're going to walk through the process we   10:10:19

 3   just discussed with the County leases that were   10:10:22

 4   awarded to the Abbey defendants that you worked on, a  10:10:25

 5   little later.                                   10:10:29

 6           But were all the Abbey leases you worked on  10:10:30

 7   awarded through this leasing and approval process we  10:10:34

 8   just discussed?                                 10:10:38

 9       A.  To the best of my recollection.         10:10:39

10       Q.  I want to talk to you about your         10:10:46

11   relationship with Donald Abbey.                 10:10:48

12           Do you know who Donald Abbey is?         10:10:51

13       A.  I do.                                   10:10:54

14       Q.  Okay.  When did you first meet Mr. Abbey?  10:10:55

15       A.  I don't recall the date or -- of when I met  10:11:01

16   Mr. Abbey.                                      10:11:04

17       Q.  Okay.  Do you recall if your first       10:11:05

18   conversation with Mr. Abbey related to County    10:11:08

19   business?                                       10:11:11

20       A.  First conversation with Don Abbey was more  10:11:11

21   of an informal meeting, discussing past careers,  10:11:17

22   opportunities in general of -- he had a lot of   10:11:24

23   properties, he would love to be able to do something  10:11:27

24   with the County.  But there was nothing specific --  10:11:31

25       Q.  So --                                   10:11:34
```

                                                        358

| | | |
|---|---|---|
| 1 | Q.  Was there at any time any further | 17:10:36 |
| 2 | conversation about where any of this money was coming | 17:10:40 |
| 3 | from? | 17:10:43 |
| 4 | A.  At no -- at no time did I ever make a | 17:10:44 |
| 5 | statement to Mr. Hanes where it was coming from, nor | 17:10:48 |
| 6 | did he ever ask.  It was simply, okay, I'm doing you | 17:10:51 |
| 7 | a favor.  Leave it at that. | 17:10:54 |
| 8 | Q.  Do you recall when this stopped? | 17:10:56 |
| 9 | A.  When the federal government came to me, and | 17:10:59 |
| 10 | then they took control of money coming from the | 17:11:10 |
| 11 | electrical contractor. | 17:11:15 |
| 12 | I would get it.  That would be wired.  They | 17:11:16 |
| 13 | would say, how much is it?  They already knew.  They | 17:11:22 |
| 14 | would count it.  Take -- get a receipt that I would | 17:11:25 |
| 15 | sign.  And then it would go to the federal | 17:11:27 |
| 16 | government, and they would do what they wanted with | 17:11:30 |
| 17 | it. | 17:11:32 |
| 18 | So they took those bribes. | 17:11:32 |
| 19 | Q.  Was it only proceeds from the arrangement | 17:11:35 |
| 20 | with the electrical contractor that was being held in | 17:11:38 |
| 21 | Mr. Hanes' safe? | 17:11:42 |
| 22 | A.  Yes. | 17:11:44 |
| 23 | Q.  Were there any proceeds being held in | 17:11:44 |
| 24 | Mr. Hanes' safe from your relationship with any other | 17:11:48 |
| 25 | defendant in this case? | 17:11:53 |

597

```
 1        A.  No.                                      17:11:55

 2        Q.  Did you ever tell Mr. Hanes that you would  17:12:13

 3   get him favorable lease contracts with the County of  17:12:16

 4   Los Angeles if he held cash for you in his safe?  17:12:22

 5        A.  No.                                      17:12:25

 6        Q.  Did you ever promise lease approvals in  17:12:38

 7   exchange for holding money in the safe?          17:12:42

 8        A.  No.                                      17:12:45

 9        Q.  Did you ever promise lucrative TI        17:12:46

10   improvement structures for holding money in his safe?  17:12:54

11        A.  No.                                      17:12:57

12        Q.  Did Mr. Hanes ever communicate directly with  17:13:15

13   the electrical contractor, to your knowledge?    17:13:18

14        A.  I'm sure he did, only by assumption that he  17:13:22

15   was trading invoices in dollars.  But I was never  17:13:26

16   present at any of those conversations.           17:13:31

17        Q.  How did the cash get back to the electrical  17:13:34

18   contractor from Mr. Hanes?                       17:13:36

19        A.  He took it out of his bank account.     17:13:38

20        Q.  And do you know where it went after that?  17:13:46

21   Did he give it to you --                         17:13:48

22        A.  No.                                      17:13:48

23        Q.  -- or did he give it --                 17:13:49

24        A.  He would take it -- he would take it out of  17:13:51

25   his cash and give it to Mr. X, the electrical    17:13:54
```

598

```
 1   contractor.                                        17:13:57

 2         The electrical contractor would then give me  17:13:58

 3   an envelope with cash in it.                       17:14:00

 4      Q.  Okay.  So you were not the intermediary     17:14:02

 5   between the two, as far as the -- the cash exchange 17:14:04

 6   was --                                             17:14:07

 7      A.  That's correct.                             17:14:08

 8      Q.  But it was that same cash that came back to 17:14:09

 9   Mr. Hanes' safe, unbeknownst to Mr. Hanes; correct? 17:14:11

10      A.  In some cases.                              17:14:16

11         In other words, once that cash was in the    17:14:17

12   safe, I didn't turn around and say, hey, Greg, do you 17:14:19

13   need me to lend you $20,000?                       17:14:24

14         I was taking it and sending money at that    17:14:26

15   time to my ex-spouse.  I was paying bills, including 17:14:32

16   what the Court demanded I pay on a monthly basis    17:14:37

17   under that postnuptial agreement.                  17:14:40

18      Q.  Okay.  So to your knowledge, was Mr. Hanes  17:14:44

19   aware of your bribery relationship with the        17:15:01

20   electrical contractor?                             17:15:04

21      A.  My belief has been, and always has been,    17:15:06

22   that Mr. Hanes didn't know anything until I        17:15:11

23   introduced him to the FBI.                         17:15:14

24         And -- and -- and I guess the answer to that 17:15:27

25   is, since that time, I have not spoken with Mr. Hanes 17:15:29
```

                                                                    599

EXHIBIT 7

1              UNITED STATES DISTRICT COURT

2        CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

3

4    THE COUNTY OF LOS ANGELES,    )
     THE STATE OF CALIFORNIA, and  )
5    THE UNITED STATES OF AMERICA  )
     ex rel. KAREN GLUCK,          )
6                                  )
                   Plaintiffs,     )
7                                  )
     v.                            )Case No. 2:19-cv-01773-
8                                  )         PA-MAAx
     THOMAS SHEPOS et al.,         )
9                                  )
                   Defendants.     )
10   _____  )

11

12      VIDEOTAPED DEPOSITION OF ALEXANDRA NGUYEN RIVERA

13                        Volume I

14

15

16               Thursday, January 15, 2026

17                1:33 p.m. - 7:24 p.m.

18

19

20               515 South Flower Street
                       41st Floor
21               Los Angeles, California

22

23   Reported by:
     Marceline F. Noble
24   CSR No. 3024

25   Job No. 334509

                                                        1

Alexandra Nguyen Rivera                                                      January 15, 2026

```
 1          Q.  I'm going to show you what was previously      14:32:33

 2   marked Exhibit 4.                                         14:32:36

 3              (Deposition Exhibit 4, previously              14:32:36

 4              marked.)                                       14:32:36

 5   BY MS. HORSTMAN:                                          14:32:36

 6          Q.  Have you ever seen this document before?      14:32:54

 7          A.  Yes.                                           14:32:55

 8          Q.  When was first time you saw it?               14:32:56

 9          A.  In 2023, when I first started.                14:32:59

10              MR. LEICHTER:  I'm sorry, Counsel.  I missed   14:33:06

11   it.  Did you give it a new number?  Or only 4?           14:33:08

12              MS. HORSTMAN:  No, this is -- it's still       14:33:09

13   Exhibit 4.                                               14:33:12

14              MR. LEICHTER:  Still 4, okay.                  14:33:12

15              MS. HORSTMAN:  Yes.                            14:33:12

16              We're trying to keep the same exhibit          14:33:13

17   numbers for the same documents.                          14:33:15

18              MR. LEICHTER:  That is very wise.              14:33:15

19   BY MS. HORSTMAN:                                          14:33:15

20          Q.  Okay.  So you first saw this in 2023.         14:33:19

21              Do you recognize this as the County Lease     14:33:21

22   Acquisition Process that was in place in 20- -- in       14:33:23

23   2015?                                                    14:33:29

24          A.  I did not know it was in place in 2015,       14:33:30

25   because there was no year referenced.  It was just a     14:33:35
```

                                                                            51

1    general document that was provided -- that was in          14:33:39

2    archives.                                                  14:33:42

3        Q.  Okay.  So down at the bottom, it's kind of         14:33:46

4    tiny letters.  It says "Flow Chart," underscore,           14:33:51

5    "2015" --                                                  14:33:53

6        A.  Mm-hmm.                                             14:33:53

7        Q.  -- version 2, dot --                                14:33:53

8            Okay.  So you just didn't notice that it           14:33:56

9    said 2015 at the time you looked at it in 2023?            14:33:58

10        A.  Correct.                                           14:34:02

11        Q.  But you recognize that this was the process       14:34:02

12    that was used by the County?                              14:34:09

13        A.  That's my assumption, that it was used by         14:34:12

14    the County.                                               14:34:14

15        Q.  And in preparing to testify today on the          14:34:15

16    County's process from 2004 to the present, can you        14:34:22

17    tell us what years this process was in place?             14:34:27

18        A.  My assumption was that it was in process for      14:34:31

19    a while.  Because when you look at the policies or        14:34:36

20    procedures that were in place historically, they          14:34:40

21    don't -- they're not significantly different.             14:34:42

22        Q.  Okay.  And did you do anything to verify         14:34:46

23    your assumption to prepare to testify today?              14:34:50

24        A.  No.                                               14:34:53

25        Q.  And are you aware of who Carlos Marquez is?       14:34:55

                                                                    52



DEPOSITION EXHIBIT 4

COLA0069652

EXHIBIT 8

Carlos Edmundo Marquez                                                December 29, 2025

1                    UNITED STATES DISTRICT COURT

2           CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

3

4    THE COUNTY OF LOS ANGELES,    )
     THE STATE OF CALIFORNIA, and  )
5    THE UNITED STATES OF AMERICA  )
     ex rel. KAREN GLUCK,          )
6                                  )
                    Plaintiffs,    )
7                                  )
        vs.                        )Case No. 2:19-cv-01773-
8                                  )          PA-MAAx
     THOMAS SHEPOS, et al.,        )
9                                  )
                    Defendants.    )
10   _____  )

11

12       VIDEOTAPED DEPOSITION OF CARLOS EDMUNDO MARQUEZ

13

14

15

16                   Monday, December 29, 2025

17                   10:04 a.m. - 5:14 p.m.

18

19

20                   515 South Flower Street
                            41st Floor
                   Los Angeles, California 90071
21

22

23   Reported by:
     Marceline F. Noble
24   CSR No. 3024

25   Job No. 333404

                                                                    1

Carlos Edmundo Marquez                                                    December 29, 2025

```
 1        A.   Yes.  The Board approved it.           11:11:40

 2        Q.   And that's because the Board evaluates  11:11:42

 3   projects; right?                                  11:11:46

 4        A.   (No audible response.)                  11:11:47

 5        Q.   Is that a "yes"?                         11:11:48

 6        A.   Yes.  I'm sorry.                         11:11:49

 7        Q.   Yeah.                                    11:11:49

 8        A.   Yes.                                     11:11:50

 9        Q.   The Board doesn't just rubber-stamp projects  11:11:50

10   that come to them; correct?                        11:11:54

11        A.   No.                                      11:11:56

12        Q.   And then I want to focus on the time frame  11:11:58

13   from 2003 to 2008, when you were that Chief Program  11:12:03

14   Specialist.                                        11:12:06

15             Right?                                   11:12:06

16        A.   Yes.                                     11:12:07

17        Q.   At that time, you were supervising County  11:12:09

18   Real Property Agents; right?                        11:12:11

19        A.   Yes.                                     11:12:13

20        Q.   And did the Real Property Agents have    11:12:15

21   authority to unilaterally decide to bind the County  11:12:19

22   to a lease?                                        11:12:23

23        A.   No.                                      11:12:24

24        Q.   Did the Real Property Agents have authority  11:12:27

25   to decide when the County needed to find a location  11:12:30
```

                                                                    41

| 1 | for a lease? | 11:12:34 |
| 2 | A. No. | 11:12:35 |
| 3 | Q. Did Real Property Agents have authority to | 11:12:36 |
| 4 | decide where the County needed to find a location for | 11:12:39 |
| 5 | a lease? | 11:12:42 |
| 6 | A. No. | 11:12:43 |
| 7 | Q. Did Real Property Agents have authority to | 11:12:44 |
| 8 | draft the County lease? | 11:12:47 |
| 9 | A. Yes. | 11:12:50 |
| 10 | Q. And that was part of the negotiation | 11:12:58 |
| 11 | process? | 11:12:59 |
| 12 | A. Yes. | 11:13:01 |
| 13 | Q. And they would have to check in with their | 11:13:01 |
| 14 | supervisor about any terms; right? | 11:13:03 |
| 15 | A. Yes. | 11:13:06 |
| 16 | Q. And they would have to check in with the | 11:13:07 |
| 17 | Director of Leasing? | 11:13:09 |
| 18 | A. No. | 11:13:11 |
| 19 | Q. Would -- would their supervisor check in | 11:13:13 |
| 20 | with the director of leasing? | 11:13:17 |
| 21 | A. Yes, but there's a process. | 11:13:22 |
| 22 | Q. And I am going to ask a lot of questions | 11:13:37 |
| 23 | about that process, we will get to that. | 11:13:40 |
| 24 | A. Okay. | 11:13:42 |
| 25 | Q. And Real Property Agents, did they have | 11:13:43 |

42

| 1 | authority to decide to unilaterally amend a lease? | 11:13:48 |

2      A.  No.                                              11:13:54

3      Q.  Did they have authority to unilaterally         11:13:55

4   extend a lease?                                        11:13:59

5      A.  No.                                              11:14:01

6      Q.  Could Real Property Agents unilaterally         11:14:03

7   approve tenant improvement?                            11:14:06

8      A.  No.                                              11:14:09

9      Q.  And as part of that multi-set process you       11:14:12

10  mentioned, the supervisor of the Real Property Agent   11:14:16

11  would have to review and approve; correct?             11:14:19

12     A.  Review, not approve.  Only the Board of         11:14:21

13  Supervisors approves.                                  11:14:28

14     Q.  Okay.  And so then you -- as the Chief          11:14:29

15  Property Specialist, you would be reviewing those      11:14:42

16  leases from the Real Property Agents?                  11:14:45

17     A.  Yes.                                             11:14:48

18     Q.  And then it would go up to your supervisor,     11:14:48

19  the Director of Leasing?                               11:14:50

20     A.  Yes.                                             11:14:51

21     Q.  Who would review it --                          11:14:51

22     A.  Yes.                                             11:14:53

23     Q.  -- but not -- but not approve it.               11:14:54

24     A.  Correct.                                         11:14:55

25     Q.  And then it would also have to go to the        11:14:57

43

```
 1   Department tenant to review?                    11:15:01

 2      A.  At times.                                11:15:04

 3      Q.  Would it have to go to County Counsel to 11:15:14

 4   review?                                         11:15:18

 5      A.  Yes.                                      11:15:18

 6      Q.  Would it have to go to the Real Estate   11:15:19

 7   Management Commission?                          11:15:20

 8      A.  Major lease, yes.                         11:15:22

 9      Q.  And then after it made it through all of 11:15:24

10   those review steps, then it would go to the     11:15:29

11   Board of Supervisors; correct?                  11:15:32

12      A.  No.                                       11:15:33

13      Q.  No?  There's someone else?              11:15:34

14      A.  Yes.                                      11:15:36

15      Q.  Who else?                                11:15:36

16      A.  The deputies who represent the Board of 11:15:37

17   Supervisors conduct public meetings.  For example, if 11:15:47

18   we were doing a lease for Public Social Services, it 11:15:54

19   would go to the Social Services' deputies.      11:15:58

20          Each supervisor appoints a deputy or     11:16:06

21   deputies to sit in on these public meetings where we 11:16:09

22   provide details on the proposed recommendation for 11:16:14

23   the lease to the Board of Supervisors.          11:16:19

24      Q.  Okay.  And then after those public meetings, 11:16:28

25   then it goes to the Board of Supervisors, or is there 11:16:30
```

44

```
 1   another level?                                      11:16:32

 2       A.  It goes to the Board of Supervisors.  It is  11:16:33

 3   agendized.                                          11:16:37

 4       Q.  What does "agendized" mean?                 11:16:39

 5       A.  The executive office of the Board puts it on  11:16:41

 6   the Board agenda.                                   11:16:47

 7       Q.  And then the Board has to review it; right?  11:16:55

 8       A.  And approve it or disapprove.               11:16:57

 9       Q.  Now, I'm going to hand you what was         11:17:02

10   previously marked as Exhibit 4.                     11:17:15

11           And this is a document bearing Bates number  11:17:30

12   COLA 69652.                                         11:17:33

13           (Deposition Exhibit 4, previously           11:17:33

14           marked.)                                    11:17:33

15           THE WITNESS:  Does this say 2015 version at  11:17:43

16   the bottom?                                         11:17:45

17   BY MS. HORSTMAN:                                    11:17:45

18       Q.  I believe that that's what it says in that  11:17:47

19   tiny...                                             11:17:50

20       A.  Okay.                                       11:17:51

21       Q.  And my first question was:  Do you recognize  11:17:52

22   this document?                                      11:17:56

23       A.  Yes.                                        11:17:57

24       Q.  Do you know whose handwriting is on this   11:18:00

25   document?                                           11:18:02
```

45

```
 1      A.  Changes...                                11:18:05

 2          No.                                       11:18:09

 3      Q.  What do you recognize this document to be?  11:18:09

 4      A.  It is a process for completing a lease    11:18:16

 5   acquisition.                                     11:18:20

 6      Q.  And as you mentioned, this version says it's  11:18:23

 7   from 2015, which I know is when you retired.     11:18:27

 8          But is this process the same as how you did  11:18:32

 9   it before you retired?                           11:18:35

10      A.  Yes.                                      11:18:40

11      Q.  Great.                                    11:20:05

12          And so I want to focus on that time frame,  11:20:06

13   2003 to 2008, and I want to walk through this.  And I  11:20:08

14   want you to tell me if you agree that that -- this  11:20:14

15   process is what was done at that time.           11:20:17

16          Okay?                                     11:20:19

17      A.  Yes.                                      11:20:19

18      Q.  Okay.  So starting at the top in the very  11:20:20

19   first oval, it says "CEO Lease Acquisition Section."  11:20:24

20          Do you see that?                          11:20:29

21      A.  Yes.                                      11:20:30

22      Q.  And it says:                              11:20:31

23          "Request from Department for new space.   11:20:32

24   Space Request Evaluation, SRE, form requested of  11:20:35

25   Tenant department for renewal space directed by BOS  11:20:40
```

46

| | | |
|---|---|---|
| 1 | or CEO Executive team." | 11:20:43 |
| 2 | Do you see that? | 11:20:45 |
| 3 | A.  Yes. | 11:20:47 |
| 4 | Q.  What is your understanding of how a request | 11:20:54 |
| 5 | for a new leased space is initiated? | 11:20:57 |
| 6 | A.  A request for a new lease is initiated by | 11:21:03 |
| 7 | the Department requiring the space. | 11:21:07 |
| 8 | Q.  And what is the CEO Lease Acquisition | 11:21:15 |
| 9 | section? | 11:21:18 |
| 10 | A.  I don't understand the question. | 11:21:18 |
| 11 | Q.  Is it a -- is it a department within the | 11:21:25 |
| 12 | County?  Is that the section that -- the section that | 11:21:33 |
| 13 | Cheryl would have been in? | 11:21:39 |
| 14 | A.  No.  When a Space Request Evaluation form is | 11:21:40 |
| 15 | submitted by a County department, it does not go to | 11:21:45 |
| 16 | the CEO for review and approval.  It goes to the CEO | 11:21:49 |
| 17 | Asset Management division. | 11:21:54 |
| 18 | The analysts within that division review the | 11:21:59 |
| 19 | Space Request Evaluation and determine that the | 11:22:04 |
| 20 | request is justified, the amount of square footage | 11:22:09 |
| 21 | required for the request. | 11:22:14 |
| 22 | And they do a complete review, not only to | 11:22:20 |
| 23 | ensure that the space requested is justified, but | 11:22:23 |
| 24 | there is a budget to support it. | 11:22:26 |
| 25 | Q.  Okay.  So I think -- if we're just staying | 11:22:33 |

47

```
 1    in this top circle here, the Space Request          11:22:35

 2    Evaluation, the SRE -- you talked about that a little 11:22:39

 3    bit.                                                 11:22:42

 4         Who made the determination that an SRE was      11:22:42

 5    needed?                                              11:22:45

 6      A.  That is part of the process.  The CEO -- CEO   11:22:46

 7    administration has created that requirement of the   11:22:57

 8    departments.                                         11:23:03

 9         You can't just ask for space.  The space        11:23:03

10    needs to be formally requested in the SRE and        11:23:09

11    reviewed by the CEO Analyst to sign that space       11:23:13

12    request.                                             11:23:18

13      Q.  So did your department play any role in        11:23:20

14    the -- that initial SRE process?                     11:23:24

15      A.  Not really.                                    11:23:29

16      Q.  And if you look at this chart, it says the     11:23:36

17    Tenant Department submits Space Request Evaluation.  11:23:38

18    That Tenant Department, that's the County department 11:23:42

19    that's going to actually use the space --            11:23:44

20      A.  Yes.                                           11:23:47

21      Q.  -- right?                                      11:23:47

22         Okay.  And so that Tenant Department needs      11:23:48

23    to fill out the SRE to say what geographic locations, 11:23:52

24    square footage, property requirements they have;     11:24:00

25    right?                                               11:24:04
```

48

```
 1        A.   Yes.                                      11:24:05

 2        Q.   And then in this top circle, it says      11:24:10

 3   "directed by BOS or CEO Executive team."            11:24:12

 4             Is the "BOS" the Board of Supervisors?    11:24:17

 5        A.   Yes.                                      11:24:21

 6        Q.   And is it correct that that "directed by BOS  11:24:22

 7   or CEO Executive team," means that the Board of     11:24:27

 8   Supervisors or the CEO Executive team would decide  11:24:31

 9   that the Tenant Department would need to fill out an 11:24:35

10   SRE?                                                11:24:38

11        A.   No.  I -- as I understand it, the Board of  11:24:39

12   Supervisors and the -- and the -- the CEO Executive 11:24:45

13   team works with the Tenant Department, because they 11:24:49

14   are providing services to County constituents and the 11:24:55

15   public.                                             11:25:03

16             And when a department needs to expand,    11:25:03

17   either because its program can no longer be serviced 11:25:06

18   in the existing location, or it's a new program, the 11:25:10

19   Board of Supervisors, the deputies and the CEO      11:25:18

20   Executive team, meaning the executive officer or the 11:25:24

21   executive officer's staff, could be in discussions  11:25:26

22   with the Department regarding the need to provide   11:25:30

23   housing to deliver services within a specific       11:25:35

24   geographic area or location.                        11:25:38

25             So that's where you have this interaction. 11:25:41
```

                                                              49

Carlos Edmundo Marquez                                December 29, 2025

```
 1    Not necessarily with the elected supervisor, but with    11:25:45

 2    his staff.  That's why you have justice deputies,         11:25:49

 3    social service deputies, health deputies, public         11:25:54

 4    safety deputies.  They each -- they all work within      11:25:57

 5    the departments that they're assigned to conduct the     11:26:02

 6    business of the County.                                   11:26:06

 7        Q.  Okay.  And so after the Tenant Department         11:26:11

 8    submits the SRE -- on this flow chart, there's two       11:26:16

 9    different tracks, if you will.                            11:26:21

10            One is for a lease renewal, and one is for a     11:26:24

11    new lease acquisition.                                    11:26:32

12            Do you see that?                                  11:26:34

13        A.  Yes.                                              11:26:35

14        Q.  Do you see those two tracks?                      11:26:38

15        A.  (No audible response.)                            11:26:41

16        Q.  Do you see the two tracks on here?                11:26:41

17        A.  Yes, I see the two tracks, "SRE request for      11:26:43

18    lease renewal, SRE request for new lease                  11:26:47

19    acquisition."  Yes.                                       11:26:52

20        Q.  So you need an SRE if you're looking for a       11:26:52

21    new lease, and you're also needing a SRE if you're        11:26:55

22    looking to renewal a lease --                             11:26:59

23        A.  Absolutely.                                       11:27:01

24        Q.  -- right?                                         11:27:02

25            Okay.  And those SREs in that diamond says        11:27:02
```

50

Carlos Edmundo Marquez                                      December 29, 2025

```
 1    it goes to CEO Asset Planning and Strategy.  Right?    11:27:07

 2        A.  Correct.                                       11:27:11

 3        Q.  And that was not your section; right?          11:27:11

 4        A.  No.                                            11:27:15

 5        Q.  Okay.  At this point, who decides whether to   11:27:24

 6    approve the SRE request for a new lease?               11:27:27

 7        A.  The CEO Asset Planning and Strategy section,   11:27:31

 8    along with their supervisors, their managers.          11:27:37

 9        Q.  Do you know how they make that determination   11:27:42

10    to provide the SRE?                                    11:27:45

11        A.  They conduct a very thorough analysis of the   11:27:46

12    request on many levels.                                11:27:51

13        Q.  Did you work with Asset Planning and           11:27:57

14    Strategy section when they were doing that             11:28:00

15    determination?                                         11:28:02

16        A.  Only in support, if they wanted to know what   11:28:04

17    might be appropriate for the requirement in terms of   11:28:13

18    space and location.  But only that.                    11:28:16

19        Q.  Did Real Property Agents, the people that      11:28:20

20    you were supervising, did they have any involvement    11:28:23

21    at this level?                                         11:28:27

22        A.  No.                                            11:28:29

23        Q.  Did the Asset Planning and Strategy            11:28:37

24    department have authority to modify the SRE?           11:28:40

25        A.  Of course.  They are the ones that are         11:28:45
```

51

| | | |
|---|---|---|
| 1 | reviewing it and approving it. | 11:28:49 |
| 2 | Q.  Did a Real Property Agent have authority to | 11:28:52 |
| 3 | modify the SRE? | 11:28:54 |
| 4 | A.  No. | 11:28:57 |
| 5 | Q.  And are there any other ways or methods to | 11:29:04 |
| 6 | initiate a new lease without an approved SRE? | 11:29:06 |
| 7 | A.  The only way I could see that happening, is | 11:29:15 |
| 8 | if the Board or a supervisor directed the CEO to | 11:29:22 |
| 9 | conduct a search and acquisition of a property for | 11:29:30 |
| 10 | the County department. | 11:29:36 |
| 11 | Q.  And in your time when were in that role from | 11:29:38 |
| 12 | 2003 to 2008, do you have any memory of the Board | 11:29:43 |
| 13 | ever doing that? | 11:29:46 |
| 14 | A.  No. | 11:29:47 |
| 15 | Q.  Okay.  And then if you go back to the flow | 11:30:01 |
| 16 | chart -- | 11:30:05 |
| 17 | A.  Might I amend that statement? | 11:30:05 |
| 18 | Q.  Yes. | 11:30:08 |
| 19 | A.  I can't recall. | 11:30:08 |
| 20 | Q.  Okay.  Then the next box, it says -- it | 11:30:10 |
| 21 | starts with "Real Estate Division Leasing Acquisition | 11:30:20 |
| 22 | Section." | 11:30:23 |
| 23 | Do you see that? | 11:30:24 |
| 24 | A.  Yes. | 11:30:26 |
| 25 | Q.  And this is your department -- | 11:30:27 |

52

EXHIBIT 9

```
 1                 UNITED STATES DISTRICT COURT

 2          CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

 3

 4   THE COUNTY OF LOS ANGELES,    )
     THE STATE OF CALIFORNIA, and  )
 5   THE UNITED STATES OF AMERICA  )
     ex rel. KAREN GLUCK,          )
 6                                 )
                     Plaintiffs,   )
 7                                 )
     v.                            )Case No. 2:19-cv-01773-
 8                                 )        PA-MAAx
     THOMAS SHEPOS et al.,         )
 9                                 )
                     Defendants.   )
10   _____  )

11

12

13        VIDEOTAPED DEPOSITION OF FARRON CHAVARRIA

14               (Via Zoom Videoconference)

15

16

17               Tuesday, January 13, 2026

18               12:11 a.m. - 5:33 p.m.

19

20

21

22

23   Reported by:
     Marceline F. Noble
24   CSR No. 3024

25   Job No. 334741
```

1

```
 1          Okay.                                    14:14:05

 2      Q.  Do you recognize this document?          14:14:05

 3      A.  Yes.                                      14:14:08

 4      Q.  What is it?                               14:14:09

 5      A.  It's a flow chart of the acquisition --   14:14:11

 6      Q.  Do you know --                            14:14:11

 7      A.  -- process.                               14:14:17

 8      Q.  Do you know who created this flow chart?  14:14:18

 9      A.  I helped -- there was a flow chart in a   14:14:21

10  existence, and I helped kind of tweak it a little bit  14:14:25

11  for Carlos Marquez.                              14:14:28

12      Q.  And this is the product of you tweaking the  14:14:32

13  prior flow chart?                                14:14:36

14      A.  It's -- it looks like -- yeah, it looks like  14:14:42

15  the version I helped create.                     14:14:46

16      Q.  Do you know around what time frame you    14:14:49

17  helped create this flow chart?                   14:14:51

18      A.  Not really.  Just under -- when I was under  14:14:57

19  Carlos Marquez.                                  14:15:01

20      Q.  During your time as a Senior Real Property  14:15:04

21  Agent in the Real Estate division, did this flow  14:15:07

22  chart accurately reflect the leasing process     14:15:14

23  throughout that time?                            14:15:17

24      A.  Uh -- uh, yes.                            14:15:19

25      Q.  Okay.                                     14:15:19
```

70

EXHIBIT 10

via 9/5/18 e-mail Cc: Robert Campbell)
Case #2016-12376
AA 07/17/19 (Saved to file by Mgmt on 9/6/18)

1  NICOLA T. HANNA
   United States Attorney
2  LAWRENCE S. MIDDLETON
   Assistant United States Attorney
3  Chief, Criminal Division
   RUTH C. PINKEL (Cal. Bar No. 164470)
4  LINDSEY GREER DOTSON (Cal. Bar No. 266973)
   Assistant United States Attorneys
5  Public Corruption and Civil Rights Section
        1500 United States Courthouse
6       312 North Spring Street
        Los Angeles, CA 90012
7       Telephone: (213) 894-6077
        E-mail: Ruth.Pinkel@usdoj.gov
8
   Attorneys for Plaintiff
9  UNITED STATES OF AMERICA

10                 UNITED STATES DISTRICT COURT

11          FOR THE CENTRAL DISTRICT OF CALIFORNIA

12 UNITED STATES OF AMERICA,           No. CR 18- 18CR00569 RGK

13          Plaintiff,                 PLEA AGREEMENT FOR DEFENDANT
                                       THOMAS M. SHEPOS
14          v.

15 THOMAS M. SHEPOS,

16          Defendant.

17
        1.   This constitutes the plea agreement between THOMAS M.
18
   SHEPOS ("defendant") and the United States Attorney's Office for the
19
   Central District of California (the "USAO") in the investigation of
20
   the above-described matter.  This agreement is limited to the USAO
21
   and cannot bind any other federal, state, local, or foreign
22
   prosecuting, enforcement, administrative, or regulatory authorities.
23
                       DEFENDANT'S OBLIGATIONS
24
        2.   Defendant agrees to:
25
        a.   Give up the right to indictment by a grand jury and,
26
   at the earliest opportunity requested by the USAO and provided by the
27
   Court, appear and plead guilty to a two-count information in the form
28

1   attached to this agreement as Exhibit A or a substantially similar

2   form, which charges defendant with False Statement to Government

3   Agent in violation of 18 U.S.C. § 1001(a)(2) and Subscribing to False

4   Tax Return in violation of 26 U.S.C. § 7206(1).

5           b.   Not contest facts agreed to in this agreement.

6           c.   Abide by all agreements regarding sentencing contained

7   in this agreement.

8           d.   Appear for all court appearances, surrender as ordered

9   for service of sentence, obey all conditions of any bond, and obey

10  any other ongoing court order in this matter.

11          e.   Not commit any crime; however, offenses that would be

12  excluded for sentencing purposes under United States Sentencing

13  Guidelines ("U.S.S.G." or "Sentencing Guidelines") § 4A1.2(c) are not

14  within the scope of this agreement.

15          f.   Be truthful at all times with Pretrial Services, the

16  United States Probation Office, and the Court.

17          g.   Pay the applicable special assessments at or before

18  the time of sentencing unless defendant lacks the ability to pay and

19  prior to sentencing submits a completed financial statement on a form

20  to be provided by the USAO.

21          h.   Not seek the discharge of any restitution obligation,

22  in whole or in part, in any present or future bankruptcy proceeding.

23                      PAYMENT OF TAXES OWED

24      3.   Defendant admits that defendant received unreported income

25  of $434,400 for 2010 to 2016, which consists of the following amounts

26  for the following years: $25,000 (2010); $12,000 (2011); $12,000

27  (2012); $52,000 (2013); $139,400 (2014); and $102,000 (2015); and

28  $92,000 (2016).  Defendant agrees to cooperate with the Internal

2

1   Revenue Service in the determination of defendant's tax liability for

2   2010 to 2016. Defendant agrees that:

3          a.   Defendant will file, prior to the time of sentencing,

4   amended returns for the year subject to the above admissions,

5   correctly reporting unreported income; will, if requested to do so by

6   the Internal Revenue Service, provide the Internal Revenue Service

7   with information regarding the years covered by the returns; will pay

8   at or before sentencing all additional taxes and all penalties and

9   interest assessed by the Internal Revenue Service on the basis of the

10  returns; and will promptly pay all additional taxes and all penalties

11  and interest thereafter determined by the Internal Revenue Service to

12  be owing as a result of any computational error(s).

13         b.   Nothing in this agreement forecloses or limits the

14  ability of the Internal Revenue Service to examine and make

15  adjustments to defendant's returns after they are filed.

16         c.   Defendant will not, after filing the returns, file any

17  claim for refund of taxes, penalties, or interest for amounts

18  attributable to the returns filed in connection with this plea

19  agreement.

20         d.   Defendant is liable for the fraud penalty imposed by

21  the Internal Revenue Code, 26 U.S.C. § 6663, on the understatement of

22  tax liability for 2010-2016.

23         e.   Defendant gives up any and all objections that could

24  be asserted to the Examination Division of the Internal Revenue

25  Service receiving materials or information obtained during the

26  criminal investigation of this matter, including materials and

27  information obtained through grand jury subpoenas.

28

3

CONFIDENTIAL                                                              COLA0184330

f.    Defendant will sign closing agreements with the Internal Revenue Service contemporaneously with the signing of this plea agreement, permitting the Internal Revenue Service to assess and collect the total sum of $110,021 (consisting of the following amounts for the following tax years: $3,941 (2010); $1,625 (2011); $3,325 (2012); $14,216 (2013); $38,972 (2014); $26,019 (2015); and $21,923 (2016)), which comprises the tax liabilities, as well as assess and collect the civil fraud penalty for each year and statutory interest, on the tax liability as provided by law.

4.    Defendant further agrees to cooperate fully with the USAO, the Federal Bureau of Investigation, Internal Revenue Service, and, as directed by the USAO, any other federal, state, local, or foreign prosecuting, enforcement, administrative, or regulatory authority. This cooperation requires defendant to:

a.    Respond truthfully and completely to all questions that may be put to defendant, whether in interviews, before a grand jury, or at any trial or other court proceeding.

b.    Attend all meetings, grand jury sessions, trials or other proceedings at which defendant's presence is requested by the USAO or compelled by subpoena or court order.

c.    Produce voluntarily all documents, records, or other tangible evidence relating to matters about which the USAO, or its designee, inquires.

5.    For purposes of this agreement: (1) "Cooperation Information" shall mean any statements made, or documents, records, tangible evidence, or other information provided, by defendant pursuant to defendant's cooperation under this agreement or pursuant to the letter agreement previously entered into by the parties dated

4

COLA0184331

1  December 16, 2016 (the "Letter Agreement"); and (2) "Plea

2  Information" shall mean any statements made by defendant, under oath,

3  at the guilty plea hearing and the agreed to factual basis statement

4  in this agreement.

## THE USAO'S OBLIGATIONS

6    6.    The USAO agrees to:

7        a.    Not contest facts agreed to in this agreement.

8        b.    Abide by all agreements regarding sentencing contained

9  in this agreement.

10        c.    At the time of sentencing, provided that defendant

11  demonstrates an acceptance of responsibility for the offenses up to

12  and including the time of sentencing, recommend a two-level reduction

13  in the applicable Sentencing Guidelines offense level, pursuant to

14  U.S.S.G. § 3E1.1, and recommend and, if necessary, move for an

15  additional one-level reduction if available under that section.

16        d.    With respect to Counts One and Two, recommend that

17  defendant be sentenced to a term of imprisonment no higher than the

18  low end of the applicable Sentencing Guidelines range.

19    7.    The USAO further agrees:

20        a.    Not to offer as evidence in its case-in-chief in the

21  above-captioned case or any other criminal prosecution that may be

22  brought against defendant by the USAO, or in connection with any

23  sentencing proceeding in any criminal case that may be brought

24  against defendant by the USAO, any Cooperation Information.

25  Defendant agrees, however, that the USAO may use both Cooperation

26  Information and Plea Information: (1) to obtain and pursue leads to

27  other evidence, which evidence may be used for any purpose, including

28  any criminal prosecution of defendant; (2) to cross-examine defendant

5

COLA0184332

1     should defendant testify, or to rebut any evidence offered, or

2     argument or representation made, by defendant, defendant's counsel,

3     or a witness called by defendant in any trial, sentencing hearing, or

4     other court proceeding; and (3) in any criminal prosecution of

5     defendant for false statement, obstruction of justice, or perjury.

6            b.    Not to use Cooperation Information against defendant

7     at sentencing for the purpose of determining the applicable guideline

8     range, including the appropriateness of an upward departure, or the

9     sentence to be imposed, and to recommend to the Court that

10    Cooperation Information not be used in determining the applicable

11    guideline range or the sentence to be imposed.  Defendant

12    understands, however, that Cooperation Information will be disclosed

13    to the probation office and the Court, and that the Court may use

14    Cooperation Information for the purposes set forth in U.S.S.G

15    § 1B1.8(b) and for determining the sentence to be imposed.

16           c.    In connection with defendant's sentencing, to bring to

17    the Court's attention the nature and extent of defendant's

18    cooperation.

19           d.    If the USAO determines, in its exclusive judgment,

20    that defendant has both complied with defendant's obligations under

21    paragraphs 2 and 3 above and provided substantial assistance to law

22    enforcement in the prosecution or investigation of another

23    ("substantial assistance"), to move the Court pursuant to U.S.S.G. §

24    5K1.1 to fix an offense level and corresponding guideline range below

25    that otherwise dictated by the sentencing guidelines, and to

26    recommend a term of imprisonment within this reduced range.

27           DEFENDANT'S UNDERSTANDINGS REGARDING COOPERATION

28    8.    Defendant understands the following:

6

1        a.   Any knowingly false or misleading statement by

2  defendant will subject defendant to prosecution for false statement,

3  obstruction of justice, and perjury and will constitute a breach by

4  defendant of this agreement.

5        b.   Nothing in this agreement requires the USAO or any

6  other prosecuting, enforcement, administrative, or regulatory

7  authority to accept any cooperation or assistance that defendant may

8  offer, or to use it in any particular way.

9        c.   Defendant cannot withdraw defendant's guilty pleas if

10  the USAO does not make a motion pursuant to U.S.S.G. § 5K1.1 for a

11  reduced guideline range or if the USAO makes such a motion and the

12  Court does not grant it or if the Court grants such a USAO motion but

13  elects to sentence above the reduced range.

14        d.   At this time the USAO makes no agreement or

15  representation as to whether any cooperation that defendant has

16  provided or intends to provide constitutes or will constitute

17  substantial assistance.  The decision whether defendant has provided

18  substantial assistance will rest solely within the exclusive judgment

19  of the USAO.

20        e.   The USAO's determination whether defendant has

21  provided substantial assistance will not depend in any way on whether

22  the government prevails at any trial or court hearing in which

23  defendant testifies or in which the government otherwise presents

24  information resulting from defendant's cooperation.  That is, whether

25  any other co-conspirator is found guilty or not guilty will have no

26  impact on what benefit, if any, defendant receives from the USAO.

27  The USAO's determination will depend only on whether defendant

28  provides truthful testimony.

7

CONFIDENTIAL

COLA0184334

NATURE OF THE OFFENSES

9.    Defendant understands that for defendant to be guilty of the crime charged in Count One, that is, False Statement to Government Agent, in violation of Title 18, United States Code, Section 1001(a)(2), the following must be true: (a) first, defendant made a false statement in a matter within the jurisdiction of the Federal Bureau of Investigation ("FBI"); (b) second, defendant acted willfully; that is, defendant acted deliberately and with knowledge both that the statement was untrue and that his conduct was unlawful; and (c) third, the statement was material to the activities or decisions of the FBI; that is, it had a natural tendency to influence, or was capable of influencing, the agency's decisions or activities.

10.    Defendant understands that for defendant to be guilty of the crime charged in Count Two, that is, Subscribing to False Tax Return, in violation of Title 26, United States Code, Section 7206(1), the following must be true: (1) defendant signed and filed a tax return for the year 2014 that he knew contained false information as to a material matter; (2) the return contained a written declaration that it was being signed subject to the penalties of perjury; and (3) in filing the false tax return, defendant acted willfully.  A matter is material if it had a natural tendency to influence, or was capable of influencing, the decisions or activities of the Internal Revenue Service.  A defendant acts willfully when defendant knows that federal tax law imposed a duty on defendant and defendant intentionally and voluntarily violated that duty.

CONFIDENTIAL                                                                                                                          COLA0184335

## PENALTIES AND RESTITUTION

11. Defendant understands that the statutory maximum sentence that the Court can impose for a violation of Title 18, United States Code, Section 1001, is: 5 years imprisonment; a 3 year period of supervised release; a fine of $250,000 or twice the gross gain or gross loss resulting from the offense, whichever is greatest; and a mandatory special assessment of $100.

12. Defendant understands that the statutory maximum sentence that the Court can impose for a violation of Title 26, United States Code, Section 7206(1), is: 3 years imprisonment; a 1 year period of supervised release; a fine of $250,000 or twice the gross gain or gross loss resulting from the offense, whichever is greatest; and a mandatory special assessment of $100.

13. Defendant understands, therefore, that the total maximum sentence for all offenses to which defendant is pleading guilty is: 8 years imprisonment; a 3 year period of supervised release; a fine of $500,000; and a mandatory special assessment of $200.

14. Defendant understands and agrees that the Court: (a) may order defendant to pay restitution in the form of any additional taxes, interest, and penalties that defendant owes to the United States based upon the count of conviction and any relevant conduct, and; and (b) must order defendant to pay the costs of prosecution, which may be in addition to the statutory maximum fine stated above.

15. Defendant understands that, by pleading guilty, defendant may be giving up valuable government benefits and valuable civic rights, such as the right to vote, the right to possess a firearm, the right to hold office, and the right to serve on a jury. Defendant understands that once the court accepts defendant's guilty

9

COLA0184336

1  pleas, it will be a federal felony for defendant to possess a firearm

2  or ammunition.  Defendant understands that the convictions in this

3  case may also subject defendant to various other collateral

4  consequences, including but not limited to revocation of probation,

5  parole, or supervised release in another case and suspension or

6  revocation of a professional license.  Defendant understands that

7  unanticipated collateral consequences will not serve as grounds to

8  withdraw defendant's guilty pleas.

9      16.  Defendant understands that, if defendant is not a United

10  States citizen, the felony convictions in this case may subject

11  defendant to: removal, also known as deportation, which may, under

12  some circumstances, be mandatory; denial of citizenship; and denial

13  of admission to the United States in the future.  The court cannot,

14  and defendant's attorney also may not be able to, advise defendant

15  fully regarding the immigration consequences of the felony

16  convictions in this case.  Defendant understands that unexpected

17  immigration consequences will not serve as grounds to withdraw

18  defendant's guilty pleas.

19      17.  Defendant understands that supervised release is a period

20  of time following imprisonment during which defendant will be subject

21  to various restrictions and requirements.  Defendant understands that

22  if defendant violates one or more of the conditions of any supervised

23  release imposed, defendant may be returned to prison for all or part

24  of the term of supervised release authorized by statute for the

25  offense that resulted in the term of supervised release, which could

26  result in defendant serving a total term of imprisonment greater than

27  the statutory maximum stated above.

28

CONFIDENTIAL                                    COLA0184337

1                          FACTUAL BASIS

2        18.   Defendant admits that defendant is, in fact, guilty of the

3   offenses to which defendant is agreeing to plead guilty.  Defendant

4   and the USAO agree to the statement of facts provided below and agree

5   that this statement of facts is sufficient to support pleas of guilty

6   to the charges described in this agreement and to establish the

7   Sentencing Guidelines factors set forth in paragraph 20 below but is

8   not meant to be a complete recitation of all facts relevant to the

9   underlying criminal conduct or all facts known to either party that

10  relate to that conduct.

11  **Background**

12       From approximately 1998 to 2017, defendant was a public official

13  employed by the County of Los Angeles ("County") in the Real Estate

14  Division.  Defendant's duties involved negotiating leases between

15  private building and property owners and various County departments.

16  Defendant was also able to request and receive proposals from private

17  real estate developers who wanted to lease their buildings to County

18  departments.  Once a property was identified for a County department

19  in need of space, defendant was able to negotiate lease terms and

20  draft lease agreements for the County and private property owners, or

21  direct others to do so.  Based on defendant's level of seniority,

22  defendant had significant autonomy to contractually bind the County.

23  In particular, defendant had authority to negotiate contract terms on

24  behalf of the county, although final contract approval lay with the

25  Board of Supervisors, and defendant had authority to approve, with

26  others, change orders on contracts.  Furthermore, in defendant's

27  capacity as a public official employed by the County, defendant owed

28  a fiduciary duty to the citizens of the County and to defendant's

                              11

1    employer to perform the duties and responsibilities of defendant's
2    office free from bias, conflicts of interest, self-enrichment, self-
3    dealing, concealment, deceit, fraud, kickbacks, and bribery.

4         The United States government provides federal assistance to
5    various County departments, including the Department of Public Social
6    Services ("DPSS"), every year -- a portion of which is used to cover
7    some of the County departments' lease expenses.  The aggregate amount
8    of federal funding received by those County departments exceeds
9    $10,000 per year.

10        **The Arman Gabaee Bribery Scheme**

11        Arman Gabaee, also known as "Arman Gabay" ("Gabaee"), was a real
12   estate developer who conducted business with the County. He was the
13   co-managing partner and co-founder of the Charles Company, a real
14   estate development firm that developed and maintained commercial and
15   residential real estate projects.  Gabaee was also a partner of the
16   California limited partnership M&A Gabaee, among other entities.

17        Sometime between 2000 and 2005, Gabaee began to seek improper
18   assistance from defendant in the course of conducting his (Gabaee's)
19   real estate business with the County.  During this time, Gabaee had a
20   lease pending approval before the County Board of Supervisors (the
21   "Board").  The lease called for DPSS to occupy a portion of the
22   Hawthorne Mall, which Gabaee owned.  The Board ultimately voted to
23   approve the lease, but the approval came over a year after it was
24   initially presented to the Board.  Defendant believed that the delay
25   on the DPSS Hawthorne Mall lease served as the catalyst for Gabaee
26   seeking influence and non-public County information about County
27   leases from defendant.  Gabaee did not compensate defendant for
28   assistance and non-public County information at this time.

CONFIDENTIAL                                          COLA0184339

1    In approximately 2010 or 2011, Gabaee began giving cash payments

2  to defendant.  Initially, the amounts were $5,000 per month for

3  approximately five to six months.  After that point, to on or about

4  April 11, 2017, Gabaee gave defendant monthly cash payments of

5  approximately $1,000.  The relationship between defendant and Gabaee

6  changed shortly after defendant began accepting these monthly

7  payments in 2010 or 2011.  Specifically, their relationship

8  transformed to an illegal business relationship, wherein defendant

9  would use his County position to provide assistance to Gabaee and

10  financially benefit Gabaee's businesses in return for Gabaee's

11  monthly payments.

12    The assistance that defendant provided to Gabaee in return for

13  the $1,000 monthly payments included the following: (a) defendant

14  providing non-public County information to Gabaee, including but not

15  limited to, information about the County's leasing needs and

16  competing bids for leases Gabaee desired; (b) defendant giving added

17  attention to, and performing official acts for, Gabaee with regard to

18  Gabaee's existing and potential leases with the County; and (c)

19  defendant resolving issues between Gabaee and various County

20  departments leasing space from Gabaee where issues have arisen within

21  the occupied properties and resolving those issues on terms that were

22  favorable to Gabaee.

23    For instance, on one occasion in 2011, defendant "ran

24  interference" for Gabaee with regard to maintenance issues that had

25  arisen in properties Gabaee was leasing to the County.  The County

26  departments leasing space in the properties owned by Gabaee were

27  upset with maintenance issues, such as broken elevators and roof

28  leaks.  Gabaee relied heavily on defendant to address the issues with

13

CONFIDENTIAL

COLA0184340

1   the departments by improperly deflecting blame away from Gabaee and

2   onto independent contractors, and by allowing Gabaee more time to

3   resolve issues.

4       In addition, prior to defendant's cooperation with the FBI

5   (which began on or about December 16, 2016), Gabaee had offered to

6   buy a property in Northern California for defendant as a bribe.  The

7   value of the properties Gabaee sought to purchase as a bribe for

8   defendant exceeded $1,000,000.  In exchange for the Northern

9   California property bribe, Gabaee sought defendant's assistance

10  securing a County lease for Gabaee, whereby DPSS would lease space in

11  the Hawthorne Mall, which Gabaee owned and was redeveloping.

12      **The Electrical Contractor Bribery Scheme**

13      In addition to bribes from Gabaee, defendant also accepted

14  bribes from an electrical contractor doing business with the County

15  (the "Electrical Contractor").  The Electrical Contractor made

16  payments to defendant in exchange for defendant providing non-public

17  County information to the Electrical Contractor and helping the

18  Electrical Contractor secure County contracts.

19      The illicit nature of their relationship began in approximately

20  August 2013 when the Electrical Contractor offered defendant $25,000

21  to $40,000 for information that would help the Electrical Contractor

22  win a bid to perform electrical work on a property leased by the

23  County.  The Electrical Contractor's work included wiring speakers

24  and installing alarms and security systems.

25      In exchange for the cash payments, defendant would obtain non-

26  public information from the County's Internal Services Department

27  ("ISD") about whether the County had received bids in response to a

28  County Request for Proposal ("RFP").  The RFP process was the means

14

CONFIDENTIAL

COLA0184341

1  by which competing contractors submitted bids to the County to
2  perform work on County properties.  Defendant would then disclose
3  that non-public information to the Electrical Contractor, and/or tell
4  the Electrical Contractor prior winning bids on similar projects, so
5  that the Electrical Contractor could submit a more competitive bid to
6  the County through the RFP process.  Defendant did this to help the
7  Electrical Contractor obtain the County contract.  In other
8  instances, when either there were no other qualifying bids submitted
9  or time constraints precluded a formal RFP, defendant would contact
10 ISD and use the influence of his County position to help the
11 Electrical Contractor obtain the County contract.

12     The Electrical Contractor always paid defendant in cash two to
13 three times per year, usually in an envelope containing $50 or $100
14 bills.  From approximately 2013 through December 2016, the Electrical
15 Contractor gave defendant a total of $250,000 to $300,000 for
16 defendant's assistance with five to seven County contracts ultimately
17 awarded to the Electrical Contractor.  Defendant did not report these
18 bribe payments as income or as anything else.

19     **The Kickback Schemes**

20     On several occasions, defendant arranged to receive improper
21 kickbacks from real estate commissions on properties leased by the
22 County.  Defendant received Form 1099s for theses commissions, which
23 totaled approximately $59,200 for 2012, 2014 and 2016, and reported
24 it as income on his individual tax returns. A

25     In another instance, approximately in 2013, defendant arranged
26 with as associate of Gabaee's to receive, and did receive, a real
27 estate commission kickback of $35,000, through a third party, for the

28 A OCI findings suggest that Shepos embezzled $26,545 in real estate commissions on County leases that he
negotiated with the Neman brothers from 1998 to 2010.  There is insufficient evidence to indicate a nexus
between the Neman brothers and the kickbacks listed in the plea agreement.  Additionally, we are unable to
identify the source of income reported on Shepos' tax returns on file.
AA 04/10/19

CONFIDENTIAL                                                    COLA0184342

Unable to locate lease in buy.org correspondence but found Lease #76019 in a document
from Shepos' emails (saved in his Background folder) showing a Probation lease at 11151
Missouri Ave, Los Angeles, with Homer M Harvey Harvey Capital Corp (Vendor #169572)
that commenced on 04/01/14.
AA 04/10/19

1 County's lease of a property on Missouri Avenue in West Los Angeles, **B**

2 but did not pay income taxes on his receipt of these funds.

3 **Other Unreported Income**

4 Defendant gave some of the cash defendant received from the

5 Electrical Contractor to Individual A to store for him (defendant).

6 On one occasion, defendant gave Individual A approximately $150,000

7 to store. On another occasion, defendant gave Individual A

8 approximately $25,000 to $40,000 to store. Individual A eventually

9 used the funds to cash checks for the Electrical Contractor and gave

10 defendant $2,500 in interest. Defendant did not report the $2,500 as

11 income.

12 **False Statements to Federal Agents**

13 On or about November 21, 2016, FBI Special Agents interviewed

14 defendant at the United States Attorney's Office in Los Angeles.

15 Defendant knowingly and willfully made materially false, fictitious,

16 and fraudulent statements and representations to the agents, which

17 included the following: (a) defendant denied that he received

18 anything of value from anyone doing business with the County; and (b)

19 defendant claimed that a $25,000 cashier's check agents questioned

20 him about represented gambling proceeds that defendant had won in

21 prior years, and (c) claimed that unexplained deposits in his bank

22 accounts were gambling proceeds.

23 In truth, as detailed above, defendant did receive money and

24 other things of value from individuals doing business with the

25 County. Furthermore, the $25,000 cashier's check actually

26 represented bribe proceeds from the Electrical Contractor that

27 Individual A had stored for defendant, and defendant did deposit cash

28 bribe payments from Gabaee and others into his bank accounts.

16

1    Defendant made the aforementioned false statements to conceal
2    his illegal bribery schemes with Gabaee and others.  Defendant's
3    false statements were material, that is, they had a tendency to
4    influence the FBI's investigation and affected the FBI's ability to
5    properly investigate the illegal activity of defendant and others.

6    **False Statements on Tax Return**

7    On or about April 14, 2015, in Los Angeles County, within the
8    Central District of California, defendant willfully made and
9    subscribed to a materially false United States Individual Income Tax
10   Return, Form 1040, for the calendar year 2014, which defendant
11   verified by a written declaration that it was made under penalty of
12   perjury, and filed such tax return with the Internal Revenue Service,
13   which defendant did not believe to be true and correct as to every
14   material matter in that it failed to report the additional income for
15   2014 described herein.  Specifically, the tax return reported total
16   income of $109,274 and failed to disclose additional income of
17   $139,400.

18   The false information provided by defendant was material in that
19   it affected the IRS's calculation of the amount of income earned and
20   prevented the IRS from verifying the accuracy of the amount of tax
21   claimed to be owed on defendant's return.  Defendant acted willfully.
22   Defendant knew that the law required him to report all income
23   accurately and to pay all income tax that was due and owing.
24   Defendant voluntarily and intentionally violated that duty.

25   **Tax Due and Owing on Unreported Income**

26   For calendar years 2010 to 2016, defendant failed to report a
27   total of $434,400 of income he received from the bribery and/or
28   kickback payments described above, which consists of the following

17

CONFIDENTIAL                                                                    COLA0184344

1   amounts for the following years: $25,000 (2010); $12,000 (2011);

2   $12,000 (2012); $52,000 (2013); $139,400 (2014); and $102,000 (2015);

3   and $92,000 (2016). Defendant's unreported income for 2014 included

4   approximately $102,000 in bribe payments.

5       Defendant's underreporting of income resulted in lowering the

6   taxes reported as due and owing on his Form 1040 individual tax

7   returns. As a result of defendant's conduct, defendant owes

8   additional taxes totaling $110,021 consisting of the following

9   amounts for the following tax years: $3,941 (2010); $1,625 (2011);

10  $3,325 (2012); $14,216 (2013); $38,972 (2014); $26,019 (2015); and

11  $21,923 (2016).

12                          SENTENCING FACTORS

13      19.  Defendant understands that in determining defendant's

14  sentence the Court is required to calculate the applicable Sentencing

15  Guidelines range and to consider that range, possible departures

16  under the Sentencing Guidelines, and the other sentencing factors set

17  forth in 18 U.S.C. § 3553(a). Defendant understands that the

18  Sentencing Guidelines are advisory only, that defendant cannot have

19  any expectation of receiving a sentence within the calculated

20  Sentencing Guidelines range, and that after considering the

21  Sentencing Guidelines and the other § 3553(a) factors, the Court will

22  be free to exercise its discretion to impose any sentence it finds

23  appropriate up to the maximum set by statute for the crime of

24  conviction.

25  //

26  //

27

28

18

CONFIDENTIAL                                                          COLA0184345

1    20.   Defendant and the USAO agree to the following applicable

2  Sentencing Guidelines factors:

3        Count One (False Statements)

4    Base Offense Level:                    6       [U.S.S.G. § 2B1.1(a)(2)]

5

6        Count Two (Subscribing to False Tax Return)

7    Base Offense Level:                   16       [U.S.S.G. § 2T1.1(a)(1)
     [$110,021 Tax Loss]                                    and § 2T4.1(F)]
8

9    Specific Offense
     Characteristics:   [Failure to
10   Report Income Over $10,000
     from Criminal Activity]              +2       [U.S.S.G. §2T1.1(b)(1)]
11

12

13   **Multi Count Adjustment:**           +0       [U.S.S.G. § 3D1.1,
                                                     3D1.3, 3D1.4]

14  Defendant and the USAO reserve the right to argue that additional

15  specific offense characteristics, adjustments, and departures under

16  the Sentencing Guidelines are appropriate.

17    21.   Defendant understands that there is no agreement as to

18  defendant's criminal history or criminal history category.

19    22.   Defendant and the USAO reserve the right to argue for a

20  sentence outside the sentencing range established by the Sentencing

21  Guidelines based on the factors set forth in 18 U.S.C. § 3553(a)(1),

22  (a)(2), (a)(3), (a)(6), and (a)(7).

23                   WAIVER OF CONSTITUTIONAL RIGHTS

24    23.   Defendant understands that by pleading guilty, defendant

25  gives up the following rights:

26        a.   The right to persist in a plea of not guilty.

27        b.   The right to a speedy and public trial by jury.

28

19

CONFIDENTIAL                                                      COLA0184346

1    c.    The right to be represented by counsel — and if
2  necessary have the court appoint counsel — at trial.  Defendant
3  understands, however, that, defendant retains the right to be
4  represented by counsel — and if necessary have the court appoint
5  counsel — at every other stage of the proceeding.
6    d.    The right to be presumed innocent and to have the
7  burden of proof placed on the government to prove defendant guilty
8  beyond a reasonable doubt.
9    e.    The right to confront and cross-examine witnesses
10 against defendant.
11    f.    The right to testify and to present evidence in
12 opposition to the charges, including the right to compel the
13 attendance of witnesses to testify.
14    g.    The right not to be compelled to testify, and, if
15 defendant chose not to testify or present evidence, to have that
16 choice not be used against defendant.
17    h.    Any and all rights to pursue any affirmative defenses,
18 Fourth Amendment or Fifth Amendment claims, and other pretrial
19 motions that have been filed or could be filed.
20                  WAIVER OF APPEAL OF CONVICTION
21    24.  Defendant understands that, with the exception of an appeal
22 based on a claim that defendant's guilty plea was involuntary, by
23 pleading guilty defendant is waiving and giving up any right to
24 appeal defendant's convictions on the offenses to which defendant is
25 pleading guilty.
26           LIMITED MUTUAL WAIVER OF APPEAL OF SENTENCE
27    25.  Defendant agrees that, provided the Court imposes a total
28 term of imprisonment on all counts of conviction of no more than 33

20

months, defendant gives up the right to appeal all of the following: (a) the procedures and calculations used to determine and impose any portion of the sentence; (b) the term of imprisonment imposed by the Court; (c) the fine imposed by the court, provided it is within the statutory maximum; (d) the amount and terms of any restitution order, provided it requires payment of no more than $110,021; (e) the term of probation or supervised release imposed by the Court, provided it is within the statutory maximum; and (f) any of the following conditions of probation or supervised release imposed by the Court: the conditions set forth in General Orders 318, 01-05, and/or 05-02 of this Court; the drug testing conditions mandated by 18 U.S.C. §§ 3563(a)(5) and 3583(d).

26. The USAO agrees that, provided (a) all portions of the sentence are at or below the statutory maximum specified above and (b) the Court imposes a term of imprisonment of no less than 27 months, the USAO gives up its right to appeal any portion of the sentence, with the exception that the USAO reserves the right to appeal the following: (a) the amount of restitution ordered if that amount is less than $110,021.

## RESULT OF WITHDRAWAL OF GUILTY PLEA

27. Defendant agrees that if, after entering guilty pleas pursuant to this agreement, defendant seeks to withdraw and succeeds in withdrawing defendant's guilty pleas on any basis other than a claim and finding that entry into this plea agreement was involuntary, then (1) the USAO will be relieved of all of its obligations under this agreement; (2) in any investigation, criminal prosecution, or civil, administrative, or regulatory action, defendant agrees that any Cooperation Information and any evidence

21

CONFIDENTIAL

COLA0184348

1  derived from any Cooperation Information shall be admissible against
2  defendant, and defendant will not assert, and hereby waives and gives
3  up, any claim under the United States Constitution, any statute, or
4  any federal rule, that any Cooperation Information or any evidence
5  derived from any Cooperation Information should be suppressed or is
6  inadmissible; and (3) should the USAO choose to pursue any charge
7  that was either dismissed or not filed as a result of this agreement,
8  then (i) any applicable statute of limitations will be tolled between
9  the date of defendant's signing of this agreement and the filing
10 commencing any such action; and (ii) defendant waives and gives up
11 all defenses based on the statute of limitations, any claim of pre-
12 indictment delay, or any speedy trial claim with respect to any such
13 action, except to the extent that such defenses existed as of the
14 date of defendant's signing this agreement.

15                    EFFECTIVE DATE OF AGREEMENT

16     28.  This agreement is effective upon signature and execution of
17 all required certifications by defendant, defendant's counsel, and an
18 Assistant United States Attorney.

19                      BREACH OF AGREEMENT

20     29.  Defendant agrees that if defendant, at any time after the
21 signature of this agreement and execution of all required
22 certifications by defendant, defendant's counsel, and an Assistant
23 United States Attorney, knowingly violates or fails to perform any of
24 defendant's obligations under this agreement ("a breach"), the USAO
25 may declare this agreement breached.  For example, if defendant
26 knowingly, in an interview, before a grand jury, or at trial, falsely
27 accuses another person of criminal conduct or falsely minimizes
28 defendant's own role, or the role of another, in criminal conduct,

                                22

                                                  COLA0184349

1  defendant will have breached this agreement. All of defendant's

2  obligations are material, a single breach of this agreement is

3  sufficient for the USAO to declare a breach, and defendant shall not

4  be deemed to have cured a breach without the express agreement of the

5  USAO in writing. If the USAO declares this agreement breached, and

6  the Court finds such a breach to have occurred, then:

7       a.   If defendant has previously entered guilty pleas

8  pursuant to this agreement, defendant will not be able to withdraw

9  the guilty pleas.

10       b.   The USAO will be relieved of all its obligations under

11  this agreement; in particular, the USAO: (i) will no longer be bound

12  by any agreements concerning sentencing and will be free to seek any

13  sentence up to the statutory maximum for the crimes to which

14  defendant has pleaded guilty; and (ii) will no longer be bound by any

15  agreement regarding the use of Cooperation Information and will be

16  free to use any Cooperation Information in any way in any

17  investigation, criminal prosecution, or civil, administrative, or

18  regulatory action.

19       c.   The USAO will be free to criminally prosecute

20  defendant for false statement, obstruction of justice, and perjury

21  based on any knowingly false or misleading statement by defendant.

22       d.   In any investigation, criminal prosecution, or civil,

23  administrative, or regulatory action: (i) defendant will not assert,

24  and hereby waives and gives up, any claim that any Cooperation

25  Information was obtained in violation of the Fifth Amendment

26  privilege against compelled self-incrimination; and (ii) defendant

27  agrees that any Cooperation Information and any Plea Information, as

28  well as any evidence derived from any Cooperation Information or any

23

COLA0184350

1   Plea Information, shall be admissible against defendant, and

2   defendant will not assert, and hereby waives and gives up, any claim

3   under the United States Constitution, any statute, Rule 410 of the

4   Federal Rules of Evidence, Rule 11(f) of the Federal Rules of

5   Criminal Procedure, or any other federal rule, that any Cooperation

6   Information, any Plea Information, or any evidence derived from any

7   Cooperation Information or any Plea Information should be suppressed

8   or is inadmissible.

9                   COURT AND PROBATION OFFICE NOT PARTIES

10       30.  Defendant understands that the Court and the United States

11   Probation Office are not parties to this agreement and need not

12   accept any of the USAO's sentencing recommendations or the parties'

13   agreements to facts or sentencing factors.

14       31.  Defendant understands that both defendant and the USAO are

15   free to: (a) supplement the facts by supplying relevant information

16   to the United States Probation Office and the Court, (b) correct any

17   and all factual misstatements relating to the Court's Sentencing

18   Guidelines calculations and determination of sentence, and (c) argue

19   on appeal and collateral review that the Court's Sentencing

20   Guidelines calculations and the sentence it chooses to impose are not

21   error, although each party agrees to maintain its view that the

22   calculations in paragraph 20 are consistent with the facts of this

23   case.  This paragraph permits both the USAO and defendant to submit

24   full and complete factual information to the United States Probation

25   Office and the Court, even if that factual information may be viewed

26   as inconsistent with the Factual Basis or Sentencing Factors agreed

27   to in this agreement.

28

                                24

CONFIDENTIAL                                                      COLA0184351

1    32.   Defendant understands that even if the Court ignores any

2    sentencing recommendation, finds facts or reaches conclusions

3    different from those agreed to, and/or imposes any sentence up to the

4    maximum established by statute, defendant cannot, for that reason,

5    withdraw defendant's guilty pleas, and defendant will remain bound to

6    fulfill all defendant's obligations under this agreement.   Defendant

7    understands that no one – not the prosecutor, defendant's attorney,

8    or the Court – can make a binding prediction or promise regarding the

9    sentence defendant will receive, except that it will be within the

10   statutory maximum.

11                        NO ADDITIONAL AGREEMENTS

12    33.   Defendant understands that, except as set forth herein,

13   there are no promises, understandings, or agreements between the USAO

14   and defendant or defendant's attorney, and that no additional

15   promise, understanding, or agreement may be entered into unless in a

16   writing signed by all parties or on the record in court.

17            PLEA AGREEMENT PART OF THE GUILTY PLEA HEARING

18    34.   The parties agree that this agreement will be considered

19   //

20   //

21

22

23

24

25

26

27

28

CONFIDENTIAL                                                    COLA0184352

1    part of the record of defendant's guilty plea hearing as if the

2    entire agreement had been read into the record of the proceeding.

3        AGREED AND ACCEPTED

4        UNITED STATES ATTORNEY'S OFFICE
         FOR THE CENTRAL DISTRICT OF
5        CALIFORNIA

6        NICOLA T. HANNA
         United States Attorney

7

8    _____          August 21, 2018
9    RUTH C. PINKEL                         Date
     Assistant United States Attorney

10   x _____           7-29-2018
11   THOMAS SHEPOS                          Date
     Defendant

12

13   _____          7-29-18
     JOEL C. KOURY                          Date
14   Attorney for Defendant
     THOMAS SHEPOS

15

16                   CERTIFICATION OF DEFENDANT

17       I have read this agreement in its entirety.  I have had enough

18   time to review and consider this agreement, and I have carefully and

19   thoroughly discussed every part of it with my attorney.  I understand

20   the terms of this agreement, and I voluntarily agree to those terms.

21   I have discussed the evidence with my attorney, and my attorney has

22   advised me of my rights, of possible pretrial motions that might be

23   filed, of possible defenses that might be asserted either prior to or

24   at trial, of the sentencing factors set forth in 18 U.S.C. § 3553(a),

25   of relevant Sentencing Guidelines provisions, and of the consequences

26   of entering into this agreement.  No promises, inducements, or

27   representations of any kind have been made to me other than those

28   contained in this agreement.  No one has threatened or forced me in

                                26

CONFIDENTIAL                                              COLA0184353

1   any way to enter into this agreement.  I am satisfied with the

2   representation of my attorney in this matter, and I am pleading

3   guilty because I am guilty of the charges and wish to take advantage

4   of the promises set forth in this agreement, and not for any other

5   reason.

6   _____          7·27·2018

7   THOMAS SHEPOS                          Date
    Defendant

8

9

10

11                  CERTIFICATION OF DEFENDANT'S ATTORNEY

12      I am defendant THOMAS SHEPOS's attorney.  I have carefully and

13  thoroughly discussed every part of this agreement with my client.

14  Further, I have fully advised my client of his rights, of possible

15  pretrial motions that might be filed, of possible defenses that might

16  be asserted either prior to or at trial, of the sentencing factors

17  set forth in 18 U.S.C. § 3553(a), of relevant Sentencing Guidelines

18  provisions, and of the consequences of entering into this agreement.

19  To my knowledge: no promises, inducements, or representations of any

20  kind have been made to my client other than those contained in this

21  agreement; no one has threatened or forced my client in any way to

22  enter into this agreement; my client's decision to enter into this

23  agreement is an informed and voluntary one; and the factual basis set

24  forth in this agreement is sufficient to support my client's entry of

25  guilty pleas pursuant to this agreement.

26  _____          7-23-18

27  JOEL C. KOURY                          Date
    Attorney for Defendant
28  THOMAS SHEPOS

                            27

CONFIDENTIAL                                                    COLA0184354

1    ## CERTIFICATE OF SERVICE

2        I, Sandy Ear, declare:

3        That I am a citizen of the United States and a resident of or

4    employed in Los Angeles County, California; that my business address

5    is the Office of United States Attorney, 312 North Spring Street,

6    Los Angeles, California 90012; that I am over the age of 18; and

7    that I am not a party to the above-titled action;

8        That I am employed by the United States Attorney for the

9    Central District of California, who is a member of the Bar of the

10   United States District Court for the Central District of California,

11   at whose direction the service by mail described in this Certificate

12   was made; that on September 5, 2018, I deposited in the United

13   States mail at the United States Courthouse in the above-titled

14   action, in an envelope bearing the requisite postage, a copy of:

15   **Plea Agreement for defendant Thomas M. Shepos**

16   service was:

17   ☐ Placed in a closed envelope     ☒ Placed in a sealed envelope
       for collection and inter-        for collection and mailing via
18     office delivery, addressed as     United States mail, addressed
       follows:                       as follows:

19
     ☐ By hand delivery, addressed as   ☐ By facsimile, as follows:
20     follows:

21   ☐ By messenger, as follows:      ☐ By Federal Express, as
                                                        follows:
22

23   Joel C. Koury
     3435 Ocean Park Blvd., Suite 107-50
24   Santa Monica, CA 90405

25   at his last known address, at which place there is a delivery

26   service by United States mail.

27

28

1    This Certificate is executed on September 5, 2018 , at Los

2  Angeles, California.  I certify under penalty of perjury that the

3  foregoing is true and correct.

4

5

6    _____
     SANDY EAR

7    Legal Assistant

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2

CONFIDENTIAL                                                      COLA0184356

EXHIBIT 11

1              UNITED STATES DISTRICT COURT

2        CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

3

4   THE COUNTY OF LOS ANGELES,    )
    THE STATE OF CALIFORNIA, and  )
5   THE UNITED STATES OF AMERICA  )
    ex rel. KAREN GLUCK,          )
6                                 )
               Plaintiffs,        )
7                                 )
    v.                            )Case No. 2:19-cv-01773-
8                                 )        PA-MAAx
    THOMAS SHEPOS et al.,         )
9                                 )
               Defendants.        )
10  _____  )

11

12

13        VIDEOTAPED DEPOSITION OF KAREN GLUCK

14

15

16              Friday, January 9, 2026

17              9:06 a.m. - 8:12 p.m.

18

19

20              515 South Flower Street
                     41st Floor
21              Los Angeles, California

22

23  Reported by:
    Marceline F. Noble
24  CSR No. 3024

25  Job No. 334043

                                                    1

| | | |
|---|---|---|
| 1 | Q.  Okay.  And did anybody come to pick them up? | 11:23:46 |
| 2 | A.  I -- yes. | 11:23:49 |
| 3 | Q.  Who came? | 11:23:50 |
| 4 | A.  Apparently it was the FBI. | 11:23:52 |
| 5 | Q.  Why do you say apparently? | 11:23:55 |
| 6 | A.  When she said that we'd like to see the box, | 11:23:57 |
| 7 | I thought she was -- wanted to look at them and was | 11:24:00 |
| 8 | sending a delivery service.  You know, a pickup and | 11:24:03 |
| 9 | delivery. | 11:24:06 |
| 10 | Q.  Mm-hmm. | 11:24:07 |
| 11 | And when the agent showed up, did they | 11:24:08 |
| 12 | identify themselves as FBI agents? | 11:24:10 |
| 13 | A.  Yeah. | 11:24:13 |
| 14 | Q.  Okay.  Do you remember their names? | 11:24:14 |
| 15 | A.  Oh, Brian Adkins. | 11:24:16 |
| 16 | Q.  A-d-k-i-n-s. | 11:24:21 |
| 17 | A.  Right. | 11:24:24 |
| 18 | Q.  Anybody else? | 11:24:25 |
| 19 | A.  Lucas -- it's so long ago. | 11:24:26 |
| 20 | Q.  Would it be Lucas Bauers? | 11:24:31 |
| 21 | A.  Oh.  That's it.  Yes. | 11:24:33 |
| 22 | Q.  B-a-u-e-r-s. | 11:24:36 |
| 23 | Do you remember when they picked them up? | 11:24:40 |
| 24 | A.  Sometime in '15.  Months later. | 11:24:43 |
| 25 | Q.  So early 2015? | 11:24:48 |

96

1      A.   Yeah.  In fact, Ranee, you know, had said      11:24:49

2   that she would like me to take the boxes home and she   11:24:55

3   would have them picked up.      11:24:57

4        I, at that time in 2015, you know, just      11:24:59

5   wanted the boxes out of there.  I wanted to live my   11:25:04

6   life, take care of my daughter, do my work.      11:25:07

7        And she... What was the question?  I'm      11:25:10

8   sorry.  Just lost...      11:25:19

9      Q.   Yes.  When -- I asked when -- do you      11:25:25

10   remember when the agents came by --      11:25:27

11      A.   Oh, yes.      11:25:27

12      Q.   -- to pick up the boxes?      11:25:28

13      A.   Yeah.  It was sometime in '15.      11:25:29

14      Q.   Okay.  And then we established it would have   11:25:32

15   been early in 2015?      11:25:33

16      A.   Yeah, I think so.  Like, February, March or   11:25:35

17   April.  Somewhere in there.      11:25:36

18      Q.   Around March or April of 2015?      11:25:40

19      A.   I believe so.      11:25:44

20      Q.   Okay.      11:25:45

21      A.   To the best of my memory.      11:25:45

22      Q.   Had you talked to Ranee in between the time   11:25:48

23   that you had that meeting and when the agents showed   11:25:53

24   up to pick up the boxes?      11:25:56

25      A.   I don't believe so.  But, again, I --      11:25:58

97

Karen Gluck                                                          January 9, 2026

```
 1        Q.  Did you talk to the agents when they came to   11:27:48

 2   pick up the boxes?                                       11:27:50

 3        A.  Briefly, yes.                                   11:27:52

 4        Q.  Did you talk to them about Tom Shepos?          11:27:54

 5        A.  Yes.                                            11:27:59

 6        Q.  Did they interview you?                         11:27:59

 7        A.  I don't know.  I don't remember.  I don't       11:28:01

 8   think so.                                                11:28:07

 9        Q.  Did they record the conversation?              11:28:07

10        A.  Not to my knowledge.                            11:28:09

11        Q.  Was anybody taking notes?                       11:28:11

12        A.  Not to my knowledge.                            11:28:13

13        Q.  Did they take all of the boxes?                11:28:14

14        A.  They took the boxes that I had already gone     11:28:24

15   through.                                                 11:28:31

16        Q.  Okay.  And how many boxes was that?             11:28:37

17        A.  Seven.                                          11:28:40

18        Q.  Out of --                                       11:28:41

19        A.  I believe.                                      11:28:42

20        Q.  Seven boxes out of how many boxes?              11:28:43

21        A.  20.  I don't know.  A lot.                      11:28:46

22        Q.  Did they ever pick up the other boxes?          11:28:49

23        A.  No.                                             11:28:53

24        Q.  Safe to say that if any documents made their    11:28:55

25   way into this litigation, they would have been in        11:28:58
```

                                                                      100

Karen Gluck                                                          January 9, 2026

```
1    Complaint.                                    19:13:04

2        Q.  Well, I'm specifically questioning this   19:13:05

3    because of the inclusion of the line "stemming from  19:13:08

4    information the County received from Ms. Gluck."   19:13:12

5        So did you provide information to the County   19:13:16

6    that Hanes considered Shepos a good friend with an   19:13:20

7    extraordinary personality?                    19:13:23

8        A.  No.  I didn't know he had an extraordinary   19:13:25

9    personality.  And I didn't even know they were   19:13:30

10   friends.  I only heard his name from my daughter.   19:13:32

11       Q.  But you have no independent knowledge that   19:13:37

12   Mr. Hanes and Mr. Shepos were friends.         19:13:40

13       A.  No.                                    19:13:44

14       Q.  Let's see.                             19:13:46

15       Moving on to paragraph 461, should still be   19:13:47

16   the same page.                                19:13:51

17       "Hanes funneled hundreds of thousands of   19:13:53

18   dollars in bribery proceeds to Shepos, including   19:13:55

19   bribes from several other defendants, helping conceal  19:14:00

20   those bribes by storing large sums of cash for   19:14:04

21   Shepos."                                      19:14:07

22       Is that information that you provided to the   19:14:07

23   County?                                       19:14:11

24       A.  No.                                    19:14:12

25       Q.  Is that information you provided for the   19:14:13
```

369

```
 1    purpose of drafting this Complaint?              19:14:15

 2         MS. FINLEY:  Objection.  I think it calls  19:14:20

 3    for privileged information.                      19:14:22

 4         But you can testify about whether this      19:14:22

 5    information came from you.                        19:14:24

 6         THE WITNESS:  No.                            19:14:28

 7    BY MS. ROSE-McCASLIN:                             19:14:31

 8    Q.  Were you aware that -- or let me rephrase    19:14:31

 9    that.                                             19:14:34

10         Did you find out that Mr. Hanes was alleged 19:14:34

11    to have been funneling money for Mr. Shepos?     19:14:41

12    A.  Was I aware?  Is that what you asked?        19:14:44

13    Q.  Yes.                                          19:14:48

14    A.  No.                                           19:14:49

15    Q.  Do you have any personal knowledge that      19:14:52

16    Mr. Hanes was holding money in a space for       19:14:54

17    Tom Shepos' benefit?                              19:15:01

18    A.  Um, hmm.  I was not aware of that.           19:15:03

19    Q.  Okay.  Moving to paragraph 465.  This is    19:15:23

20    page 111.                                         19:15:27

21    A.  Okay.                                         19:15:32

22    Q.  It -- it begins:                              19:15:33

23         "On yet another occasion, according to the 19:15:35

24    County's subsequent investigation stemming from 19:15:38

25    information the County received from Ms. Gluck,  19:15:41
```

370

Karen Gluck                                                        January 9, 2026

```
 1    Shepos gave Hanes $128,000 in cash to store in Hanes'   19:15:44

 2    safe, telling Hanes it was a real estate commission,"   19:15:51

 3    et cetera.                                               19:15:54

 4         Was this information that you provided to          19:15:55

 5    the County?                                              19:15:58

 6       A.  No.                                               19:16:02

 7       Q.  The same paragraph:                               19:16:05

 8         "According to the County's subsequent              19:16:07

 9    investigation stemming from information the County       19:16:10

10    received from Ms. Gluck, Hanes agreed to store cash      19:16:13

11    from Shepos' real estate commission kickbacks in his     19:16:17

12    office safe in a bank bag with Shepos' name and the      19:16:20

13    amount of money listed on the outside."                  19:16:24

14         Is this information that you provided to the       19:16:26

15    County?                                                  19:16:28

16       A.  No.                                               19:16:29

17       Q.  Paragraph 466:                                    19:16:37

18         "According to the County's subsequent              19:16:39

19    investigation stemming from information the County       19:16:42

20    received from Ms. Gluck, Hanes said he agreed to         19:16:45

21    store cash that Shepos received as real estate           19:16:50

22    commissions as a favor."                                 19:16:53

23         Is that information that you provided to the       19:16:55

24    County?                                                  19:16:57

25       A.  No.                                               19:16:58
```

371

```
 1        Q.   Paragraph 467, the very next paragraph:    19:17:08

 2             "Hanes also helped Shepos launder bribe     19:17:13

 3   proceeds by funneling bribes to Shepos from other     19:17:17

 4   developers and contractors.  For example, on multiple 19:17:21

 5   occasions after approximately August 2013, at Shepos' 19:17:24

 6   direction Hanes cashed $25,000 checks from an         19:17:31

 7   electrical contractor who was bribing Shepos in       19:17:35

 8   connection with County contracts.                     19:17:38

 9             "According to the County's subsequent       19:17:40

10   investigation stemming from information the County    19:17:43

11   received from Ms. Gluck, the electrical contractor    19:17:46

12   wrote the checks to Hanes or his entities with        19:17:49

13   falsified memo lines and Hanes cashed those checks to 19:17:53

14   store the cash proceeds in Shepos' bank bag in Hanes' 19:17:56

15   safe."                                                19:17:56

16             Did you provide the information contained in 19:18:05

17   this allegation to the County?                        19:18:07

18        A.   No.                                         19:18:10

19        Q.   Okay.  We're done with the Complaint.       19:18:13

20             Aside from providing the County a copy of   19:18:15

21   the cashier's check that we talked about earlier, did 19:18:20

22   you provide any further information relative to        19:18:24

23   Gregory Hanes?                                        19:18:30

24        A.   There was an e-mail that I gave them.  And  19:18:33

25   at this moment, that's all I can remember.            19:18:46
```

                                                           372

```
 1          Q.  Do you recall the subject of the e-mail?      19:18:50

 2          A.  He, I think, was giving Hanes someone else's   19:18:53

 3    e-mail address or -- it was a very short e-mail.        19:18:59

 4          Q.  And when you say "he," are you talking about   19:19:04

 5    Tom?                                                     19:19:06

 6          A.  Yes.                                           19:19:08

 7          Q.  So it was an e-mail from Tom to Mr. Hanes      19:19:08

 8    wherein he was conveying someone else's contact         19:19:11

 9    information.                                             19:19:15

10          A.  I can't recall if it was that way, or Tom      19:19:16

11    was giving somebody else Greg's e-mail.  I can't        19:19:20

12    remember which way it was.                              19:19:27

13          Q.  So then besides the cashier's check and the    19:19:29

14    e-mail that we just discussed, is there anything else   19:19:35

15    you provided to the County related to Gregory Hanes     19:19:38

16    and his relationship with Tom Shepos?                   19:19:41

17          A.  I don't recall.                               19:19:46

18          Q.  Besides the cashier's check, is there         19:19:50

19    anything else that you provided to the FBI related to   19:19:56

20    Gregory Hanes' and Tom Shepos' relationship?            19:20:00

21          A.  I don't recall.                               19:20:05

22          Q.  And do you remember the year in which you      19:20:11

23    came across the cashier's check?                        19:20:16

24          A.  Oh... I think it was around 2016 or '17.      19:20:20

25          Q.  And is there something that's jogging your     19:20:41
```

373

EXHIBIT 12

1                    UNITED STATES DISTRICT COURT

2                    CENTRAL DISTRICT OF CALIFORNIA

3                         WESTERN DIVISION

4

5      ------------------------------)

6      THE COUNTY OF LOS ANGELES,      )

7      et al.,                         )

8                      Plaintiffs,    ) Case No. 2:19-cv-

9                 vs.                  ) 01773-PA-MAA

10     THOMAS SHEPOS, et al.,          ) VOLUME II

11                     Defendants.     )

12     ------------------------------)

13

14

15         Videotaped Deposition of BRYAN BELL, at

16         515 S. Flower Street, Suite 4100, Los Angeles,

17         California, 90071, commencing at 10:11 A.M.,

18         Wednesday, January 21, 2026, before

19         Judith Schlussel, CSR No. 4307.

20

21

22

23

24

25

                                                             329

```
 1   Gluck, correct?

 2       A.   Correct.

 3       Q.   Okay.  Let's take a look at, I believe --

 4   my apologies.  There is something going on with my

 5   computer which is why I was late to announce my        04:53:18

 6   presence a moment ago.  Okay.

 7           Let's look at the page ending Bates stamp

 8   9156.  It would be Page 9 of 14.

 9       A.   Okay.

10       Q.   Last bullet point of the large set of        04:53:39

11   bullet points on that page says look at Greg Hanes,

12   put in prison, too.  Do you see that?

13       A.   Yes.

14       Q.   Do you have any reason to believe that that

15   would be my client, Gregory Hanes, or would that be    04:53:54

16   some other Greg Hanes potentially related to this

17   case?

18       A.   It speaks for itself.  She told me to look

19   at Greg Hanes.

20       Q.   Okay.  Going to the page immediately          04:54:10

21   preceding that, the beginning of those bullet

22   points, the grayed area where it says interview date

23   and time, August 29, 2017 at 5:45 P.M., would that

24   be the time and date of this particular interview

25   wherein you got that information from Ms. Gluck?       04:54:28
```

                                                        583

```
 1   say this.

 2           It's kind of an odd statement.  I recognize

 3   you probably put this in rather shorthand for her to

 4   say put in prison, too.  Do you have any idea what

 5   it is that she meant by that?                        04:58:10

 6       A.   So the reason for the shorthand is Karen

 7   spoke really fast.  So -- you'd have to get

 8   permission to record people, and Karen was very

 9   skeptical of being recorded, although she did allow

10   us to record her sometimes.  This looks like it was  04:58:31

11   an interview that might have taken place in the

12   beginning.  So we took notes on this.  We were

13   writing really fast and we on were doing shorthand

14   writing stuff down.

15           So her insinuation by put in prison, too,    04:58:43

16   would be that he had something to do with the

17   misconduct and that I need to look into him because

18   he needs to go to jail, too, with the rest of the

19   people that were involved in the misconduct with

20   Thomas Shepos.  That's what I believe she meant by   04:58:57

21   that.

22       Q.   Now I recognize that this Interview

23   Summary -- actually, let me ask you, did you prepare

24   the Interview Summary?

25       A.   If we look at the notes, it was -- so it    04:59:17
```

586

EXHIBIT 13

## COUNTY OF LOS ANGELES
## DEPARTMENT OF AUDITOR-CONTROLLER

OFFICE OF COUNTY INVESTIGATIONS

### CONFIDENTIAL

## INTERVIEW SUMMARY

| | |
|---|---|
| CASE: | #2016-12376 |
| INTERVIEW DATE/TIME: | VARIOUS NON-RECORDED INTERVIEWS – SEE DATES BELOW |
| 0INTERVIEWER (1): | BRYAN W. BELL, SUPERVISING INVESTIGATOR |
| INTERVIEWER (2): | AMANDA ANDREWS, INVESTIGATOR |
| AUDIO RECORDING: | NO |

| | |
|---|---|
| INTERVIEW LOCATION: | VARIOUS – TELEPHONE/GLUCK'S RESIDENCE |
| INTERVIEWEE: | KAREN GLUCK |
| POSITION/TITLE: | THOMAS SHEPOS' EX-SPOUSE, INFORMANT/WITNESS |
| DEPARTMENT/BUSINESS: | NA |

THIS DOCUMENT WAS PREPARED ON VARIOUS DATES BY AMANDA ANDREWS FROM HAND-WRITTEN NOTES.
THIS DOCUMENT IS THE ONLY OFFICIAL RECORD OF THE INTERVIEW DESCRIBED ABOVE, UNLESS AN AUDIO
RECORDING WAS ALSO MADE. HAND-WRITTEN NOTES SUPPORTING THE FOLLOWING NARRATIVE WERE
DESTROYED PURSUANT TO OCI POLICY.

*This is NOT an official transcript; topics determined to be irrelevant to the investigation may be omitted.*

OCI Investigators conducted 17 witness interviews with Ms. Gluck on the date(s) and time(s)
indicated below. Ms. Gluck declined being recorded.

| | |
|---|---|
| *Interview Date/Time:* | *June 27, 2017 at 3:22 PM (1 hour)* |
| *Interview Location:* | *Phone interview in Bryan W. Bell's Office* |
| *Investigators Present:* | *Bryan W. Bell, Supervising Investigator* |
| | *Amanda Andrews, Investigator* |

Explained to Karen that we are looking for a financial link between Visco and Shepos that gives
us probable cause, such as an invoice for work done on their Roscomare residence addressed
to Visco.

Karen answered some of our questions and indicated the following:

- She wishes to sit down with both FBI and us in order for her to provide her documents
  because everyone in the County is involved.
- She never sees Shepos, they communicate via text only.
- She has been gathering documents from Shepos since 2002 when she first noticed
  suspicious behavior in regard to their finances. Shepos kept documents in the garage.
- Shepos committed bigamy before he married her. She has evidence.
- She shared information with Scott Bernstein, an attorney that is like a brother to her.
- She is attempting to retain a qui tam lawyer.
- She knows of 30 gift cards that they have paid Shepos off with. Does not have cards but
  has receipts, ranging from small to large.

*Help Conserve Paper – Print Double-Sided*
*"To Enrich Lives Through Effective and Caring Service"*

BE COUNTED ✓     http://census.lacounty.gov

- Shepos takes out insurance policies, that is how he is committing fraud. He cashed out $5k.
- Karen has lupus.
- Karen mentioned a credit line at the House of Blues in connection with a developer.
- Believes that Shepos is hiding the money he is getting and is not gambling with it. He took a 3 month $100,000 CD. It is a never-ending cycle.
- Pete Norrell was hired by the County to investigate Shepos, Allen (her BK attorney) spoke with Pete and Pete was also hired by developer.
- She has one of Shepos' cell phones. Doesn't think there are text messages but believes there is a phone log history.

## Gambling

- She does not know whether Shepos is still in Gamblers Anonymous. She would not comment further until she knows the FBI is onboard.
- Does not know how many times Shepos left work to gamble.

## Frank Visco and Michele Lantz

- Shepos has been in Visco's pocket for 20 years.
- She has a letter that Shepos wrote to her regarding Visco and money >40k.
- When Shepos stated 'Frank, I just wanted to be like you,' Karen witnessed him cry and had never seen him cry before and observed that his reaction was real. When we asked what Shepos meant by this, Karen stated that Shepos "wants to be a mobster."
- When asked what she meant in her text message to Shepos, 'Is Frankie proud of what he has accomplished?', Karen stated that Visco got Shepos to be one of his corrupt players in the Antelope Valley.
- She has met Visco a dozen times. They had dinner with Visco in Vegas. They used to go twice a year and have been to the Hilton and the Mirage. Shepos and Visco gambled in the high roller room, played cards and craps. Shepos took care of the finances and she does not know whether Visco paid for any of their trips.
- Visco borrowed money from Shepos, she has the email chain.
- Shepos excitedly traveled to Lancaster every Wednesday.
- In 2005 during a trip to Vegas, Visco's wife mentioned Michele Lantz at dinner and said, 'I told you to get rid of her – she's going to be nothing but trouble.' Karen also overheard Visco ask Shepos after dinner if he wanted to see Michele Lantz.
- Believes they are funneling money through Michele Lantz's daughter. Could not comment further.

## Roscomare Residence

- Does not see any documents with direct connection to Visco on construction bills.
- Has bills going from Don Abbey's company for landscaping and/or front door.

## Dr. George Boris

- When asked how long she thinks Shepos stole money from Dr. Boris, Karen stated that with everything she knows about Tom, the criminal evidence she has, and her belief that he has been a scammer his entire life, Shepos stole money from Dr. Boris since he has known him.
- The condo she lives in at 1925 Montana Ave was hers before her marriage to Shepos and he took a second out on it to pay Dr. Boris back. He stole this money from her.

O.B.I.
COUNTY OF LOS ANGELES

AA 01/24/18

| Interview Date/Time: | July 17, 2017 at 4:38 PM (45 minutes) |
| Interview Location: | Phone interview in Bryan W. Bell's Office |
| Investigators Present: | Bryan W. Bell, Supervising Investigator |
| | Amanda Andrews, Investigator |

Karen called with an update on releasing her information and indicated the following:

- Qui tam lawyer is not taking her case. She is speaking with her divorce lawyer regarding civil service. She trusts Bryan and wants to work with him and the County but has been instructed by her lawyers to stop talking to us and hold off on releasing information because they feel she is completely unprotected in regard to the information she has about the five developers and Shepos. Karen is working with lawyer in Washington specializing in no bid scandals – Martin Randall of Clark...Company, and requested she put her evidence together in a two-page summary.
- Karen knows how they are laundering money through Chase Bank to an individual and back to Tom.
- Don Abbey is a pedophile and will go down in the Sandusky case.
- Shepos went to San Diego Credit Union with Arman, Visco, and Bond. David Bond (CEO RED) is laundering money and helping Tom. Informed Karen we need probable cause and do not have any evidence David Bond is involved and to please provide if she has any evidence.
- Karen noted that Shepos leaves the memo blank on checks that are not legitimate and includes a memo for checks that are legitimate.
- Shepos told daughter he might be going to France. Karen believes he may not be here by August 1 because he combined his house and child support payment to her this month. Does not know if he is going to France permanently or on vacation.
- Karen transcribed Shepos' conversation regarding no bid contracts with Visco on her answering machine that he left after pocket dialing her home. [OCI recorded message and has Karen's transcribed notes.]
- David Schaeffer changed his name to David Schaeffer Fox.
- Too many people in the DA office are involved.

AA 01/24/18

| Interview Date/Time: | July 18, 2017 at 1:03 PM (40 minutes) |
| Interview Location: | Phone interview in Bryan W. Bell's Office |
| Investigators Present: | Bryan W. Bell, Supervising Investigator |
| | Amanda Andrews, Investigator |

Karen called with an update on releasing her information and indicated the following:

- Karen estimates Shepos used 30 gift cards on various purchases in the receipts she has. For example, she has Home Depot receipts with gift card purchases on items for their home that she originally believed were purchased through their checking account.
- Sam Aldridge, a Don Abbey employee, is getting paid in gift cards.
- Hawthorne Electric bills reflect Abbey, Arman, and Visco with Shepos being the monkey in the middle.
- Washington lawyers are interested in taking her case, she provided them with information she has for Visco to see if any conflict of interest. They have offices in Las Vegas, Florida, and Chicago.

O.C.I.
**COUNTY OF LOS ANGELES**

- Karen does not want information sent up the County channels, only wants information funneled to FBI. Bryan informed her that we are the County we are not the FBI. He has worked with FBI on other cases in the past and shared information with them. Clarified again for her that he works for the County and not the FBI. Karen expressed that she needs to recover money that was stolen from her and her new film could take up to three years before it brings in any revenue.
- Asked Karen who real estate agent was on Roscomare residence. Karen stated it was Ginger Glass from their neighborhood and Shepos was not a real estate broker at the time.
- Karen states Shepos uses insurance policies as a bank.
- Karen states that Paul Cook in Baldwin Hills has been exposing the gift card scandal and she met with Mr. Cook's associate and James Biddle. Shepos and developers are laundering payoffs and kickbacks via gift cards.
- Karen mentions a hospital deal where everyone lost, except Visco and Lantz. Visco trained her.
- Karen states that 50 people are going down for this scandal.
- Karen states that she has been to dinner many times with Dave and Mindy Gullen.
- Karen states that Shepos is a sociopath, suffers from anti-social personality disorder like Ted Bundy and Scott Peterson.
- Karen states that Ken Woods told her that Don Abbey likes little boys and alluded to an occurrence on a plane and HBO is working on it. Karen recommended to check out blinkoncrime.com.
- Karen states that Nancy Schaeffer was murdered after going to Congress with this scandal.
- Bryan requested that Karen do what she needed to do to get her paperwork filed with her attorney so that we may obtain the information from her.

AA 01/24/18

| Interview Date/Time: | July 18, 2017 at 1:57 PM (23 minutes) |
| Interview Location: | Phone interview in Bryan W. Bell's Office |
| Investigators Present: | Bryan W. Bell, Supervising Investigator |
| | Amanda Andrews, Investigator |

Karen called with an update on releasing her information and indicated the following:

- Karen found 10 different gift cards and states Shepos probably received hundreds of thousands of dollars throughout the years. She states, "now I get it", this is how Tom got away with filing bankruptcy, took my inheritance, forged my signature, and destroyed my life. She comments that she can't believe Shepos left these gift card records.
- Karen states Shepos has also been fraudulent with Visco and Lantz in Ojai.
- Bryan informed Karen that any information she provides will be used by us and also forwarded to the FBI.
- Karen states Shepos is a psychopath.
- Karen states Shepos is a criminal that will go live on an island with the mobster's favorite girl (Lantz).
- Bryan informs Karen she needs to get all her documents compiled to her attorney so she can in turn provide to us.
- Karen states many big deals were going on in 2006.
- Bryan informs Karen that everything we get from her will go to the FBI regardless, but he cannot withhold any information from his superiors at the County. Karen states she will hold off on sending us information until she has secured her attorney in Washington.
- Bryan reminds Karen that she promised to send us copy of the checks to Sarah Withers for

O.C.I.
COUNTY OF LOS ANGELES

the Dodger tickets. Karen describes the fraud regarding these checks – Withers used to be a Secretary/Assistant for Arman Gabay and suddenly became the Head of Redevelopment Agency in Lynwood where Arman wanted to get in. Gloria finally agreed for the Golden Gate Theatre to be torn down and Arman got the deal. Karen has checks in the amounts of $14,940 and $8,050 written to Withers but states that the check is not in Tom's handwriting but the memo says Dodger Tickets and the Visa number is legitimate.

- Karen states there is a check for $112 to Jim Brubacker, somebody her colleagues describe as intimidating however Karen did not find him so when they would go to lunch, but Mr. Brubacker is probably person number six to put a gun on her.
- Karen states David Bond is involved, has PO Box 3878 in Calexico and Sarah Withers has PO Box 2374 in Calexico.
- Karen suggests we interview Bob Leselle in Lancaster and that he knows everything.
- Bryan requests copies of checks to Sarah Withers and tells Karen we are responsible to report our findings to our bosses and to produce results in a timely manner.

AA 01/24/18

| Interview Date/Time: | July 24, 2017 at 1:27 PM (18 minutes) |
| Interview Location: | Phone interview in Bryan W. Bell's Office |
| Investigators Present: | Bryan W. Bell, Supervising Investigator |
| | Amanda Andrews, Investigator |

Karen called with an update on releasing her information and indicated the following:

- Creating LLC management companies and receiving kickbacks.
- Everyone in Lancaster is afraid to give information because of Biddle's death.
- Scott Pelka knows where evidence is. She uses a fake name with him.
- Diana Beard Williams has evidence. Worked for Quartz Hill.
- Rogue FBI agent from Lancaster. Hired by Arman, a guy he was investigating.
- Carlos, Visco, Shepos would go to Vegas together.
- So much more I'm not telling you because advised it will go nowhere in the County because involved. Wants to share, appreciates what we are doing but has to recover money and protect herself.

AA 07/18/19

| Interview Date/Time: | July 27, 2017 at 12:35 PM (1 hour 7 minutes) |
| Interview Location: | Phone interview in Bryan W. Bell's Office |
| Investigators Present: | Bryan W. Bell, Supervising Investigator |
| | Amanda Andrews, Investigator |

Karen called with an update on releasing her information and indicated the following:

- Jalilel Dozier attorney in Washington.
- Lazy prosecutor on Chuck West.
- Visco and Parris trying Palmdale. Supposedly citizens of Palmdale. Trying to get Loa to be mayor. Rex Parris is best friends with Jack Lacey. Parris turned in Ledford, put in someone else.
- Lantz is silent partner.
- Steve Baker probably turn Frank in. Frank not happy with him. Voicemail.
- Cannot prosecute because ring is too big. Including Lancaster Sheriff.
- Isaac Becerra – Mental Health Palmdale. Tom working on this on camera will go to FBI with

O.C.I.
COUNTY OF LOS ANGELES

CONFIDENTIAL

it.

- Scott Pelka – Karen's fake name is "Sandra".
- Taking vacations with Michele Lantz with $2M he took from her.
- Hiding money in Logics Bank.
- Ken Wood worked on house. Will speak to us.
- Swift Realty. Tom is working with. Email RE annual stockholder's meeting.
- Douglass D. Abbey. Unsure related to Donald Abbey. Looked up companies that were on Tom's bankruptcy records. A lot of stuff to Tom from Doug Abbey for stocks.
- Tom hiding money in Macerieh (sp?).
- Tom hiding money with Lantz, daughter, and other people's LLCs.
- Sending stuff to LV, to Meridian.
- Rouge FBI agent's partner Andrew Stouffer. Bad guy now, was a federal prosecutor.
- Sam Aldridge of Don Abbey's company sent emails to Tom.
- Frank → KF LLC (King Funding?)
- Sam Aldridge paid vendors on Roscomare.
- David Bond (CEO RED) is involved.
- Something going on with Kendy Wilson.
- Abbey set up LLCs and paying him as property management/manager.
- Tom and Don both from Pennsylvania. Northrup, moved to Harrisburg.
- Thinks hiding money through chamber with Frank.
- Tom said he graduated from Catholic College but untruthful. Finally graduated St. Vincent.
- Tom knew about Don Abbey for years. He put 2 other corrupt developers with Abbey to get money.
- Taking over Palmdale first then Santa Clarita.
- Roger Hernandez from the County emailing Tom 'use this' and 'use that'.
- Note from Tom's phone appeared on her computer. "David Wilson." 2015. She printed.
- 1888 Century Blvd. Hired CPA for BK. Forensic. Pete Norrell looking into corruption.
- What about your people? You said Brian was not avail, called Ruth someone…. You should contact FBI in Westwood with done with investigation.
- 2012 check to David Bond. [OCI recalls check being small and was likely for Dr. Boris' appraisal?]
- Email King Funding LLC. Buy condo in cash. 1239 Rosecrans, Gardena. [This is CEO RED employee David Bond's condo.]
- Arranged rooms for stepdaughter's wedding. Thinks he paid for rooms. Karen looked him up. Involved in real estate.
- Tom's first job at Shell back East. Embezzled. Company let him go. Then he embezzled from Dr. Boris. Karen signed a second mortgage, her father was dying, said money back on sale of home.
- Tied to Gilley, Frank. Las Vegas #. Brad Creel old friend of Tom's. Bob Miller. Visco was the "whale". Believes Arman contacted.
- Alan Lipkin. Retired from IRS. Criminal lawyer. Visco is untouchable.
- Alan Lipkin spoke with Pete Norrell.
- Karen has piece of paper where Tom wrote down his Vegas trips and gambling while in bed with certain developers. (OCI received this paper.)
- Pete Norrell is a bad guy.
- Hearing back from qui tam lawyer in a few days.
- Isaac Moradi cousin of Alex Moradi.
- Alex Moradi and Arman Gabay are cousins.
- Admitted to $5k in 2009.

O.C.I.
COUNTY OF LOS ANGELES

- El Monte, Hawthorne. Flying with Arman RE SF properties.
- $4-8k mo deposits in Wells Fargo savings.
- Met Tom at City of Hope event in LV. Airport.
- Transposed social security number on records – fraudster.
- Plan is to work with qui tam attorney and have them organize her evidence then go to FBI together. She is entitled.
- Call Diana Beard Williams RE Lancaster. Ask her for docs.

AA 07/18/19

| | |
|---|---|
| Interview Date/Time: | August 16, 2017 at 10:55 AM (15 minutes) |
| Interview Location: | Phone interview in Bryan W. Bell's Office |
| Investigators Present: | Bryan W. Bell, Supervising Investigator |
| | Amanda Andrews, Investigator |

Karen called with an update on releasing her information and indicated the following:

- Did we get info on Carl Lee?
- Jerry Wise involved with Arman Gabay. Tom put Wise in touch with guys on Palmdale deals.
- Ken Harges grips golf gear – lawsuit with Visco.
- Manilla folder with writing of names and phone numbers.
- Unsure if he admitted to anything in writing on $5k. That's when he stopped trial and filed bankruptcy.

AA 07/18/19

| | |
|---|---|
| Interview Date/Time: | August 23, 2017 at 10:00 AM (15 minutes) |
| Interview Location: | Phone interview in Bryan W. Bell's Office |
| Investigators Present: | Bryan W. Bell, Supervising Investigator |
| | Amanda Andrews, Investigator |

Karen called with an update on releasing her information and indicated the following:

- Shepos took her business credit card. Went to bank kiosk. Took $12k cash advance from her credit card.
- He is giving money to developers. Drops envelopes off at people's houses at night.
- Working on a serious documentary. Mark Ridley Thomas, he is dirty.
- Exposing criminal of sober living houses, body brokering, drugs.
- Yolanda Vera CEO employee [OCI notes current County employee no longer with CEO and formerly with BOS.]

AA 07/18/19

| | |
|---|---|
| Interview Date/Time: | August 23, 2017 at 11:03 AM (27 minutes) |
| Interview Location: | Phone interview in Bryan W. Bell's Office |
| Investigators Present: | Bryan W. Bell, Supervising Investigator |
| | Amanda Andrews, Investigator |

Karen called and indicated the following:

- Karen sent Bryan Bell Bacara receipt. Says $5k gift certificate to Bacara was a present on 60th birthday in 2010. Never knew gift certificate was used. From someone he didn't want

O.C.I.
**COUNTY OF LOS ANGELES**

CONFIDENTIAL                                              COLA0169154

her to know about.

- Home Depot – other companies of Visco. One was from Squires and Sawyer Construction (worked on Roscomare, remembers the sons).
- Scott Pelka knows this stuff too. Stuff she doesn't have.
- Kenneth Hargis – KJH Development. 28824 Quickside Dr. Lives there. Development company. Owns Grips Golf Gear. Seen something from investigative reporter. Got something on Frank. Drew Palmoract sued.
- David Schaeffer – Texas trip.
- Visco $100k/mo grand deeded Chris Montana.
- FCG Schaeffer – Saturn golf with Frank. LLCs money laundering.

AA 07/18/19

| Interview Date/Time: | August 28, 2017 at 1:48 PM (16 minutes) |
| Interview Location: | Phone interview in Bryan W. Bell's Office |
| Investigators Present: | Bryan W. Bell, Supervising Investigator |
| | Amanda Andrews, Investigator |

Karen called and indicated the following:

- Jeff Kurtz. Shepos met in Gambling Anonymous (GA).
- John Carroll – works for Arman Gabay. Real estate transactions. Slimy guy but so is Arman. Shepos takes envelopes to people's homes. Three weeks ago daughter took pic.
- Going to Vegas with Arman (Arizona deals) and Visco. $18k $30k on a credit card. Visco borrowed $50k didn't want wife to know. Busted him. He claims he is a gambler.
- Met Kurtz in GA. Bad guys. Writing letters to guy in jail. Bob something. Michele Lantz is an alcoholic. Kurtz is a teller at a bank per her investigation.
- Kurtz giving gift cards and cash to Tom. Kurtz getting married. Maybe Tom getting married to Michele so can't turn states evidence against him. Lantz involved in Frank and Tom's fraud for 20 years.

AA 07/18/19

| Interview Date/Time: | August 29, 2017 at 5:45 PM (60 minutes) |
| Interview Location: | Phone interview in Bryan W. Bell's Office |
| Investigators Present: | Bryan W. Bell, Supervising Investigator |
| | Amanda Andrews, Investigator |

Karen called and indicated the following:

- Alan Lipkin – 2012 boxes.
- Advice of attorney – bankruptcy attorney uncovered $4-8k transfers in an account she did not know about. It was an account attached to a loan from the bank. Putting $4-8k cash in these. PMA. Tom told him Arman giving $5k cash but for many years 2009, 2010, 2011, 2012.
- To talk to criminal lawyer.
- DA DOJ Ronnie Catenstein. Fidler Institute – networking. Carlin. Nothing. Could not get him.
- Introduced to Brandon Fox at refreshments. Attorney they sent her to, if you are not going to go to DOJ, you need to work with a forensic accountant. $11k or suggest call Alan Lipkin. Retired IRS agent. Not an attorney.
- Not attorney client privilege. Gluck forwards to him. Told her your husband is going to

O.C.I.
COUNTY OF LOS ANGELES

prison. Nobody deposits $100k (CT Mgmt) while making $90k. They gave him bankruptcy.

- I went to court in 2012. Told her grant it to him. Woman commented to Karen, 'Nothing like a woman scorned.' Demanded take it to federal court. Made appointment for Alan and her. Met Alan in Sherman Oaks.
- Hatt, Yip (Judge).
- On our way traveling together, Alan gets a phone call and says 'Hey Pete. You're still working?' Pete has been hired by County to investigate real estate fraud. Pete indicates he received paperwork and stated, 'Arman Gabay and Shepos are in big trouble.' Indicates that he will probably be indicted. Alan says, 'Karen, listen to me very carefully. Pete Norrell has been hired to defend Arman Gabay. Pete wants to meet you.' Alan indicated Pete was like his son before.
- Pete was FBI. Alan was IRS, criminal investigator for IRS, worked on many mafia cases. They worked together.
- First fraud found in 1999. Conflict of interest.
- Paid him $10k.
- Alan saw all docs in her boxes.
- Pete knows everything.
- Steve Arciatti, lobbyist.
- Pete Norrell was fired by FBI, took government information. On Twitter. If you win, you get percentage.
- Bryan Bell tells Karen she can go to FBI. Replies all BOS are crooks. Designated person.
- Visco buys for a dollar. Rezones. Sells for $20/foot in a few years.
- Scott Pelka knows everything.
- DA Jackey Lacey. People in Lancaster will protect her. Jim Gilley, he is in bed with guys in charge.
- Deliver envelopes to developers on Saturday night.
- I was so in love, such a happy couple. A curse now. Post traumatic. Checks written people.
- Used to work for Arman? He didn't. I got Tom job with County.
- Baldwin Park Paul Cooked attorney. Knows what's going on. Took it to court. All paid off.
- Afraid to go to FBI.
- Older daughter is hiding money. She sent Tom letter. Direct deposit can be made to Bank of America.
- Willing to give evidence, waiting for qui tam lawyer.
- Going to talk to Robert Sharpiro.
- Letter Tom wrote sister. My friend at County Counsel this how he should write it up. Forfeit my 50% inheritance and give it to my sister.
- SMDA Amy Caves. Contract. Very close.
- Aura Frank.
- Look at Greg Haynes. Put in prison too.

AA 07/22/19

| Interview Date/Time: | August 31, 2017 at 12:00 PM (60 minutes) |
| Interview Location: | Phone interview in Bryan W. Bell's Office |
| Investigators Present: | Bryan W. Bell, Supervising Investigator |
| | Amanda Andrews, Investigator |

Karen called and indicated the following:

- Question RE wiretap. Recordings if she talked to Tom.

0.C.I.
COUNTY OF LOS ANGELES

- Karen busted Tom in 2010. Found more in 2012.
- County Counsel... Amy Caves to help him defraud her on money from her father.
- Lockheed Credit Union. Had massive loan. Money to date her. Dinner, money to live, kids schools.
- Marilyn Jenson. Defrauded her. Took him to court. He conceded. Brad helping him. His buddy in Vegas. He brought Frank.
- Encouraged Karen to talk to qui tam lawyer.
- Kurtz. Roommate. Gamblers Anonymous. In writing, one time Frank needed to borrow $50k. Diary. Moving into after 18 months.
- Kurtz – Chase Bank in Westwood. John Carroll. Not good guy. Arman's partner. Payment from Glitner Realty to pay Jeff Kurtz. Pay Kurtz and he gives it to Tom somehow. Visa/Mastercard. 30 cards. Not just gift. How Arman paid off Tom via Kurtz.
- Did same with Sarah Withers. She became a big wig. A former secretary. $25k to Withers, not Tom's signature. CT Mgmt checks. How Arman paid off Sarah. Obviously pattern and practice of Arman.
- Wither's now works for shoe company. If Bill Knight owns shoe company.
- Doing research by herself for 7 years.
- Wolf of Wall Street, Blue Jasmin, Bernie Madoff.
- Once or twice a year for their birthday. Bacara or Delmar. Going during County office hours.
- He had a lot of bills he paid with Amex. How did he get money to pay? What account?
- Gluck theory. Took money out of house put in CT Mgmt. Deposits along with loan deposits folded into developers doing it. $4-8k month. Wells Fargo account cash deposits. Has whole book on this.
- Karen busted in March 2010. Found $5k. Admitted it $900 - $4k payment on condo. Took payments.
- Why he fraudulently stopped trial. Bankruptcy attorney paid by Visco. Her theory. One is in New Jersey. Visco lives in Thousand Oaks. Visco has office in New Jersey. They visited. Phone call by Hannah Rose. #2 Brad Boch. Second bankruptcy attorney in Jersey. Doesn't make sense. Third bankruptcy attorney Alan Horowitz. Son in gamblers anonymous – Seth. [Shepos' largest deposit in CT Management BofA account was a check from Seth Horowitz on 8/8/2016 for $37,879.50.]
- Notes from Tom's phone appeared on Karen's computer. One note came up regarding guns. Theory – guns with David Schaeffer.
- Backed up on her computer. Tom infiltrated 8 months ago. She backed it up on hard drive.
- Has not seen any new notes from Tom's phone on her computer.
- Don Simpson. County employee. Involved.
- Visco hiding money. Taking out insurance. Cashes it in. Normal people don't do that. Voya – took insurance out. Got Voya insurance through Lantz. Opened a 457, treats as a savings account.
- Taking up collectibles.
- Tom's daughter indicated to Tom 'this is how you give me a direct deposit.'
- Open Scape. San Francisco.
- Why does he have so many insurance accounts?
- Karen mentioned Tom's first wife and a promise he made to her.
- 15030 Valleyheart Drive. Horowitz sold it to him. Deeding him property.

AA 07/20/20

O.C.I.
COUNTY OF LOS ANGELES

| Interview Date/Time: | September 12, 2017 at 2:00 PM (1 hour 45 minutes) |
| Interview Location: | Phone interview in Bryan W. Bell's Office |
| Investigators Present: | Bryan W. Bell, Supervising Investigator |
| | Amanda Andrews, Investigator |

Karen called and indicated the following:

- Karen working on eight-part series A&E – truth about sober living. Judges own facilities, orders drug testing.
- Working on panel of whistleblowers.
- 42 binders, getting close with qui tam.
- Tom used to take daughter to Laker games. Told her his developers gave the tickets to him. Karen told daughter to keep the tickets as developers names are on the tickets.
- Brad Salio, CA Capital Mgt.
- Hyrdo Scape Products – Roscomare invoices. Nittany Lions [Donald Abbey's company] was billed by Hydro Scape Products. They are based out of San Diego. Mentions Tom's affiliation with San Diego Credit Union.
- Developers paid for Roscomare construction with gift cards. 2006 & 2007 invoices. 12 gift cards, 4 Visa, 1 debit. Two cards ending 2250 and 5029. Karen to send handwritten sheet. (OCI received this.)
- Steve Baker – Visco is mad at him.
- Hyrdro System (661 area code?). Frank was paying Roscomare bills?
- Paying cash with Tom for a condo. Hiding money with Tom. King Funding contract. 2010. Ray Duran with World Market. Listing agent.
- Sarah Withers PO Box in Calexico
- Sober living layering.
  - 1239 W. Rosecrans Ave., #47, Gardena. Owned by churches. 2014 history includes phone number with one transposed number. $339k sold to King Funding LLC. Quick claimed.
  - 15030 Valleyheart Drive. Seth Horowitz as seller. Mark Ridley Thomas turning into sober living.
  - 1447 W. 20th St., Apt. 6, Los Angeles
- Offer from King Funding $84k in Tom's email.
- Los Tres Hermanos purchase.
- World Market Realty Ray Duran.
- Robin Sacks – friend of Karen's. Sandusky, Abbey will go down.
- Ed Roski, Majestic Realty. 99% sure he owns Wiltern Theatre. He's another Donald Abbey.
- Barry Ackermann – involved, in Tom's phone. Karen called his office and they said Oltman's Construction.
- Arnie P. – County?
- Majestic Realty Jacob Ackermann owner, Tom had many calls with
- Michael Roski – Ed's son
  - Seth?
  - Jerry Wise – is that who was in surveillance (taken by daughter?)?
  - Michelle Geller is married to one of Arman's relatives
- Karen is curious about Amy Caves.
- Baldwin Park, Section 8 voter fraud.
- Raymond Dick, Insurance broker at Visco's office.
- Tickets from developer, looked up Wiltern Theatre, found Roski.

O.C.I.
COUNTY OF LOS ANGELES

- Johnny Merritt.  FCG Castaic.  David Schaeffer.
- Tim Moore, Okada.

AA 07/21/20

| Interview Date/Time: | September 20, 2017 at 3:50 PM (40 minutes) |
| Interview Location: | Phone interview in Bryan W. Bell's Office |
| Investigators Present: | Bryan W. Bell, Supervising Investigator |
| | Amanda Andrews, Investigator |

Karen called and indicated the following:

- Two people came to Karen's door.  Pete Norrell (rogue FBI agent, hired as PI to investigate corruption in Planning & Zoning, like a son to her attorney Alan, indicated Shepos was a bad guy and is in trouble 2 years ago), whom she previously met through her attorney Alan.
    - o Pete hired to help Arman Gabay.
    - o Thomas O'Brien – defense attorney, big time lawyer, Fidler Institute.
    - o Asked her how she knew about Tom.  Told them because he told me, and I found $5k.
    - o Brian Bell indicated they are setting up defense for Arman Gabay and could say Tom used him too.
    - o They were there for a half hour.
    - o Told them she was approached by the County and she spoke with someone named Bryan (with a y) and did not know last name.
    - o Brian Bell encouraged Karen to talk to FBI.
    - o They alleged Tom was involved in "converting" money and claimed that she is a victim like Gabay.
    - o They repeated five times they were representing Arman Gabay.
    - o Brian Bell again encouraged Karen to go to FBI in Westwood.
    - o Karen mentioned, "Bribery, kickback, taking money from a furniture vendor."
- Keep Karen as anonymous as possible.
- Brian Bell again encouraged Karen to go on record and indicated he was not an attorney and should not advise.  Brian indicated she has been helpful and steered us in the right direction.
- Karen submitted information to qui tam lawyer on Friday.  Waiting to see if they will take case.
- 1888 Century Park East.  Gabay guy.  Used to work for him.  Found it 2 years ago.
- Karen would like to provide no bid contract voicemail and Tom's phone.

AA 07/21/20

| Interview Date/Time: | September 21, 2017 at 3:50 PM (30 minutes) |
| Interview Location: | Phone interview in Bryan W. Bell's Office |
| Investigators Present: | Bryan W. Bell, Supervising Investigator |
| | Amanda Andrews, Investigator |

Karen called and indicated the following:

- Shaken up after men visited yesterday.  Pete Norrell got off because his father is a Judge.
- They told her bribes, kickbacks, money laundering, and using other people's real estate license.
- Helping Tom launder money:
    - o Neal Keneth – Gabay guy

O.C.I.
**COUNTY OF LOS ANGELES**

- o  Mike Gellar – Gabay connection and on Tom's phone.
- o  Seth Horowitz – helping Tom, 15030 Valleyheart Drive.  Coins.  Baseball paraphernalia.
- Robert Rodriquez, Coldwell Bank.  On Tom's phone.
- Michele Lantz's daughter Marisa – Logix Bank.
- David Schaeffer, owner, Texas.  Works with Johnny Merit.  Quick claim.
- Viridian [Shepo's outside business on 2013, 2014, and 2015 tax return.].  Solar company.  Tom's bankruptcy.  Made payments to Viridian.  Deep web.

AA 07/21/20

| | |
|---|---|
| *Interview Date/Time:* | *January 31, 2018 at 2:30 PM* |
| *Interview Location:* | *Karen Gluck's Residence* |
| | *1925 Montana Ave., Apt. 5* |
| | *Santa Monica, CA 90403-1966* |
| *Investigators Present:* | *Bryan W. Bell, Supervising Investigator* |
| | *Amanda Andrews, Investigator* |
| | *Pollie Pent, Detective, CA Department of Insurance* |
| | *Randy Hudson, Investigator, CA Department of Insurance* |

OCI met with Detective Pollie Pent, Investigator Randy Hudson, and Karen Gluck at her residence.  Karen provided a background of the fraud she uncovered since March 2010 and copies of documents.  Karen indicated the following during our interview:

- Her father passed away in 2008 while they were building house on Roscomare.
- Furniture vendor dinner.  There is a female employee number in Tom's phone.
- Arman Gabay, House of Blues with Tom, and brother's funeral.  Arman at delivery room where she met him for the first time.
- Visco called when they were building house in 2003, 2004, or 2005.  Visco just bought a car and wanted to take Tom for a drive on a Sunday.
- Went to Vegas for Superbowl.  Brought daughters.  Good friend – Brad Creel (Beth & Brad) in his phone.  Started going on trips to Vegas with Visco.
- Visco is dismissive of women.  Visco possibly interested in Tom.
- Health hotel in Thousand Oaks.  Four Seasons?  2007 dinner with Visco and Shepos for Karen's 50th birthday.  Met Sharon before.  Visco betting $1M/hand in cards.
- Foot massage – Beth Creel.
- Visco asks Shepos if he wants to see Lantz (during Vegas trip).  His head was down.  Said no.
- Tom's 60th birthday at Bacara in January 2010.
- Buyer pulled out of Roscomare purchase in 2008 when market crashed.  Jay Z's partner bought.
- $18k (credit card transaction).  Tom admitted to going to casinos with Visco & Gabay.  Asked Karen if she was going to get him in trouble.
- Karen has handwritten list from Tom admitting the times he gambled.  (OCI received this.)  Tom says Frank Visco borrowed money.  Doesn't make any sense.  She made Tom call Frank.  Tom says to Frank, 'She knows.'  March 2010.  Tom claimed he was working on a big project with Frank and asked to give him till Sept/October.
- Tom became emotionally abusive to their daughter.
- Encouraged to get divorce even if they stayed together.  Tom moved out 2011.  Karen didn't find boxes [in joint storage] until 2012.
- Karen is preparing a timeline.  48 years of fraud.  Tom kept it all.

O.C.I.
COUNTY OF LOS ANGELES

- Tom changed his social security number with casinos – 7377 changed to 7739, 7337.
- Karen tried for divorce in 2011. Tom stops divorce by filing bankruptcy. Her divorce trial would have put developers away [see Request for Admissions document from her attorney].
- Karen changed locks on storage unit in 2012. Still one box she has not gone through.
- Pollie requested copies of all insurance documents.
- Jim Gilley. Lives in Henderson. Baptist Church. Pedophilia.
- Bankruptcy attorneys – who paid Tom's bills?
- Where is money? British Islands. Metal box in house. Marissa (Lantz's daughter).
- She demanded it go to feds after discussing with Patty at DOJ Federal Bankruptcy Court. "Woman scorned." Hatti is assistant.
- Discussed Department of Insurance obtaining copy of computer and what was deleted.
- TN. Visco has new business. Brent Wood.
- David Schaeffer [owner of Castaic FCG Properties, LLC] – payments to Viridian in bankruptcy to Castaic.
- Tom is conduit. Paying Sarah Withers, Gabay. Per Pollie, LLC would make payment. Money transmitter. Non reducible felonies.
- Karen has 15 boxes from storage.

AA 07/21/20

| Interview Date/Time: | May 24, 2018 at 1:10 PM (50 minutes) |
| Interview Location: | Phone interview |
| Investigators Present: | Amanda Andrews, Investigator |

Karen called and indicated the following:

- Barger ordered lease review. She is very tight with Visco and Rx Parris.
- September 28 hearing – child support or spousal.
- Withers was secretary to Arman Gabay.
- Wade Sawyer and wife Bonnie – involved in Roscomare. Tom sold Wade Jaguar. Also involved Wade's father. 2007 invoice.
- Royal Investors Group – Gabay and Visco. Ohana Resorts.
- Melanie Star Barger – Tom gave money to this person at night at their home. Someone took pictures of him doing it.
- Both Tom's daughters involved.
  - Kristen is the oldest. Tom was bused in March 2010. Looked like he had no money. He bough car worth $4k. But giving her checks in 2012. Direct deposit to her account.
  - Tracey Cenami. Has little boy. Bill Folley Wineries. She is chef. January 2018. Ohana, Folley. Heldsburg. Home in Santa Rosa.

AA 07/21/20

O.C.I.
COUNTY OF LOS ANGELES

CONFIDENTIAL                                                        COLA0169161

EXHIBIT 14

| From: | Andrews, Amanda |
|---|---|
| Sent: | Monday, January 22, 2018 9:15 AM PST |
| To: | Bell, Bryan |
| Subject: | Background Info |
| Attachments: | The AV Times - 2015-09-24 Readers Speak Out Blog (EXCERPT OF HIGHLIGHTED ITEMS).pdf, The AV Times - 2015-12-24 Readers Speak Out Blog (EXCERPT OF HIGHLIGHTED ITEMS).pdf, The AV Times - 2016-05-23 Readers Speak Out Blog (EXCERPT OF HIGHLIGHTED ITEMS).pdf |

Hi Bryan,

I drafted this email to send to Pollie and Randy.  Please let me know if okay to send.

Hi Randy and Polly,

We did a due diligence background review of the blogs/articles found on the internet from The AV Times.  Specifically, we searched the articles for Shepos, Visco, and Lantz and highlighted relevant references to these individuals (attached for reference).

We did not discover any new findings related to our investigation, however we noted the following background information:

- David Schaeffer [of Castaic FCG Properties, LLC} mentioned several times as one of Visco's "boys" and "partner" and is involved in no-bid deals with Tom Shepos.  (The AV Times - 2015-09-24 Readers Speak Out Blog.pdf)
- Antelope Valley 'Fern Street Mafia" includes Rex (Mayor), Visco, and Jim Gilley.  Tom Shepos is mentioned as a silent partner of the Fern Street Mafia.  (The AV Times - 2015-09-24 Readers Speak Out Blog.pdf)
- Kickbacks alleged in the AV Valley and "real estate deals… reek in corruption and kickbacks.  Bidding on real estate contracts against Frank (and he's got Shepos in his pocket still!) made it impossible for other developers like me."  (The AV Times - 2015-09-24 Readers Speak Out Blog.pdf)
- Visco started the Antelope Valley Republican Association.  (The AV Times - 2015-12-24 Readers Speak Out Blog.pdf)
- Michele Lantz mentioned as one of Visco's loyal employees and minions.  (Various AV Times Blog pdfs)
- Shepos and Lantz observed at Fremont Hotel in Del Mar.  "I would wager that the trip was paid for by the Godfather himself, Frank 'Putty nose' Visco.  I'm sure good ole Tommy boy Shepos couldn't afford it.  After all, he' gone bankrupt twice, screwed a couple of wives out of millions and was even a bigamist."  (The AV Times - 2016-05-23 Readers Speak Out Blog.pdf)
- Noted that one of Shepos' biggest critics in the Antelope Valley, a guy named James P. Biddle who was a former town councilman, was found dead in his home on September 1, 2016.  LA Coroner is investigating.  Following statements found in The AV Times - 2016-05-23 Readers Speak Out Blog.pdf:
  - Biddle states in his July 20, 2016 blog "More on the Unholy Trinity and their stooges to follow.  If anyone out there has any documentation, I'm preparing a case to take to the DOJ.  I don't think they own the Justice Department, yet."
  - Biddle states in his July 21, 2016 blog "I am working on follow up articles… that I can present to DOJ when the time comes."
- Visco is part owner of the Law Enforcement Aerial Platform System (LEAPS).  (The AV Times - 2015-12-24 Readers Speak Out Blog.pdf)  Google search revealed this system is used by LA County Sheriff and

COLA0170275

designed and integrated by Spiral Technology Inc for AeroView LLC.  We do not see a direct correlation to Shepos/Visco real estate fraud allegation.  Pass further analysis.

Thank you.

**Amanda Andrews**
Investigator



Office of County Investigations
Department of Auditor-Controller
County of Los Angeles
Phone: (213) 893-0588
Fax: (213) 633-0991
Email: aandrews@auditor.lacounty.gov
Website: http://auditor.lacounty.gov

CONFIDENTIALITY NOTICE: This e-mail, including any attachments, is intended for the sole use of the named recipient(s) and may contain confidential and privileged information pertaining to official investigations for the County of Los Angeles, California. Any unauthorized review, use, disclosure, or dissemination is prohibited. Distribution of the e-mail and any attachments are subject to Federal, State, and County regulations pertaining to law enforcement communications.  If you received this e-mail in error, please notify the sender, permanently delete this e-mail and all attachments from your system, and destroy all printed copies of the e-mail.

Ole Rex you double talker , diesel fuel is fossil fuel and it ain't as clean as natural gas. What a hippocrite.

Anon says
November 27, 2015 at 10:13 am

Anyone who votes for Parris is complicit in his corruption, ineptness, wasteful spending, and lunatic ideas. You should all be ashamed of yourselves.

RC says
November 27, 2015 at 1:30 pm

You can thank Lancaster Baptist Church for putting him in office, and it also does not help having city elections on off cycles from state elections. people are to lazy to go and vote for the small town crap.

James P. Biddle says
November 27, 2015 at 3:47 pm

King Rex has a plan up is corrupt sleeve. Behind this you will find the usual suspects (The Fern Street Mafia.) Any business Corrupt Rex brings in will only benefit The Good ol' boys and the Fern Street Mafia.

Let's not forget–Ol' Rex and his cronies from LBC keep him in business. While I'm not of the Christian faith and one of the reasons is I look at their behavior (Rex's, the Fern Street mafia, LBC and Paul Chappell) and have no desire to be a part of any organization that would have Rex as a member.

College Grad says
November 30, 2015 at 1:01 pm

We hope you will someday write a book about all the antics going on around here.

Riley Jones says
December 14, 2015 at 1:02 pm

Other bloggers have suggested the same. That would be great Mr. Biddle. Write a book!

Riley Jones says
December 14, 2015 at 12:56 pm

Yes, the King and his cronies Visco/Gilley and their ole boys Tom Shapos, Paul Chappell, David Schaffer and probably half the county and city council members. T. Rex in China? Isn't their an express train deal coming? Who is going to get contracts? bid or no bid, just like Mr. Biddle has said the companies owned by the Visco/Gilley.

CONFIDENTIAL                                                                  COLA0170277

Union Worker says
November 11, 2015 at 7:00 pm

Pirnurns, while I disagree with your views on oil and fracking, I could not
agree with you more on your assessment of Parris and the blind believers at
Lancaster Babtist. He is as corrupt as they come and yet Chappell toes the
line. Hopefully Rachel Maddow or someone will take a look behind the
curtain. There has been more money deals in total dollars then what
happened in Bell.

Joe says
November 12, 2015 at 3:56 pm

Yes Yes Yes...Rachel Maddow, or how about the new clean up guy there Max
Huntsman? Or just contact the local DOJ...let em investigate the whole
bunch starting with T. Rex, Frankie Visco and his boys Tom Shepos, Marvin
Crist, Greg Hanes, David Schaeffer and all the county and city officials in
with these guys. Do It. Wish I had years ago. I just left. Talk to JP Biddle,
sounds like he knows where the bodies a.... er.... I mean dirty deals are
buried. Squeeky wheel?

Jason Zink says
November 10, 2015 at 8:01 am

No one lives in East Lancaster on the council even though Perris appointed two new
members to the council and didn't bother to see that the Eastside had representation.
Lancaster citizens demand districts. It's up to U for your voice to be heard at council
meetings.

Tim Scott says
November 10, 2015 at 8:19 am

You could always sue the city. I hear there is an attorney in Lancaster who is so
dedicated to voter's rights that he handles that sort of case all the time. Rex
something.

Son of the Anti Rex says
November 10, 2015 at 9:56 am

you have to be special scum to bring a lawsuit like this against a city. there
are very few of them and one sits behind a mike on the second and fourth
tuesday of the month. it is doubtful that he would sue his own city despite
the obvious fact that only white west siders get elected. when he wants to
diversify he appoints west siders who are yes people. he also believes that
ron smith was the choice candidate of the minority voters. that is in addition
to believing birdie noises keep crime down and a spy plane drives bad guys
out. there is either something in the air or water here.

Then, poor marv will be stuck with the clean up if that is even still possible.
Poor marv probably doesn't even see that a-comin'.

Does poor marv even have a second home to re-locate to?


Tim Scott says
November 12, 2015 at 2:33 pm

He'll follow in Rex's steps. No cleanup for Marv. He'll just drain the coffers
into his pockets long enough to move next door to Rex down by the shore
and they'll laugh together about the good old days.


Joe says
November 12, 2015 at 3:21 pm

Comment The AV has been going down hill and bringing the nearby cities
with them. Thanks to the Fern Street Mafia, county corruption, outrageous
lawsuits and monies being spent on to eye in da sky....


Tim Scott says
November 12, 2015 at 3:32 pm

Joe, you do realize that everything you said applies to Lancaster, not "the
AV", right? The AV includes one of the most consistent award winners the
League of California Cities has.


James P. Biddle says
November 10, 2015 at 1:12 pm

As soon as ole King Rex leaves office, he will sue the s# #t out of Lancaster. Let's not
forget how many lawsuits he filed against Lancaster before he was Mayor. But thanks
to LBC and it's leader Paul Chapell, he wins elections.

Greed rules every time, King Rex is the King of greed.


joe says
November 11, 2015 at 4:03 pm

Kickbacks in the AV? T. Rex? Frank Visco? Jim Gilley? Tom Shepos? the other silent
members of the Fern Street Mafia? County employees? Council Members? Lawsuits, real
estate deals, or other companies these boys are affiliated with reek in corruption and

CONFIDENTIAL                                                              COLA0170279

kickbacks. Bidding on real estate contracts against Frank (and he's got Shepos in his pocket still) made it impossible for other developers like me. That's why I left.. still love reading the blogs after all these years. Biddle's the best.

Anon says
November 11, 2015 at 7:02 pm

Yes James Biddle is a light in this dark valley. I hope he writes a book.

Joe says
November 12, 2015 at 3:35 pm

Yes a book J.P! then a movie, and maybe Frankie V. will want to produce it. Oh that's a bad idea his movies are all flops. Seriously, this town and its years of back door deals, non transparency and obvious corruption is worse than the Bell scandal and I believe lala land is making that a movie.

William says
November 9, 2015 at 8:39 am

Thank you to The AV Times staff for closing comments on the article about the business and the church and respecting the family's request.

Hopefully, such articles involving families of victims shouldn't have a comment section available as they tend to deteriorate into harmful and insensitive comments..

There really is no need for open discussion on such sensitive articles in the first place. . It's also amazing how an article on even a traffic accident generates so many comments from people who weren't even there as participants or witnesses.

Ben William ... says
November 12, 2015 at 5:53 am

Maybe, then, the AV Times staff should just close comments, period.
99.9% of articles on this site breed ridiculous comments and responses.
But then, William, what ever would you do to fill your days?

William says
November 12, 2015 at 8:55 am

@Ben William

There are many issues that invite and are designed for debate/discussion such as local and national politics and how we are governed in a democracy.

But, apparently that is lost on you.

This is the first time I've noticed your username here and you wasted it on such a comment as you did. Better luck next time.

CONFIDENTIAL    COLA0170280

Just Saying says
November 4, 2015 at 8:13 pm

Anybody that thinks they helped in stopping the roundabout at Lancaster Blvd and 10th St W, it
looks like we've been had. Turns out that construction started quietly and aggressively 2 weeks
ago at Challenger and L, with streets closed off in all 4 directions. It took a trek on foot to get
close enough to see the curbs already in place for a traffic circle. I had noticed traffic counters
across those roads early in October, but didn't think much about it. I guessed maybe a widening
in the next 6 months. I was wrong. My guess now is it's the Fern Street Mafia getting that old
roundabout money spent before the year is over and it is rolled against the 2016 budget.

AV Observer says
November 3, 2015 at 1:09 pm

First, R. Rex Parris endorsed Rick Perry for president. I immediately crossed him of the list.
Now, Parris' pastor/political supporter/prayer partner Pastor Paul Chappel of Lancaster Baptist
Church is endorsing Ted Cruz. That takes another one off my list. I wish these two yahoos would
go down the rest of the field in both parties and tell us who they endorse and who they don't.
That'll help narrow down the field.

https://www.tedcruz.org/news/ted-cruz-announces-endorsement-of-key-baptist-leader/

Tim Scott says
November 3, 2015 at 1:22 pm

Imperious Rex was probably angling for a position on Perry's defense team. His case in
Texas should be coming up soon.

James P. Biddle says
November 8, 2015 at 1:25 pm

When I was a reporter, I obtained all the financials for all candidates and contributors. King
Rat, uh, . . .er, ...Rex and Frank Visco, Jim Gilley, et al, all donate to all candidates and to
both parties. No matter who wins, they win. We-the people lose. That's how the game is
played.

Joe says
November 11, 2015 at 4:25 pm

You know it! I have followed you for years. Examiner, Town Crier! Why and how is the
corruption of a few still so prevalent in the AV even after the Bell Scandal? What do
you know about this Tom Shepos? When I googled him I found he lived in Nevada in
1991 with his wife Mikki Barrows. Did he know the Fern Street Boys back then?

Riley Jones says
December 14, 2015 at 1:52 pm

Joe, I knew Tom Shepos in the late 90's and he was married to a Katherine
Shepos and had two daughters. Accordingly to a google search he was married to
both at the same time for almost a year. I guess he does belong with Gilleys
church...don't they believe in bigamy? He is the same guy pictured in a photo with
Frank Visco at a 2007 heart foundation fundraiser. He apparently has been Frank
Viscos county real estate person for many years and many county real estate
projects.

Turd Ferguson says
December 14, 2015 at 2:52 pm

Frank Visco is an owner of LEAPS.Frank Visco is an owner of LEAPS.LEAPS is
the piece of turd spy plane that catches Wal-Mart shoplifters and not much
else.LEAPS is the piece of turd spy plane that catches Wal-Mart shoplifters
and not much else.All for the low price of $90,000.00 a month.All for the low
price of $90,000.00 a month.For ten years.For ten years.That is
$10,800,000.00.That is $10,800,000.00.In tax payer dollars.In tax payer
dollars.That Rex is sending to his political contributor Frank.That Rex is
sending to his political contributor Frank.While our crime goes up.While our
crime goes up.While our streets are crumbling.While our streets are
crumbling.While our stores are closing.While our stores are closing.While our
BLVD is filled with homeless.While our BLVD is filled with homeless.No to
LEAPS.No to LEAPS.

pirrurris says
November 2, 2015 at 6:13 pm

More bad news for republicans. The keyston pipeline is not happening. I think it is time to start
pushing for passing the jobs Bill, but everyone knows that as long as we have a do nothing
republican controled congress...that is not going to happen.

Union Worker says
November 3, 2015 at 7:14 am

That's not bad news for Republicans. That's bad news for the workers who would have built
the pipeline.

pirrurris says
November 3, 2015 at 8:10 am

Union worker, please stop with your nonesense. If you were really concerned about
union jobs, you would be outraged at republicans for not passing the jobs bill. I also
think that any union worker that votes for republicans, want to get rid of unions (Scott
Walker) should get kicked out of the union and start getting paid the regular minimum
wage.

Tim Scott says

James P. Biddle says
October 13, 2015 at 12:48 pm

The broken windows were caused by employees of the King Rex and Frankie V's window
repair service. There was a business card taped to the rock that went thru the window.

———————

Between the spy-in-da-sky, birdie sounds, and Rexville being a Christian city, there is no
crime. Therefore no broken windows. You must've been in Rosmond not Rexville.

Joe says
October 15, 2015 at 4:24 pm

Completely corrupt. What "other" businesses does Visco own?
The gang will run out the ma and pa liquor stores under the guise of controlling the
drinking problems? Then open their own!

James P. Biddle says
October 17, 2015 at 4:48 pm

Frank V owns an insurance company, eye-in-da-sky, he's a movie producer, and
has his hands in numerous development schemes.

He contributes to most candidates running for office that effects his operations.

His biggest scams, along with Jim G. is to buy land zoned rural for let's say $0.25
a sq. ft. Then has his cronies change the zoning to commercial. Now that same
piece of land is worth $10.00 a sq. ft. Nice profit.

They, either develop it themselves, or sell it to another crony developer and keep
a piece of the action.

Frank V gets numerous no-bid contracts (basically illegal, except that bids are
rigged so that only Frank's company qualifies. This is right out of the Halliburton
playbook.

William says
October 18, 2015 at 2:28 pm

@James F. Biddle

Do you know the details of the land purchase, selling it to Walmart and the
rezoning at the location across from Quartz Hill High School?

That whole thing stunk to high heaven yet seems to go unnoticed or be
forgotten.

I've said it over and over that the 'Christian community' of Lancaster would
get the sales tax revenue and Quartz Hill would get all the problems but no
benefit. If that's how a 'Christian community' acts, count me out.

BTW Is that Walmart still going to be built. I drove by there recently and
there are no signs on the lot.

No Quartz Hill Walmart says
October 18, 2015 at 9:30 pm

Was Visco also involved in the shady deal on the property across from Quartz
Hill High School? It is pretty disgusting that Jim Vose sold the land when it
was still residential, made a hefty profit, and then as a planning
commissioner voted to rezone it as commercial. That's how it works in
Lancaster. It always works for Rex's friends and the people always get
screwed.


James P. Biddle says
October 20, 2015 at 12:47 pm

The chair of the Planning Commission (whose name eludes me at the
moment (a senior thing) Was real estate director for Wal*Mart. Jim Gilley
(Then City manager (and partner with Visco) arranged the land purchase
years ago. It was hush-hush.

Once the plan went public, Rexville made all kinds of monetary deals with QH
High School for numerous improvements and other goodies.


Joe says
October 20, 2015 at 2:27 pm

Had to laugh. I knew of Franks many other companies years ago when I
lived there. Movie Producer? No wonder he has to make money on other
schemes to pay for his failed attempt in the Hollywood movie business.


Joe says
October 20, 2015 at 3:07 pm

It appears that one of the other county real estate schemes with the Fern
Street boys is having another entity or developer do the "deal". Then a grant
deed is put in place with the good ole boys eventually getting the deal. Not
sure, but it appears through documents on line, that the Castaic Library
Project went that way. Anyone know?


Mr fed up says
October 9, 2015 at 9:56 pm

What's going on around Lancaster, with all the businesses with broken windows, theses
criminals need to be stopped, wait we can't cause the lawsuits staes the sheriff's department
can't stop anyone, Tim Scott! We wait for your sarcastic responses to being wrong, I.e.blaming

LEAPS is like teets on a bull
LEAPS is on empty when full
LEAPS steals tax payer dough
LEAPS and Rex they both gotta go

William says
October 13, 2015 at 5:06 pm

LEAPS is as useless as an ashtray on a motorcycle.

Joe says
October 15, 2015 at 4:31 pm

Leaps is very useful to Visco/T.Rex it's their private bank!

James P. Biddle says
October 18, 2015 at 1:44 pm

Good ole Frankie boy developed the Eye-in-da-sky for profit. They use the
City of Rexville for proof of concept and to push the prototype. The plan is to
license the tech to other cities.

To do this they need to have stats proving that crime is down thanks to the
eye-in-da-sky.

As soon as King Rex leaves office, his stock in the 'eye' will revert from a
proxy to his portfolio.

The Fern Street mafia turns a nifty profit year after year after year.

Now the gang wants to control Rosamond. They sent good ole boy Ronnie
there to run the place.

I'm sure Frankie V and Jimmy G are already setting up real
estate/development deals.

Joe says
October 20, 2015 at 2:54 pm

Your right J.P. I'm sure development deals have been in place for a long
time. They'll probably take care of there loyal "friend" Tom Shepos for his
many years of "good deals." he provided them. Do you know of his other
county clients? Think I'll sit with google tonight. I'm curious.

Idiot Police says
October 23, 2015 at 6:29 pm

Rex makes as much sense as a Kamikaze Pilot wearing a helmet.

CONFIDENTIAL                                                          COLA0170285

William says
October 5, 2015 at 1:24 pm

If they surveyed Palmdale residents, I wonder what percent would favor a merge
with Lancaster.

I'm guessing 0.000000001% or less.

What would Palmdale benefit from a merge with Lancaster....the blvd? LOL

> AV Observer says
> October 5, 2015 at 3:12 pm
>
> You have to be nuts in the head or one of the good old boys to want to
> merge with Lancaster. It could work if you could get rid of the Parris-Gilley-
> Visco Triune, but they're not going anywhere. There's too much easy money
> to be made.

Tim Scott says
October 5, 2015 at 5:07 pm

I can't think of any approach that would convince a single resident of Palmdale to
support such a merger.

Joe says
October 7, 2015 at 1:10 pm

LOL! Biddle you've always made me laugh, and always right on the spot! Probably
already know the Ferris Street Mafia has expanded into Quartz Hill...yet another
county real estate deal made possible for Visco and his "partner" David Schaeffer
by Tom Shepos of the LA County. All on line, google is great, since I left years
ago...

> Son of the Anti Rex says
> October 7, 2015 at 1:32 pm
>
> Joe, is this the Tom Shepos of who you speak?
>
> http://state-employees.findthedata.com/l/6135929/Thomas-J-Shepos

> Joe says
> October 8, 2015 at 2:09 pm
>
> Yep, that's the one.

CONFIDENTIAL                                              COLA0170286

Son of the Anti Rex says
October 8, 2015 at 2:29 pm

How is he tied in to the Visco-Parris-Gilley Triune?

Joe says
October 8, 2015 at 3:28 pm

He is the county real estate person responsible for county real estate
projects and Franks long time friend, and apparently one of the good ole
boys. Good for Frank and his gang to have someone on the inside as Frank
always seems to do. Bids, no bids, Frank gets the gig. That's why I left the
AV. Corruption. Lancaster looks like the City Of Bell...on steroids. I hope for
the sake of all you still living there, that the corruption gets exposed.

seer says
October 8, 2015 at 4:15 pm

Good joe, if they left a paper trail.

James P. Biddle says
October 9, 2015 at 6:28 pm

The main difference between the Bell corruption and Lancrapsters is; Bell
Mafia was greedy and stole from the general fund. Big mistake--jail.

The Fern Street mafia make their money on no-bid (illegal) contracts. Plus
they contribute to ALL candidates thus garnering friendship of all.

Don't bet that the fern Street mafia won't merge with Pamdale. king Rex can
sue them into bankruptcy and the only way out would be the King riding in
and rescuing the good folks of Palmdale by merging them with Lancrapster
(Rexville)

Don't bet that king rex doesn't amass his army and fit the spy-in-da-sky with
missiles and take over Palmdale that way., The Cactus Curtain war.

James P. Biddle says
October 10, 2015 at 10:48 pm

The main difference between the Bell corruption and Lancrapsters is; Bell
Mafia was greedy and stole from the general fund. Big mistake--jail.

The Fern Street mafia make their money on no-bid (illegal) contracts. Plus
they contribute to ALL candidates thus garnering friendship of all.

Don't bet that the fern Street mafia won't merge with Pamdale. king Rex can
sue them into bankruptcy and the only way out would be the King riding in

and rescuing the good folks of Palmdale by merging them with Lancraoster (Rexville)

Don't bet that king rex doesn't amass his army and fit the spy-in-da-sky with missiles and take over Palmdale that way., The Cactus Curtain war.

Joe says
October 15, 2015 at 4:56 pm

There is always a paper trail and people who know, they just don't come forward and should. Where there is smoke there is fire. Visco, Gilley, T.Rex, T. Shepos, David Schaeffer...construction and property management deals and no-bid contracts. Didn't work out too well for Barbara Byrd-Bannett, of Chicago who just got busted for kickbacks and other conducts...read articles. Maybe anyone who knows anything should contact Max Huntsman...I heard he is a great guy.

William says
October 4, 2015 at 2:38 pm

@AV Observer

Yes, I've pointed that out countless times about rex since he 'took over' the mayor's office and city council in Lancaster.

Apparently, a majority of residents in Lancaster don't care, aren't voting and/or not going to council meetings and offering legitimate complaints to those in charge.

What else is there to do? I live in Palmdale and I predicted the failure of the blvd and rex's leadership in general years ago. It wasn't hard if anyone paid any attention to what was going on.

I just don't get the apathy of so many Lancaster residents when a city of over 150,000 has so little going for it while a city next door is booming, hasn't had its credit rating lowered and has better numbers in nearly every measuable category from unemployment to crime stats to property values.

I wish Lancaster was doing better and was also a better neighbor as that would enhance the entire Antelope Valley, but until rex and his minions are gone, it will continue to decline. And, that's predictable.

Joe says
October 8, 2015 at 3:45 pm

Lancaster will never do better, except for Visco-Gilley-T. Rex and the boys behind them and their "deals". Sorry, that's the truth.

CONFIDENTIAL                                                              COLA0170288

William says
October 4, 2015 at 2:42 pm

@AV Observer

As for Claire, the long standing solution to offensive 'free' speech is more free speech.

That's why Claire is being replied to so often.

pirrurris says
October 6, 2015 at 8:24 pm

I say it is the Lancaster Baptist chirch that keep voting for him.

joe says
October 7, 2015 at 12:39 pm

Spy plane/LEAPS = money for Visco/Rex/Gilley
Lawsuits by Rex=MONEY for Rex
Yes men= a laundry list...Marv Crist? Tom Shepos?

james P., Biddle says
October 8, 2015 at 4:23 pm

AV, you seemed surprised by Rex's schemes. he's there to support himself, Visco and Gilley
(and all the rest of the Fern Street mafia. If you're not a member of the LBC Mafia, please
leave town. If you're NOT a Christian, please leave town. Do it now. If you don't support
King Rex--please leave town.

pirrurris says
October 4, 2015 at 9:54 am

Claire, you never told me how much you made or where you worked before retiring, and getting
that ugly socialist program called social security. I bet you are one of those hypocrite greedy
republicans, that always made more than the minimum wage, and is now complaining about
other people getting a raise. Also, you keep saying that this is going to be bad for business, but
those businesses never complained when they were making record profits, all those decades
that the minimum wage was not raised. Also, if the businesses can afford to pay their CEO's
millions in bonuses every year, they certainly can afford to pay their employees (the ones that
are making them rich) a pay raise.

Claire says
October 4, 2015 at 11:14 am

Couldn't agree more.

James P. Biddle says
September 29, 2015 at 1:46 pm

Clearly the new appointee to the City Council will be one that is favorable to the Rex, Visco,
Gilley clan,aka the Fern Street mafia.

joe says
October 7, 2015 at 1:45 pm

Yah...All in he family...nothing has changed in years. Where is a George Theophanis when
we need him? Remember the Lancaster Redevelopment Agency (which members were the
same as the City Council)would have loaned Visco 1.5Million to acquire land for a new
courthouse in 1989? The proposal was attacked as UNFAIR TO OTHER DEVELOPERS (like
me)and then Visco abruptly withdrew a proposed agreement. How did the recent Quartz
Hill Library project happen with the county?
Is this another Visco county deal handled by Tom Shepos ?(LA County Real Property Agent)
is Tom Shepos the silent member of the Fern Street Mafia? He sure spent a lot of time in
our city over the last ten years. I would see him ALL over the AV ALL the time with Visco
and Gilley. Does anyone know him?

Mensa says
September 28, 2015 at 9:46 am

Who will the next yes man or woman be to take Ron Smith's vacated seat on the Lancaster City
Council? Rex is being tight lipped, but he did tell the AV Press that the person he picks will be
someone smarter than him.

Considering Rex thinks that bird sounds lower crime, spending $10 million on a useless spy
plane is good policy, putting a Walmart next to a high school is a good idea, selling garbage for
profit is a winner, and Bangladesh is going to be destroyed by a cyclone in his lifetime, he
should have no problem finding someone smarter than him.

Anyone with a pulse will do.

We may not know who the person will be, but we do know it will be someone he can fully
control. Free thinkers and those with opinions contrary to his highness are not welcome. Ask
Johnathan Ervin, the man who dared stand up to Rex, only to be labeled a "gang candidate" by
the bearded Mensa.

William says
September 28, 2015 at 1:05 pm

A 'yes man/women' is all that's required for rex to put on the council so they will always
have unanimous votes on everything rex wants

They will have to leave their conscience and integrity at the door and they'll do fine.

So, it really doesn't matter who it is, does it, as long as they meet those guidelines?

CONFIDENTIAL                                                          COLA0170290

But, not to worry. You like all of us won't live forever and eventually your suffering will end. You might want to look at having a little joy in your life while you can. Or not. The universe doesn't care either way.

Try to have a nice day. Do something that brings you happiness. Or should I say it more correctly, bring happiness to something or someone in you life.

Claire says
September 26, 2015 at 3:58 pm

Dear William...I honestly hope you will apply to yourself the advice you have given to me.Try not to be so antagonistic toward everyone in your life and find a way in your mind to be at peace with others. I might suggest to you William that you step out of yourself and volunteer in your community. Whatever you have a heart for Bill. Maybe volunteering at the senior center, or helping the homeless, etc. Have a peaceful day!

Joe says
October 2, 2015 at 2:06 pm

Did you forget to mention T. Shepos? another member of the clan and Visco's golden Boy who makes all Visco's county real estate projects possible.

AV Observer says
October 2, 2015 at 4:59 pm

Who is T. Shepos? Do tell. The web of deceit and deception in Lancaster needs to be exposed. It is most unfortunate that Parris has bought and paid for the hands off approach of the local paper through his prolific advertising budget. They lack the balls to delve into the truth of the Lancaster corruption because if they do, Parris will pull his ads.

William says
October 2, 2015 at 5:59 pm

I pointed out rex's ads to Dennis Anderson when he was editor and he denied knowing that rex had ads on the online version.

BTW A person who used to comment here a while back tried to find out who owned the AV Press and couldn't locate the information.

Neither can the folks at Get Parris Out of Lancaster's website.

It's a weird paper. The fox 'news' of the Antelope Valley. I'm pretty sure they endorsed every republican who ran for office no matter how lousy they were.

The AV Press's right wing letter writers are so misinformed, it's scary.

Joe says
October 7, 2015 at 2:32 pm

A former spy says he found evidence of an 'established exchange of information' between Trump and the Kremlin.

An explosive story in Mother Jones by David Corn reports that a "former Western intelligence officer" was hired by a Republican to investigate Trump's connections to Russia. The officer allegedly found evidence that " there was an established exchange of information between the Trump campaign and the Kremlin of mutual benefit."

"Russian regime has been cultivating, supporting and assisting TRUMP for at least 5 years. [The] [a]im, endorsed by PUTIN, has been to encourage splits and divisions in western alliance," according to a memo prepared by the former officer and reviewed by Mother Jones.

The source also claims the FBI became interested in his findings and requested more information in August.

The FBI is investigating connections between Trump campaign staff and Russian oligarchs.

NBC News reports that the FBI has launched a preliminary investigation into the "Donald Trump's former campaign manager Paul Manafort" and his connection to Russian and Ukrainian oligarchs.

Manafort stepped down from his post in the Trump campaign in August after questions were raised about large payments he allegedly received from pro-Russian entities.

According to Senate Minority Leader Harry Reid, the FBI has "explosive information about close ties and coordination between Donald Trump, his top advisors, and the Russian government."

Taken together, the three stories paint a troubling picture of a candidate and a campaign with potentially significant ties to a country that has emerged as one of the United State's chief antagonists.

A story published later on Monday in the New York Times, takes an opposing view, highlighting that the FBI has not yet found proof of a direction connection between Russia and the Trump campaign. Anonymous FBI officials also told the New York Times they concluded that Russia is merely interested in disrupting the election, not helping Trump. It is an odd conclusion since all of Russia's activities have been directed at the Clinton campaign or the Democratic Party.

Reid and other Democrats are calling on the FBI to release more information prior to the election.

William says
November 1, 2016 at 12:45 pm

That's why patriot won't admit he's voting for trump.

Palmdale Republican says
November 1, 2016 at 8:45 am

Palmdale voters – beware of AVRA\Lancaster backed candidates. AVRA stands for Antelope Valley Republican Association. They were started in 1977 by Frank Visco, a staunch supporter and contributor of Parris, and co-owner of the company that owns LEAPS, which is paid $10 million dollars by our tax dollars.

AVRA supports Republicans with Lancaster interests in mind. Republicans who do not toe the AVRA line are shunned. Palmdale Republicans are left behind by AVRA. AVRA would rather support a candidate like Parris, who is against Republican Steve Knight and who fights against job creating projects, than a candidate like Ledford or Bettencourt. AVRA supports Republicans who put Lancaster's priorities in front of Palmdale's priorities.

CONFIDENTIAL
COLA0170295

Mike Pence might have indeed won the debate by successfully avoiding the questions. But Tim Kaine was the only one that night who got to leave with his dignity still intact. I mean it. Really.

Just Saying says
October 9, 2016 at 8:45 am

Trump has 3 objectives.

1)Make greed driven obscene sums of money.
2)Run the GOP into a ditch by mimicking it's hateful base.
3)Enjoy his friends, Bill and Hillary, becoming a president in his pocket. (see objective #1)

The Anti-REX says
October 6, 2016 at 5:58 am

Lancaster residents get out and vote "NO" this Tuesday to stop this Homeless Tax scam. The Mayor's tax does nothing but fill his pockets and make Lancaster a magnet for the homeless. I have some inside information that he has plans to create a tent city on the vacant property behind the courthouse. Guess who has a financial interest in this property? go ahead guess...

Bart says
October 6, 2016 at 3:44 pm

<mark>Nothing is done in Lancaster without the good old boys getting paid. LEAPS is the most obvious offender with $10 million tax dollars being siphoned off to long time Parris political contributor and friend Frank Visco.</mark>

The so-called "Homeless Tax" is a scam to raise money for more law enforcement that is necessary to deal with the rising crime rate. The crime rate is rising because instead of spending money on Sheriffs, we're wasting it on LEAPS and lawsuits. It will not help homeless. It will become an attractant and attempt to criminalize something that isn't criminal.

West Palmdale Voter says
October 5, 2016 at 9:22 pm

Watching the Palmdale City Council meeting online. Time to say goodbye to Hoffbauer. If his online rants, questionable posts, and insults of Fred Thompson aren't bad enough, his rude snipes at the meeting seal the deal for me. I voted for Hoffbauer for years. Not this time. Fred doesn't deserve that.

William says
October 3, 2016 at 8:26 pm

If and when Trump loses, it's likely that his 'fans' will then go after the GOP establishment in Congress during the 2018 midterms and 'primary' them. They've done it before.

CONFIDENTIAL                                                          COLA0170296

Homeless is everywhere in our state, it's just more prolific here because were at the end of the line. I was in Anaheim back in June on a ride along with Anaheim police helicopter and from the air you can see all the tents under the over pass in the Santa Ana river bed as well as in the freeway green belts. I believe this is a money grab for the city and I voted no! This good old boy club needs to be shut down and take their eye in the sky with them..

NO ON MEASURE A says
September 30, 2016 at 9:52 am

Right you are Fed Up As Well. This city is a dirty good old boys club that benefits the Unholy Trinity of Gilley, Parris and Visco along with their insider friends. Measure A is the latest fleecing they have concocted. It does NOTHING to address the causes of homelessness and EVERYTHING to give them millions of dollars to spend on their friends and their pet projects. NO ON MEASURE A.

Mikey b says
September 22, 2016 at 4:17 pm

I don't know if anyone, (Rex, la sheriffs, city planners, etc) have noticed that the stop sign, intersection problem in the neighborhood south of lancaster blvd between sierra highway and 10th street west. It is inundated with constant close calls and daily fender benders and worse! When I happen to be home during the day, I see it all day long. The intersections are not set up right as far as CLEAR that you have to stop or not. On west newgrove, I see potential disaster for the cars traveling on newgrove, every intersection on that street has a close call constantly! I find it preposterous that this has not been dealt with by any local goverment agency! This is not SOMETHING NEW! It has been like this for decades. What has to happen for this to be addressed? I am blown away. REALLY........?

Tim Scott says
September 22, 2016 at 4:40 pm

It has been like that, but has been made worse. A lot of people avoiding Lancaster Blvd are on those streets that didn't used to be. Newgrove in particular is now the preferred through street and should be treated that way.

Vic says
September 22, 2016 at 7:00 pm

Why would Rex care? He lives in Newport Beach and it's not the BLVD.

CONFIDENTIAL                                                              COLA0170297

No on Prop A says
September 21, 2016 at 3:43 pm

Vote NO on Proposition A.

This so-called homeless tax is a smoke screen to raise money for law enforcement because the
current administration has squandered $10 million of our tax dollars on a failed "Eye in the
Sky".

Prop a will not address the root causes of homelessness. It will create a cash fund for the
current administration to continue down the road of reckless and ridiculous projects like the
"Eye in the Sky", "Ecolution", "Bird Songs on the BLVD", "TractionSeal", "Quartz Hill Super
Walmart", and so on.

Almost half of the money is earmarked for law enforcement because $10 million is being wasted
on the "Eye in the Sky".

It is time to put our foot down and say NO to more taxes on ideas that are not well thought out.
We already lost millions. It is time to say NO.

Palmdalian says
September 21, 2016 at 9:42 am

Lancaster money is pouring into Palmdale for signs to support Rex backed candidates. Avoid the
Lancaster Overthrow. Vote for candidates who will work for Palmdale residents, not Frank Visco,
Jim Gilley, R. Rex Parris, Marv Crist, and the rest of the Fern St. Mafia.

William says
September 21, 2016 at 10:09 am

What are the names of rex backed characters in the Palmdale election?

Thanks.

Les says
September 22, 2016 at 9:36 am

I thought I read somewhere on here that it was Hofbauer, Alvarado and Carrillo.

Frank says
September 22, 2016 at 11:55 am

Loa and Bishop too. They're getting Lancaster money. The plan is to merge sale
tax revenues to pay off Lancaster's huge redevelopment debt. The current
administration in Lancaster has spent millions on pet projects that line the
pockets of the good old boys but have left the city with junk bonds. Palmdale
residents should not have to pay for their mismanagement.

Daniel T says
September 22, 2016 at 7:04 pm

CONFIDENTIAL                                                       COLA0170298

Visco Financial Services, owned by Frank Visco, gave $1000 to Loa. Visco is pals with
Rex. Visco is one of the owners of LEAPS. Visco gets $10 million from Lancaster
taxpayers thanks to Rex for LEAPS.


No Rex Candidates says
September 23, 2016 at 11:25 am

Rex's Dream Team: Loa (money from Visco) Mayor. Hoffbauer (Marv Crist's boy).
Carillo (over worked and underpaid city worker who lives in Coachella most of the
week). Alvarado (wife lives in Lancaster but he shacks up with girlfriend in Palmdale).
Estrada (will do his bidding).


Tim Scott says
September 17, 2016 at 11:45 pm

So Pete Knight is advertising like mad about his "No Hero Left Untreated" bill...the only thing he
did or even tried to do in two years in congress. So, being the curious sort I figured I'd take a
look at what this "major veterans health care reform" actually is.

It's a directive to the VA to set up a handful of pilot programs to try out one particular recently
developed and as yet mostly unproven treatment for PTSD. "No Hero Left Untreated" has
absolutely nothing to do with ANY veteran that has a problem other than PTSD. Five pilot
programs across the country would be a drop in the bucket even among those who DO have
PTSD.

What this LOOKS like is a demand by some interested congressmen that the VA set up a testing
program for this unproven treatment...which uses a pretty expensive piece of equipment.
Anyone want to investigate the manufacturer of that piece of equipment and see if they "just
happen" to be contributors to Mr Knight's campaign? I couldn't be bothered myself.

Just the fact that this bill was given this totally hyperbolic name so that it could be
misrepresented in his ads, and that it has been booted back to committee EVEN BY THE GOP
DOMINATED HOUSE because it was so clearly a joke, not an actual attempt to craft a law, was
enough for me.


Nancy p says
September 13, 2016 at 9:18 pm

Good program on FRONTLINE tonight about, for profit education and all that fraud.


Lancaster Voter says
September 12, 2016 at 12:26 pm

Starting today all voters in the city of Lancaster will receive a ballot regarding Measure A, which
will increase taxes on residential, commercial, multi family and undeveloped or vacant
properties to fund the construction and operation of a community shelter for homeless people in
Lancaster. I don't believe helping the poor should be mandated by law. This is something that

CONFIDENTIAL
COLA0170299

I'm thinking the answer to that has to be "not very many," and as far as I know there is only one.

Second question. So how did that one person, Paul Manafort, just happen to turn up as Trump's campaign manager?

Doesn't that seem like a really extraordinary choice? How does that interview go? "Ah. I see here in your resume that you have experience with looting the treasury. That's a plus. And exile planning. Very good." Seriously, how does that happen?

William says
August 15, 2016 at 2:09 pm

Then, there's his spokescretin, Katrina Pierson.

Yet, there are millions of suicide voters that will vote for Trump even if he takes the country down with him. They don't care if they symbolically 'die' in the process.

They are whining and kvetching about the economy now. Just imagine the mess it will be under a Trump administration. He loves bankruptcies.

Wrecks says
August 13, 2016 at 7:35 am

Here we go again. Now Wrecks is whining about Palmdale's crime going down while Lancaster's is going up. He wants to investigate.

An investigation sounds good. Let's start by investigating LEAPS. How can our crime keep going up when we are spending $10 million on a program like LEAPS? Who is getting this money and why is crime not going down?

The last time crime went up in Lancaster and down in Palmdale Marv blamed it on Lancaster being a "college town". Now Wrecks is blaming it on the number of community events. Is he saying its not safe to bring your kids to Lancaster events? Don't they have security? Heck, Palmdale has the Mall which attracts ore people annually than all of Lancaster's events. Crime should be through the roof in Palmdale.

Let's keep wasting $90k a month on LEAPS and moan about Palmdale and maybe things will get better.

James F. Biddle says
August 13, 2016 at 9:00 am

You just don't understand the value of LEAPS. It is very valuable indeed. Just ask Frank Visco.

R says
August 13, 2016 at 5:57 pm

So very, very, very true. Visco, Gilley and Stepos have made millions raping the Valley,thanks to people like Rex.

It must be hard for Captain Nelson to keep a straight face when he is asked to defend LEAPS. The rank and file know it is worthless. Nelson does too, but he can't say anything.

Tim Scott says
August 31, 2016 at 6:55 am

Wow. That well thought out bit of name calling was sure enlightening. Let me guess,
you are Dingbat Donny's debate coach.

Cgi says
August 31, 2016 at 11:38 am

TRUMP TRUMP TRUMP TRUMP TRUMP

. To hell with you Hillary puppets and you puppets are the same ones that voted for Obama
and now you're not happy with him think about it with Hillary once a month you will push
the button

Tim Scott says
August 31, 2016 at 11:45 am

LOL...Trump supporters showing their true colors. Misogynist much?

James P. Biddle says
August 9, 2016 at 1:16 pm

We in the AV know of the antics of the Fern Street Mafia. Did you know some of the same
scams are going on in a lot of the smaller cities down below. Recently the Mayor of South
Elmonte pleaded guilty to taking bribes.
Instead of Visco/Gilley you have the likes of Arman Gabay. Same no bid contracts, same
developer kickbacks, etc. But there is a common figure to all of them. I can't reveal the name . .
.cough . . .cough . . .Tom . . .cough ...cough . . .Shepos . . .cough . . .cough. Sorry-must be a lot
of dust in the air.
In addition to numerous kickback schemes from developers, you have super high priced
consultants who over bill hours. Gee, this sounds vaguely a lot like our dear ole loveable King
Wrecks.

Here's a link to a very interesting blog site: http://alchemistcook.blogspot.com/ A lot of the
same issues he deals with down below mirror what's going on up here.
Ex Sate Senator Ron Calderon pleaded guilty to bribery also had connections to LA County's real
estate department. I won't mention names, but you can guess who . .cough . . .cough.

Tracey says
August 9, 2016 at 2:26 pm

There has to be a young, hungry reporter who wants to do the right thing while making a
name for him or herself. They would have a field day here on Fern Street.

Tim Scott says
August 7, 2016 at 6:09 pm

Today no less than Newt Gingrich said that "the numbers just don't add up" in Trump's
economic "plan." Anyone expect Trump supporters to make any concession to basic
mathematics, or is that one of the sciences they just don't believe in?

> Vic says
> August 7, 2016 at 7:18 pm
>
> I get it. No Trump. Do you get it? No Rex endorsed candidates?

>> Tim Scott says
>> August 7, 2016 at 7:28 pm
>>
>> Palmdale city council election...absolutely.

>>> Vic says
>>> August 7, 2016 at 9:28 pm
>>>
>>> Rex will try to take over however he can. He will be supporting those not on
>>> Palmdale First, and he will try to influence through Cafario.

>>>> James P. Biddle says
>>>> August 8, 2016 at 6:42 am
>>>>
>>>> Lancaster (ala, Rex, Gilley and Visco, aka the Fern Street Mafia) have
>>>> wanted to merge with palmdale for decades. There's a lot of prime real
>>>> estate than they want to control development on. Plus the additional power
>>>> that it brings (a megalamaniac's dream).
>>>>
>>>> This would also put them in position to start annexing unincorporated areas.
>>>>
>>>> The AV will become 'The Land (or Kingsom) of Rexville.

>>>> Tim says
>>>> August 8, 2016 at 8:13 am
>>>>
>>>> The people of Palmdale aren't stupid. They would never stand for a takeover
>>>> by Rex. Rex would either have to take control of the city council, which he is
>>>> trying to do in this election, or do something like he did with the voting
>>>> rights lawsuit to somehow force a "one city". I don't know how that could be
>>>> possible, but Rex is a low as they come and he will stop at nothing in his
>>>> quest for power.
>>>>
>>>> No one in their right mind would want any part of a Rex-controlled Palmdale.

>>>> William says
>>>> August 8, 2016 at 8:38 am

CONFIDENTIAL                                                  COLA0170302

girlfriend,wait I live alone.I pay no taxes,wait I now own my own house.I'll
meet you at the time,place that you said,wait no i wont.I hate cops,wait no i
never said that.take a breath,get your stories in order,so there are no more
holes.I could go on,but I have a date,a REAL date.

Antelope Valley Truth Teller says
July 21, 2016 at 8:13 am

This Month in Rexhistory… the saga of a mayor who purchased a building in a redevelopment
area while sitting on the redevelopment board ( a major no-no).

July 27, 2011 – City redevelopment board shy one mayor – Mayor R. Rex Parris resigned his
seat on the city's redevelopment agency board Tuesday night because of his law firm's purchase
of a vacant furniture store building for future use as an office. City Manager Mark Bozigian said
he and City Attorney David McEwen had advised the mayor that his firm was allowed to
purchase the building – about a mile from the law firm's present office – as an expansion of the
business.

"That advice might not have been entirely accurate," Bozigian said at the start of Tuesday
night's council meeting.

A complaint, apparently anonymous, has been received by the Los Angeles County District
Attorney's office calling the ownership a violation of state law because the building – the long-
vacant McMahan's store on 10th Street West south of Avenue K – is in a redevelopment project
area, Bozigian said.

Parris resigned his redevelopment agency seat, effective immediately, and said a replacement
will be appointed at the next council meeting. He retains his seat as mayor.

The complaint against Parris cites a section of the California Health and Safety Code that says
"no agency or community officer who in the course of his or her duties is required to participate
in the formulation of, or to approve plans or policies for, the redevelopment of a project area
shall acquire any interest in any property included within a project area within the community."
AV Press – 7/27/11

Also interesting is that the building is located next to land owned by Rex's political contributors
Frank Visco and Jim Gilley.

Never a dull moment in the monkey business of Lancaster

James P. Biddle says
July 20, 2016 at 5:35 pm

Well it's time to bring up the unholy trinity again; R Rex 'the ambulance chaser' Paris, James
Gilley, and Frank 'the wise guy' Visco and some of their minions, Michele Lantz, Tom Shepos,
George Runner, James D. Vose, just to name a few.
July 4th weekend proved to be an interesting time. Observed at the Fremont Hotel in Del Mar
were Michele Lantz and Tom Shepos. If I were a betting man I would wager that the trip was
paid for by the Godfather himself, Frank 'Putty nose' Visco. I'm sure good ole Tommy boy
Shepos couldn't afford it. After all, he' gone bankrupt twice, screwed a couple of wives out of
millions and was even a bigamist (which was very big of him.)
Coming soon to a neighborhood near you: neighborhood sober living homes. These are

unlicensed haven for molesters, and other ne'er-do-wels. A fortune can be made with these. Just Google Chris Bathum. I'm sure if you dig into these scams you might find some interesting names cough, Tom, cough, Shepos, cough. Pardon my coughing spell. Must be the dust. These so-called sober living houses, AA or whatever, have a crappy success rate. Less than 5%. But boy, do they rake in the moola. I wish I could get in on this gold mine. Add to this the fact that the local judges (owned and operated by the unholy trinity.) sentence these offenders to various AA programs. Many of the same judges own (whether outright or as silent partners) many of these sober living homes. Already a conflict of interest. Then these AA 12 step programs have a Christian component (not intended as a slight against said) but it's a clear violation of the US Constitution (which has been missing in action for a long time now) separation of church and state (that wording is actually not in the Constitution but a Supreme Court ruling.)

Let me repeat: THESE SOBER LIVING HOMES ARE NOT LICENSED BY THE STATE! If you thought Section 8 was bad—you ain't seen nothing yet.

Many child abusers, and other low-life criminal types enroll in these programs to get a roof over their heads.

More on the Unholy Trinity and their stooges to follow. If anyone out there has any documentation, I'm preparing a case to take to DOJ. I don't think they own the Justice Department, yet.)

Antelope Valley Truth says
July 21, 2016 at 11:36 am

Thank you James P. Biddle. You are a beacon of light over the darkness that is the Unholy Trinity in Lancaster.

Please go forward with your complaint, and feel free to add to it all the other shenanigans that go on around here.

James P. Biddle says
July 21, 2016 at 12:02 pm

I am working on follow up articles and hoping some of you have some documents that I can present to DoJ when the time comes.

Anyone who contributes anything will be kept confidential. No one will ever know who you are.

Concerned Resident says
July 21, 2016 at 3:06 pm

Count me in.

Tim Scott says
July 21, 2016 at 1:27 pm

While you are accurately depicting the corrupt Lancaster government and the high profit no results nature of this business that so many judges are conflictedly involved in, I have to correct one thing.

Twelve step programs do NOT "have a Christian component." They do rely on acknowledgement of "a higher power" which is a critical point in breaking the state of arrogant "my life is totally in my control" thinking that many addicts can't escape otherwise, but there is no requirement that said higher power be the Christian version of

God...or any version of God. For many addicts just acknowledging that "the law" or "civilization" or "the program" is a higher power is more than sufficient.

That said, keep up the good work, keep a spotlight on the blackness of Fern Avenue, and may the higher power of your understanding protect you from the adverse consequences that I am sure Wrecks would love to marshal against you.

Shane Falco says
July 21, 2016 at 3:43 pm

You can't call them "low life criminals". According to many here, these are just misunderstood people just out doing good and they are harassed by the pigs who arrest them and prosecute them for no reason at all.

William says
July 21, 2016 at 4:21 pm

Who woulda thunk it given the high ethics and integrity of rex et al?

Nothing is beyond them. They've gotten away with so much already, why stop now? For them, there are no limits that ethical people are bound by.

The same thing happens with animals that are allowed to rip up the furniture with no consequences. They will just keep doing worse damage unchecked.

James p. biddle says
July 21, 2016 at 5:50 pm

To send docs or contact me my email is: avtowncrier7@gmail.com

James P. Biddle says
July 23, 2016 at 3:17 pm

AVTA embezzlement scandal. I would cut and paste the 2006 and 2007 segments of the audits. But I can't on this site. Both the years the auditor faulted the AVTA for improper bookkeeping and unaccountable spending.

During this time Marvin and even Rex sat on the board. They forced out Randy Floyd and his administrative team.

During the prelims, Child porn charges were leveled at Floyd. Child porn images were allegedly found on his work computer. But you can't file those charges in court. The judge tossed them. The judge told them to file said with US Attorney. They did not.

My guess is those charges were filed in an attempt to get Floyd to take a plea deal. They may have even been planted by the shyster law firm (I'm sure you can guess which one I mean.)

When that failed they declined to file charges against Floyd or his top aides. The CFO did plead out to one charge. I think she got probation.

CONFIDENTIAL                                                                      COLA0170305

Son of the Anti Rex says
May 21, 2016 at 8:29 pm

Tonight, while the cities of Santa Clarita, Palmdale, and Highland have millions of less dollars to
use for the public good, "Mayor" R. Rex Parris is enjoying life in his beach mansion, paid off the
backs of the taxpayer. Thanks, Rex, for all you do—for yourself.

> SuhDuude says
> May 26, 2016 at 10:45 am
>
> Lets's not forget the people who made this possible, like Tom Shepos or Frank Fisco,
> Marvin Christ, Michelle Lance, Paul Shapell... He's not alone. He's good, but he's not that
> good. There are people making deals with people making deals, from the County to the
> City to the private sector.
>
> > John says
> > May 26, 2016 at 11:43 am
> >
> > SuhDuude, I'm a bit lost on what you're talking about. there's a lot of (misspelled)
> > names here, but not a lot of sense. care to elaborate?
> >
> > > Clueless says
> > > May 26, 2016 at 9:01 pm
> > >
> > > Are you new to town John? The Visco/Parris/Gilly unholy trinity has raped this city
> > > for decades with insider deals. Projects like the $8 million dollar culvert on their
> > > property, the Eye in the Sky, the QH Walmart and other deals are all tax payer
> > > funded. Deals for the boys. "Pastor" Paul Chapell had the infrastructure for his
> > > compound put in by the city of Lancaster on the backs of the taxpayers. Land
> > > gifts to Costco, R.Rex Parris buying redevelopment land illegally, the Ave.L
> > > overpass built with housing funds, $300k gift to AVChevy, the "fertilizer"
> > > giveaway—it's like the real slogan for the city. Lancaster-it's perfectly corrupt.

pirrurris says
May 13, 2016 at 6:01 pm

I have decided I am going to become a goat farmer so that I can designate my property as
agricultural land and get exemptions from the government.

i wonder when the village idiot Trump, is going to release his taxes?

pirrurris says
May 10, 2016 at 8:52 pm

CONFIDENTIAL                                                            COLA0170292

We know he is aware that East Lancaster exists. He and the city have done plenty to help
Lancaster Baptist Church get up and running, including but not limited to providing the
infrastructure to build the "compound".
But what about the rest of East Lancaster? Crime is rising. Stores are closing. Have you driven
on Ave. I, J or K lately? Apparently Ole Rex and his Hand Picked Council haven't.

Part of the problem is that East Lancaster has NO representation on the Council. None. Zippo.
Nada. Ole Rex and his Hand Picked Council are well-to-do West Side residents. Every one of
them.

It makes it more ironic that Ole Rex would sue the cities of Santa Clarita and Palmdale for
districts and yet in his own city, he refuses to do so. He hides behind the charade that Lancaster
is somehow "different". Oh, it's different all right—holding elections in April instead of
November, counting its own ballots at City Hall, all West Side council, hand picked Council, and
so on an so firth.

Also, Ole Rex likes to think that because Ole Henry Hearns was mayor, minorities are
"represented" in Lancaster. Really? Ole Henry was and is a Rex Yes Man. But at least Ole Henry
was elected to his position. The only other two minority candidates on Lancaster's council were
both appointed by Ole Rex. They were Sandra Johnson, a wealthy West Sider (she did win an
election after her appointment), and Angela Underwood-Jacobs, another wealthy West Sider.
(Did you know she makes $100k a year from some East Coast energy company? It's all on her
Form 460). The new kid on the block, Raj Mahli, still another wealthy West Sider, was also
appointed. You may know Ole Raj from the Antelope Valley Republican Association, that
illustrious group started by Ole Frank Visco. You may know Ole Frank Visco, the part owner of
the company that has the Law Enforcement Aerial Platform System (LEAPS) which Ole Rex has
committed $10 million dollars to.

Election day is coming. Resident of East Lancaster need to think long and hard about who they
want to represent them. Crime is on the rise. Business is stagnant. But if you look to the skies,
you may see Ole Rex's flying fiasco LEAPS overhead. Ask yourself, wouldn't that $10 million
dollars that Ole Rex and his wealthy West Side council are giving to Ole Frank be better spent
on personnel on the streets of East Lancaster?

There are other choices to elect than the same Ole same Ole.


        Sue says
        April 7, 2016 at 1:18 pm

        Someone needs to sue Lancaster like he sued Santa Clarita and Palmdale.




        James P. Biddle says
        April 19, 2016 at 2:29 pm

        Rex has written off East Lancrapster. You all are going to die, at least according to Vice
        mayor Marvin 'the weasel' Crist. The deadly plum of gas from Palmdale's power plant will
        descend upon East Lancrapster killing you all. Well, almost all of you, with the exception of
        those who attend LBC and Paul Chappell.


            Turd Ferguson says
            April 19, 2016 at 3:59 pm

            But we have LEAPS.But we have LEAPS.East Lancaster has gone straight to hell.East
            Lancaster has gone straight to hell.But Rex's political pal is making
            $10,800,000.00.But Rex's political pal is making $10,800,000.00.No to LEAPS.No to
            LEAPS.Yes to Sherriffs in East Lancaster.Yes to Sherriffs in East Lancaster.No to
            LEAPS.No to LEAPS.

Tim Scott says
February 11, 2016 at 4:36 pm

Watching the hilarious antics of the GOP primary campaign is so much fun, but it is once again time to settle in for a graduate level seminar in public policy, featuring the Democratic party candidates. Never fear though, the battle for the cherished title of Captain Insano will continue unabated to the scheduled crescendo in the GOP debate Saturday...which will likely be held in a steel cage.

Question Lancaster Authority says
February 11, 2016 at 5:06 pm

It's boring compared to watching a Lancaster City Council meeting. Now that's entertainment!

Tim Scott says
February 11, 2016 at 5:09 pm

I can be amused by the GOP primary antics because I'm confident that whoever they pick will lose anyway so no harm done. Watching Rex destroy the neighboring city is interesting, for sure, but too horrible in the impact to be really entertained.

Question Lancaster Authority says
February 11, 2016 at 6:10 pm

Rex's total inability to recognize what he has done and is doing to our city is astounding. He is a modern day Nero who is fiddling while Lancaster burns.

His latest bizarre act is this nonsense about creating an ordinance that would make it illegal to bury people who are classified as terrorists. He went so far to make idiotic statements like he wanted to bulldoze the homes of the terrorists families and that he wished dead terrorists would be thrown in the dump.

This is the latest in his long line of loony statements.

LeSigh says
June 7, 2016 at 1:18 pm

The Three Amigos (Parris/Visco/Gilly) aren't stupid: they're disingenuous. the reason Rex sounds so insane and makes so little sense is because he's making up rationales that he THINKS sound good, but because they're not the real reason for his actions, he jumps all over.

what they're doing is simple: pocketing as much taxpayer money as possible.
the Eye in The Sky is a private jet for these guys to run off to Vegas on a whim.
the Super Walmart is a simple land grab so that his developer buddies can get a fat no-bid contract.
driving away businesses drives down property values, so that his County buddy (Tom Shepos) can snag it for pennies on the dollar, develop it (once again, no bid), and flip for bokum bucks.

These people are smart, they're just liars of the first degree.

CONFIDENTIAL

COLA0170294

EXHIBIT 15

**COUNTY OF LOS ANGELES    ☐ DEPARTMENT OF AUDITOR-CONTROLLER**
OFFICE OF COUNTY INVESTIGATIONS

| Case Number | Department | Supervising Investigator | Lead Investigator | Investigator |
|---|---|---|---|---|
| 2016-12376 | CEO | Reassigned: Kenneth Diaz (as of 10/3/2022)<br>Reassigned: Steven Lee (as of 8/24/20)<br>Reassigned: James Christensen (as of 3/16/20)<br>Reassigned: Nancy Neville (as of 5/1/19)<br>Reassigned: Timothy Takara (as of 3/26/19)<br>Reassigned: Thomas Wood (as of 4/24/18)<br>Previously: Bryan Bell (as of 10/5/16) | Reassigned: Amanda Andrews (as of 05/01/19)<br>Reassigned: Graciela Soto (as of 11/14/18)<br>Reassigned: Amanda Andrews (as of 09/25/17)<br>Previously: Chris Magtoto | |

## CASE BACKGROUND

| | | Subject(s) / Employee # | | |
|---|---|---|---|---|
| Board Special | **N/A** | | | |
| Date Received | 09/28/16 | Thomas Shepos | Frank Visco (Vendor) | Christopher Montana |
| Date Assigned | 10/05/16 | Summary of Allegation(s) | | |
| Date of Report | Various | A coworker (Property Management Section Manager Susan Holman, Chief Program Specialist) alleged that CEO Real Estate Division employee Thomas Shepos, Chief Program Specialist, is receiving gifts/payoffs from County vendors in exchange for favorable lease agreements and tenant improvement contracts.<br><br>CEO Real Estate employees are receiving event tickets from County vendors in which they conduct business. | | |
| Report Issued | Varios | | | |
| Referred to DA | 03/29/18 | | | |
| Date Closed | 03/09/23 | | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| 05/22/18 | 5:00 PM | Covarrubias Draft Subject Memo Discussion Meeting A-C Executive Conf Room | {Redacted} | {Redacted} | {Redacted} | AA |
| 05/22/18 | 5:00 PM | Note to file | Potential interviewees:  Seth Horowitz (CT Mgt client), John Carroll, Jeff Kurtz, and Farmers & Merchant Bank loan officers. | | | AA |
| 05/23/18 | | BOS<br>KFI Radio (Today's Headlines) | BOS ordered a review of all leases negotiated by former County employee. | | | AA |
| 05/24/18 | 4:20 PM | Shepos Office/Person Files (SW3) | Completed review of physical documents seized from Shepos' office/person (SW3-01).  We went through four boxes of seized items and scanned the items that Shepos personally created and did not scan CEO lease background info. | | | AA |
| 05/24/18 | 1:40 PM | CitiBank<br>Gabriela Pesina | Called Ms. Pesina to confirm why OCI was sent bank docs from Office Funiture Heaven, Inc.  She stated that the company must have come up during her search of "Office Furniture."  GLS requeted her to send e-mail confirming discussion.  Also, asked Ms. Pesina to confirm what e-mails were intended to be recalled for Batch # 6.  She stated that total e-mail shsould be 2 e-mails which contain full docs.  teh remaining three w-mails should be recalled. | | | GLS |
| 05/24/18 | 2:00 PM | CitiBank<br>David W. Pitcher | Called Mr. Ritcher to inquire about credit card account numbers.  Mr. Ritcher was unavailable, received his vm stating that he will be out of the office until 5/29/18.  GLS to call-back next week. | | | GLS |
| 05/25/18 | 2:14 PM | CitiBank<br>Gabriela Pesina | Ms. Pesina sent AA & cc'd GLS a secure e-mail.  I was unable to open the document, AA was able to open the document & saved it to the case file. | | | GLS |
| 05/25/18 | 10:00 AM | Forensics Evidence Room | In preparation of sending the CEO lease files to CEO for scanning, I checked the items inventoried and added some additional detail to our intake form (G:\Investigations\2016\201612376\C - BACKGROUND\CEO Lease Files).  Boxes are ready to return to CEO for scanning. | | | AA |
| | 2:15 PM | CEO Lease Files | Kevin Webb, CEO Chief Program Specialist, picked up 6 boxes of CEO lease files and signed our chain of custody form. Copy provided. | | | AA |
| 05/31/18 | 4:00 PM | Shepos Emails - Additional Keyword Searches | Drafted the additional keywords to search Tom Shepos' Google account, County email, and County HDD and submitted for review.  I do not believe it is necessary to conduct keyword searches on Shepos' AOL account because it was recently 100% reviewed by Bryan Bell (Feb 2018). | | | AA |

**COUNTY OF LOS ANGELES    u DEPARTMENT OF AUDITOR-CONTROLLER**

O F F I C E   O F   C O U N T Y   I N V E S T I G A T I O N S

| Case Number | Department | Supervising Investigator | Lead Investigator | Investigator |
|---|---|---|---|---|
| 2016-12376 | CEO | Reassigned: Kenneth Diaz (as of 10/3/2022)<br>Reassigned: Steven Lee (as of 8/24/20)<br>Reassigned: James Christensen (as of 3/16/20)<br>Reassigned: Nancy Neville (as of 5/1/19)<br>Reassigned: Timothy Takara (as of 3/26/19)<br>Reassigned: Thomas Wood (as of 4/24/18)<br>Previously: Bryan Bell (as of 10/5/16) | Reassigned: Amanda Andrews (as of 05/01/19)<br>Reassigned: Graciela Soto (as of 11/14/18)<br>Reassigned: Amanda Andrews (as of 09/25/17)<br>Previously: Chris Magtoto | |

## C A S E   B A C K G R O U N D

| | | | | |
|---|---|---|---|---|
| Board Special | **N/A** | Subject(s) / Employee # | | |
| Date Received | 09/28/16 | Thomas Shepos | Frank Visco (Vendor) | Christopher Montana |
| Date Assigned | 10/05/16 | Summary of Allegation(s) | | |
| Date of Report | Various | A coworker (Property Management Section Manager Susan Holman, Chief Program Specialist) alleged that CEO Real Estate Division employee Thomas Shepos, Chief Program Specialist, is receiving gifts/payoffs from County vendors in exchange for favorable lease agreements and tenant improvement contracts.<br><br>CEO Real Estate employees are receiving event tickets from County vendors in which they conduct business. | | |
| Report Issued | Varios | | | |
| Referred to DA | 03/29/18 | | | |
| Date Closed | 03/09/23 | | | |

| | | | | |
|---|---|---|---|---|
| 12/21/16 | 10:30 AM | | Performed additional keyword search for laker, kings, clipper, dodger, and ticket in Tom Shepos' e-mails.  See separate testwork.  We found that:<br>1) Thomas Shepos accepted event tickets from six County vendors on 11 occasions.  On two of the occasions, Mr. Shepos accepted the tickets on behalf of Kevin Webb, CEO, and on one occasion, Mr. Shepos accepted the tickets on behalf of Christopher Montana, CEO.<br>2) Thomas Shepos reserved event tickets from two County vendors for four other events.<br>3) Thomas Shepos requested event tickets from three County vendors on eight other occasions. | AA |
| 12/28/16 | 9:03 AM | David Howard | I received a call from David Howard concerning the status on the case.  He asked for a timeline as to when our inquiry would be completed.  I informed him that there had been a new discovery that provided us with probable cause for a search warrant on Mr. Shepos' personal e-mails and bank accounts.  I explained to him that the search warrants would only be served on Mr. Shepos' financial institutions and internet service providers and at this time we could not say for certain that a crime had been committed.  Mr. Howard inquired as to what the new discoveries were and I gave him a brief summary of Mr. Shepos Gamblers Anonymous confession that he had committed illegal and career threatening activities and requested that we set up a meeting to further discuss the details.  Mr. Howard stated that he would like Jim Jones to be included in this meeting and that Mr. Jones was on vacation until January 9th.  I am currently working with his secretary to arrange a meeting when Mr. Jones returns for myself, Hellmold, Campbell, Jones, and Howard. | BWB |
| 01/03/17 | 7:50 AM | | Chris Magtoto noted recommendation to update Leasing Procedure Manual as it is old and vague (per email). | AA |
| 01/04/17 | 11:10 AM | Connie Yee, Accounting | Bryan Bell emailed Connie Yee recapping the action items that Accounting is assisting OCI with (under the purview that Accounting needs the information to verify that assets are classified properly):<br>• Request copies of all appraisals done on 27971 Sloan Canyon Road, Castaic from CEO Real Estate.<br>• Request copies of all "Memorandum of Tenant Improvement Costs" (Addendum C To Landlord's Work Letter) for work performed on 27971 Sloan Canyon Road, Castaic from CEO Real Estate.<br>• Review the file for DPSS lease 17600 Santa Fe Ave to assist OCI with determining what events triggered the lease changing from a Capital Lease to an operating lease. | AA |
| 01/10/17 | 11:00 AM | | Noted additional keywords for Thomas Shepos personal e-mail search: video, machine, Gluck, divorce, dissolution, settlement, illegal, career, Agua Caliente, ticket, lakers, dodgers, concert. | AA |
| 01/17/17 | 11:33 AM | Stacey Winters | Followed up with Stacey regarding the Hard Drive scan and search warrant and left a message with her secretary to return my call.  I also sent her an e-mail letting her know that Josh would be her POC for the hard drive scan and Magtoto would be her contact for the personnel file review. | BWB |
| 01/19/17 | 1:41 PM | Stacey Winters | Called and left a message with Stacey Winters secretary asking her to give me a call on an urgent matter. | BWB |

EXHIBIT 16

AGN. NO.\_\_\_\_

MOTION BY SUPERVISORS JANICE HAHN AND                    May 22, 2018
KATHRYN BARGER

### Review of Real Estate Leases

Beverly Hills real-estate developer Arman Gabaee (also known as Arman Gabay) was arrested on Wednesday on a federal felony charge of bribing a Los Angeles County employee in exchange for a ten-year County lease worth $45 million. According to the federal complaint, the alleged bribes to that County employee included monthly $1,000 payments over a six- to seven-year period and an offer to purchase a residence in Santa Rosa for nearly $1.1 million in exchange for, among other things, providing non-public County information to Gabaee and performing official acts to help Gabaee with obtaining leases with the County. Additionally, according to the federal complaint, the employee acknowledged accepting "numerous bribe payments" from Gabaee and others, as well as committing or attempting to commit tax fraud and bankruptcy fraud.

The conduct of this former Los Angeles County employee is reprehensible and a serious betrayal of the public's trust. The County must hold its employees to the highest ethical standard and we have no room for individuals only looking to use their position to enrich themselves. To date, the Chief Executive Officer and the Auditor-Controller have

-MORE-

MOTION

SOLIS                    _____

RIDLEY-THOMAS_____

HAHN                    _____

BARGER                    _____

KUEHL                    _____

CONFIDENTIAL                                                      COLA0186054

conducted extensive reviews of leasing practices, which have resulted in stringent new policies, practices and safeguards. County taxpayers need assurances that these incidents will not be tolerated or repeated.

**WE, THEREFORE, MOVE** that the Board of Supervisors direct the Chief Executive Officer, Auditor-Controller, and County Counsel to review any leases that involve (a) the former County employee referenced in the federal complaint, or (b) Arman Gabaee and his companies, and to provide a report to the Board of Supervisors in 90 days that includes options to re-evaluate the fair market value of such leases, to renegotiate the leases identified, to pursue contractual and legal remedies available to the County, if necessary, and to establish an ongoing monitoring and assurance protocol to ensure that the recommendations from the Auditor-Controller's November 21, 2017 Audit of County Leasing are fully implemented. These actions will ensure the integrity and fairness of the County's real-estate operations and protect the taxpayers' money.

#　　#　　#

JH:KB:lo

CONFIDENTIAL

COLA0186055

EXHIBIT 17

DERRYBERRY & ASSOCIATES LLP
ATTORNEYS AT LAW
41240 11th Street West, Suite A
Palmdale, California 93551
(661) 945-6115; FAX (661) 948-4772
civil@derryberrylawyers.com

R. Steven Derryberry
State Bar No. 245234
Kimberly R. Rose-McCaslin
State Bar No. 248428

Attorneys for Defendants Gregory Hanes; 300 K-6, LLC and 43917 Division Street, LLC

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LOS ANGELES COUNTY, THE STATE OF CALIFORNIA AND THE UNITED STATES OF AMERICA ex rel. KAREN GLUCK,<br><br>                    Plaintiffs,<br><br>          v.<br><br>THOMAS SHEPOS; et al.<br><br>                    Defendants. | Case No. 2:19-cv-01773- JFW-MAA<br><br>**DECLARATION OF GREGORY HANES** |

I, Gregory Hanes, declare as follows:

1.      I am an individual over the age of eighteen and am competent to testify to the matters stated herein. I have personal knowledge of the facts set forth in this declaration, and if called as a witness, I could and would testify competently thereto.

2.      I am the sole owner of 300 K-6 LLC.

3.      I am the sole owner of 43917 Division Street, LLC.

4.      At all times relevant, I had exclusive authority to act on behalf of and to bind 300 K-6 LLC.

1
DECLARATION OF GREGORY HANES

Doc ID: ca687b51dbe8b85355700b2f875ce045f2343704

5.    At all times relevant, I had exclusive authority to act on behalf of and to bind 43917 Division Street, LLC.

6.    I personally signed all lease agreements entered into by 300 K-6 LLC, including leases relating to the property commonly known as the 300 K-6 location.

7.    I personally signed all lease agreements entered into by 43917 Division Street, LLC, including leases relating to the property commonly known as the 43917 Division Street location.

8.    Thomas Shepos has no ownership interest in 300 K-6 LLC.

9.    Thomas Shepos has no ownership interest in 43917 Division Street, LLC.

10.    Thomas Shepos has never made any financial investment in 300 K-6 LLC.

11.    Thomas Shepos has never made any financial investment in 43917 Division Street, LLC.

12.    Thomas Shepos is not, and has never been, a director, officer, partner, employee, or manager of 300 K-6 LLC, nor has he held any position of management or control with respect to that entity.

13.    Thomas Shepos is not, and has never been, a director, officer, partner, employee, or manager of 43917 Division Street, LLC, nor has he held any position of management or control with respect to that entity.

14.    At all times relevant, the County of Los Angeles has occupied the premises located at the 300 K-6 location pursuant to a lease agreement and remains in occupation as of the execution of this declaration.

15.    At all times relevant, the County of Los Angeles has occupied the premises located at 43917 Division Street pursuant to a lease agreement and remains in occupation as of the execution of this declaration.

/////

2

DECLARATION OF GREGORY HANES

Doc ID: ca687b51dbe8b85355700b2f875ce045f2343704

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.

Executed on ___02 / 02 / 2026___ at Palmdale, California.

_____

GREGORY HANES

DERRYBERRY & ASSOCIATES LLP
Attorneys at Law

3

DECLARATION OF GREGORY HANES

Doc ID: ca687b51dbe8b85355700b2f875ce045f2343704

 **Dropbox** Sign

Audit trail

| | |
|---|---|
| Title | Declaration_GH.pdf |
| File name | Declaration_GH.pdf |
| Document ID | ca687b51dbe8b85355700b2f875ce045f2343704 |
| Audit trail date format | MM / DD / YYYY |
| Status | ● Signed |

**This document was requested from app.clio.com**

## Document History

| | | |
|---|---|---|
| SENT | **02 / 02 / 2026**<br>12:50:21 UTC-8 | Sent for signature to Gregory Hanes (gregoryhanes@yahoo.com)<br>by services@clio.com acting on behalf of<br>myriam@derryberrylawyers.com<br>IP: 76.81.21.34 |
| VIEWED | **02 / 02 / 2026**<br>12:55:59 UTC-8 | Viewed by Gregory Hanes (gregoryhanes@yahoo.com)<br>IP: 207.171.60.180 |
| SIGNED | **02 / 02 / 2026**<br>12:59:39 UTC-8 | Signed by Gregory Hanes (gregoryhanes@yahoo.com)<br>IP: 207.171.60.180 |
| COMPLETED | **02 / 02 / 2026**<br>12:59:39 UTC-8 | The document has been completed. |