Michael S. Devereux (SBN 225240)
9440 Santa Monica Blvd, Suite 301
Beverly Hills, California 90210
Telephone: (424) 600-8584
Email: mike@wex.law

Attorneys for DEFENDANT, ARMAN GABAEE

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| THE COUNTY OF LOS ANGELES, THE STATE OF CALIFORNIA and THE UNITED STATE OF AMERICA *ex rel.* KAREN GLUCK,<br><br>Plaintiffs,<br><br>v.<br><br>THOMAS SHEPOS, et al.,<br><br>Defendants. | Case No. 2:19-cv-01773-PA-MAA<br><br>**VOLUME OF EVIDENCE IN SUPPORT OF DEFENDANT ARMAN GABAEE'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT**<br>**(Hon. Percy Anderson)**<br><br>Filed Concurrently with the Notice of Motion and Motion; Statement of Uncontroverted Material Facts; Declaration of Michael Devereux; [Proposed] Order |

EXHIBIT A

**Page 25**

1 from April 1st, 2003 until December 1st, 2013;
2 correct?
3    A. Yes.
4    Q. And was Chief Program Specialist the last
5 position you held at the County?
6    A. Yes.
7    Q. Other than the roles we've just discussed,
8 did you have any other roles with the County during
9 your employment there?
10   A. No.
11   Q. All right. I'll let you take a sip, and
12 then I'll direct you back to Bates ending 664.
13   A. I apologize.
14      Number?
15   Q. 664.
16   A. Okay.
17   Q. So as we previously discussed, you started
18 as a Real Property Agent II. You held that position
19 for about eight months.
20      What were your responsibilities in that role
21 as a Real Property Agent II?
22   A. Very similar to those that I had as a
23 contract employee, which were to do administrative
24 leases and begin to be exposed to long-term
25 County-approved leases.

**Page 27**

1 improvements, because they were small-term-in-size
2 leases.
3    Q. Did you supervise anybody in that role as a
4 Real Property Agent II?
5    A. No.
6    Q. Do you remember who you reported to at that
7 time in 1998?
8    A. It would have been, to the best of my
9 recollection, one of two people: Maurice Salama or
10 Carlos Marques.
11   Q. And what position would they have held at
12 that time?
13   A. They could have been a Senior Real Property
14 Agent or a Principal Real Property Agent.
15   Q. And was that typical during your time at the
16 County, that a Real Property Agent II would be
17 reporting to either of the two positions you just
18 mentioned?
19   A. Yes.
20   Q. As a Real Property Agent II, would you have
21 had any authority to award County leases to the
22 lessor of your choosing?
23   A. Unless it was a lease renewal, no.
24   Q. Unless it was a lease renewal in 1998, as a
25 Real Property Agent II, you wouldn't have had

**Page 26**

1    Q. So safe to say during this time frame, you
2 wouldn't be assigned to work on long-term,
3 County-approved leases necessarily on your own?
4    A. I could have been.
5    Q. Okay.
6    A. But I don't recall if I was doing anything
7 on my own versus working with a Senior Real Estate
8 Agent.
9    Q. Do you recall whether you would have been
10 working on negotiating new -- new County long-term
11 leases?
12   A. Not at that point.
13   Q. Okay.
14   A. Other than the administrative leases.
15   Q. Okay. What about negotiating extensions or
16 amendments for long-term leases?
17   A. I could have been doing that, but I don't
18 recall.
19   Q. Okay. Would you have been overseeing any
20 tenant improvements on long-term leases?
21   A. Not to the best of my recollection.
22   Q. Would you have been overseeing tenant
23 improvements on administrative leases, or would those
24 have been too small to have --
25   A. They would have not had any tenant

**Page 28**

1 authority to award a lease?
2    A. I wouldn't have had the authority to
3 finalize the lease. But it would have still gone
4 through the process of Board approval, if it was
5 beyond an administrative lease.
6    Q. To the extent you worked on it at all?
7    A. Correct.
8    Q. Okay. Let's go to page ending 660.
9    A. I'm sorry? 6- --
10   Q. 6-6-0.
11   A. Okay.
12   Q. So this is the page that notes that you were
13 promoted to a Senior Real Property Agent on
14 November 1st, 1998?
15   A. Yes.
16   Q. Would your -- would your responsibilities
17 have changed at all at that time when you were
18 promoted to this position?
19   A. The position would be such that you would be
20 given larger leases.
21   Q. What do you mean by that?
22   A. They would be leases that were more than
23 likely Board approved in the end. You might have
24 some administrative leases. The position with the
25 County as an agent, in most cases, deemed that once

**Page 29**

1 you received the project, it carried with you all the
2 way through your term.
3     So there may have been a project as a Real
4 Property Agent II that as a Senior, I carried forward
5 and did whatever was related to that. And the -- the
6 same happened as you progressed into different
7 positions.
8     Q. Okay. I'm getting about what carried over
9 as a Real Property Agent II, what type of leases
10 would you have been starting to get assigned now as a
11 Senior Real Property Agent?
12    A. They would have been -- I guess at that
13 time, the County was in a growth mode. Departments
14 were receiving a lot more federal funding and
15 expanding their programs.
16    So as a Senior agent, you would begin
17 working on those larger projects.
18    Prior to that, to the best of my knowledge
19 or recollection, leases with the County were 5- or
20 10,000 square feet.
21    If you looked back, the records would
22 show -- there might be a few larger. But in general,
23 they tended to be that size.
24    Once that expansion started, they began to
25 grow from 5- or 10- to 20-, 30- and 40,000 square

**Page 30**

1 feet. So they grew based upon the Department's need,
2 their funding, and their requirement for whatever
3 program they were doing.
4     So as a Senior, you would begin working
5 those as -- as needed as you were given that
6 assignment.
7     Q. And so at the beginning of your answer, you
8 said at that time, the County was in growth mode.
9     And just so I'm clear, what do you mean at
10 that time? You mean around 1998?
11    A. I'm thinking anytime from '98 forward. I --
12 it could have been 1999 or 2000. But as a Senior, I
13 recall the expansion starting.
14    Q. Okay. Right around the time you were
15 promoted to a Senior, is when you remember those
16 bigger projects coming in?
17    A. To the best of my knowledge, yes.
18    Q. And as a Senior Real Property Agent between
19 1998 and -- and 2003, how would you best describe
20 your responsibilities with respect to those larger
21 projects?
22    A. I was given an assignment. But I still
23 reported to a Principal Real Property Agent so that
24 they could guide me. I also worked with people who
25 carried positions above them.

**Page 31**

1     One person, in fact, was Cheryl Feurth. And
2 she would make herself available, if need be, to a
3 counselor to work with you as an agent to begin
4 processing those more involved County leases.
5     Q. So safe to say you would never be working on
6 these more involved County leases on your own?
7     A. You may be. But at some point, you weren't
8 doing it on your own. You always had to review it
9 with a principal. Or at that time, the title that --
10 that Cheryl Feurth may have had would have been the
11 Chief Program Specialist, or another title in that
12 same level.
13    Q. And then the principals at that time, would
14 that have been the same gentlemen you mentioned
15 earlier, Mr. Salama and Mr. Marques?
16    A. Yes.
17    Q. Anyone else?
18    A. Not from my -- not that I can recall.
19    Q. So to recap, the way I understand it, when
20 you were a Senior Real Property Agent, you would have
21 been working with a Principal Real Property Agent
22 which could have been either Mr. Salama or
23 Mr. Marques.
24    But also, the person above them, which could
25 have been Cheryl Feurth as the Chief Program

**Page 32**

1 Specialist.
2     A. Correct.
3     Q. Okay. During that time frame of 1998 to
4 2003, could anybody, other than Cheryl Feurth, have
5 been in that Chief Program Specialist position?
6     A. Yes. Susan Holman, who was her counterpart.
7 But I don't recall ever directly working under Susan
8 Holman. But I could have been.
9     Q. Okay. And how did you receive your
10 assignments during that time frame?
11    A. Generally speaking, the person you reported
12 to, who would have been the principal, would give you
13 the assignment. And they would receive it from the
14 person they reported to.
15    Q. And just so I complete the chain of command,
16 who would have been above Cheryl Feurth, or whoever
17 was in the Chief Program Specialist position?
18    A. It would have been the Director or Assistant
19 Director of Real Estate.
20    Q. Do you remember who was in that position at
21 that time?
22    A. I could tell you who I recall had that
23 position, but I don't know the time frames.
24    Q. Okay. Who do you recall having that
25 position?

**Page 321**

1  A. Right.
2  Q. And it looks like it was amended a second
3  time on October 1st, 2002.
4  A. Yes.
5  Q. So would you have worked on that amendment?
6  A. Yes.
7  Q. And you negotiated this amendment?
8  A. Yes.
9  Q. And was it ultimately approved by the Board
10 of Supervisors?
11 A. Yes.
12 Q. And were you compensated by Mark Gabay for
13 procuring this amendment?
14 A. No.
15 Q. Were you compensated by Arman Gabay for
16 procuring this amendment?
17 A. No.
18 Q. And then it looks like it was amended again
19 on December 18th, 2007.
20 A. Yes.
21 Q. Did you work on that amendment?
22 A. Yes.
23 Q. And were you compensated in connection with
24 procuring that amendment?
25 A. No.

**Page 322**

1  Q. And was this amendment approved by the Board
2  of Supervisors?
3  A. Yes.
4  Q. And it looks like it was amended again on
5  April 2nd, 2013.
6     Do you see that?
7  A. Yes.
8  Q. And did you negotiate this amendment?
9  A. Yes.
10 Q. And was this amendment approved by the Board
11 of Supervisors?
12 A. Yes.
13 Q. And did Mark Gabay compensate you for
14 procuring this amendment?
15 A. No.
16 Q. What about Arman Gabay?
17 A. No.
18 Q. Okay. We're almost wrapping up with the
19 Gabay properties.
20    So if you go to page 40. And the -- do you
21 see down at the bottom, paragraph 175?
22 A. I'm -- I'm sorry. I'm making myself a note.
23 Q. Sure.
24 A. Okay. Go ahead.
25 Q. So you see down at the bottom, paragraph

**Page 323**

1  175?
2  A. Yes.
3  Q. Are you familiar with this property at
4  2910 West Beverly Boulevard?
5  A. Yes.
6  Q. Now, I take it you didn't work on the
7  original lease --
8  A. That's correct.
9  Q. -- in 1969.
10    But are you aware that the Gabays or the --
11 or their entities acquired this property in 2000?
12 A. Yes.
13 Q. And at the time they acquired it, there had
14 already been a lease in place?
15 A. That's correct.
16 Q. And it looks like it was amended in 2007, in
17 February 2007.
18    Do you see that?
19 A. Yes.
20 Q. Did you negotiate that amendment?
21 A. I'm not sure. I may have, but I -- I don't
22 recall.
23 Q. So -- let me take a step back.
24    Were you -- did you -- were you the person
25 at the CEO RED office that handled all the Gabay

**Page 324**

1  leases? Or were there other people who had other
2  leases that you weren't involved in?
3  A. There may have been other people prior to me
4  that had moved on, that dealt with them. But in most
5  cases, I did the majority of the Gabay leases.
6  Q. And is that because you had a good
7  relationship with them? Or is that just because you
8  were the most senior person at the office at the
9  time?
10 A. No. It -- it was -- it was a combination of
11 ability to get whatever, the project was done and/or
12 my contact with the Gabays.
13 Q. So you likely negotiated this amendment in
14 2007, for this lease at the Beverly property?
15 A. I would have to say yes, looking at -- I --
16 it just doesn't ring a bell.
17    But -- but in 2007, I would have been the
18 one that probably handled it, yes.
19 Q. And this was ultimately approved by the
20 Board, this amendment?
21 A. Yes.
22 Q. And were you compensated by Mark Gabay in
23 connection with this amendment?
24 A. No.
25 Q. How about Arman Gabay in 2000- --

Thomas Joseph Shepos December 19, 2025

**Page 325**

1  A. No.
2  Q. Okay. And then at the bottom here,
3  paragraph 182, 3303 North Broadway Street.
4    Are you familiar with this property?
5  A. It doesn't ring a bell. But obviously, I
6  worked on it. I'm -- I'm trying to picture the
7  location and the user.
8  Q. So it -- it looks like the Department of
9  Mental Health occupied --
10 A. Yes.
11 Q. -- the space?
12 A. Mm-hmm.
13 Q. So does that refresh your recollection as to
14 whether you did --
15 A. And that's what --
16 Q. -- work on it?
17 A. -- says I probably --
18    THE REPORTER: What -- hold on.
19    THE WITNESS: Okay.
20    (Reporter clarification.)
21 BY MR. HEWITT:
22 Q. -- as to whether you, in fact, did works on
23 this lease?
24 A. I would have to say I probably did. But
25 it -- this one doesn't ring a bell.

**Page 326**

1  Q. And I -- I noticed, too, it was within a
2  year of your retirement from the Department.
3    I don't know if that -- it...
4  A. Again, the projects that I had may have been
5  moved to someone else below me. Because if it was
6  just a simple lease renewal or a lease, I may not
7  have been the one -- it may have gone down below me.
8  Because I was doing a number of things in 2016
9  besides just doing leases.
10 Q. Is that --
11 A. I was managing staff under me and whatever.
12 So in some cases, if it was a smaller lease, it could
13 be passed on. It would have been -- and that's what
14 I believe in this one.
15 Q. It says here that the monthly rent was
16 129,000, and it was a 15-year term.
17 A. Yeah.
18 Q. Is that a smaller lease for -- at the
19 time --
20 A. Well, what -- what's --
21 Q. -- for the County?
22 A. I think the thing that stands out, was it's
23 a 15-year term. That is not -- 10 years is what the
24 County normally did.
25    Why it was 15, I -- I don't know. I --

**Page 327**

1  that -- I mean, I have to look at the lease and it
2  would maybe remind me.
3    But that -- that is -- is an unusual --
4  Q. Yeah.
5  A. If you looked at the leases, most of them
6  are 10 years. There's -- there may be a few, but
7  that's the unusual thing that stands out.
8  Q. So ultimately, the Board approved this
9  lease.
10 A. Yes.
11 Q. And were you compensated by Mark Gabay in
12 connection with this lease?
13 A. No.
14 Q. What about Arman Gabay for this lease?
15 A. Not specifically for this lease. I think at
16 that point, I may have been -- October, I would have
17 been accepting money from Arman.
18 Q. But it -- so...
19 A. He didn't say, here's a thousand dollars, I
20 want that lease done. No.
21    I may have been taking money from Arman, but
22 he was not directing me to do something, at no
23 time -- other than an issue --
24 Q. So other than the Hawthorne Mall --
25 A. That's correct.

**Page 328**

1  Q. -- where you were wearing a wire --
2  A. Yes.
3  Q. -- where -- with -- for the FBI --
4  A. Yes.
5  Q. -- to get him -- where he asked you for
6  renewal.
7    Other than that, at no time did Arman ever
8  tie any of these monthly payments to any leases of
9  the County.
10 A. Thank you. That's correct.
11 Q. No problem.
12    And at no time during this process, was
13 there ever an expectation from Arman that you throw
14 County business his way at more favorable terms,
15 because he was giving you money?
16 A. That's correct.
17 Q. Up until the wire?
18 A. That's correct.
19 Q. Okay. So...
20    Okay. Are you familiar with a property at
21 Telstar that -- that's referred to Telstar?
22 A. The -- the name rings a bell, yes.
23 Q. Is that a lease you worked on?
24 A. I -- I don't recall.
25 Q. Okay.

Thomas Joseph Shepos                                                                December 19, 2025

**Page 325**

1  A. No.
2  Q. Okay. And then at the bottom here,
3  paragraph 182, 3303 North Broadway Street.
4      Are you familiar with this property?
5  A. It doesn't ring a bell. But obviously, I
6  worked on it. I'm -- I'm trying to picture the
7  location and the user.
8  Q. So it -- it looks like the Department of
9  Mental Health occupied --
10 A. Yes.
11 Q. -- the space?
12 A. Mm-hmm.
13 Q. So does that refresh your recollection as to
14 whether you did --
15 A. And that's what --
16 Q. -- work on it?
17 A. -- says I probably --
18    THE REPORTER: What -- hold on.
19    THE WITNESS: Okay.
20    (Reporter clarification.)
21 BY MR. HEWITT:
22 Q. -- as to whether you, in fact, did works on
23 this lease?
24 A. I would have to say I probably did. But
25 it -- this one doesn't ring a bell.

**Page 326**

1  Q. And I -- I noticed, too, it was within a
2  year of your retirement from the Department.
3     I don't know if that -- it...
4  A. Again, the projects that I had may have been
5  moved to someone else below me. Because if it was
6  just a simple lease renewal or a lease, I may not
7  have been the one -- it may have gone down below me.
8  Because I was doing a number of things in 2016
9  besides just doing leases.
10 Q. Is that --
11 A. I was managing staff under me and whatever.
12 So in some cases, if it was a smaller lease, it could
13 be passed on. It would have been -- and that's what
14 I believe in this one.
15 Q. It says here that the monthly rent was
16 129,000, and it was a 15-year term.
17 A. Yeah.
18 Q. Is that a smaller lease for -- at the
19 time --
20 A. Well, what -- what's --
21 Q. -- for the County?
22 A. I think the thing that stands out, was it's
23 a 15-year term. That is not -- 10 years is what the
24 County normally did.
25    Why it was 15, I -- I don't know. I --

**Page 327**

1  that -- I mean, I have to look at the lease and it
2  would maybe remind me.
3     But that -- that is -- is an unusual --
4  Q. Yeah.
5  A. If you looked at the leases, most of them
6  are 10 years. There's -- there may be a few, but
7  that's the unusual thing that stands out.
8  Q. So ultimately, the Board approved this
9  lease.
10 A. Yes.
11 Q. And were you compensated by Mark Gabay in
12 connection with this lease?
13 A. No.
14 Q. What about Arman Gabay for this lease?
15 A. Not specifically for this lease. I think at
16 that point, I may have been -- October, I would have
17 been accepting money from Arman.
18 Q. But it -- so...
19 A. He didn't say, here's a thousand dollars, I
20 want that lease done. No.
21    I may have been taking money from Arman, but
22 he was not directing me to do something, at no
23 time -- other than an issue --
24 Q. So other than the Hawthorne Mall --
25 A. That's correct.

**Page 328**

1  Q. -- where you were wearing a wire --
2  A. Yes.
3  Q. -- where -- with -- for the FBI --
4  A. Yes.
5  Q. -- to get him -- where he asked you for
6  renewal.
7     Other than that, at no time did Arman ever
8  tie any of these monthly payments to any leases of
9  the County.
10 A. Thank you. That's correct.
11 Q. No problem.
12    And at no time during this process, was
13 there ever an expectation from Arman that you throw
14 County business his way at more favorable terms,
15 because he was giving you money?
16 A. That's correct.
17 Q. Up until the wire?
18 A. That's correct.
19 Q. Okay. So...
20    Okay. Are you familiar with a property at
21 Telstar that -- that's referred to Telstar?
22 A. The -- the name rings a bell, yes.
23 Q. Is that a lease you worked on?
24 A. I -- I don't recall.
25 Q. Okay.

**Page 329**

1  A. The name rings a bell. It could be one.
2  But it could have been someone else.
3      But the -- I -- the Telstar, I know we
4  have -- there is a location that says Telstar.
5   Q. And curiously, it's not one of the
6  properties being sued over.
7      So I'm just wondering if it's not a lease
8  you worked on.
9   A. Probably not.
10  Q. Okay. As part of evaluating leases and
11 making proposals to the Board, recommendations to the
12 Board, were you truthful in those staff reports that
13 you authored?
14  A. Yes.
15  Q. So when you would tell the Board, this is
16 the monthly rental rate and it falls within the --
17 this average, those were truthful.
18  A. Yes.
19  Q. Did you ever at this time, or any time,
20 inflate those numbers to be more favorable to the
21 Gabays?
22  A. No.
23  Q. Were the Gabay leases on average at the
24 lower end of the market ability? At the high end?
25 Were they above market?

**Page 330**

1  A. In -- without knowing the exact square
2  footage cost, 'cause I can't compute that, because it
3  will give you square footage in rent, so I can't
4  compute it. I'm looking at a number.
5      That number is meaningless to me, unless you
6  take the square footage and are coming up with a cost
7  per square foot in all of this information.
8      But to get to the complete answer for you,
9  in most cases, the Gabays were more than competitive
10 in the marketplace.
11  Q. And by "more competitive," you mean on the
12 much lower end of the marketplace?
13  A. They would be lower than --
14     (Reporter clarification.)
15     MR. HEWITT: -- lower end of the market.
16     THE WITNESS: Let's say the market was
17 paying $2. The Gabays were willing to negotiate to a
18 dollar ninety-five. Now was that lower? Much lower?
19     Well, when you're talking about a bigger
20 lease, we're talking about considerable money. So --
21 but they would tend to be on the lower side of the
22 market.
23 BY MR. HEWITT:
24  Q. And did they -- Gabays ever ask you to tell
25 them what the next highest bid was so they could

**Page 331**

1  undercut it?
2   A. No. In most cases, when I was negotiating
3  with them, I would say, hey, guys, I can go get --
4  down the street for two bucks. If you guys aren't
5  coming in at a dollar ninety or a dollar ninety-five,
6  I'm going down the street. So...
7   Q. So in any of the leases we just went
8  through, do you recall if any of the leases were
9  above market?
10  A. To the best of my knowledge, no.
11  Q. And were you paid to make sure they were
12 above market by the Gabays?
13  A. No.
14  Q. Did Arman Gabay ever ask you to increase the
15 rental value to be above market in exchange for you
16 taking money from him?
17  A. No.
18  Q. Did Mark ever ask that of you?
19  A. No.
20  Q. Did you ever have an opportunity when you
21 were dealing with the County Board of Supervisors'
22 representative, were you asked about the
23 marketability of the rents?
24  A. I don't believe so, no.
25  Q. Are you aware of whether or not the County

**Page 332**

1  Board of Supervisors' representative would conduct
2  their own market analysis? Or would they accept your
3  recommendation?
4   A. No. They were sharp enough to -- to look.
5  They knew what was going on in their -- in their
6  particular area. So you could go in and say, I can
7  get that for 250. And they knew if the market was
8  $2, they weren't going to accept that either.
9      They were smart enough and knowledgeable
10 enough to be aware of what was going on in their
11 area.
12  Q. Now...
13     I'm sorry. I don't have it in front of me.
14     But there's this allegation in Ms. Gluck's
15 Complaint that you had the authority to bind the
16 County.
17     Is that true?
18  A. No. I didn't have any authority to bind the
19 County.
20  Q. Did you ever hold yourself out as having
21 authority to bind the County?
22  A. No.
23  Q. For every lease that you negotiated, worked
24 on, touched, on behalf of the Gabays, did you follow
25 the proper County procedure with respect to all of

**Page 313**

1   A. No.
2   Q. Now -- we'll come back to this later, maybe.
3      Ultimately, this lease was terminated by the
4   County?
5   A. Yes.
6   Q. Do you know why?
7   A. Yes.
8   Q. And why is that?
9   A. The lease we're talking about, the entire
10  lease or the space that was expansion space?
11  Q. The entire lease.
12  A. I don't know if the entire lease was --
13  I'm -- I'm not familiar enough to tell you about the
14  entire lease. I can tell you about the expansion
15  space.
16     The expansion space was the childcare
17  center. It was never opened. It was built out and
18  left vacant for a long period of time.
19     We were paying rent on it. Because the
20  Board of Supervisors had this great idea of opening
21  up childcare centers. But building them and running
22  them were two different stories.
23     They couldn't get a user. They couldn't
24  meet the needs that it took to run a childcare
25  center.

**Page 314**

1   Q. The County?
2   A. The County.
3      So it sat there vacant for a -- many number
4   of years. Finally, it came to light that we needed
5   to get out of this, because it sat there vacant. We
6   were spending a lot of money.
7      And sooner or later, someone is going to ask
8   the question, why are you sitting there with a vacant
9   childcare center and paying rent?
10     So we finally negotiated a cancellation.
11  Q. And were you compensated for that
12  cancellation?
13  A. No.
14  Q. Was the cancellation favorable to the
15  Gabays?
16  A. It was favorable to the County. We got out
17  of a space -- it was unfavorable to them. They were
18  collecting rent on vacant space. So...
19  Q. What year was -- was the -- do you recall
20  when the childcare center was cancelled?
21  A. I do not.
22  Q. Okay.
23     All right. Let's go on to the lease at
24  532 East Colorado Boulevard.
25     Are you familiar with that property?

**Page 315**

1   A. I am.
2   Q. Did you work on this lease?
3   A. I did.
4   Q. In 1999?
5   A. Yes.
6      Actually, would have been '98. It takes us
7   about a year from when we begin till we open the
8   doors, with construction, everything.
9      So the lease says it was approved in 1999,
10  but it would have been sometime in -- prior to that.
11  Q. So I don't see here an L in front of this
12  number. So this was a long-term lease?
13  A. Yes.
14  Q. And did the County Board of Supervisors
15  ultimately approve this lease?
16  A. Yes.
17  Q. And were you compensated by Mark Gabay in
18  connection with this lease?
19  A. No.
20  Q. How about Arman Gabay in connection with
21  this lease?
22  A. No.
23     Other than this was the lease where we had
24  issues with the elevator, which we talked about
25  running interference.

**Page 316**

1   Q. Right.
2      But you weren't compensated --
3   A. No.
4   Q. -- for running interference?
5   A. But -- but I'm just tying the two together
6   as --
7   Q. Right.
8   A. -- as it relates to that location.
9   Q. My question was compensation. So if you
10  weren't compensated --
11  A. No.
12  Q. -- there's no tie.
13     But I -- I appreciate it.
14     So this is the -- I appreciate that.
15     So this is the lease where there was the
16  issue with the elevator.
17  A. Correct.
18  Q. Was that -- and the elevator was ultimately
19  fixed?
20  A. Rebuilt.
21  Q. Rebuilt?
22  A. Yes.
23  Q. At whose expense?
24  A. The landlord, which would be the Gabays.
25  Q. Did the County reimburse the Gabays for

**Page 289**

1  A.  I would have to say yes.  But I -- without
2  looking at the rental rate or the specifics.  But
3  more than likely, yes.
4      Q.  So at this -- the monthly rent is $11,567.
5  Is that a rental rate that would be considered an
6  administrative lease or a long-term lease?
7      A.  Would be a long-term lease.
8      Q.  And so this monthly rental rate would
9  require County Supervisor approval?
10     A.  Yes.
11     Q.  And would you have been the one to offer the
12 Board letter --
13     A.  Yes.
14     Q.  -- at this time?
15     A.  Yes.
16     Q.  And once you offered the Board letter and
17 submitted it to the County, were you involved in the
18 County Board of Supervisors' decision thereafter?
19     A.  The Board of Supervisors made its own
20 decision, I think.  I turned in and submitted the
21 documents required as it related to the lease and the
22 Board letter explaining what was going on.
23         And then it was up to the Board to approve
24 it or not approve it.
25     Q.  Did you ever discuss, for instance, this

**Page 290**

1  lease at 23- -- 3220 Rosemead Boulevard with any
2  supervisors?
3      A.  I don't recall.  I don't believe so.
4      Q.  And at the time this lease was entered into,
5  were you being bribed by Mr. Gabay, Arman Gabay, in
6  1999?
7      A.  I didn't believe I was being bribed, no.
8      Q.  But Mr. -- neither Mark Gabay nor
9  Arman Gabay gave you anything of value in connection
10 with securing this lease in 1999, did they?
11     A.  No.
12     Q.  Okay.  Let's go to page 28.
13         Are you familiar with the lease at
14 3220 Rosemead Boulevard, Building G?
15     A.  Yes.
16     Q.  It looks like this space was also for the
17 District Attorney's office?
18     A.  Yes.
19     Q.  Were you involved in procuring this lease?
20     A.  I would say yes.
21     Q.  And you negotiated with -- negotiated with
22 the Gabays for this lease?
23     A.  Yes.
24     Q.  When you would negotiate a lease with the
25 Gabays, who did you deal with primarily?

**Page 291**

1      A.  Arman Gabay.
2      Q.  Was Mark involved in the lease negotiation
3  process?
4      A.  In most cases, I would say no.
5      Q.  And this lease was ultimately approved by
6  the Board of Supervisors?
7      A.  Yes.  Um...
8      Q.  Well, maybe not.
9      A.  I'm -- I'm looking --
10     Q.  All right.
11     A.  -- and that's why I'm saying maybe --
12     Q.  Is this --
13     A.  It was an L lease, so an L --
14     Q.  What is an L lease?  Let me ask you this.
15         Take a step back.
16         What is an L lease?
17     A.  An L lease would have been an administrative
18 lease.  And -- and what caught my eye was the monthly
19 rent of 2485, which would set the guideline -- kept
20 it under the monthly rent that needed to move forward
21 to go to the Board of Supervisors.  And it would also
22 depend on the size of the space.
23         In all cases, it never talks about the
24 square footage in any of this document.
25     Q.  Right.

**Page 292**

1      A.  And if the square footage was there, it
2  would allow you to figure out what the cost of the
3  rent was on a square-foot basis.  But you can't do
4  that.
5          All I know is it says so much a month.  But
6  it doesn't say whether I rented one square foot or
7  10,000 square feet, which would certainly determine
8  the rental rate.
9      Q.  So does this code L-0793, would that mean
10 it's an administrative lease?
11         Because some -- I've noticed some leases
12 have an L in front of it, and some do not.
13     A.  An L, I believe, would -- would designate
14 that it was an administrative lease.
15     Q.  So if this was an administrative lease, did
16 you have the authority to enter into it on behalf of
17 the County, or did someone else?
18     A.  No.  I never had the authority.  It would
19 have to go through its process.  It didn't have to go
20 to the Board for approval.  But it did have to go to
21 the Chief Administrative Officer to sign off on it.
22     Q.  And did this lease go to the Chief
23 Administrative Officer to review?
24     A.  Otherwise, it wouldn't have been signed.
25     Q.  And when you presented an administrative

**Page 354**

1  The court reporter today is Marceline Noble
2  with Network Depo.
3      Would the reporter please swear in the
4  witness.
5          THOMAS JOSEPH SHEPOS,
6  having been duly resworn, was examined and testified
7  as follows:
8
9      THE REPORTER:  Thank you.
10
11              EXAMINATION
12 BY MR. OROZCO:
13    Q.  Good morning, Mr. Shepos.
14    A.  Good morning.
15    Q.  At the beginning of last week's deposition,
16 we went over a number of ground rules.
17      Do you remember those?
18    A.  Yes.
19    Q.  Okay.  And those same rules apply today.
20      Do you understand?
21    A.  Yes.
22    Q.  Do we need to go over those again?
23    A.  No.
24    Q.  All right.  Thank you.
25      Over the weekend, did you have any

**Page 355**

1  conversations with the County about your deposition,
2  either Friday or today?
3    A.  No.
4    Q.  Okay.  Prior to your deposition on Friday,
5  did you have any conversations about-- with the
6  County about that deposition?
7    A.  No.
8    Q.  Okay.  So I know I asked you a number of
9  questions in the morning on Friday, and then we had a
10 few other folks ask you some questions.
11      But going back to our discussion, do you
12 remember that we left off talking about Exhibit 4,
13 which was a flow chart of the County lease
14 acquisition process?
15    A.  Yes.
16    Q.  Okay.  And we talked about how there was a
17 lot of checks and approvals needed for large leases,
18 renewals, and amendments.
19      You remember that conversation?
20    A.  Yes.
21    Q.  And it's fair to say that this process we
22 went through does require a lot of checks, approvals
23 for large leases, renewals and amendments.
24    A.  Yes.
25    Q.  Okay.  So when you were a real property

**Page 356**

1  agent, specifically a Principal Real Property Agent
2  between the time frame of 2003 and 2013, before the
3  lease was approved, it would need to have been
4  reviewed by your supervisor, which would have been
5  the Chief Program Specialist; correct?
6    A.  Yes.
7    Q.  Okay.  And it would also have been -- need
8  to have been approved by your supervisor's
9  supervisor, which was the Director of Leasing;
10 correct?
11    A.  Yes.
12    Q.  And that lease would need to have been
13 approved by the department that was going to be the
14 tenant in the building; correct?
15    A.  Yes.
16    Q.  And that lease would have had to have been
17 approved by County Counsel?
18    A.  Yes.
19    Q.  And that lease would have had to have been
20 approved by the Real Estate Management Commission?
21    A.  If it met the criteria for specific leases,
22 which was a certain period of term.  And over a
23 certain dollar amount, it would have gone to the Real
24 Estate Commission, that's correct.
25    Q.  Right.

**Page 357**

1      And we're talking -- we -- we usually refer
2  to those -- I think last time, we referred to them as
3  large leases, renewals, and amendments; right?
4    A.  Correct.
5    Q.  Okay.  And those large leases, renewals, and
6  amendments that you worked on when you were a
7  Principal Property Agent, would have needed to have
8  been approved by the Real Estate Management
9  Commission.
10    A.  Yes.
11    Q.  And they also would have had to have been
12 approved by the Board of Supervisors.
13    A.  Yes.
14    Q.  Okay.  Could any of those individuals or
15 groups of people that we just discussed -- Chief
16 Program Specialist, Director of Leasing, the
17 department tenant, County Counsel, the Real Estate
18 Management Commission, or the Board of Supervisors,
19 could any of them have stopped the lease from being
20 finalized if they didn't think the lease was to the
21 benefit of the County?
22    A.  I would say yes.
23    Q.  And that's because this process is designed
24 to ensure the County always gets a favorable lease in
25 these deals; correct?

**Page 358**

1  A. Yes.
2  Q. We're going to walk through the process we
3  just discussed with the County leases that were
4  awarded to the Abbey defendants that you worked on, a
5  little later.
6      But were all the Abbey leases you worked on
7  awarded through this leasing and approval process we
8  just discussed?
9  A. To the best of my recollection.
10 Q. I want to talk to you about your
11 relationship with Donald Abbey.
12     Do you know who Donald Abbey is?
13 A. I do.
14 Q. Okay. When did you first meet Mr. Abbey?
15 A. I don't recall the date or -- of when I met
16 Mr. Abbey.
17 Q. Okay. Do you recall if your first
18 conversation with Mr. Abbey related to County
19 business?
20 A. First conversation with Don Abbey was more
21 of an informal meeting, discussing past careers,
22 opportunities in general of -- he had a lot of
23 properties, he would love to be able to do something
24 with the County. But there was nothing specific --
25 Q. So --

**Page 359**

1  A. -- as -- as it relates to a specific
2  location or anything like that.
3  Q. I see.
4      So your first conversation with him would
5  have been about -- informal discussions about
6  potential opportunities, but nothing specific as to a
7  County lease itself?
8  A. Yeah. If I recall correctly, the majority
9  of the conversation concerned Penn State, and both of
10 us having lived on the East Coast, and my going to
11 school out in western Pennsylvania.
12 Q. And how did that meeting come about?
13 A. I don't recall.
14 Q. And to the best of your recollection, when
15 would that conversation have taken place?
16 A. I -- I have no specific date or time. I can
17 recall our initial conversations. But beyond that, I
18 do know that it took place, I believe, in Long Beach
19 at their -- what was then an office that he had in
20 Long Beach.
21 Q. Do you remember the location in Long Beach?
22 A. I just recall it was -- you looked out, and
23 you could see where the Catalina Express left that
24 dock and went to Catalina.
25 Q. Do you remember what prompted that

**Page 360**

1  conversation?
2  A. No, I do not.
3  Q. At some point, did you talk to Mr. Abbey
4  about a specific leasing opportunity with the County?
5  A. Not necessarily during that meeting, but at
6  some point, we did speak about what spaces he had
7  available in Palmdale and/or Lancaster.
8  Q. Okay. And what prompted that conversation?
9  A. Probably a need we had in that area for
10 department and space.
11 Q. Do you know around what time that
12 conversation would have taken place?
13 A. If we went to the first Abbey lease, we
14 would determine that it had to be somewhere --
15 anywhere between six months and a year before that.
16 Q. Okay. And do you remember where that first
17 Abbey lease was located?
18 A. Not without looking at the timeline or the
19 leases, no.
20     MR. OROZCO: And I'm now introducing the
21 next exhibit, which is Bates-stamped TAMCO 0000006.
22     THE REPORTER: Exhibit what? 8?
23     (Deposition Exhibit 8 was marked for
24     identification by the court reporter.)
25     THE WITNESS: That's what I would agree to.

**Page 361**

1      MR. OROZCO: Okay. Exhibit 8.
2      Yeah. I was trying to figure that out.
3  Q. Go ahead and take a look at that Exhibit 8
4  document, Mr. Shepos.
5  A. (Reviewing document.)
6      Okay.
7  Q. What is Exhibit 8?
8  A. When you say Exhibit A [sic], I'm -- I'm not
9  certain which one.
10 Q. I'm sorry.
11     Exhibit 8, the document in front of you,
12 this document that you just viewed.
13 A. Oh, Exhibit 8. Okay.
14 Q. What -- what is that? Yeah.
15 A. This is a -- a copy of a letter that was
16 sent to -- well, the first cover is a letter to
17 Mr. Abbey, letting him know it encloses a copy of
18 an -- an approved lease for the Department of
19 Children and Family Services. And he is a landlord
20 at AP Sierra LLC.
21     (Reporter clarification.)
22     THE WITNESS: -- is a landlord. And his
23 company's name was AP Sierra LLC. And it was for a
24 location located at 39959 Sierra Highway, Palmdale,
25 California.

67

1  deposition in this lawyer's experience.

2  BY MR. DEVEREUX:

3   Q.  All right.  I have a few questions for you,

4  Mr. Shepos.  Whenever we're ready.

5       THE VIDEOGRAPHER:  This is the videographer.

6  We're ready.

7       MR. DEVEREUX:  Okay.  Thank you.

8   Q.  Good afternoon, Mr. Shepos.  My name is

9  Michael Devereux, I represent Arman Gabay.

10      Now I've heard the word in your -- by the

11  plaintiff's attorneys and relator's attorneys and

AG-msj-000011

12  whomever turned the word bribery around a lot.

13      Were you convicted of bribery?

14   A.  No.

15   Q.  Were you ever charged with bribery?

16   A.  No.

17   Q.  Has anyone found that you accepted a bribe.

18       Well, let me ask you this.  Has anybody explained

19  the difference to you between the legal term bribery and

20  the legal term gratuity?

21   A.  No.

22   Q.  Okay.  Your plea did not require you to admit to

23  bribery charges, did it?

24   A.  No.

AG-msj-000012

25   Q. Okay. Let me ask you a few questions here.

Case 2:19-cv-01773-PA-MAA   Document 754   Filed 02/02/26   Page 15 of 19   Page ID #:16248

AG-msj-000013

AG-msj-000014

69

1  BY MR. DEVEREUX:

2   Q. Okay.  At sentencing, there is no requirement to

3  pay restitution, was there?

4   A. There was.

5   Q. Was that to the county?

6   A. No.

7   Q. Okay.  After all the investigation, did the

8  county point to any specific financial loss due to your

9  conduct?

10       MS. BONN:  Objection.  Calls for

11  speculation.  Lacks foundation.

AG-msj-000015

12      MS. SYPEK: Join.

13      THE WITNESS: Not to me.

14      MR. DEVEREUX: .

15   Q. Okay. Now, we had, Mr. Orozco is confusing the

16   heck out of me he's bringing up these exhibits, he's

17   saying Exhibit 20, I will look at Exhibit 20 from I

18   think the 134th of January and it would be Exhibit 20

19   from a different date last year.

20      Anyway, do you have the economics in front of you

21   from the previous, say on the 13th of January?

22   A. I do have some.

23   Q. Okay. Do you know -- hold on. Let me see which

24   one I'm looking at. Because I got all of the numbers

AG-msj-000016

25   confused here.  I'm looking at Exhibit 21, dated

Case 2:19-cv-01773-PA-MAA   Document 754   Filed 02/02/26   Page 19 of 19   Page ID #:16252

AG-msj-000017